1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   Post Montgomery Center
3  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
4  Telephone:  415/288-4545
   415/288-4534 (fax)
5  shawnw@rgrdlaw.com
          – and –
6  MICHAEL A. TRONCOSO (221180)
   BRIAN E. COCHRAN (286202)
7  655 West Broadway, Suite 1900
   San Diego, CA  92101-8498
8  Telephone:  619/231-1058
   619/231-7423 (fax)
9  bcochran@rgrdlaw.com

10 Attorneys for Plaintiff

11 [Additional counsel appear on signature page.]

12                 UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14 CORINNE GONSALVES, Individually and on )   Case No.
   Behalf of All Others Similarly Situated,    )
15                                             )   CLASS ACTION
                               Plaintiff,      )
16                                             )   COMPLAINT FOR VIOLATIONS OF THE
        vs.                                    )   FEDERAL SECURITIES LAWS
17                                             )
   BLOCK, INC., JACK DORSEY, and               )
18 AMRITA AHUJA,                               )
                                               )
19                             Defendants.     )
                                               )   DEMAND FOR JURY TRIAL
20 _____ )

21

22

23

24

25

26

27

28

Plaintiff Corinne Gonsalves ("plaintiff"), by and through plaintiff's undersigned attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of defendants' public documents, conference calls, announcements, and U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Block, Inc. ("Block" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Block Class A common stock between February 26, 2020 and April 30, 2024, inclusive ("Class Period"), seeking to pursue remedies and recover damages caused by defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.      Block is a financial technology conglomerate.  The Company's inaugural product is Square, a financial services platform for small and medium-sized businesses.  The Company later launched Cash App (f/k/a "Square Cash"), a mobile payment service that allows users to transfer money using a mobile phone.  Through the Cash App, users can transact in bitcoin, and Block prides itself in providing a "frictionless" consumer experience with minimal hurdles to opening an account, sending and receiving payments, and depositing and withdrawing funds.

3.      During the Class Period, defendants claimed that Block maintained robust anti-money laundering ("AML") and other compliance protocols and procedures designed to effectively prevent the use of the Company's products and services from being used for illicit or criminal activities.  For example, in periodic SEC filings, defendants represented that the Company had "implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity."  Defendants further

stated that this compliance program was "designed to prevent [Block's] network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities." Defendants highlighted Block's "policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer" and its purported "vet[ting] and monitor[ing]" of Block's customers and the transactions on Block's platforms, which defendants claimed addressed the Company's "legal and regulatory requirements and [were designed] to assist in managing risk associated with money laundering and terrorist financing."

4.      These and similar representations made by defendants during the Class Period were materially false and misleading when made. In truth, and as defendants knew or recklessly disregarded, Block failed to implement even basic due diligence and know your customer ("KYC") protocols, effectively creating a haven for criminal and illicit activities on its Square and Cash App platforms. Among the numerous illegal activities that proliferated on Block products during the Class Period, Company customers used Block products to engage in money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and illicit payments to entities and persons subject to economic sanctions. Block failed to report thousands of suspicious transactions to regulatory authorities, permitted customers subject to sanctions alerts to complete transactions before the alerts were resolved, and failed to screen customer biographies against sanctions key word lists, among numerous other compliance shortfalls. As former employees would later reveal, defendants failed to course-correct, even after senior Block leadership was alerted to these deficiencies and despite numerous red flags, ultimately leading to multiple whistleblower complaints and probes and fines by regulators.

5.      As a result of defendants' wrongful acts and omissions, and the subsequent declines in the market value of Block Class A common stock, which dropped 77% to a low of less than $66 per share by Class Period end from its Class Period peak of over $289 per share, plaintiff and other members of the Class (defined below) suffered significant financial losses and economic damages under the federal securities laws.

**JURISDICTION AND VENUE**

6.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

7.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

8.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material fact, occurred in this District, and the Company's headquarters are located in this District.

9.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

10.      Plaintiff Corinne Gonsalves purchased Block Class A common stock as described in the attached certification, which is incorporated herein by reference, and suffered damages as a result of the conduct alleged herein.

11.      Defendant Block is payment processing headquartered in Oakland, California. Shares of Block Class A common stock trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SQ."

12.      Defendant Jack Dorsey ("Dorsey") was the Principal Executive Officer of Block, a position the Company styles as "Block Head," and Chairperson of Block's Board of Directors (the "Board") during the Class Period.

13.      Defendant Amrita Ahuja ("Ahuja") was the Chief Financial Officer ("CFO") and, since February 2023, the Chief Operating Officer ("COO") of Block during the Class Period.

14.      Defendants Dorsey and Ahuja are collectively referred to as the "Individual Defendants."  The Individual Defendants, together with Block, are collectively "defendants."

15. Each of the Individual Defendants acted and/or made the statements detailed herein in his capacity as an officer and/or director of Block. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, and present and future business prospects. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

16. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

17. Block is a financial technology services firm. The Company provides financial services to consumers and small and medium-sized business ("SMBs"), and is a U.S. market leader in point-of-sale ("POS") systems. The Company's two main operating segments are: (i) Square, a financial services platform for SMBs that enables credit card payments using smartphones as POS registers; and (ii) Cash App, a consumer-focused service that offers peer-to-peer money transfers, direct deposits, savings accounts, debit cards, stock and bitcoin investing, tax filing services, and personal loans.

18. Block has reported exceptional growth in recent years, in particular after the Company allowed transactions in bitcoin through Cash App. For Block's fiscal year ended

December 31, 2023, the Company reported total net revenue of $21.92 billion and gross profit of $7.5 billion.  This compares to total net revenue of $1.31 billion and gross profit of $527 million for the fiscal year ended December 31, 2019 – or more than 1,500% revenue growth and more than 1,300% profit growth during the Class Period.  Defendants attributed this monumental growth to Block's relatively "frictionless" user interface; the ease of use for customers seeking to open an account, to transact, or to deposit or withdraw funds; and the Company's successful efforts to reach unbanked communities.  For example, during the Class Period defendants described Cash App as a means "to redefine the world's relationship with money by making it more relatable, instantly available, and universally accessible."  Similarly, defendants pointed to Square's purported "ability to add new sellers efficiently, help them grow their business, and cross-sell [Block's] products and services" as historically leading "to continued and sustained long-term growth." Defendant Ahuja likewise summarized Block's "ambition" as providing "the values and services that people get today from traditional financial institutions and to do that in a[s] seamless, easy-to-onboard, frictionless, consumer-friendly way as possible."

19.    Unbeknownst to investors, however, in reality Block's growth during the Class Period was propelled by defendants' intentional (or at the very least reckless) and systemic disregard for the Company's regulatory compliance obligations.  Defendants fostered a "'Wild West'" approach to monitoring and preventing illicit transactions at Block and – despite numerous red flags, internal reports of system deficiencies by Company employees, and user complaints – effectively created a safe haven for criminals and other bad actors seeking to engage in illicit or illegal activities.  Block's products were used for, *inter alia*, money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and illicit payments to entities and persons subject to economic sanctions.  Block failed to report thousands of suspicious transactions, permitted customers subject to sanctions alerts to complete transactions before the alerts were resolved, and failed to screen customer biographies against sanctions key word lists, among numerous other compliance failures.  As former employees would later reveal, defendants failed to course-correct even after senior Block leadership was alerted to these deficiencies and despite numerous red flags, ultimately leading to multiple whistleblower complaints and probes

by regulators.  As described by one former employee: "'***From the ground up, everything in the compliance section was flawed . . . .  It is led by people who should not be in charge of a regulated compliance program***'" – a sentiment wholly at odds with defendants' Class Period representations to investors.

20.    On January 15, 2025, a group of 48 state financial regulators announced that Block had agreed to pay an $80 million fine after the agencies determined the Company had insufficient policies for policing money laundering through Cash App.

21.    On January 16, 2025, Block entered into a stipulation and consent order with the Consumer Financial Protection Bureau ("CFPB") and was ordered to refund and pay other redress to consumers up to $120 million and a $55 million penalty.  According to CFPB director Rohit Chopra: "Cash App created the conditions for fraud to proliferate on its popular payment platform. . . . When things went wrong, Cash App flouted its responsibilities and even burdened local banks with problems that the company caused."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

22.    The Class Period begins on February 26, 2020.  On that date, Block issued a shareholder letter for the Company's fourth fiscal quarter and year ended December 31, 2019 signed by defendants Dorsey and Ahuja ("FY19 Letter").  For the fourth quarter, the FY19 Letter stated that Block achieved 41% year-over-year total net revenue growth to $1.31 billion and 39% year-over-year gross profit growth to $527 million.  For the year, the FY19 Letter stated that Block achieved 43% year-over-year total net revenue growth to $4.71 billion and 45% year-over-year gross profit growth to $1.89 billion.  For the Square (f/k/a "Seller") segment, the FY19 Letter stated that Block achieved 26% year-over-year revenue growth to $938 million and 27% year-over-year gross profit growth to $379 million in the fourth quarter.  For the Cash App segment, the FY19 Letter stated that Block achieved 147% year-over-year revenue growth to $361 million and 104% year-over-year gross profit growth to $144 million in the fourth quarter.  The FY19 Letter also stated that Cash App had approximately 24 million monthly active customers in December 2019, achieving 60% year-over-year growth.

23.    Also on February 26, 2020, Block filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2019, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud.  The Form 10-K included the financial and operating information about Block contained in the FY19 Letter.  In addition, the Form 10-K highlighted that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business."  The Form 10-K stated that Block and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."  In particular, the Form 10-K represented that the Company had implemented an effective AML program designed to prevent money laundering, terrorist financing, and other illicit activity, stating in pertinent part as follows:

> We are subject to anti-money laundering (AML) laws and regulations in the United States and other jurisdictions.  ***We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity.  Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities.  Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing***.

24.    On May 6, 2020, Block issued a shareholder letter for the Company's first fiscal quarter ended March 31, 2020 signed by defendants Dorsey and Ahuja ("1Q20 Letter").  For the quarter, the 1Q20 Letter stated that Block achieved 44% year-over-year total net revenue growth to $1.38 billion and 36% year-over-year gross profit growth to $539 million.  For the Square segment, the 1Q20 Letter stated that Block achieved 16% year-over-year revenue growth to $853 million and 18% year-over-year gross profit growth to $356 million.  For the Cash App segment, the 1Q20 Letter stated that Block achieved 197% year-over-year revenue growth to $528 million and 115% year-over-year gross profit growth to $183 million.  The 1Q20 Letter also stated that, in April, "Cash App delivered strong revenue and gross profit growth year over year, and achieved its highest monthly totals for net-new transacting active customers, peer-to-peer volumes, Cash

Card spend, Cash Card orders, direct deposit transacting active customers, bitcoin volumes, stock brokerage volumes, and stored funds."

25.    Also on May 6, 2020, Block filed with the SEC a quarterly report on Form 10-Q for its first fiscal quarter ended March 31, 2020, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud.  The Form 10-Q included the financial and operating information about Block contained in the 1Q20 Letter.  In addition, the Form 10-Q highlighted that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business."  The Form 10-Q stated that Block and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

26.    On August 4, 2020, Block issued a shareholder letter for the Company's second fiscal quarter ended June 30, 2020 signed by defendants Dorsey and Ahuja ("2Q20 Letter").  For the quarter, the 2Q20 Letter stated that Block achieved 64% year-over-year total net revenue growth to $1.92 billion and 28% year-over-year gross profit growth to $597 million.  For the Square segment, the 2Q20 Letter stated that Block had quarterly revenue of $723 million and gross profit of $316 million, with both metrics negatively impacted by the onset of the COVID-19 pandemic.  For the Cash App segment, the 2Q20 Letter stated that Block achieved 361% year-over-year revenue growth to $1.2 billion and 167% year-over-year gross profit growth to $281 million.  The 2Q20 Letter also stated that, in June, "Cash App had more than 30 million monthly transacting active customers, with more than 7 million spending on Cash Card."

27.    On August 5, 2020, Block filed with the SEC a quarterly report on Form 10-Q for its second fiscal quarter ended June 30, 2020, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud.  The Form 10-Q included the financial and operating information about Block contained in the 2Q20 Letter.  In addition, the Form 10-Q highlighted that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business."  The Form 10-Q stated that Block and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

28.    On November 5, 2020, Block issued a shareholder letter for the Company's third fiscal quarter ended September 30, 2020 signed by defendants Dorsey and Ahuja ("3Q20 Letter"). For the quarter, the 3Q20 Letter stated that Block achieved 140% year-over-year total net revenue growth to $3.03 billion and 59% year-over-year gross profit growth to $794 million.  For the Square segment, the 3Q20 Letter stated that Block achieved 5% year-over-year revenue growth to $965 million and 12% year-over-year gross profit growth to $409 million.  For the Cash App segment, the 3Q20 Letter stated that Block achieved 574% year-over-year revenue growth to $2.07 billion and 212% year-over-year gross profit growth to $385 million.  The 3Q20 Letter also stated that, in the third quarter of 2020, "the number of average daily transacting active Cash App customers nearly doubled from the same period last year."

29.    Also on November 5, 2020, Block filed with the SEC a quarterly report on Form 10-Q for its third fiscal quarter ended September 30, 2020, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud. The Form 10-Q included the financial and operating information about Block contained in the 3Q20 Letter.  In addition, the Form 10-Q highlighted that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business."  The Form 10-Q stated that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

30.    On January 4, 2021, Block issued a press release signed by defendant Dorsey opposing regulations proposed by the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") to enhance KYC and due diligence requirements for the processing of cryptocurrency transactions.  The lengthy release claimed that one of Block's "core principles" was "that people should have the ability to participate in financial systems easily and equitably."  As a result, the release claimed that Square had "invested substantially in the health of its ecosystem from a product, leadership, innovation, and legal perspective" rendering the proposed rules "unnecessary."  The release further claimed that the proposed rules would actually increase the risk of illicit activities and that "private sector solutions and companies" such as those offered by Block were better at mitigating risks.  The release continued: "Flexible, risk-based

1    regulation allows compliance programs to be more comprehensive and actually mitigate risk using

2    tools that are compatible with blockchain technology" and gave the example of Square that was

3    purportedly "able to use data that is available through blockchain analysis to identify signals of

4    unlawful activity."  According to the release, Block's efforts and coordination with regulators had

5    "prove[n] extraordinarily effective in identifying and stopping illicit activities."

6        31.    On February 23, 2021, Block issued a shareholder letter for the Company's fourth

7    fiscal quarter and year ended December 31, 2020 signed by defendants Dorsey and Ahuja ("FY20

8    Letter").  For the fourth quarter, the FY20 Letter stated that Block achieved 141% year-over-year

9    total net revenue growth to $3.16 billion and 52% year-over-year gross profit growth to $804

10   million.  For the year, the FY20 Letter stated that Block achieved 101% year-over-year total net

11   revenue growth to $9.5 billion and 45% year-over-year gross profit growth to $2.73 billion.  For

12   the Square segment, the FY20 Letter stated that Block achieved 5% year-over-year revenue growth

13   to $987 million and 13% year-over-year gross profit growth to $427 million in the fourth quarter.

14   For the Cash App segment, the FY20 Letter stated that Block achieved 502% year-over-year

15   revenue growth to $2.17 billion and 162% year-over-year gross profit growth to $377 million in

16   the fourth quarter.  The FY20 Letter also stated that "Cash App continued to drive strong

17   acquisition of new customers and retain its existing base: In December, Cash App had more than

18   36 million monthly transacting active customers, up more than 50% year over year."

19       32.    Also on February 23, 2021, Block filed with the SEC an annual report on Form 10-

20   K for its fiscal year ended December 31, 2020, which was signed by defendants Dorsey and Ahuja

21   who also certified that the report was materially complete, accurate, and free from fraud.  The

22   Form 10-K included the financial and operating information about Block contained in the FY20

23   Letter.  In addition, the Form 10-K highlighted that Block had put in place a "compliance program

24   focused on the laws, rules, and regulations applicable to [its] business."  The Form 10-K stated

25   that Block and its employees "vet and monitor [the Company's] customers and the transactions we

26   process for them as part of our risk management efforts."  In particular, the Form 10-K represented

27   that the Company had implemented an effective AML program designed to prevent money

28   laundering, terrorist financing, and other illicit activity, stating in pertinent part as follows:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                    - 10 -

We are subject to anti-money laundering (AML) laws and regulations in the United States and other jurisdictions. ***We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing***.

33.     On May 6, 2021, Block issued a shareholder letter for the Company's first fiscal quarter ended March 31, 2021 signed by defendants Dorsey and Ahuja ("1Q21 Letter"). For the quarter, the 1Q21 Letter stated that Block achieved 266% year-over-year total net revenue growth to $5.06 billion and 79% year-over-year gross profit growth to $964 million. For the Square segment, the 1Q21 Letter stated that Block achieved 19% year-over-year revenue growth to $1.02 billion and 32% year-over-year gross profit growth to $468 million. For the Cash App segment, the 1Q21 Letter stated that Block achieved 666% year-over-year revenue growth to $4.04 billion and 171% year-over-year gross profit growth to $495 million. The 1Q21 Letter also stated: "We continued to drive acquisition of net-new transacting active Cash App customers as well as engagement with Cash Card, Boost, direct deposit, stock brokerage, bitcoin investing, and business accounts."

34.     Also on May 6, 2021, Block filed with the SEC a quarterly report on Form 10-Q for its first fiscal quarter ended March 31, 2021, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud. The Form 10-Q included the financial and operating information about Block contained in the 1Q21 Letter. In addition, the Form 10-Q highlighted that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business." The Form 10-Q stated that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

35.     On August 1, 2021, Block issued a shareholder letter for the Company's second fiscal quarter ended June 30, 2021 signed by defendants Dorsey and Ahuja ("2Q21 Letter"). For

the quarter, the 2Q21 Letter stated that Block achieved 143% year-over-year total net revenue growth to $4.68 billion and 91% year-over-year gross profit growth to $1.14 billion.  For the Square segment, the 2Q21 Letter stated that Block achieved 81% year-over-year revenue growth to $1.31 billion and 85% year-over-year gross profit growth to $585 million.  For the Cash App segment, the 2Q21 Letter stated that Block achieved 177% year-over-year revenue growth to $3.33 billion and 94% year-over-year gross profit growth to $546 million.  The 2Q21 Letter also stated that, in the second quarter, "volume sent through Cash App's network increased by nearly 4x compared to two years ago, driven by growth in existing customers and newer customers transacting more frequently."

36.    On August 2, 2021, Block filed with the SEC a quarterly report on Form 10-Q for its second fiscal quarter ended June 30, 2021, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud.  The Form 10-Q included the financial and operating information about Block contained in the 2Q21 Letter.  In addition, the Form 10-Q highlighted that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business."  The Form 10-Q stated that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

37.    On November 4, 2021, Block issued a shareholder letter for the Company's third fiscal quarter ended September 30, 2021 signed by defendants Dorsey and Ahuja ("3Q21 Letter").  For the quarter, the 3Q21 Letter stated that Block achieved 27% year-over-year total net revenue growth to $3.84 billion and 43% year-over-year gross profit growth to $1.13 billion.  For the Square segment, the 3Q21 Letter stated that Block achieved 44% year-over-year revenue growth to $1.39 billion and 48% year-over-year gross profit growth to $606 million.  For the Cash App segment, the 3Q21 Letter stated that Block achieved 16% year-over-year revenue growth to $2.39 billion and 33% year-over-year gross profit growth to $512 million.  The 3Q21 Letter also stated: "In October, we expect Cash App to deliver strong gross profit growth year over year and on a two-year CAGR basis driven by growth in monthly actives, engagement across our ecosystem, and inflows into Cash App."

38.     Also on November 4, 2021, Block filed with the SEC a quarterly report on Form 10-Q for its third fiscal quarter ended September 30, 2021, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud. The Form 10-Q included the financial and operating information about Block contained in the 3Q21 Letter.  In addition, the Form 10-Q highlighted that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business."  The Form 10-Q stated that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

39.     On February 24, 2022, Block issued a shareholder letter for the Company's fourth fiscal quarter and year ended December 31, 2021 signed by defendants Dorsey and Ahuja ("FY21 Letter").  For the fourth quarter, the FY21 Letter stated that Block achieved 29% year-over-year total net revenue growth to $4.08 billion and 47% year-over-year gross profit growth to $1.18 billion.  For the year, the FY21 Letter stated that Block achieved 86% year-over-year total net revenue growth to $17.66 billion and 62% year-over-year gross profit growth to $4.42 billion.  For the Square segment, the FY21 Letter stated that Block achieved 49% year-over-year revenue growth to $1.47 billion and 54% year-over-year gross profit growth to $657 million in the fourth quarter.  For the Cash App segment, the FY21 Letter stated that Block achieved 18% year-over-year revenue growth to $2.55 billion and 37% year-over-year gross profit growth to $518 million in the fourth quarter.  The FY21 Letter also stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

40.     That same day, Block held a conference call to discuss the Company's fourth fiscal quarter of 2021 hosted by defendants Dorsey and Ahuja.  In response to an analyst question, defendant Dorsey claimed that Block was focused on preventing fraud on Cash App, stating in pertinent part as follows:

> Well, ***I'll say that I think our biggest constraint right now is just how we think about building Cash App's risk and compliance efforts, everything that we see around fraud***.  We want to make sure that we are building a system that is scalable, that allows for limits for customers who might have more resources at their disposal and want to use Cash App for more and more things such as – as they would treat their normal bank.

*So we have limits in place to manage all these things, and a big goal for us is to make sure that we're looking for opportunities to increase those and to, at the same time, maintain all of the risk controls and fraud and continue to do what we've done so well over the years. And not just on the Cash App side, but on the Square side, keep it in our business forever.*

41.    Also on February 24, 2022, Block filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2021, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud. The Form 10-K included the financial and operating information about Block contained in the FY21 Letter. In addition, the Form 10-K highlighted that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business." The Form 10-K stated that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts." In particular, the Form 10-K represented that the Company had implemented an effective AML program designed to prevent money laundering, terrorist financing, and other illicit activity, stating in pertinent part as follows:

> We are subject to anti-money laundering ("AML") laws and regulations in the United States and other jurisdictions. *We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.*

42.    On May 5, 2022, Block issued a shareholder letter for the Company's first fiscal quarter ended March 31, 2022 signed by defendants Dorsey and Ahuja ("1Q22 Letter"). For the quarter, the 1Q22 Letter stated that Block achieved total net revenue of $3.96 billion, which was down 22% year over year due to a decrease in bitcoin revenue, and gross profit growth of 34% to $1.29 billion. For the Square segment, the 1Q22 Letter stated that Block achieved 42% year-over-year revenue growth to $1.44 billion and 41% year-over-year gross profit growth to $661 million. For the Cash App segment, the 1Q22 Letter stated that Block achieved revenue of $2.46 billion and gross profit growth of 26% to $624 million. The 1Q22 Letter also stated: "We are focused on

expanding our customers' awareness and access to bitcoin, which has allowed us to drive meaningful adoption: As of the end of the first quarter, more than 10 million Cash App accounts have bought bitcoin since the product was introduced."

43.    Also on May 5, 2022, Block filed with the SEC a quarterly report on Form 10-Q for its first fiscal quarter ended March 31, 2022, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud.  The Form 10-Q included the financial and operating information about Block contained in the 1Q22 Letter.  In addition, the Form 10-Q highlighted that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business."  The Form 10-Q stated that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

44.    On August 4, 2022, Block issued a shareholder letter for the Company's second fiscal quarter ended June 30, 2022 signed by defendants Dorsey and Ahuja ("2Q22 Letter").  For the quarter, the 2Q22 Letter stated that Block achieved total net revenue of $4.4 billion, which was down 6% year over year due to a decrease in bitcoin revenue, and gross profit growth of 29% to $1.47 billion.  For the Square segment, the 2Q22 Letter stated that Block achieved 32% year-over-year revenue growth to $1.73 billion and 29% year-over-year gross profit growth to $755 million.  For the Cash App segment, the 2Q22 Letter stated that Block achieved revenue of $2.62 billion and gross profit growth of 29% to $705 million.  The 2Q22 Letter also stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem, such that overall inflows grew quarter over quarter and year over year."

45.    Also on August 4, 2022, Block filed with the SEC a quarterly report on Form 10-Q for its second fiscal quarter ended June 30, 2022, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud.  The Form 10-Q included the financial and operating information about Block contained in the 2Q22 Letter.  In addition, the Form 10-Q highlighted that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business."  The Form 10-Q

1    stated that Block and its employees "vet and monitor [the Company's] customers and the

2    transactions we process for them as part of our risk management efforts."

3        46.    On November 3, 2022, Block issued a shareholder letter for the Company's third

4    fiscal quarter ended September 30, 2022 signed by defendants Dorsey and Ahuja ("3Q22 Letter").

5    For the quarter, the 3Q22 Letter stated that Block achieved 17% year-over-year total net revenue

6    growth to $4.52 billion and 38% year-over-year gross profit growth to $1.57 billion.   For the

7    Square segment, the 3Q22 Letter stated that Block achieved 27% year-over-year revenue growth

8    to $1.77 billion and 29% year-over-year gross profit growth to $783 million.   For the Cash App

9    segment, the 3Q22 Letter stated that Block achieved 12% year-over-year revenue growth to $2.68

10   billion and 51% year-over-year gross profit growth to $774 million.   The 3Q22 Letter also stated:

11   "We drove growth in net new transacting actives and strong engagement across products in our

12   Cash App ecosystem."

13       47.    Also on November 3, 2022, Block filed with the SEC a quarterly report on Form

14   10-Q with the SEC for its third fiscal quarter ended September 30, 2022, which was signed by

15   defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate,

16   and free from fraud.  The Form 10-Q included the financial and operating information about Block

17   contained in the 3Q22 Letter.  In addition, the Form 10-Q highlighted that Block had put in place

18   a "compliance program focused on the laws, rules, and regulations applicable to [its] business."

19   The Form 10-Q stated that Block and its employees "vet and monitor [the Company's] customers

20   and the transactions we process for them as part of our risk management efforts."

21       48.    On February 23, 2023, Block issued a shareholder letter for the Company's fourth

22   fiscal quarter and year ended December 31, 2022 signed by defendants Dorsey and Ahuja ("FY22

23   Letter").   For the fourth quarter, the FY22 Letter stated that Block achieved 14% year-over-year

24   total net revenue growth to $4.65 billion and 40% year-over-year gross profit growth to $1.66

25   billion.  For the year, the FY22 Letter stated that Block achieved $17.53 billion in total net revenue

26   and 36% year-over-year gross profit growth to $5.99 billion.  For the Square segment, the FY22

27   Letter stated that Block achieved 19% year-over-year revenue growth to $1.76 billion and 22%

28   year-over-year gross profit growth to $801 million in the fourth quarter.   For the Cash App

segment, the FY22 Letter stated that Block achieved 12% year-over-year revenue growth to $2.68 billion and 64% year-over-year gross profit growth to $848 million in the fourth quarter. The FY22 Letter also stated: "We ended the year with 51 million monthly transacting actives in December, with two out of three transacting each week on average."

49.    Also on February 23, 2023, Block filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2022, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud. The Form 10-K included the financial and operating information about Block contained in the FY22 Letter. In addition, the Form 10-K highlighted that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business." The Form 10-K stated that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts." In particular, the Form 10-K represented that the Company had implemented an effective AML program designed to prevent money laundering, terrorist financing, and other illicit activity, stating in pertinent part as follows:

> We are subject to anti-money laundering ("AML") laws and regulations in the United States and other jurisdictions. ***We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing***.

50.    The statements referenced in ¶¶22-49 above were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them as follows:

(a)    that Block had engaged in widespread and years-long compliance lapses at Square and Cash App, including by failing to conduct basic due diligence regarding its customers' identities or the nature of customer transactions so as to prevent the platforms from being used for illegal or illicit activities;

(b)     that Block had effectively created a haven for widespread illegal and illicit activities on its Square and Cash App platforms by imposing minimal obligations on customers seeking to open accounts, transact, and deposit or withdraw funds; encouraging the use of bitcoin; and pressuring the Company's banking partners to forgo ordinary KYC due diligence activities;

(c)     that thousands of transactions on Square and Cash App were made in connection with a wide variety of illegal and illicit activities, including, *inter alia*, money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and illicit payments to entities and persons subject to economic sanctions;

(d)     that Block allowed its customers to withdraw funds even after the accounts had been flagged for potentially illegal or illicit activities;

(e)     that Block customers could open up multiple accounts using fake identities in order to engage in illegal or illicit activities;

(f)     that Block's senior leadership and the Board had failed to correct identified compliance deficiencies despite numerous red flags, internal employee reports of deficiencies, and customer complaints;

(g)     that Block's Cash App user metrics had been artificially inflated through the use of fake accounts and the ability of criminals and other bad actors to open multiple accounts; and

(h)      that, as a result of (a)-(g) above, Block was subject to a material, undisclosed risk of its conduct being exposed, thereby exposing the Company to reputational harm, adverse regulatory actions, the loss of business activity, and adverse impacts to the Company's operations and financial results.

51.     On March 23, 2023, short-biased analyst firm Hindenburg Research published a damaging exposé on the Company titled: "Block: How Inflated User Metrics and 'Frictionless' Fraud Facilitation Enabled Insiders To Cash Out Over $1 Billion" (the "Hindenburg Report"). Claiming to have conducted a two-year investigation that included interviews with dozens of former Block employees, partners, and industry experts; an extensive review of regulatory and litigation records; and the receipt of materials pursuant to Freedom of Information Act and public

records requests, the Hindenburg Report detailed Block's lax approach to compliance issues.  The Hindenburg Report concluded that the "'magic'" of Block's success had not been business innovation or its purported desire to serve legitimate unbanked communities, "but rather the company's willingness to facilitate fraud against consumers and the government, avoid regulation, dress up predatory loans and fees as revolutionary technology, and mislead investors with inflated metrics."  The Hindenburg Report highlighted Block's "'Wild West'" approach to compliance and efforts to effectively court criminal activity, making it "easy for bad actors to mass-create accounts for identity fraud and other scams, then extract stolen funds quickly."  Cash App was reportedly widely used for, *inter alia*, sex trafficking, drug trafficking, consumer scams, COVID-19 relief fraud, and even contract killing payments.  Former employees reportedly described how Cash App systemically suppressed internal concerns and ignored user pleas and numerous red flags to allow criminal activity to proliferate and fraud to run rampant on the platform and claimed that the Company strategically disregarded AML rules.  According to the Hindenburg Report: "Cash App's embrace of non-compliance begins by making it easy for users to get on the platform, easy for them to get back on the platform if their accounts are closed, and easy to remain anonymous or operate under blatantly false identities."  The Hindenburg Report also stated that permitting illegal and illicit activities had allowed Block to artificially inflate its Cash App user metrics and artificially understate Cash App's customer acquisition costs.

52.     On this news, the price of Block Class A common stock fell from $72.65 per share at market close on March 22, 2023, to $61.88 per share at market close on March 23, 2023 – a decline of nearly 15% on unusually heavy trading volume of over 140 million shares traded – and continued to fall the next trading day.  However, because defendants failed to disclose the full truth and continued to make material misrepresentations, the price of Block Class A common stock remained artificially inflated.

53.     Within hours of the release of the Hindenburg Report, on March 23, 2023, Block issued a press release disavowing the report's allegations.  The release described the Hindenburg Report as "factually inaccurate and misleading" and stated that the Company would be pursuing regulatory reprisals with the SEC against Hindenburg Research, stating in pertinent part as follows:

*We intend to work with the SEC and explore legal action against Hindenburg Research for the factually inaccurate and misleading report they shared about our Cash App business today*.

Hindenburg is known for these types of attacks, which are designed solely to allow short sellers to profit from a declined stock price. *We have reviewed the full report in the context of our own data and believe it's designed to deceive and confuse investors*.

*We are a highly regulated public company with regular disclosures, and are confident in our products, reporting, compliance programs, and controls* will not be distracted by typical short seller tactics.

54.    On May 4, 2023, Block issued a shareholder letter for the Company's first fiscal quarter ended March 31, 2023 signed by defendants Dorsey and Ahuja ("1Q23 Letter"). For the quarter, the 1Q23 Letter stated that Block achieved 26% year-over-year total net revenue growth to $4.99 billion and gross profit growth of 32% to $1.71 billion. For the Square segment, the 1Q23 Letter stated that Block achieved 15% year-over-year revenue growth to $1.67 billion and 16% year-over-year gross profit growth to $770 million. For the Cash App segment, the 1Q23 Letter stated that Block achieved 33% year-over-year revenue growth to $3.27 billion and 49% year-over-year gross profit growth to $931 million. The 1Q23 Letter also stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

55.    That same day, Block held a conference call to discuss the Company's first fiscal quarter of 2023 hosted by defendants Dorsey and Ahuja. The first question by an analyst was about the Hindenburg Report. In response, defendant Dorsey denied the allegations in the Hindenburg Report and stated: "I would say that we stand by our response to the shareholder report. . . . [Our] regulators trust us as well. So this is a significant focus for us and always has been." Defendant Ahuja provided additional detail, claiming that Block maintained a robust culture of compliance and stating in pertinent part as follows:

Block operates a business that is highly regulated, and our goal is ultimately to expand access to the economy through intuitive financial products. In order to do that, *we must maintain a culture of compliance and responsible risk management, including through investment in programs, processes, controls and teams with deep compliance expertise, prioritizing compliance ultimately helps us drive trust to their customers with regulators and external partners, and that enables us to then develop innovative products responsibly. We have significantly grown our investment in compliance over the last few years*.

56.     Also on May 4, 2023, Block filed with the SEC a quarterly report on Form 10-Q for its first fiscal quarter ended March 31, 2023, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud.  The Form 10-Q included the financial and operating information about Block contained in the 1Q23 Letter.  In addition, the Form 10-Q highlighted that Block had put in place a "compliance program focused on the laws, rules, and regulations applicable to [its] business."  The Form 10-Q stated that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

57.     On August 3, 2023, Block issued a shareholder letter for the Company's second fiscal quarter ended June 30, 2023 signed by defendants Dorsey and Ahuja ("2Q23 Letter").  For the quarter, the 2Q23 Letter stated that Block achieved 26% year-over-year total net revenue growth to $5.53 billion and gross profit growth of 27% to $1.87 billion.  For the Square segment, the 2Q23 Letter stated that Block achieved 12% year-over-year revenue growth to $1.93 billion and 18% year-over-year gross profit growth to $888 million.  For the Cash App segment, the 2Q23 Letter stated that Block achieved 36% year-over-year revenue growth to $3.56 billion and 37% year-over-year gross profit growth to $968 million.  The 2Q23 Letter also stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

58.     Also on August 3, 2023, Block filed with the SEC a quarterly report on Form 10-Q for its second fiscal quarter ended June 30, 2023 (the "2Q23 Form 10-Q"), which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud.  The 2Q23 Form 10-Q included the financial and operating information about Block contained in the 2Q23 Letter.  In addition, the 2Q23 Form 10-Q highlighted that Block had put in place a "compliance program focused on the laws, rules, regulations, and standards applicable to [its] business."  The 2Q23 Form 10-Q stated that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

59.     The 2Q23 Form 10-Q also revealed that the SEC and the U.S. Department of Justice were investigating the allegations against Block and its employees contained in the Hindenburg Report, despite defendants' prior claims that the SEC should investigate Hindenburg Research for purportedly misleading Block investors.

60.     On this news, the price of Block Class A common stock fell from $73.55 per share at market close on August 3, 2023, to $63.52 per share at market close on August 4, 2023, a decline of nearly 14% on unusually heavy trading volume of over 33 million shares traded.  However, because defendants failed to disclose the full truth and continued to make material misrepresentations, the price of Block Class A common stock remained artificially inflated.

61.     On November 2, 2023, Block issued a shareholder letter for the Company's third fiscal quarter ended September 30, 2023 signed by defendants Dorsey and Ahuja ("3Q23 Letter"). For the quarter, the 3Q23 Letter stated that Block achieved 24% year-over-year total net revenue growth to $5.62 billion and 21% year-over-year gross profit growth to $1.9 billion.  For the Square segment, the 3Q23 Letter stated that Block achieved 12% year-over-year revenue growth to $1.98 billion and 15% year-over-year gross profit growth to $899 million.  For the Cash App segment, the 3Q23 Letter stated that Block achieved 34% year-over-year revenue growth to $3.58 billion and 27% year-over-year gross profit growth to $984 million.  The 3Q23 Letter also stated that, in September, "Cash App had 55 million monthly transacting actives, up 11% year over year."

62.     Also on November 2, 2023, Block filed with the SEC a quarterly report on Form 10-Q for its third fiscal quarter ended September 30, 2023, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud. The Form 10-Q included the financial and operating information about Block contained in the 3Q23 Letter.  In addition, the Form 10-Q highlighted that Block had put in place a "compliance program focused on the laws, rules, regulations, and standards applicable to [its] business."  The Form 10-Q stated that Block and its employees "vet and monitor [the Company's] customers and the transactions we process for them as part of our risk management efforts."

63. The statements referenced in ¶¶53-58 and 61-62 above were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them as follows:

(a) that Block had engaged in widespread and years-long compliance lapses at both Square and Cash App, including by failing to conduct basic due diligence regarding its customers' identities or the nature of customer transactions so as to prevent the platforms from being used for illegal or illicit activities;

(b) that Block had effectively created a haven for widespread illegal and illicit activities on its Square and Cash App platforms by imposing minimal obligations on customers seeking to open accounts, transact, and deposit or withdraw funds; encouraging the use of bitcoin; and pressuring the Company's banking partners to forgo ordinary KYC due diligence activities;

(c) that thousands of transactions on Square and Cash App were made in connection with a wide variety of illegal and illicit activities, including, *inter alia*, money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and illicit payments to entities and persons subject to economic sanctions;

(d) that Block allowed its customers to withdraw funds even after the accounts had been flagged for potentially illegal or illicit activities;

(e) that Block customers could open up multiple accounts using fake identities in order to engage in illegal or illicit activities;

(f) that Block's senior leadership and the Board had failed to correct identified compliance deficiencies despite numerous red flags, internal employee reports of deficiencies, and customer complaints;

(g) that Block's Cash App user metrics had been artificially inflated through the use of fake accounts and the ability of criminals and other bad actors to open multiple accounts;

(h) that defendants' prior denials of the allegations contained in the Hindenburg Report were materially false and misleading; and

(i) that, as a result of (a)-(h) above, Block was subject to a material, undisclosed risk of its conduct being exposed, thereby exposing the Company to reputational harm,

1  adverse regulatory actions, the loss of business activity, and adverse impacts to the Company's

2  operations and financial results.

3         64.    On February 16, 2024, *NBC News* reported that federal regulators were probing

4  allegations by two whistleblowers that Cash App performed inadequate due diligence on its users –

5  including "'no effective procedure to establish the[ir] identity'" – opening the door to potential

6  money laundering, terrorism financing, and other illegal and illicit activities.  The whistleblowers

7  detailed Cash App transactions with entities under sanction by the U.S. Department of the

8  Treasury's Office of Foreign Assets Control, operations known to sell personal information and

9  credit card data for illegal purposes, and offshore gambling sites barred to U.S. citizens.  The

10  whistleblowers reportedly had filed complaints with the FinCEN, the SEC, and the Commodity

11  Futures Trading Commission.  The whistleblowers described Block as operating "'*a shadow*

12  *financial system beyond the reach of regulators*.'"  According to the report, Cash App had

13  pressured its banking partners to forgo traditional due diligence and KYC steps with the express

14  purpose of easing the process of account opening in order to generate revenues for Block.  In

15  addition, the Company reportedly siloed parts of the transactions on Cash App from its banking

16  partners, which prevented those partners from evaluating the entire nature of a transaction and thus

17  impaired their ability to identify illegal or illicit activities.  The report described Block's 2018

18  decision to allow bitcoin transactions on its platforms as opening the Company's flawed customer

19  due diligence to terrorist financing worldwide.  The whistleblowers further described a vibrant

20  market for opened Cash App accounts on the black market that reportedly allowed criminals to

21  avoid even the minimum due diligence involved in setting up a new account.

22         65.    On this news, the price of Block Class A common stock fell from $69.48 per share

23  at market close on February 15, 2024, to $65.64 per share at market close on February 16, 2024 –

24  a decline of over 5% on unusually heavy trading volume of over 12 million shares traded.

25  However, because defendants failed to disclose the full truth and continued to make material

26  misrepresentations, the price of Block Class A common stock remained artificially inflated.

27         66.    Then, on May 1, 2024, *NBC News* reported that federal prosecutors were

28  investigating Block due to allegations by a former employee that the Company had engaged in

widespread and years-long compliance lapses at its two main units, Square and Cash App. Reportedly, the employee had provided prosecutors with internal Company documents demonstrating that Block had failed to conduct basic due diligence on its customers, that Square had processed thousands of transactions involving countries subject to economic sanctions (including Cuba, Iran, Russia, and Venezuela), and that Block had processed multiple cryptocurrency transactions for terrorist groups.  The Company also reportedly failed to properly report transactions to U.S. regulatory authorities, and failed to correct compliance deficiencies even after being alerted to the breaches.  Reportedly, documents turned over by the whistleblower showed that these violations were known by both the senior management of the Company and the Board.  According to this former employee: "'***From the ground up, everything in the compliance section was flawed . . . .  It is led by people who should not be in charge of a regulated compliance program***'" – a sentiment reportedly shared by a second person with knowledge of Block's monitoring programs and practices.  The article also described woefully deficient compliance practices, such as allowing customers subject to a sanctions alert to withdraw funds before the alert review was complete or failing to screen against sanctions keyword lists.  In addition, the employee rejected Block's contention that it had voluntarily reported thousands of suspicious transactions, stating that Block had excluded thousands of other transactions that the Company had failed to report.  The article also stated that Block had hired an outside consultant in 2023 who identified nearly 50 instances of deficiencies in the Company's internal systems for monitoring suspicious activities.  In addition, the former employee rejected Block's contention that it had voluntarily reported thousands of suspicious transactions, stating that there were in fact thousands of other transactions that the Company had failed to report.  Collectively, the two reports by *NBC News* corroborated the allegations contained in the Hindenburg Report and directly contradicted defendants' prior denials.

67.    On this news, the price of Block Class A common stock fell from $73 per share at market close on April 30, 2024, to $66.84 per share at market close on May 1, 2024 – a decline of over 8% on unusually heavy trading volume of over 22 million shares traded.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 25 -

68.    In Block's subsequent Form 10-Q quarterly report, filed on August 1, 2024, the Company stated that in July 2024 it had received a follow-on inquiry from the SEC regarding the Company's alleged compliance as described in the Hindenburg Report.

69.    On January 15, 2025, a coalition of 48 state regulatory agencies announced that Block had agreed to pay $80 million for violations of the Bank Secrecy Act and AML laws.  The Company also agreed to correct ongoing deficiencies, submit to the review of an independent consultant regarding its compliance lapses, and submit a progress report to the states within nine months.

70.    On January 16, 2025, the CFPB ordered Block to refund and pay other redress to consumers up to $120 million and a penalty of $55 million into the CFPB's victims relief fund. The CFPB found that Block employed weak security protocols for Cash App that put users at risk of fraud and then attempted to avoid its investigative obligations and attempted to use fine print to escape its legal requirements.  When it did conduct investigations, the CFPB found that Block used intentionally shoddy investigation practices to close reports of unauthorized transactions in the Company's favor.  According to the CFPB, Block also deprived Cash App users of meaningful and effective customer service and left the network vulnerable to criminals defrauding users. Consumers looking for an alternate route to Cash App customer service through web searches were targeted by fraudsters posing as Cash App representatives, who tricked them into giving up their passwords and other personal information.  The CFPB found that Block knew that its customers were being targeted by fraudsters in this way but failed to take timely action to address the issue. In addition to monetary penalties, Block was also ordered to cure deficiencies in its customer service and support functions.

71.    As a result of defendants' wrongful acts and omissions, and the subsequent declines in the market value of the Company's Class A common stock, plaintiff and other Class members suffered financial losses and economic damages under the federal securities laws.

### ADDITIONAL SCIENTER ALLEGATIONS

72.    As alleged herein, defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the

Company were materially false and misleading and omitted material facts, knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public, and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Block, their control over and/or receipt and/or modification of allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Block, participated in the fraudulent scheme alleged herein.

73.    In addition, Block's widespread compliance failures involved the Company's two most important operating segments – Cash App and Square – which were closely followed by the Individual Defendants, who held themselves out to the investing public as the persons most knowledgeable about the Company's compliance framework in investor conference calls and through periodic SEC filings.  Indeed, defendant Dorsey personally penned a letter opposing proposed FinCEN regulations in which he falsely and misleadingly represented that Block's compliance efforts were sufficient to prevent widespread criminal or illicit activities. Whistleblowers have also disclosed that Block's senior leadership were aware of the Company's compliance deficiencies and intentionally failed to correct them.

74.    Furthermore, defendants had the motive and opportunity to commit fraud.  During the Class Period, Block insiders sold over $1.5 billion worth of Block Class A common stock at artificially inflated prices.  Defendant Dorsey sold over $618 million worth of Block stock at prices as high as $279 per share, and defendant Ahuja sold nearly $48 million worth of Block stock at prices as high as $280 per share.

75.    The numerous state and federal investigations and imposition of significant monetary penalties and other sanctions against Block further support a compelling inference of scienter.

76.    Further contributing to an already-compelling inference of scienter, Block experienced numerous defections in its senior leadership during the Class Period.  The exodus of

1    senior executives and Board members during the Class Period indicates that the Company was

2    suffering from behind-the-scenes turmoil in its senior ranks, particularly with respect to the

3    Company's legal and compliance infrastructure. Senior leadership departures from the Company

4    during the Class Period included several members of the Board, Square's CEO, Square's Capital

5    Lead, and the Company's Chief Legal Officer and Corporate Secretary.

6                        **FRAUDULENT SCHEME AND COURSE OF BUSINESS**

7           77.    Defendants are liable for: (i) making false statements; and/or (ii) failing to disclose

8    adverse facts known to them about Block. Defendants' fraudulent scheme and course of business

9    that operated as a fraud or deceit on purchasers of Block Class A common stock was a success, as

10   it: (i) deceived the investing public regarding Block's prospects and business; (ii) artificially

11   inflated the price of Block Class A common stock; and (iii) caused plaintiff and other members of

12   the Class to purchase Block Class A common stock at artificially inflated prices and suffer

13   damages when that artificial inflation was removed from the price of Block Class A common stock.

14                        **LOSS CAUSATION/ECONOMIC LOSS**

15          78.    During the Class Period, as detailed herein, defendants engaged in a scheme to

16   deceive the market and a course of conduct that artificially inflated the price of Block Class A

17   common stock and operated as a fraud or deceit on Class Period purchasers of Block Class A

18   common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When

19   defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent

20   to the market, the price of Block Class A common stock fell precipitously as the prior artificial

21   inflation came out of the stock's price. As a result of their purchases of Block Class A common

22   stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*,

23   damages, under the federal securities laws when the truth about Block was revealed through the

24   disclosures specified herein, which removed the artificial inflation from the price of Block Class

25   A common stock.

26          79.    By failing to disclose to investors the adverse facts detailed herein, defendants

27   presented a misleading picture of Block's business and prospects. Defendants' false and

28

1    misleading statements had the intended effect and caused Block Class A common stock to trade at

2    artificially inflated levels throughout the Class Period.

3        80.    As a direct result of the disclosures identified herein, the price of Block Class A

4    common stock fell precipitously.  This removed the artificial inflation from the price of Block

5    Class A common stock, causing real economic loss to investors who had purchased Block Class

6    A common stock at artificially inflated prices during the Class Period.

7        81.    The price declines were a direct result of the nature and extent of defendants' fraud

8    being revealed to investors and the market through partial disclosures.  The timing and magnitude

9    of the price declines in Block Class A common stock negate any inference that the losses suffered

10   by plaintiff and the other Class members were caused by changed market conditions,

11   macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent

12   conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was

13   a direct result of defendants' fraudulent scheme to artificially inflate the price of Block Class A

14   common stock and the subsequent significant declines in the value of Block Class A common

15   stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

16                    **APPLICABILITY OF PRESUMPTION OF RELIANCE:**
17                       **FRAUD ON THE MARKET DOCTRINE**

18       82.    At all relevant times, the market for Block Class A common stock was an efficient

19   market for the following reasons, among others:

20       (a)    Block Class A common stock met the requirements for listing and was listed

21   and actively traded on the NYSE, a highly efficient and automated market;

22       (b)    as a regulated issuer, Block filed periodic public reports with the SEC;

23       (c)    Block regularly communicated with public investors via established market

24   communication mechanisms, including the regular disseminations of press releases on the national

25   circuits of major newswire services and other wide-ranging public disclosures, such as

26   communications with the financial press and other similar reporting services; and

27       (d)    Block was followed by several securities analysts employed by major

28   brokerage firms who wrote reports that were distributed to the sales force and certain customers

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 29 -

1  of their respective brokerage firms.  Each of these reports was publicly available and entered the

2  public marketplace.

3        83.    As a result of the foregoing, the market for Block Class A common stock promptly

4  digested current information regarding Block from all publicly available sources and reflected such

5  information in the price of the stock.  Under these circumstances, all purchasers of Block Class A

6  common stock during the Class Period suffered similar injury through their purchase of Block

7  Class A common stock at artificially inflated prices and a presumption of reliance applies.

8                                            **NO SAFE HARBOR**

9        84.    The "Safe Harbor" warnings accompanying Block's reportedly forward-looking

10 statements ("FLS") issued during the Class Period were ineffective to shield those statements from

11 liability.   To the extent that projected revenues and earnings were included in the Company's

12 financial reports prepared in accordance with generally accepted accounting principles, including

13 those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe

14 Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

15       85.    Defendants are also liable for any false and misleading FLS pled because, at the

16 time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

17 authorized and/or approved by an executive officer of Block who knew that the FLS was false.  In

18 addition, the FLS were contradicted by existing, undisclosed material facts that were required to

19 be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe

20 Harbor" warnings were themselves misleading because they warned of "risks" that had already

21 materialized or failed to provide meaningful disclosures of the relevant risks.

22                                       **CLASS ACTION ALLEGATIONS**

23       86.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

24 of Civil Procedure on behalf of all purchasers of Block Class A common stock during the Class

25 Period who were damaged thereby as alleged herein (the "Class").  Excluded from the Class are

26 defendants and their immediate families, the officers, directors, and affiliates of defendants, at all

27 relevant times, and their immediate families, and their legal representatives, heirs, successors, or

28 assigns, and any entity in which defendants have or had a controlling interest.

87.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Block Class A common stock trades on the NYSE and Block has millions of shares outstanding, owned by hundreds, if not thousands, of persons.

88.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    whether defendants violated the Exchange Act;

(b)    whether statements made by defendants to the investing public omitted and/or misrepresented material facts about Block;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    whether the price of Block Class A common stock was artificially inflated; and

(f)    the extent of damages sustained by Class members and the appropriate measure of damages.

89.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

90.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

91.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violations of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

92.     Plaintiff incorporates ¶¶1-91 by reference.

93.     During the Class Period, Block and the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

94.     Block and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Block Class A common stock during the Class Period.

95.     In addition to the duties of full disclosure imposed on Block and the Individual Defendants as a result of their affirmative false and misleading statements to the public, they had a duty to promptly disseminate truthful information with respect to Block's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, so that the market price of the Company's stock would be based on truthful, complete, and accurate information.  SEC Regulation S-X, 17 C.F.R. §210.1-01 *et seq.*; SEC Regulation S-K, 17 C.F.R. §229.10 *et seq.*

96.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Block Class A common stock during the Class Period, because, in reliance on the integrity of the market,

they paid artificially inflated prices for Block Class A common stock and experienced losses when the artificial inflation was released from Block Class A common stock as a result of the partial revelations and price declines detailed herein. Plaintiff and the Class would not have purchased Block Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

97.    By virtue of the foregoing, Block and the Individual Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

98.    Plaintiff incorporates ¶¶1-97 by reference.

99.    Block and the Individual Defendants acted as controlling persons of Block within the meaning of §20(a) of the Exchange Act. By reason of their controlling positions with the Company, and their ownership of Block Class A common stock, the Individual Defendants had the power and authority to cause Block to engage in the wrongful conduct complained of herein. Block controlled the Individual Defendants and all of its employees. By reason of such conduct, Block and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, and certifying plaintiff as a Class representative and appointing plaintiff's counsel as Lead Counsel under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

1          D.        Awarding such equitable, injunctive, or other relief as deemed appropriate by the

2    Court.

3                                              **JURY DEMAND**

4          Plaintiff demands a trial by jury.

5    DATED:  January 17, 2025                ROBBINS GELLER RUDMAN
                                                & DOWD LLP
6                                            SHAWN A. WILLIAMS

7

8                                              s/ Shawn A. Williams
                                             SHAWN A. WILLIAMS
9
                                             Post Montgomery Center
10                                           One Montgomery Street, Suite 1800
                                             San Francisco, CA  94104
11                                           Telephone:  415/288-4545
                                             swilliams@rgrdlaw.com
12
                                             ROBBINS GELLER RUDMAN
13                                              & DOWD LLP
                                             MICHAEL A. TRONCOSO
14                                           BRIAN E. COCHRAN
                                             655 West Broadway, Suite 1900
15                                           San Diego, CA  92101-8498
                                             Telephone:  619/231-1058
16                                           bcochran@rgrdlaw.com

17                                           JOHNSON FISTEL, LLP
                                             FRANK J. JOHNSON
18                                           501 West Broadway, Suite 800
                                             San Diego, CA  92101
19                                           Telephone:  619/230-0063
                                             frankj@johnsonfistel.com
20
                                             Attorneys for Plaintiff
21

22

23

24

25

26

27

28

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

Corinne Gonsalves ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the United States of America that the foregoing is true and correct.  Executed this <u>16</u> day of January, 2025.



Signed by:
Corinne Gonsalves
0AD7A54030692430

_____
                Corinne Gonsalves

BLOCK

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|:---:|:---:|:---:|
| 02/25/2021 | 200 | $239.00 |

Prices listed are rounded up to two decimal places.