1   Richard M. Heimann (S.B.N. 063607)          Julie Goldsmith Reiser (*pro hac vice*)
    Katherine Lubin Benson (S.B.N. 259826)      COHEN MILSTEIN SELLERS & TOLL
2   LIEFF CABRASER HEIMANN &                     PLLC
    BERNSTEIN, LLP                               1100 New York Avenue NW, 5th Floor
3   275 Battery Street, 29th Floor               Washington, DC 20005
    San Francisco, CA 94111                      Telephone: (202) 408-4600
4   Telephone: (415) 956-1000                    jreiser@cohenmilstein.com
    rheimann@lchb.com
5   kbenson@lchb.com

6
    [Additional attorneys listed on signature page]
7
    *Counsel for Lead Plaintiff NYC Funds and Co-*
8   *Lead Counsel for the Proposed Class*

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                        SAN JOSE DIVISION

12

13

14   CORINNE GONSALVES, individually        Case No. 5:25-cv-00642-NW
     and on behalf of others similarly situated,
15                                           **AMENDED CONSOLIDATED CLASS**
                    Plaintiff,               **ACTION COMPLAINT**
16
            v.                               **CLASS ACTION**
17
     BLOCK, INC., JACK DORSEY, and
18   AMRITA AHUJA,                           **DEMAND FOR JURY TRIAL**

                    Defendants.
19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page

3    I.    NATURE AND SUMMARY OF THE ACTION ................................................. 3

4    II.   JURISDICTION AND VENUE ........................................................................ 5

     III.  PARTIES ........................................................................................................ 5

5          A.   Lead Plaintiff NYC Funds ................................................................... 5

6          B.   Defendants .......................................................................................... 5

7    IV.   SUMMARY OF THE FRAUD ......................................................................... 7

           A.   Block Offers Mobile-First Financial Services for the Social Media Era. ............... 7

8          B.   Cash App's "Frictionless" User Experience Was a Magnet for Fraud and
                Criminality. .......................................................................................... 9

9

10         C.   For Much of the Class Period, Defendants Were Aware of But Did Nothing
                to Remedy Cash App's Glaring Compliance Issues. ........................ 16

11         D.   In March 2023, the Hindenburg Report Begins to Expose the Truth About
                Cash App's Compliance Failures and Inflated User Metrics. ............ 17

12         E.   Defendants Were Concerned About the Hindenburg Revelations Regarding
                the Company's User Metrics and Compliance Protocols. ................. 20

13
           F.   Further Corrective Disclosures Reveal the Falsity of Defendants'
14              Statements Regarding Compliance and Cash App User Metrics. ....... 21

           G.   In 2025, Block Enters into Consent Orders with Federal and State
15              Regulators to Address Compliance Deficiencies. ............................. 23

16   V.    DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING
           STATEMENTS DURING THE CLASS PERIOD. ........................................ 25

17         A.   Defendants Made Materially False and Misleading Statements in 2020. .......... 26

18         B.   Defendants Made Materially False and Misleading Statements in 2021 ........... 31

           C.   Defendants Made Materially False and Misleading Statements in 2022. .......... 34
19
           D.   Defendants Made Materially False and Misleading Statements in 2023. .......... 40
20
           E.   Defendants Made Materially False and Misleading Statements in 2024. .......... 46
21   VI.   ADDITIONAL ALLEGATIONS OF SCIENTER ........................................... 47

22         A.   Individual Scienter of Dorsey and Ahuja ........................................... 47

           B.   Corporate Scienter ............................................................................ 53

23   VII.  EXPERT ANALYSIS CONFIRMS BLOCK'S USER METRIC STATEMENTS
           WERE MATERIALLY FALSE AND MISLEADING. ..................................... 55
24
     VIII. DEEFENDANTS' MISREPRESENTATIONS AND OMISSIONS CAUSED
25         INVESTORS' LOSSES. ................................................................................ 61

26         A.   March 23, 2023: The Hindenburg Report Partially Reveals Defendants'
                Fraud. .................................................................................................. 62

27         B.   August 3, 2023: Block Discloses Regulatory Scrutiny Related to the
                Hindenburg Report. ............................................................................ 63

28         C.   February 16, 2024: NBC News Reports Whistleblower Allegations
                Relating to the Absence of Internal Controls at Cash App. ............... 63

AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT
CASE NO. 5:25-CV-00642-NW

1

**TABLE OF CONTENTS**
**(continued)**

2

Page

3       D.      May 1, 2024: NBC News Reports on Another Former Employee's
                Revelations About Cash App's Willfully Insufficient Compliance. ...................... 64

4       E.      May 2, 2025: Block Posts Another Disappointing Quarter of Earnings on
                Flat User Growth. ....................................................................................................... 65

5

IX.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................. 66

6   X.      PRESUMPTION OF RELIANCE ............................................................................. 67

7   XI.     CLASS ACTION ALLEGATIONS ........................................................................... 68

8   XII.    CLAIMS FOR RELIEF .............................................................................................. 70

    XIII.   PRAYER FOR RELIEF ............................................................................................. 73

9   XIV.    JURY DEMAND ........................................................................................................ 74

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Lead Plaintiff Teachers' Retirement System of the City of New York, New York City

2    Employees' Retirement System, New York City Fire Pension Fund, New York City Board of

3    Education Retirement System, Police Superior Officers' Variable Supplements Fund, Police

4    Officers' Variable Supplements Fund, Firefighters' Variable Supplements Fund, Fire Officers'

5    Variable Supplements Fund, New York City Fire Department Life Insurance Fund, and Teachers'

6    Retirement System Variable A (collectively, the "NYC Funds" or "Lead Plaintiff") brings this

7    federal class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

8    ("Exchange Act"), as well as Securities and Exchange Commission ("SEC") Rule 10b-5, on

9    behalf of all entities and individuals who purchased the Class A common stock of Block, Inc.

10   ("Block" or the "Company") between February 26, 2020 to May 1, 2025, inclusive (the "Class

11   Period"). Lead Plaintiff brings this Complaint against: (1) Block, Inc. ("Block" or the

12   "Company"); (2) Jack Dorsey, Block's co-founder, Chairman, and Chief Executive Officer

13   ("CEO") (formally titled "Block Head"); and (3) Amrita Ahuja, Block's Chief Financial Officer

14   ("CFO") and Chief Operating Officer ("COO") (formally titled "Foundational Lead") (together

15   with Dorsey, the "Individual Defendants," and collectively with Block, "Defendants").

16   Lead Plaintiff's allegations are based, among other things, on an investigation conducted

17   by and through their attorneys, which included an analysis of:

18   • SEC filings made by Block, including quarterly Form 10-Qs, annual Form 10-Ks,

19   and other public filings concerning Block or its related entities;

20   • Additional public statements by Defendants, including those made during

21   Company earnings calls, at investor conferences, and in shareholder letters and

22   press releases;

23   • Research reports issued by securities and financial analysts concerning Block;

24   • Economic analyses of Block stock, including stock price movements in response

25   to disclosures relating to the misconduct detailed in this Complaint;

26   • Other publicly available information, including the March 23, 2023 Hindenburg

27   Research report titled *"Block: How Inflated User Metrics and 'Frictionless' Fraud*

28   *Facilitation Enabled Insiders To Cash Out Over $1 Billion"* (the "Hindenburg

Report"); the March 31, 2023 Hindenburg Research follow-up report titled, "*Block's Response Confirmed Inflated User Counts While Ignoring Other Key Issues*"; the January 15, 2025 Settlement Agreement and Consent Order issued by 49 state money transmission regulators (the "Multistate Consent Order"); the January 16, 2025 Consent Order issued by the Consumer Financial Protection Bureau (the "CFPB Consent Order"); and the April 10, 2025 Consent Order issued by the New York Department of Financial Services ("NYDFS") (the "NYDFS Consent Order");

- Expert analysis from Dr. Daniel McCarthy, Ph.D.; and

- Interviews with former Block employees ("FEs") who worked at the Company during the Class Period in roles involving risk management, compliance, internal controls, or marketing, and who possess firsthand knowledge of facts relating to the fraud underlying Lead Plaintiff's claims.[1] Below is a table summarizing the FEs and their responsibilities and tenure at Block:

| FE | Title/Responsibility | Tenure |
|---|---|---|
| FE 1 | Block compliance manager[2] | March 2021 to February 2023 |
| FE 2 | Regulatory counsel[3] | August 2023 to May 2024 |
| FE 3 | Cash App Bitcoin Program Manager | January 2022 to October 2022 |
| FE 4 | Global Risk Assessment Program Manager | May 2023 to March 2025 |
| FE 5 | Cash App Behavioral Insights Investigator | November 2021 to November 2022 |
| FE 6 | Fraud Investigator | January 2022 to March 2024 |
| FE 7 | Head of Bitcoin Compliance | November 2021 to December 2024 |
| FE 8 | Risk Operations Leader | October 2020 to April 2024[4] |
| FE 9 | Cash App OFAC Sanction and KYC Lead | December 2021 to June 2024 |

---

[1] For confidentiality purposes, this Complaint uses gender-neutral pronouns to refer to all FEs.

[2] **FE 1** asked to be identified as a "Block compliance manager" rather than by their specific title at Block.

[3] **FE 2** asked to be identified as a "regulatory counsel" rather than by their specific title at Block. **FE 2** worked closely with Block's legal department and obtained direct knowledge of Block's compliance and risk policies and procedures through their role at the company.

[4] **FE 8** previously worked at Block in the Square business from November 2019 to October 2020.

Co-Lead Counsel's investigation is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes substantial additional evidentiary support for the allegations exists and would be uncovered through a reasonable opportunity for discovery.[5]

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Defendants portrayed Block as a mission-driven technology company committed to "economic empowerment." Central to this narrative was Cash App, marketed as a revolutionary tool to serve the "unbanked" and "underbanked" through accessible and low-cost financial services.

2.    For much of the Class Period, Cash App's reported user growth was staggering. In December 2019, Block reported 24 million monthly active users; by December 2020, it was 36 million users; and by December 2023, the Company touted 56 million users. Defendants attributed Cash App's rapid user growth during the Class Period to viral adoption among customers and an intuitive, social network-like user experience. Throughout this period, Defendants repeatedly emphasized the Company's purportedly strong compliance infrastructure for the Cash App mobile payment system.

3.    Unbeknownst to investors, Cash App's growth was driven by systemic failures in know-your-customer ("KYC"), anti-money laundering ("AML"), and sanctions screening controls, which attracted illicit actors who utilized fake and duplicate accounts. These controls are all core functions for a financial payments company. Whistleblowers later described Block's "frictionless onboarding" as a "shadow financial system beyond the reach of regulators," where Cash App knowingly processed transactions involving sanctioned entities and unlawful operations, including the sale of stolen personal data, offshore gambling banned to U.S. users, and potentially terrorism financing. As a result of these violations, the Company ultimately incurred nearly $300 million in regulatory fines imposed by state and federal authorities and agreed to the imposition of a compliance monitor for a one-year period.

---

[5] Unless otherwise indicated, all emphasis in this Complaint has been added. Additionally, unless otherwise indicated, references to "¶ __" are to paragraphs of this Complaint.

AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT
CASE NO. 5:25-CV-00642-NW

4.      For Block, the growth of its user base is essential to its valuation as a company. Throughout the Class Period, Defendants reported Cash App's user base counts prominently in earnings calls, investor presentations, and SEC filings, often repeatedly emphasizing the year-over-year growth of Cash App's user base. The investing community relied on these figures to model Block's scalability and profitability, and to determine a fair price for Block's stock. Due to its undisclosed compliance failures, Cash App's user base was materially smaller than publicly represented, because the reported numbers were inflated by duplicate, fraudulent, and illicit accounts enabled by Cash App's lack of adequate compliance. And, halfway through the Class Period, the Company even changed the way it measured "users"—from active "customers" to active "accounts"—so that Cash App would reflect continued growth.

5.      The illusion of rapidly scalable growth supported by robust compliance practices began to unravel in March 2023 when, following a two-year investigation involving interviews with dozens of former employees, partners, and industry experts, Hindenburg Research ("Hindenburg")—a prominent and widely respected short-seller—published a report partially exposing Cash App's artificially inflated user base numbers and the fraud and absence of compliance procedures that generated those inflated numbers. Although Block issued a statement vigorously disputing Hindenburg's research and threatening litigation, it acknowledged a substantial discrepancy between the active accounts claimed and Social Security numbers ("SSNs") associated with those accounts, revealing that its earlier user-base claims were inflated by 15–30%. In response to the Hindenburg Report, state and federal agencies launched enforcement actions that culminated in substantial penalties and fines against Block for compliance failures related to Cash App.

6.      As a consequence, and following a series of disclosures of corrective information, Block's stock price collapsed from its Class Period high of $289 per share to just $46 per share—an 84% decline that inflicted massive losses on investors.

## II.    JURISDICTION AND VENUE

7.    Lead Plaintiff brings the claims asserted herein under and pursuant to §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

8.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

9.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material fact, occurred in this District, and the Company maintained its headquarters in this District at the start of the Class Period.

10.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiff NYC Funds

11.    Lead Plaintiff NYC Funds are a group of retirement pension funds based in New York City that collectively manage more than $279 billion in assets. The NYC Funds purchased Block Class A common stock at artificially inflated prices during the Class Period and were damaged thereby. Lead Plaintiff's purchases of Block Class A common stock during the Class Period are set forth in the Appendix, incorporated herein by reference.

### B.    Defendants

12.    Defendant Block is a payment processing and financial technology ("fintech") company with its principal executive offices in Oakland, California. Block was co-founded by Defendant Jack Dorsey and Jim McKelvey in 2009 as Square, Inc. The Company was renamed

Block, Inc. in December 2021.[6] Shares of Block Class A common stock trade on the New York Stock Exchange ("NYSE") under the ticker symbol "XYZ."

13.     Defendant Jack Dorsey is Block's chief executive officer (a position the Company has termed its "Block Head" since April 2022) and Chairman of its Board of Directors (the "Board"). He served in these positions throughout the Class Period.

14.     Defendant Amrita Ahuja is Block's current Foundational Lead, overseeing the finance, legal, and people functions. Defendant Ahuja served as Block's CFO throughout the Class Period and as COO starting in February 2023.

15.     Each of the Individual Defendants acted and/or made the statements detailed herein in their capacities as an officer and/or director of Block. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, and present and future business prospects. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities law.

16.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

---

[6] For ease of reference, this Complaint uses "Block" or "the Company" to refer to all iterations of Defendant Block, including when it was known as Square, Inc.

AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT
CASE NO. 5:25-CV-00642-NW

1   **IV.**    **SUMMARY OF THE FRAUD**

2       **A.**    **Block Offers Mobile-First Financial Services for the Social Media Era.**

3       17.    Dorsey and Jim McKelvey founded Block in 2009. The Company's first offering

4   was Square: a mobile credit card reader designed to facilitate electronic payment acceptance for

5   small businesses. Dorsey envisioned the company as a revolutionary personal finance social

6   network. Under Dorsey's direction, Block evolved into a multifaceted platform offering a suite of

7   financial products and services to both businesses and consumers.

8       18.    Block describes its corporate architecture as an "ecosystem of ecosystems,"

9   meaning the company's offerings are organized into a small number of distinct but interconnected

10   business units, each targeting a specific user base. Each "ecosystem" operates with a degree of

11   autonomy while remaining strategically aligned through shared infrastructure and leadership

12   oversight. Block's two main ecosystems are Square and Cash App.

13       19.    The Company designed the Square ecosystem for businesses, or "sellers." It offers

14   tools for point-of-sale processing, inventory and customer relationship management, payroll,

15   loans, and banking united under a single platform. In 2024, the Seller segment generated

16   approximately $3.6 billion in gross profit, accounting for roughly 40% of Block's gross profit.

17       20.    Block geared the Cash App ecosystem toward individual consumers, and it serves

18   as a mobile-based financial platform offering services across payments, banking, investing,

19   cryptocurrency, tax filing, and small-dollar lending. Launched in 2013 under the name "Square

20   Cash," Cash App began as a mobile-first tool that enabled users to send money using just a debit

21   card and an email address or phone number, circumventing traditional banking infrastructure that

22   would otherwise typically require proof of identification, place of residence, an SSN or Individual

23   Taxpayer Identification Number, and other personal identification information. It offered a fast

24   digital alternative to physical cash—hence its name.

AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT
CASE NO. 5:25-CV-00642-NW

21.    Block designed Cash App as a social networking app, aiming to replicate the simplicity and viral reach of Facebook, Instagram, and Twitter/X. The signup process was intentionally designed to require minimal information—just a ZIP Code and an email address or phone number. The app's interface was equally deliberate in its design: smooth, intuitive, visually minimalistic, and touch-friendly. The onboarding screenshots[7] below illustrate how effortlessly users could begin using the platform:



22.    Cash App employs gamified design features to increase user engagement and drive frequent transactional activity. These include animated cash rewards, limited-time "Boost"

[7] These screenshots are October 2020 captures of Cash App hosted on http://uxarchive.com/flow/cash-app/app-74e22761884c303d/onboarding/appflow-02fdd7c8dd6e8763 (accessed June 10, 2025).

promotions, and referral bonuses that grant instant credits to both the referring and new user following account creation and a first transaction.

23.    Block executives highlighted Cash App's ability to deliver instant access to wages, transfers, and government benefits, particularly for users who might find it difficult to sign up for traditional bank accounts, or who might otherwise face overdraft penalties or multi-day delays.

24.    Over time, Cash App evolved into a full-service financial application offering a wide array of consumer-facing tools, allowing users to store balances within the app, receive wages or benefits through direct deposit, make purchases using a Cash App-issued Visa debit card, send and receive peer-to-peer payments, buy and sell bitcoin, invest in publicly traded equities through fractional shares, and file personal income taxes.

25.    During the Class Period, Cash App became an increasingly important part of Block's business. In 2020, it generated $1.23 billion in gross profit, about 45% of the Company's total. By 2024, Cash App's gross profit had more than quadrupled to $5.24 billion, making up approximately 59% of Block's total gross profit.

26.    Cash App's business model relies on two primary levers for revenue growth: (1) acquiring new users, and (2) monetizing existing users by expanding their engagement across multiple products and encouraging higher fund inflows.

27.    During the Class Period, the growth of Cash App's user base was Block's "North Star." As Cash App's then-CEO Brian Grassadonia explained at Block's 2022 Investor Day, "everything we built was towards achieving a low-cost customer acquisition model that could scale our network virally and eventually become massive."

28.    Block measured the expansion of its user base by publicly reporting to investors the number of active Cash App users who conducted transactions within a specified period— typically monthly or annually.

**B.    Cash App's "Frictionless" User Experience Was a Magnet for Fraud and Criminality.**

29.    Cash App's "frictionless" user experience—paired with its failure to implement AML protocols, KYC procedures, and sanctions controls—transformed the platform into a

magnet for bad actors. These individuals exploited the Company's lax oversight to create numerous duplicate and fraudulent accounts, which in turn artificially inflated the Company's reported active user metrics by as much as 30%.

30.    Under federal and state law, money transmitters and virtual currency businesses like Block are required to establish and enforce risk-based KYC procedures to verify customer identities at onboarding and to reassess user integrity over time. These are core operations for payment-processing and fintech companies as these procedures are intended to prevent the use of financial platforms by criminals employing fake, stolen, or synthetic identities, and to detect repeat or impersonated users attempting to evade controls.

31.    Block deliberately underinvested in its compliance infrastructure. **FE 9,** the former OFAC Sanctions and KYC Lead at Cash App[8]—with over 18 years of compliance experience at financial institutions prior to joining Block—described Cash App's compliance environment as a toxic "Wild West" marked by pressure on compliance personnel to approve high-risk accounts with minimal checks. As further detailed below, other former Block employees shared that Block cultivated a culture where executives routinely disregarded experienced compliance professionals and that Block retaliated against compliance personnel advocating for stricter compliance measures.

32.    Throughout the Class Period, Cash App was plagued by major U.S. sanctions compliance deficiencies that Block failed to remedy in a prompt or thorough manner, even after they were identified. For example, by 2020, Block had accumulated a transaction monitoring backlog that had grown to 169,000 alerts. As another example, in 2022 Block discovered that approximately 30 members of a Russian criminal network opened *8,359* Cash App accounts using falsified information, adding thousands of bogus, prohibited users to Cash App's publicly reported user base totals. Even when Block closed an account due to problematic activity, it often permitted the same user to open new accounts.

---

[8] From December 2021 to June 2024, **FE 9** oversaw onboarding, sanctions screening, and due diligence processes for a large, multinational team comprising over 70 full-time employees and additional contingent workers. **FE 9** led core compliance functions across the United States, United Kingdom, and Ireland.

33.     FEs have further corroborated the longstanding deficiencies in Cash App's adherence to U.S. sanctions laws:

a.     **FE 1**, who had first-hand experience with Cash App's sanctions program, reported that Cash App's sanctions team maintained a growing log of the U.S. Treasury Department Office of Foreign Assets Control ("OFAC") sanctions violations missed by internal controls. By the time of **FE 1**'s departure from Block,[9] this log included "hundreds" of entries—possibly as many as 800—which had never been properly disclosed to OFAC.

b.     **FE 5**,[10] who worked as a Behavioral Insights Investigator at Cash App, similarly disclosed that Block submitted few SARs to FinCEN related to Cash App transactions. Of the few SARs that were submitted, many were allegedly altered to downplay the severity of the underlying conduct, apparently in an attempt to limit Block's regulatory exposure.

c.     Shortly after joining Cash App, **FE 9** identified a systemic failure in sanctions enforcement when they reviewed a "Missed Block Report" and discovered that transactions involving sanctioned jurisdictions—such as Cuba—were not being properly blocked. Although these transactions were flagged on Day 2 of Cash App's screening process, by that point the funds had already been released. **FE 9** described this as a fundamental failure that even a basic compliance program should have prevented. **FE 9** raised the issue internally with both the global sanctions team and Block's Global Head of Sanctions. However, they were told that the company did not want to self-report the violations to OFAC, fearing it would trigger a broader regulatory investigation. To **FE 9**'s knowledge, Block had not submitted a self-disclosure by the time they left in mid-2024. The "missed block" issues were discussed in internal steering committee meetings and were brought to the attention of senior leaders, including Block's senior-most compliance officers, including its Chief Compliance Officer ("CCO").

34.     Former Block compliance employees reported that Cash App's weak controls enabled a recurring pattern: users banned for fraud or other prohibited activity could easily create

---

[9] **FE 1** disclosed their detailed concerns about Block's sanctions program during their exit interview, telling Block, "You have a serious problem here."

[10] **FE 5** stated they were not directly involved in filing SARs but were familiar with the SAR team's operations.

new accounts using different email addresses or phone numbers—even when those users had earlier provided their full SSNs. Block often blacklisted only the flagged account, not the individual user, allowing repeat offenders to maintain or regain access to the platform. These banned users were frequently linked to networks of accounts suspected of fraudulent conduct, which Block failed to detect or disrupt. Without robust identity verification or effective transaction monitoring, individuals operated multiple accounts under false or synthetic identities. These systemic failures not only facilitated ongoing fraud but also artificially inflated Cash App's reported user metrics—the primary benchmarks utilized by investors to value Block's stock. According to the Hindenburg Report, based on interviews with former Block employees, between 40% and 75% of the Cash App accounts they reviewed were fake, involved in fraud, or tied to a single user opening multiple accounts.

35.    Several FEs have likewise described Cash App as a favored tool for illicit actors, citing the platform's lax controls and management's unwillingness to address known risks. **FE 5** reported that Block routinely disregarded red flags suggestive of illicit conduct, including money laundering and human trafficking, in an apparent effort to avoid triggering regulatory scrutiny. According to fraud investigator **FE 6**, Cash App became, during their tenure at the Company, the platform of choice for criminals engaged in drug trafficking and the distribution of child sexual abuse material. While acknowledging that bad actors can misuse any financial platform, **FE 6** noted that "They aren't using Bank of America as much as they're using Cash App."

36.    Over time, Cash App also became a vector for fraudulent schemes. For example, Cash App became a major vehicle for benefits fraud during the COVID-19 pandemic. Block heavily promoted the platform's ability to rapidly disburse federal stimulus funds—highlighted by Dorsey's tweets:



37.    The campaign was effective: 11 million people activated direct deposit or opened new deposit-enabled accounts, providing a critical boost to Block's business as demand for Square's merchant-facing products plummeted during the pandemic. But the rapid growth came at a cost. Several states identified Cash App as leading sources of fraudulent unemployment claims and payments, seeking to claw back over $700 million in fraudulent payments.

38.    **FE 6** recounted further examples of Cash App malfeasance. One was a large-scale fraud targeting U.S. military personnel, resulting in nearly $500,000 in losses. Fraudsters used Cash App accounts to pose as a military payroll entity, deceiving active-duty service members into sending payments under the false premise of back pay collection. Block continued to allow the transactions to be processed through Cash App even after internal alerts were raised and law enforcement began investigating. In another example, **FE 6** reported that Cash App was commonly used in sextortion schemes in which overseas scammers extorted teenagers by

funneling illicit payments through U.S.-based money mules. Some of these cases had devastating consequences, including suicides. Despite internal awareness of the problem, Block failed to implement meaningful countermeasures.

39.    Block's KYC systems also failed to effectively screen for obvious impersonation. In 2023, Hindenburg researchers were able to create Cash App accounts under the names "Elon Musk" and "Donald Trump," order physical Cash Cards linked to those names, and successfully conduct transactions without triggering any verification safeguards or identity validation checks. Likewise, multiple FEs who worked in compliance-related positions described Cash App's KYC program as fundamentally inadequate throughout the Class Period:

a.    **FE 5** described Cash App's KYC practices as seriously deficient, with users often maintaining dozens of accounts and bypassing identity verification.

b.    **FE 6** corroborated these deficiencies, noting that Block did not implement meaningful KYC measures—such as SSN verification and account limits—until late 2023, following the Hindenburg Report. Before then, users could create hundreds of accounts with minimal identity checks. **FE 6** characterized Block's internal compliance controls as a "complete disaster."

c.    **FE 3** highlighted critical flaws in Cash App's onboarding process, including the absence of a cap on verification attempts—users could fail 49 times and succeed on the 50th. Moreover, the system failed to track repeated failed attempts across different identities. When **FE 3** raised these concerns, the product team dismissed the proposals, citing concerns about introducing "friction"—that is, "anything that would slow down [a user's] use of Cash App"—to the Cash App experience.

d.    **FE 1** recounted that a user successfully passed identity verification by submitting a photo of a Barbie doll instead of valid ID—demonstrating the ease with which users could circumvent Cash App's KYC protocols.

e.    **FE 9** recalled discovering accounts registered under names such as "Jesus Christ" and "Barbie." **FE 9** also noted that, for most of their tenure, there was no meaningful Know Your Business (*i.e.*, the business counterpart to KYC) program in place.

f.      **FE 8** reported that a "big" weakness in Cash App's compliance program was its account creation process—customers could open accounts using only an email address. Identity verification and user communication were also conducted via email. As a result, individuals routinely created multiple accounts using the same email address and frequently registered them with fraudulent identification documents—practices that occurred "pretty regularly," essentially "every day." **FE 8** described the compliance environment at Cash App as resembling the "Wild West."

g.      **FE 2** recalled that Cash App withheld information from its banking partners in ways that impeded KYC due diligence. **FE 2** noted, "There were other potential bank partners who would not work with us because of the information we would not give them." **FE 2** further confirmed that Block deliberately avoided collecting information typically required under KYC standards, stating, "We maintained that there was certain information that we did not have to collect at the time of account opening."

40.     Cash App's inadequately monitored Bitcoin functionality was also a significant and ongoing source of compliance deficiencies throughout the Class Period:

a.      According to **FE 1**, Block's compliance leadership was well aware of the risks associated with Bitcoin transactions. However, the company's response was marked by organizational inertia, conflicting internal guidance, and a failure to take decisive action. This sustained neglect, they explained, allowed non-compliant activity to continue unchecked and reflected a broader institutional failure to manage cryptocurrency-related risks.

b.      **FE 7**, Block's Head of Bitcoin Compliance, stated that they regularly escalated compliance concerns through formal channels—including weekly documented one-on-one meetings with CCO Amelia Childress, submissions to the Board's Audit and Risk Committee, and in strategic planning documents. Despite these efforts, **FE 7** reported that their submissions concerning compliance issues were frequently rejected or diluted, impeding effective compliance oversight and reflecting a corporate culture that prioritized growth and profitability over security and experienced leadership.

c.      One major point of conflict arose when **FE 9**'s team was pressured to approve a bitcoin transaction valued between $1–2 billion for an account linked to a friend of Cash App's CEO, Brian Grassadonia. **FE 9** refused, citing that the transaction was high-risk, poorly understood, and inconsistent with company protocols. After documenting their concerns in Slack and requesting a discussion, their supervisor followed up with a call during which **FE 9** was repeatedly pressured to approve the transaction. When **FE 9** continued to resist, they escalated the matter to an internal ethics officer—their only use of that channel during their time at the company—who ultimately declined to approve the transaction, stating it fell outside normal business practices. **FE 9**'s supervisor later remarked that the transaction would likely be approved by the Board regardless, suggesting the compliance review was only a formality meant to convey the appearance of oversight. **FE 9** described the episode as an effort to force a "rubber stamp."

## C.      For Much of the Class Period, Defendants Were Aware of But Did Nothing to Remedy Cash App's Glaring Compliance Issues.

41.      Dorsey, Ahuja, and other senior leaders at Block were aware of—yet failed to disclose—these significant compliance deficiencies and the resulting inflation of Cash App's user base figures. As detailed further below in Section VI, Dorsey and Ahuja were repeatedly apprised of critical compliance failures by internal reports and personnel. Dorsey received Board-level materials that highlighted Cash App's persistent compliance issues. Dorsey nevertheless directed strategic and personnel decisions that deliberately weakened Cash App's compliance infrastructure and kept non-performing personnel in key compliance positions. Both Dorsey and Ahuja also had ongoing visibility into compliance issues through all-hands meetings and internal forums. Their involvement in governance structures—most notably Dorsey's dual role as CEO and Board Chair—provided direct access to risk assessments that went to Block's Audit and Risk Committee. Multiple FEs have reported that senior executives, including Block's Chief Legal Officer ("CLO") Sivan Whiteley and CCO Amelia Childress, also knew of these failures but took no corrective action or actively suppressed internal dissent. This misconduct coincided with substantial insider stock sales during the Class Period, with Dorsey and Ahuja together selling over $650 million in Block Class A common stock.

42.     Defendants also repeatedly learned of Block's compliance deficiencies through external assessments. According to **FE 2,** who served as a regulatory counsel at Block, Afterpay's former CCO remarked to Block employees following the 2022 acquisition of Afterpay, "You all don't have a compliance program at all." In 2023, two third-party compliance reviews echoed this assessment, according to **FE 2.** The first review, commissioned by Cash App's leadership, was reportedly suppressed by that team once it returned unfavorable findings. A second, independent review was later commissioned by Block's broader leadership. **FE 2,** who personally reviewed both reports, stated that each reached the same conclusion: Block lacked an adequate compliance program. Despite these explicit warnings, Block's senior executives reportedly disputed the reviews' methodologies, sought to undermine their findings, and failed to implement meaningful remedial measures.

43.     Instead of sharing these known problems with the market, Block's senior executives hid them with positive statements about regulatory compliant growth. For instance, in the first quarter analyst call for 2023, Defendant Ahuja represented that Block had "significantly grown our investment in compliance over the last few years. . . . These dedicated compliance resources support our business units and our customers that our business units serve and ultimately provide oversight across the ecosystem."

**D.      In March 2023, the Hindenburg Report Begins to Expose the Truth About Cash App's Compliance Failures and Inflated User Metrics.**

44.     The truth about Cash App's inadequate compliance practices, the illicit activity that they attracted and enabled, and the artificial inflation of Cash App's key user base metrics they caused, began to emerge through a series of investigative reports—first from Hindenburg in March 2023, and later from NBC News publishing whistleblower accounts in early 2024. These independent investigative reports, and the regulatory actions that followed, exposed Block's compliance failures and their impact on artificially inflated user base numbers and growth.

45.     On March 23, 2023, Hindenburg, a respected short-seller, published a report titled "*Block: How Inflated User Metrics and "Frictionless" Fraud Facilitation Enabled Insiders to*

*Cash Out Over $1 Billion*" (defined above as the "Hindenburg Report").[11] Based on a two-year investigation, the Hindenburg Report asserted that Block enabled widespread fraud through its Cash App platform by failing to implement basic compliance controls which, in turn, resulted in significantly overstated user metrics through the inclusion of fake, duplicative, and fraudulent accounts.

46.     The Hindenburg Report drew upon interviews with dozens of former employees (many identified by job title), partners, and industry experts; information obtained through Freedom of Information Act and other public records requests; federal indictments involving sex trafficking and child pornography that referenced Cash App; whistleblower testimony, including a sworn declaration (affidavit) by a former engineering manager filed in federal court in July 2021; internal documents and screenshots; and independent testing and law enforcement records.

47.     Hindenburg's investigation concluded Block's business model was fundamentally reliant on "the [C]ompany's willingness to facilitate fraud against consumers and the government." According to the Hindenburg Report, Cash App's deficient compliance protocols made it "easy for bad actors to mass-create accounts for identity fraud and other scams, then extract stolen funds quickly." Former employees and law enforcement documents cited in the report indicated that Cash App was used to facilitate illegal activity ranging from widespread identity fraud, consumer scams, and fraudulent collection of government benefits disbursements to reported uses for sex trafficking and contract killings.

48.     Hindenburg found that "Cash App's embrace of non-compliance begins by making it easy for users to get on the platform, easy for them to get back on the platform if their accounts are closed, and easy to remain anonymous or operate under blatantly false identities."

49.     A central allegation in the Hindenburg Report was that Block "wildly overstated its genuine user counts," misleading investors about the scale of Cash App's user base. Former employees interviewed by Hindenburg estimated that between 40% and 75% of the accounts they reviewed were fake, fraudulent, or duplicative. The report criticized Block's use of the "transacting actives" metric, adopted in February 2022, which Hindenburg claimed obscured the

---

[11] The Hindenburg Report is attached as **Exhibit A**. This report and all other documents attached as exhibits to this Amended Complaint are incorporated by reference hereto.

AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT
CASE NO. 5:25-CV-00642-NW

1  true number of individual users by including multiple accounts tied to the same person, as well as

2  fraudulent accounts and accounts tied to illicit activities. Hindenburg asserted that Block

3  internally tracked more accurate data—including metrics for unique SSNs and verified

4  accounts—but chose not to disclose those figures to investors.

5       50.    Block requires customer identity "verification" only for accounts that meet certain

6  transacting thresholds, use a Cash App Card, buy bitcoin or stocks, or sponsor a minor. Thus,

7  millions of Cash App accounts that did not meet these criteria remain unverified, and the

8  Company had no way of knowing how many individuals were associated with those accounts, or

9  whether they were fraudulent, duplicative, or fake.

10       51.    Consistent with the Hindenburg Report, several FEs have since confirmed that it

11  was known internally at Block that Cash App's reported user metrics were misleading:

12       a.    **FE 6** stated that they believed the user numbers Block reported in its

13  financial disclosures were materially misleading, noting that during their tenure it was known that

14  Cash App allowed users to create hundreds of fake accounts while evading KYC checks. As **FE 6**

15  explained: "It always rubbed me the wrong way" when "they were reporting the financial

16  statements to investors," because "that number was never true or accurate because one person

17  could have dozens of accounts."

18       b.    **FE 3** and **FE 1** pointed to the lack of controls to limit multiple account

19  creation or ensure reliable user verification. According to **FE 1,** Block failed to implement

20  effective mechanisms to detect or prevent individuals from opening multiple accounts, which

21  undermined detection thresholds and artificially inflated the company's user metrics. As **FE 1** put

22  it: "We don't even know how many actual people those are. It could be one person with like a

23  million accounts."

24       c.    **FE 9** raised serious concerns about the integrity of Cash App's user

25  metrics. They explained that the company routinely allowed individuals to open multiple

26  accounts—sometimes as many as 1,000 per person. These duplicate accounts artificially inflated

27  customer metrics and imposed significant compliance and operational burdens. Although a cap of

28

five accounts per person was eventually implemented, it applied only prospectively and was not

accompanied by any retroactive cleanup.

52.     In an article about the Hindenburg Report the day it was issued, Bloomberg News

noted:

> Investors have long worried about Cash App as well as many of its mobile-money
> rivals such as PayPal Holdings Inc.'s Venmo, which have faced scrutiny in recent
> months as fraudsters have seized the technology to fool consumers into sending
> them payments. But in its research, Hindenburg alleges Cash App's problems go
> deeper and can be traced back to shortcomings in compliance protocols. . . .
> Investors have been on high alert for such activity ever since PayPal last year
> announced it closed 4.5 million accounts and lowered its forecast for new customers
> after finding "bad actors" were taking advantage of its incentives and rewards
> programs.

53.     In response the following day, the price of Block Class A common stock fell

nearly 15%, from $72.65 per share to $61.88 per share, and continued to fall the next trading day.

**E.      Defendants Were Concerned About the Hindenburg Revelations Regarding
the Company's User Metrics and Compliance Protocols.**

54.     Internally, Defendants acknowledged that the allegations in the Hindenburg Report

had merit—according to **FE 7**, Block's leadership was "so concerned" about the Hindenburg

Report "because it was true."

55.     Externally, though, Defendants were defiant. On March 23, 2023—the very day

the Hindenburg Report was published—Block issued a statement dismissing the report as

"factually inaccurate and misleading" and announced that it was "exploring legal action against

Hindenburg."

56.     On March 30, 2023, Block issued a more detailed response that continued to

deceive the market about its compliance with AML and KYC requirements, claiming its

"approach to compliance is consistent with other financial services platforms," and that "the

company's compliance investments have grown more than twice as fast as overall gross profit,

and compliance investments have also meaningfully increased as a percentage of our overall

operating expenses." Block stated that 44 million of its 51 million monthly transacting accounts

were associated with verified identities, and that those accounts were in turn associated with 39

million unique SSNs, but did not dispute that millions of accounts remained unverified and failed

to address core Hindenburg allegations concerning fraud facilitation, interchange fee evasion, and compliance breakdowns.

57.     Block also attempted to minimize the impact of the Hindenburg Report internally. After the Report's release in 2023, Block leadership circulated an internal memo attacking the report's findings. During a subsequent call with CLO Whiteley, fraud investigator **FE 6** openly criticized Block's internal memo as "ridiculous" and inconsistent with both **FE 6**'s investigative findings and ongoing law enforcement activity. Whiteley dismissed **FE 6**'s concerns. Shortly thereafter, **FE 6** was formally reprimanded for their remarks during the call and disciplined for speaking out.

**F.     Further Corrective Disclosures Reveal the Falsity of Defendants' Statements Regarding Compliance and Cash App User Metrics.**

58.     In response to Block's public-facing denial, on March 31, 2023, Hindenburg Research published a second report titled "*Block's Response Confirmed Inflated User Counts While Ignoring Other Key Issues*."[12] The follow-up report challenged the credibility of Block's denial and alleged that Block's detailed response to the Hindenburg Report (*see* ¶ 56) confirmed the Company's reported user metrics were materially overstated and its internal controls were deficient. Hindenburg highlighted that Block's response had, for the first time, disclosed that its 51 million "monthly transacting actives" included approximately 7 million accounts not associated with a verified identity. Based on Block's own numbers—44 million verified accounts tied to 39 million unique Social Security numbers—Hindenburg estimated that Block's reported "transacting actives" totals were inflated by as much as 16–31%.

59.     On August 3, 2023, Block filed its Form 10-Q for the second quarter of 2023, signed and certified by defendants Dorsey and Ahuja as materially complete and accurate. The filing disclosed that Block had received inquiries from the SEC and DOJ following the March 2023 publication of the Hindenburg Report, which the Company acknowledged were likely related to the Report's allegations. Following this disclosure, Block's Class A common stock declined nearly 14%, dropping from $73.55 to $63.52 per share on August 4, 2023.

---

[12] This report is attached as **Exhibit B**.

AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT
CASE NO. 5:25-CV-00642-NW

60.     On February 16, 2024, NBC News published investigative reports based on disclosures from two former Block employees whom NBC News concluded were "knowledgeable on financial services compliance issues," and who revealed new information about the pervasive compliance failures within Cash App. The whistleblowers' complaints, which NBC News reviewed, alleged Cash App lacked effective customer due diligence procedures, enabling users to create accounts and conduct transactions without meaningful identity verification. They described Block's "frictionless onboarding" as a "shadow financial system beyond the reach of regulators," in which Cash App knowingly facilitated transactions with sanctioned entities and illicit businesses, including operations involved in selling stolen personal information, offshore gambling prohibited to U.S. citizens, and potentially terrorism financing. The whistleblowers further alleged that Cash App had "no effective procedure" to establish customer identities and that transactions involving entities under sanction by OFAC were routinely processed without adequate screening. The complaints detailed that Block's compliance deficiencies dated back to at least 2016 and persisted through 2022. The whistleblowers claimed to have submitted formal complaints to the Financial Crimes Enforcement Network ("FinCEN"), the U.S. Securities and Exchange Commission ("SEC"), and the Commodity Futures Trading Commission ("CFTC"). After the article was released, Block's Class A common stock dropped over 5%, from $69.48 to $65.64 per share on February 16, 2024.

61.     On April 10, 2024, the National Center on Sexual Exploitation ("NCOSE") published a letter it sent to Block a week earlier advising that Cash App was placed on its annual "Dirty Dozen List" of mainstream contributors to sexual exploitation and abuse.[13] The NCOSE cited Cash App's use in sex trafficking, child sexual abuse material transactions, and the sexual extortion of minors, attributing this to its ease of use, anonymity, and rapid transfers. It urged Block to implement stringent age and identity verification, require adult sponsorship at sign-up for minor aged accounts, enhance privacy and safety settings for minors, and partner with the National Center for Missing and Exploited Children.

---

[13] This letter is attached as **Exhibit C**.

62.     On May 1, 2024, NBC News published another report revealing that federal prosecutors were examining whistleblower allegations concerning Block's financial transactions, including whether Block processed transactions for customers in sanctioned countries such as Cuba, Iran, Russia, and Venezuela. According to the article, NBC News received 100 pages of documents corroborating that these transactions occurred. Investigators were also probing whether Cash App had facilitated cryptocurrency transactions for terrorist organizations. The whistleblower stated: "From the ground up, everything in the compliance section was flawed . . . . It is led by people who should not be in charge of a regulated compliance program." A second person "with direct knowledge of Block's monitoring practices and programs" echoed the former employee's allegations to NBC News. NBC News further reported that Edward Siedle, a former Securities and Exchange Commission lawyer who represents the former employee and participated in the discussions with prosecutors, said, "It's my understanding from the documents that compliance lapses were known to Block leadership and the board in recent years." The whistleblower likewise alleged that Block's senior management and Board were "informed of extensive lapses at the company." In response, the price of Block Class A common stock declined over 8%, falling from $73.00 per share at market close on April 30 to $66.84 per share.

63.     On May 2, 2024—one day after the NBC News story broke—Dorsey attempted to downplay the report during Block's Q1 2024 earnings call. He assured investors the article concerned the same DOJ inquiry previously disclosed by Block, criticized the report for omitting critical information about potential sanctions violations, and maintained Block had a "robust control environment" along with "industry-leading blockchain analytics" to prevent terrorist financing via Bitcoin transactions on Cash App. He also cited Block's "industry-leading machine learning models and product controls aimed at detecting and preventing bad activity in real time."

**G.      In 2025, Block Enters into Consent Orders with Federal and State Regulators to Address Compliance Deficiencies.**

64.     On January 15, 2025, Block entered into a Settlement Agreement and Consent Order with state money transmission regulators from 48 states, coordinated through the Conference of State Bank Supervisors and the Money Transmitter Regulators Association.[14] The

---

[14] The Multistate Consent Order is attached as **Exhibit D**.

multistate investigation, initiated on May 15, 2023 shortly after the Hindenburg Report was released, examined Block's compliance with state and federal AML laws between January 1, 2021, and March 31, 2023. Regulators identified systemic deficiencies in Block's AML Program, including inadequate transaction monitoring, insufficient internal controls, and failure to comply with Bank Secrecy Act obligations. Ultimately, pursuant to the Multistate Consent Order, Block agreed to pay $80 million and undergo independent AML program reviews under multistate supervision.

65.    On January 16, 2025, the Consumer Financial Protection Bureau ("CFPB") issued the CFPB Consent Order[15] against Block. As the CFPB's then-Director Rohit Chopra stated in a press release, "Cash App created the conditions for fraud to proliferate on its popular payment platform." Then, "[w]hen things went wrong Cash App flouted its responsibilities and even burdened local banks with problems that the company caused." The CFPB Consent Order also recounted how Cash App tried to avoid its legal requirements and "used intentionally shoddy investigation practices to close reports of unauthorized transactions in the company's favor." The CFPB found that Block violated the Electronic Fund Transfer Act and Regulation E by failing to reasonably investigate consumer reports of unauthorized transactions, systematically denying fraud claims without investigation, requiring excessive documentation from consumers, and improperly refusing refunds for verified unauthorized transfers. The CFPB further determined that Block's practices constituted unfair acts or practices under the Consumer Financial Protection Act. As part of the CFPB Consent Order, Block agreed to pay a $55 million fine and at least $75 million and potentially up to $120 million in consumer redress.

66.    On April 10, 2025, NYDFS issued a Consent Order against Block following its own examination of Cash App operations between February 28, 2021, and September 30, 2022.[16] NYDFS found that Block failed to maintain an effective AML program, citing insufficient KYC processes, a significant backlog of unfiled SARs, and inadequately calibrated transaction monitoring. NYDFS also determined that Block failed to implement risk-based OFAC

---

[15] The CFPB Consent Order is attached as **Exhibit E**.
[16] The NYDFS Consent Order is attached as **Exhibit F**.

compliance controls. Block agreed to pay a $40 million civil penalty and undertake significant remedial measures.

67.     These government investigations and enforcement actions confirmed Block's compliance failures were systemic, longstanding, and largely unremediated throughout the Class Period. As regulators forced Block to improve its compliance infrastructure and activities, Cash App saw a dramatically reduced amount of growth, resulting in five consecutive quarters of stagnation in its reported user base metrics.

68.     On May 1, 2025, Block missed its first-quarter earnings estimates and lowered its profit forecast for the year, attributing the disappointing results to broader macroeconomic conditions. However, analysts and investors, for the first time, fully connected stagnant user growth on Cash App—unchanged at 57 million monthly active users for the fifth consecutive quarter—as the true cause of the weak outlook. On May 2, 2025, as the market fully absorbed the financial impact of increased regulatory scrutiny—which had forced Block to increase AML, KYC, and sanctions controls and curtail its "frictionless" onboarding practices—the Company's stock fell over 20%, dropping from $58.48 per share on May 1 to $46.53 per share at market close.

## V.     DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD.

69.     Defendants made numerous materially false and misleading statements about the strength of Block's compliance, including its anti-fraud efforts and compliance with AML, KYC, and sanctions laws and regulations. As set forth herein, the statements were materially false and misleading because, *inter alia*, they omitted material facts about Cash App's deficient compliance practices, including that: (1) Cash App's compliance infrastructure was chronically under-resourced, fundamentally flawed, and reliant on substandard systems and processes for customer due diligence, identity verification, and transaction monitoring that violated AML and sanctions laws and enabled widespread fraud, illegal activity, and the creation of duplicate accounts; (2) Cash App's "frictionless" user experience—characterized by lax onboarding protocols—further facilitated misuse by bad actors engaged in identity theft, scams, and the

exploitation of public assistance programs; and (3) Block's senior leadership knowingly deprioritized compliance in favor of growth, as evidenced by a large backlog of unresolved alerts and a persistent failure to shut down accounts involved in illicit conduct. These statements also materially misled investors by creating the false impression that Cash App's reported user metrics were accurate and reliable because they were supported by sound compliance practices.

70.    Defendants also made material misstatements concerning Cash App's user metrics and user growth. As set forth herein, the user metric statements were materially false and misleading because, *inter alia*, (1) they materially overstated the size and growth of Cash App's user base by knowingly including large numbers of duplicate, fraudulent, and illicit accounts, which proliferated due to Block's inadequate AML, KYC, and sanctions compliance controls; (2) Block failed to disclose that internal data—including, but not limited to, information on account verifications and the number of distinct SSNs linked to user accounts—indicated the actual number of unique Cash App users was substantially lower than publicly reported; and/or (3) for part of the Class Period, Block inflated Cash App's growth by comparing higher numbers of "accounts" with lower "customer" metrics. The user metric statements were also materially false and misleading for the reasons described by Dr. Daniel McCarthy, Ph.D., in section VII below.

A.    **Defendants Made Materially False and Misleading Statements in 2020.**

1.    **February 26, 2020 Annual Report on Form 10-K (and Subsequent Annual SEC Filings)**

71.    The Class Period began on February 26, 2020, when Block filed its annual report on Form 10-K for the fiscal year 2019 signed by Defendants Dorsey and Ahuja. In its 2019 10-K, Block stated:

> We are subject to anti-money laundering (AML) laws and regulations in the United States and other jurisdictions. *We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity.* Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. *Our AML compliance program includes policies, procedures, reporting protocols, and internal controls*, including the designation of an AML compliance officer, and *is designed to address these legal and*

1

*regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing*.

2

Block repeated this language in substantially similar form in the subsequent Form 10-Ks it issued

3

during the Class Period.[17]

4

72.    The highlighted statements in ¶ 71 above (and in each of the subsequent Form

5

10-Ks) were materially misleading because they omitted material facts about Cash App's

6

deficient compliance practices, including: (1) Cash App's compliance infrastructure was

7

chronically under-resourced, fundamentally flawed, and reliant on substandard systems and

8

processes for customer due diligence, identity verification, and transaction monitoring that

9

violated AML and sanctions laws and enabled widespread fraud, illegal activity, and the creation

10

of duplicate accounts; (2) Cash App's "frictionless" user experience—characterized by lax

11

onboarding protocols—further facilitated misuse by bad actors engaged in identity theft, scams,

12

and the exploitation of public assistance programs; and (3) Block's senior leadership knowingly

13

deprioritized compliance in favor of growth, as evidenced by a large backlog of unresolved alerts

14

and a persistent failure to shut down accounts involved in illicit conduct. These statements also

15

materially misled investors by creating the false impression that Cash App's reported user metrics

16

were accurate and reliable because they were supported by sound compliance practices.

17

**2.    Throughout 2020, Defendants Made False and Misleading Statements about User Metrics in Shareholder Letters and Earnings Calls.**

18

19

73.    On February 26, 2020, Defendants sent a letter to shareholders regarding the

20

Company's Q4 2019 results. The letter was signed by Defendants Dorsey and Ahuja. In the letter,

21

Defendants discussed the growth and strength of Cash App through the metric of "***active Cash***

22

***App customers***," which the Company defined as a "***customer [with] at least one cash inflow or***

23

***outflow during the specified period***." Defendants represented that "***Cash App had approximately***

24

***24 million monthly active customers in December 2019, achieving 60% year-over-year***

25

***growth***."

26

[17] Block's 2020, 2021, and 2022 Form 10-Ks contained identical language regarding the Company's AML compliance efforts. Block's 2023 and 2024 Form 10-Ks contained similar language that stated in relevant part: "We have implemented [2023: an AML program / 2024: compliance programs and controls] designed to comply with the laws and regulations to which we are subject."

27

28

- 27 -

74.    On May 6, 2020, Defendants sent a letter to shareholders regarding the Company's Q1 2020 results. The letter was signed by Defendants Dorsey and Ahuja. In the letter, Defendants again discussed the growth and strength of Cash App through the same metric of "***transacting active Cash App customers***." Defendants represented that, in March 2020, "***Cash App added its largest number of net-new transacting active customers . . . before exceeding this monthly high again in April***."

75.    On August 4, 2020, Defendants sent a letter to shareholders regarding the Company's Q2 2020 results. The letter was signed by Defendants Dorsey and Ahuja. In the letter, Defendants again discussed the growth and strength of Cash App through the same metric of "***transacting active Cash App customers***." Defendants represented that Cash App's quarterly "***[g]rowth was . . . driven by strong acquisition of net-new transacting active Cash App customers*** and increased adoption of other products in our ecosystem."

76.    During the Company's August 5, 2020 earnings call, one analyst asked about "the sustainability of Cash App":

> Question: I heard the 200% growth in July and the 100% obviously was running at before. So I know the sustainability question is really hard to answer, given stimulus and the uncertainty there, but anything else to help maybe unpack the thinking if stimulus isn't extended? What might happen? Then the 30 million users, how sticky do you think that number is? You acquired them. How do you expect to retain them and monetize that given the various scenarios that are out there?

> Ahuja: . . . ***First, as you noted, customer acquisition, which remains a top priority for Cash App, and we continued to rapidly expand our network here. In June, we had over 30 million monthly active[s], which is up approximately 25% just in the past six months, and this was followed in July by our highest month of net new actives added.***

77.    During that same call, another analyst asked whether the Company had the "components . . . for an SMB [small and medium business] digital bank," as distinguished from Cash App's status as "the leading consumer digital bank or neobank in the U.S." As part of her response, Ahuja described

> [Cash App's] strong network effects, which leads to efficient acquisition. These network effects obviously come from the peer-to-peer aspect of the service, where Cash App can acquire new customers for a fraction of the cost of other banks or a financial services company, and ***that's really enabled us to scale this network of active customers rapidly and efficiently now at 30 million monthly active and growing.***

78.      Finally, an analyst asked whether Dorsey and Ahuja could provide "some more color on the evolving demographics of these Cash App users." She also asked, "in light of the traction you've seen, what in your view could evolve to be Cash App's total addressable user base?" In response, Dorsey stated: "we do believe Cash App has reached a mainstream scale, and that's with over *30 million monthly active customers in June*. *And these are monthly active customers, not overall accounts*."

79.      On November 5, 2020, Defendants sent a letter to shareholders regarding the Company's Q3 2020 results. The letter was signed by Defendants Dorsey and Ahuja. In the letter, Defendants again discussed the growth and strength of Cash App through the metric of "*transacting active Cash App customers*." Defendants represented that "*Cash App saw increased engagement as customers adopted multiple products: In the third quarter of 2020, the number of average daily transacting active Cash App customers nearly doubled from the same period last year*." The letter also stated: "*Given Cash App's strong growth during the third quarter*, we will continue to focus on customer acquisition and product velocity for Cash App. *We see a compelling opportunity to invest in acquiring new customers, driven by peer-to-peer payments as well as creative marketing strategies.* We intend to continue identifying opportunities to launch new products and expand the ways that Cash App can help customers manage their money."

80.      The statements in ¶¶ 73–79 were materially false and misleading because (1) they materially overstated the size and growth of Cash App's user base by knowingly including large numbers of duplicate, fraudulent, and illicit accounts, which proliferated due to Block's inadequate AML, KYC, and sanctions compliance controls; and (2) Block failed to disclose that internal data—including, but not limited to, information on account verifications and the number of distinct SSNs linked to user accounts—indicated the actual number of unique Cash App users was substantially lower than publicly reported. These statements were also materially false and misleading for the reasons described by Dr. Daniel McCarthy, Ph.D., in section VII below.

1

2

**3.     Block Made False and Misleading Statements about Cash App's Compliance Efforts in Response to 2020 Articles about Fraud on the Platform.**

3

81.     On October 11, 2020, the *New York Times* ran an article about "fast fraud" on

4

mobile payment apps. The article noted that "fraud issues have been particularly acute for . . .

5

Cash App." The article discussed the plight of Charee Mobley, who, "[a]fter seeing an errant

6

online shopping charge on her Cash App, . . . called what she thought was a help line for it. But

7

the line had been set up by someone who asked her to download some software, which then took

8

control of the app and drained her account." In response, a Block spokesperson said that the

9

Company was "aware that there has been a recent rise in scammers trying to take advantage of

10

customers using financial products, including Cash App. *We've taken a number of proactive*

11

*steps and made it our top priority.*"

12

82.     The highlighted statement in ¶ 81 above was materially false and misleading

13

because thwarting the rise in scammers was not, in fact, Cash App's top priority, and because it

14

omitted material facts about Cash App's deficient compliance practices, including: (1) Cash

15

App's compliance infrastructure was chronically under-resourced, fundamentally flawed, and

16

reliant on substandard systems and processes for customer due diligence, identity verification,

17

and transaction monitoring that violated AML and sanctions laws and enabled widespread fraud,

18

illegal activity, and the creation of duplicate accounts; (2) Cash App's "frictionless" user

19

experience—characterized by lax onboarding protocols—further facilitated misuse by bad actors

20

engaged in identity theft, scams, and the exploitation of public assistance programs; and (3)

21

Block's senior leadership knowingly deprioritized compliance in favor of growth, as evidenced

22

by a large backlog of unresolved alerts and a persistent failure to shut down accounts involved in

23

illicit conduct. The highlighted statement also materially misled investors by creating the false

24

impression that Cash App's reported user metrics were accurate and reliable because they were

25

supported by sound compliance practices.

26

83.     Later that month, on November 18, 2020, CNBC ran another article about app-

27

based financial fraud. The article note that "online complaints on Google Play and the App Store

28

about fraud and scams have been on the increase this year, with the most related to Cash App." In

1    response, a Cash App spokesperson said, "***Preventing fraud is critically important to Cash App.***

2    ***We continue to invest in and bolster fraud-fighting resources by both increasing staffing and***

3    ***adopting new technology. We are constantly improving systems and controls to help prevent,***

4    ***detect, and report bad activity on the platform***."

5    84.    The highlighted statement in ¶ 83 was materially false and misleading because

6    preventing fraud was not critically important to Cash App's leadership and the Company was not

7    "increasing staffing" to address compliance failures, and because it omitted material facts about

8    Cash App's deficient compliance practices, including: (1) Cash App's compliance infrastructure

9    was chronically under-resourced, fundamentally flawed, and reliant on substandard systems and

10   processes for customer due diligence, identity verification, and transaction monitoring that

11   violated AML and sanctions laws and enabled widespread fraud, illegal activity, and the creation

12   of duplicate accounts; (2) Cash App's "frictionless" user experience—characterized by lax

13   onboarding protocols—further facilitated misuse by bad actors engaged in identity theft, scams,

14   and the exploitation of public assistance programs; and (3) Block's senior leadership knowingly

15   deprioritized compliance in favor of growth, as evidenced by a large backlog of unresolved alerts

16   and a persistent failure to shut down accounts involved in illicit conduct. The statement also

17   materially misled investors by creating the false impression that Cash App's reported user metrics

18   were accurate and reliable because they were supported by sound compliance practices.

19   **B.    Defendants Made Materially False and Misleading Statements in 2021.**

20   **1.    Throughout 2021, Defendants Continued to Make False and
         Misleading Statements about User Metrics.**

21

22   85.    On February 23, 2021, Defendants sent a letter to shareholders regarding the

23   Company's Q4 2020 results. The letter was signed by Defendants Dorsey and Ahuja. In the letter,

24   Defendants again discussed the growth and strength of Cash App through the metric of

25   "***transacting active Cash App customers***," which the Company defined as it did in the 2020

26   shareholder letters. Defendants represented that as of December 2020, "***Cash App had more than***

27   ***36 million transacting active customers, up more than 50% year over year***." Defendants pointed

28

to the "network effects" stemming from this "[g]rowing" network as the cause of the "*low acquisition cost of fewer than $5*" in 2020 for a new transacting active customer."

86.     The Company's Form 10-K, reporting Q4 2020 results, and signed by Defendants Dorsey and Ahuja, similarly reported:

> Our Cash App Customers: As of December 2020, Cash App had more than *36 million monthly transacting active customers* across the United States and Europe who had at least one financial transaction using any Cash App product or service during the specified period. In 2020, Cash App was the number one finance app in both the iOS App Store and Google Play, and was the number nine and number five app in the iOS App Store and Google Play, respectively, based on downloads in the United States. Cash App has a diverse mix of customers. In the United States, Cash App had transacting active customers in each of the 50 states and nearly every county as of December 2020.

87.     On August 1, 2021, Defendants sent a letter to shareholders regarding the Company's Q2 2021 results. The letter was signed by Defendants Dorsey and Ahuja. In the letter, Defendants again discussed the growth and strength of Cash App through the metric of "*transacting active Cash App customers*". Defendants stated:

> We remain focused on the health of our network, including attracting and retaining engaged customers. *In June, Cash App reached 40 million monthly transacting active customers. With our marketing efforts, we are focused on attracting customers who could use more products and bring greater funds into our ecosystem.*

88.     During the Company's August 2, 2021 earnings call, Ahuja stated:

> From a Cash App perspective, we've seen that as we've added that weekly and daily utility with additional products and features and functionality in the Cash App that our customers have exhibited growing engagement with us. Weekly actives have steadily increased as a percent of monthly actives over time with nearly now two-thirds of our monthly – *40 million monthly actives using Cash App each week on average in June*. This engagement has, in turn, driven monetization as inflows and product adoption has increased. *Gross profit per transacting active was up 2.5 times from two years ago in the quarter and up one third from just two quarters ago.* Historically, what we've seen is that *the average customer who adopts two or more products in Cash App generates 3 times to 4 times the gross profit compared to the average peer-to-peer customer*.

89.     During the Company's November 4, 2021 earnings call, characterizing the growth of Cash App's user base, Ahuja said: "I think a key focus area for us is the *engagement of this customer base*. As we said, back in June, *nearly two thirds of those 40 million monthly actives that you referenced transacted each week on average across our Cash App ecosystem*."

90.     The highlighted statements in ¶¶ 85–89 were materially false and misleading because (1) they materially overstated the size and growth of Cash App's user base by knowingly including large numbers of duplicate, fraudulent, and illicit accounts, which proliferated due to Block's inadequate AML, KYC, and sanctions compliance controls; and (2) Block failed to disclose that internal data—including, but not limited to, information on account verifications and the number of distinct SSNs linked to user accounts—indicated the actual number of unique Cash App users was substantially lower than publicly reported. These statements were also materially false and misleading for the reasons described by Dr. Daniel McCarthy, Ph.D., in section VII below.

**2.      Defendants Also Made False and Misleading Statements about Block's Compliance Efforts in 2021.**

91.     On April 23, 2021, Little Rock, Arkansas-based television station KATV ran a report on an Arkansas woman who was "scammed out of $4,800 after using Cash App." A Company spokesperson was quoted as stating: "Preventing fraud is critically important to Cash App. *We continue to invest in and bolster fraud-fighting resources by both increasing staffing and adopting new technology. We are constantly improving systems and controls to help prevent, detect, and report bad activity on the platform.*"

92.     Block continued to come under scrutiny for COVID-related fraud on the Cash App platform. On August 15, 2021, in response to one NBC News investigation into how "international scam artists pulled off an epic theft of COVID benefits," a Cash App spokesperson stated that Cash App "*enhanced our systems to monitor and act upon deposits that we deem to be risky*, despite coming from largely trusted sources like state unemployment agencies. We also partner with law enforcement and government agencies to investigate potential fraud and work collaboratively to return those funds when possible."

93.     The highlighted statements in ¶¶ 91–92 were false and misleading because they omitted material facts about Cash App's deficient compliance practices, including: (1) Cash App's compliance infrastructure was chronically under-resourced, fundamentally flawed, and reliant on substandard systems and processes for customer due diligence, identity verification,

and transaction monitoring that violated AML and sanctions laws and enabled widespread fraud,

illegal activity, and the creation of duplicate accounts; (2) Cash App's "frictionless" user

experience—characterized by lax onboarding protocols—further facilitated misuse by bad actors

engaged in identity theft, scams, and the exploitation of public assistance programs; and (3)

Block's senior leadership knowingly deprioritized compliance in favor of growth, as evidenced

by a large backlog of unresolved alerts and a persistent failure to shut down accounts involved in

illicit conduct. These statements also materially misled investors by creating the false impression

that Cash App's reported user metrics were accurate and reliable because they were supported by

sound compliance practices.

C.      **Defendants Made Materially False and Misleading Statements in 2022.**

1.      **In a February 24, 2022 Letter to Shareholders, Block Replaced the "Transacting Active Cash App Customers" Metric with "Transacting Actives."**

94.     On February 24, 2022, Defendants sent a letter to shareholders regarding the

Company's Q4 2021 results. The letter was signed by Defendants Dorsey and Ahuja. For the first

time, Defendants discussed the growth and strength of Cash App through the use of the term

"*transacting actives*" (as opposed to "transacting customer"). Transacting active was defined as

follows:

> A *transacting active* is a Cash App account that has at least one financial transaction using any product or service within Cash App during the specified period. A transacting active for a specific Cash App product has at least one financial transaction using that product during the specified period and is referred to as an *active*.

95.     This materially differed from the previous metric Defendants used, "transacting

active Cash App *customers*." A single Cash App customer can and often did have multiple

accounts, meaning the number of customers on the platform is, by definition, smaller than the

number of accounts. Further, because of the Company's inadequate compliance processes, there

were a significant number of fraudulent or illicit accounts which were not connected to a verified

customer, and which should have properly been denylisted.

96.     Defendants were motivated to change the user metric from customers to active

accounts in order to make it appear that the Company's growth was continuing. For the next

several quarters, the Company misleadingly touted its year-over-year "growth" by comparing this new "transacting actives" metric to previous disclosures of the number of "transacting active Cash App customers" without providing any explanation of the difference between the two. The February 24, 2022 Letter to Shareholders, signed by Defendants Dorsey and Ahuja, stated:

> *Peer-to-peer payments have allowed us to virally grow Cash App's network and remained the primary driver of customer acquisition in the fourth quarter.* In December [2021], *there were more than 44 million monthly transacting actives on Cash App, an increase of 22% year over year*. . . . By expanding peer-to-peer capabilities, we see an opportunity to drive network effects across other products within our ecosystem and encourage customers to try new products within Cash App.

97. The Company's statement that its December 2021 user metrics reflected 22% year-over-year growth from December 2020 was materially false and misleading. This claimed increase—from 36 million to 44 million users—was based on a comparison of fundamentally different metrics. In 2020, the Company reported the number of transacting active *customers*, a more conservative and narrowly defined measure, as Dorsey himself has acknowledged. By 2021, however, Block had shifted to reporting the number of active *accounts*—a broader metric that naturally produces a higher count, since a single customer can hold multiple accounts. Despite this material change, the Company calculated year-over-year growth by comparing the 2021 accounts figure to the more restrictive 2020 customer figure. This apples-to-oranges comparison created a misleading impression of robust growth. For several subsequent quarters, the Company continued to rely on this flawed methodology to obscure stagnation in its user base.

98. Around this time, financial analysts focused heavily on Block's claims of year-over-year growth on Cash App, and did not register that the metric had changed to inflate the growth moving forward. For instance, in an April 2022 report, Wells Fargo analysts stated: "Cash App MAUs were 44M at the end of '21, up by 83% from 24M in 4Q19 and 22% from 36M in 4Q20." This report accepted Block's reports of user growth as evidence of Cash App's continued success, unaware that the statistics the Company recently provided were a misleading apples-to-oranges comparison that only provided the illusion of user growth on the platform.

99. The highlighted statements in ¶ 96 were also materially false and misleading because (1) they materially overstated the size and growth of Cash App's user base by knowingly

1    including large numbers of duplicate, fraudulent, and illicit accounts, which proliferated due to

2    Block's inadequate AML, KYC, and sanctions compliance controls; and (2) Block failed to

3    disclose that internal data—including, but not limited to, information on account verifications and

4    the number of distinct SSNs linked to user accounts—indicated the actual number of unique Cash

5    App users was substantially lower than publicly reported. These statements were also materially

6    false and misleading for the reasons described by Dr. Daniel McCarthy, Ph.D., in section VII

7    below.

8                    **2.      Block's February 2022 Form 10-K Confused Customer and Account
                            Metrics.**

9

10          100.    On February 24, 2022, Block filed its Form 10-K signed by Defendants Dorsey

11   and Ahuja with results through December 2021. Despite changing the Company's user metric in

12   the Shareholder Letter on its website, the Company failed to disclose the change in its Form 10-K

13   filed with the SEC. Instead, the Company described its "customers" as follows:

14          *Our Cash App Customers*: *As of December 2021, Cash App had more than 44
            million monthly transacting actives across the United States and Europe which
15          had at least one financial transaction using any Cash App product or service*. In
            2021, across the iOS App Store and Google Play, Cash App was the number one
16          finance app and the number four app overall, based on downloads in the United
            States. *Cash App has a diverse mix of customers*. In the United States, Cash App
17          had *monthly transacting actives* in each of the 50 states and nearly every county
            as of December 2021.
18

19          101.    These statements were materially false and misleading because they omitted that

20   Block had changed Cash App's reported growth metric from "active customers" to "actives,"

21   meaning transacting active *accounts*, for the December 2021 reporting period. In Block's Form

22   10-K, the Company used the terms "customer" and "actives" interchangeably—describing "Cash

23   App customers" in the section title, citing 44 million "transacting actives" (*i.e.*, accounts),

24   referencing a "diverse mix of customers," and then concluding with "monthly transacting

25   actives." This inconsistent terminology obscured a critical distinction: under Block's own user

26   metric definitions, "customers" and "accounts" were not equivalent. Because individual

27   customers could maintain multiple accounts, the number of accounts significantly exceeded the

28

number of customers. By conflating these two distinct metrics, the Company misled investors about the nature and extent of Cash App's user growth.

102.    The highlighted statements were also materially false and misleading because (1) they materially overstated the size and growth of Cash App's user base by knowingly including large numbers of duplicate, fraudulent, and illicit accounts, which proliferated due to Block's inadequate AML, KYC, and sanctions compliance controls; and (2) Block failed to disclose that internal data—including, but not limited to, information on account verifications and the number of distinct SSNs linked to user accounts—indicated the actual number of unique Cash App users was substantially lower than publicly reported. These statements were also materially false and misleading for the reasons described by Dr. Daniel McCarthy, Ph.D., in section VII below.

### 3.    Defendants Continued to Mislead the Public about Cash App User Metrics Throughout 2022.

103.    During the Company's February 24, 2022 earnings call held following the 10-K filing, Defendant Ahuja again misled investors about the Company's growth rate and size of Cash App's user base:

> *We grew Cash App's network to 44 million monthly transacting actives as of December for a growth of 22% year over year.* Our active base is highly engaged, and we've seen growing adoption of Cash Card, which reached more than 13 million monthly actives as of December, a 31% attach rate to our monthly active base, up from a 22% attach rate two years ago. *As we've grown our overall base of customers*, we've also seen growing usage for Cash Card customer. In the fourth quarter, spend for Cash Card actives increased year over year as actives used Cash Card for a diverse range of everyday purchases from fast-food restaurants to big-box retailers to gas stations and more.

104.    She later added:

> I'd just add, to underscore Jack's point, *Cash App at 44 million monthly active, growing 22% year over year*, was the No. 1 downloaded finance at in the U.S. in 2021 and the No. 4 downloaded app overall in the U.S. in 2021 on iOS. So, we are reaching mainstream scale and want to continue to enable broad-based utility, as Jack was saying, around deposits and limits. But as you see through the strength of our cohort economics, with growing ARPU $47 in the fourth quarter, up 13% year over year, with strong gross profit retention of over 125% year over year for each of the last four years and with strong ROIs at 6x over the last three years.

105.    During the Company's August 4, 2022 earnings call, Ahuja stated:

> Let's discuss some of the drivers here using our inflow framework, looking at active

and inflows per active. First, ***we continued growth from monthly transacting actives, reaching 47 million as of June, up 18% year-over-year, with weekly and daily actives growing even faster***. We have been focused on enhancing the reality of peer-to-peer by expanding our presence in new demographics. When an active has more of their friends and family using Cash App, they have more reasons to come back and their retention often improves.

106.    On November 3, 2022, Defendants sent a letter to shareholders regarding the Company's Q3 2022 results. The letter was signed by Defendants Dorsey and Ahuja. In the letter, Defendants again discussed the growth and strength of Cash App through the metric of "***transacting actives***." Defendants represented that, as of September 2022, Cash App had "***more than 49 million monthly transacting actives . . . , up approximately 20% year over year***."

107.    The highlighted statements in ¶¶ 103–106 were materially false and misleading because as of Q4 2021, Block changed its reported growth metric from "active customers" to "actives," meaning transacting active accounts—a materially different metric that Defendants themselves recognized as such. By comparing the broader "actives" figure to the more conservative "customers" metric, the Company artificially inflated the appearance of user growth. The statements were also false and misleading because the year-over-year growth figures were based on an apples-to-oranges comparison of an account-based transacting actives figures pre-Q4 2021 customer-based figures, and because (1) they materially overstated the size and growth of Cash App's user base by knowingly including large numbers of duplicate, fraudulent, and illicit accounts, which proliferated due to Block's inadequate AML, KYC, and sanctions compliance controls; and (2) Block failed to disclose that internal data—including, but not limited to, information on account verifications and the number of distinct SSNs linked to user accounts—indicated the actual number of unique Cash App users was substantially lower than publicly reported. These statements were also materially false and misleading for the reasons described by Dr. Daniel McCarthy, Ph.D., in section VII below.

### 4. Block Updated the Definition of "Transacting Actives" in a May 5, 2022 Shareholder Letter.

108.    On May 5, 2022, Defendants sent a letter to shareholders regarding the Company's Q1 2022 results. The letter was signed by Defendants Dorsey and Ahuja. In the letter, Defendants updated the definition of the "transacting active" metric to include the following underlined text:

A transacting active is a Cash App account that has at least one financial transaction using any product or service within Cash App during the specified period. A transacting active for a specific Cash App product has at least one financial transaction using that product during the specified period and is referred to as an active. <u>Certain of these accounts may share an alias identifier with one or more other transacting active accounts. This could represent, among other things, one customer with multiple accounts or multiple customers sharing one alias identifier (for example, families).</u>

109.    The updated definition acknowledged that the Company understood "accounts" and "customers" to be two different metrics, that the difference was important, and that there were more Cash App "accounts" than Cash App "customers." Defendants were therefore aware that their year-over-year growth comparison between metrics quantifying "active customers" and "transacting actives" were apples-to-oranges comparisons between materially different metrics.

### 5.    The Company Continued to Make False and Misleading Statements in Response to Public Scrutiny Relating to Fraud on Cash App.

110.    On August 24, 2022, *Vice* published an article about the proliferation of fraud on Cash App entitled, "Hackers Are Breaking into and Emptying Cash App Accounts." A Cash App spokesperson was quoted as saying:

Preventing fraud is critically important to Cash App. ***We continue to invest in and bolster fraud-fighting resources by both increasing staffing and adopting new technology***. We are constantly improving systems and controls to help prevent, detect, and report bad activity on the platform[.] . . . For those who believe they have fallen victim to an identity-theft or account take-over scams, we encourage them to reach out to Cash App Support where ***we will review the account in question***. If deemed fraudulent, ***we will take the necessary action starting with account closure and disablement of all applicable products***.

111.    The highlighted statements in ¶ 110 above were materially false and misleading because they omitted material facts about Cash App's deficient compliance practices, including: (1) Cash App's compliance infrastructure was chronically under-resourced, fundamentally flawed, and reliant on substandard systems and processes for customer due diligence, identity verification, and transaction monitoring that violated AML and sanctions laws and enabled widespread fraud, illegal activity, and the creation of duplicate accounts; (2) Cash App's "frictionless" user experience—characterized by lax onboarding protocols—further facilitated misuse by bad actors engaged in identity theft, scams, and the exploitation of public assistance programs; and (3) Block's senior leadership knowingly deprioritized compliance in favor of

growth, as evidenced by a large backlog of unresolved alerts and a persistent failure to shut down accounts involved in illicit conduct. These statements also materially misled investors by creating the false impression that Cash App's reported user metrics were accurate and reliable because they were supported by sound compliance practices.

**D.**     **Defendants Made Materially False and Misleading Statements in 2023.**

112.    In its Q4 2022 Shareholder Letter dated February 23, 2023 and signed by Defendants Dorsey and Ahuja, Defendants represented that by the end of 2022, Cash App had "***51 million monthly transacting actives, an increase of 16% year over year***." Block's 2022 Form 10-K, signed by Defendants Dorsey and Ahuja and filed February 23, 2023, emphasized the same user metric, stating that "[a]s of December 2022, Cash App had ***more than 51 million monthly transacting actives*** across the United States and Europe."

113.    The highlighted statements in ¶ 112 above were materially false and misleading because (1) they materially overstated the size and growth of Cash App's user base by knowingly including large numbers of duplicate, fraudulent, and illicit accounts, which proliferated due to Block's inadequate AML, KYC, and sanctions compliance controls; and (2) Block failed to disclose that internal data—including, but not limited to, information on account verifications and the number of distinct SSNs linked to user accounts—indicated the actual number of unique Cash App users was substantially lower than publicly reported. These statements were also materially false and misleading for the reasons described by Dr. Daniel McCarthy, Ph.D., in section VII below.

114.    Block's 2022 Form 10-K also contained the below graph:

1
2
3
4
5
6
7
8
9
10
11



12     115.    This graph was materially false and misleading because it contained an

13  apples-to-oranges comparison of account-based figures from 2021 and 2022 to customer-based

14  figures from 2015 through 2020, which as explained above created a misleading impression of

15  robust growth. This graph was also materially false and misleading because (1) it materially

16  overstated the size and growth of Cash App's user base by knowingly including large numbers of

17  duplicate, fraudulent, and illicit accounts, which proliferated due to Block's inadequate AML,

18  KYC, and sanctions compliance controls; and (2) Block failed to disclose that internal data—

19  including, but not limited to, information on account verifications and the number of distinct

20  SSNs linked to user accounts—indicated the actual number of unique Cash App users was

21  substantially lower than publicly reported. The graph was also materially false and misleading for

22  the reasons described by Dr. Daniel McCarthy, Ph.D., in section VII below.

23     116.    Financial analysts continued to focus on Block's claims of year-over-year growth

24  on Cash App as a metric of the Company's continued success. For instance, in early March 2023,

25  Phillip Capital noted the "16% YoY surge in monthly active users . . . to 51mn." The Hindenburg

26  Report would soon reveal that this purported number of active "users" was massively inflated.

27
28

**2.    The March 2023 Hindenburg Report Revealed the False and Misleading Nature of Defendants' Statements Regarding Compliance, Fraud Prevention, and User Metrics.**

117.    A week after the Hindenburg Report, on March 30, 2023, Block issued a response that continued to deceive the market about its compliance with AML, KYC, and sanctions requirements and the associated effect on its user metrics. Specifically, the response claimed that its "***approach to compliance is consistent with other financial services platforms***," and that "***the company's compliance investments have grown more than twice as fast as overall gross profit, and compliance investments have also meaningfully increased as a percentage of our overall operating expenses***."

118.    The highlighted statements in ¶ 117 above were materially false and misleading because they omitted material facts about Cash App's deficient compliance practices, including: (1) Cash App's compliance infrastructure was chronically under-resourced, fundamentally flawed, and reliant on substandard systems and processes for customer due diligence, identity verification, and transaction monitoring that violated AML and sanctions laws and enabled widespread fraud, illegal activity, and the creation of duplicate accounts; (2) Cash App's "frictionless" user experience—characterized by lax onboarding protocols—further facilitated misuse by bad actors engaged in identity theft, scams, and the exploitation of public assistance programs; and (3) Block's senior leadership knowingly deprioritized compliance in favor of growth, as evidenced by a large backlog of unresolved alerts and a persistent failure to shut down accounts involved in illicit conduct. These statements also materially misled investors by creating the false impression that Cash App's reported user metrics were accurate and reliable because they were supported by sound compliance practices.

**3.    Before and After the Hindenburg Report, Defendants Repeatedly Conflated Monthly Active Accounts with Actual Customers.**

119.    The Company held its Q4 2022 earnings call on February 23, 2023. On the call Defendants Dorsey and Ahuja made several materially false and misleading statements that conflated the monthly active account figures with actual customers. For example:

Q: But I wanted to ask a little bit about Cash App. Amrita, I believe you said pretty much all of those 3 core drivers would be up in '23. The one that I wanted to ask

about was the inflows per MAU. You certainly did cite some, at least in the Square business, slowdown in discretionary spend. But I assume there are offsets, things like obviously, Cash Card attach, which I'm assuming is going to lead to higher direct deposit, which obviously had a really nice step up on the metrics you gave at 3Q. So I'm curious to hear a little bit just about the drivers there as well as the monetization rate. Certainly, you mentioned the pricing changes and that's had a sizable impact. But as we look forward, should we be thinking about Borrow as a bigger driver or other items around monetization side?

AMRITA AHUJA: Sure. Thanks for the question, Josh. So let's break down our inflows framework for Cash App. And we'll talk in a little bit more detail on 1 of the 3 measures, inflows per active, to your question. *So starting first with actives, 51 million monthly transacting actives in December. That grew 16% year-over-year with, importantly, weekly and daily actives growing even faster*.

*Over time, we've increasingly leveraged marketing to enhance the inherent virality in our peer-to-peer network efforts. And that's enabled us to drive greater acquisition and product adoption for these new customers.*

*I think what's even maybe more important than the 51 million is that 2 out of 3 of those 51 million transacting actives are using Cash App on a weekly basis on average.* And I think that's an indication of the growth of our product ecosystem and the product adoption within it that's becoming a more and more everyday use case.

120.    In its May 4, 2023 Q1 2023 earnings call, Block reverted to only disclosing the "transacting actives" metric (as opposed to the number of verified accounts or the number of unique SSNs associated with Cash App accounts, both of which Block disclosed in its March 30, 2023 response to the Hindenburg Report). Ahuja stated:

I would look at unpacking Cash App's performance according to our inflows framework, where we have seen strong growth in each of the three variables that ultimately ladder up to gross profit, whether it's actives, inflows per active, or monetization rate. *So, if we look at Q1 growth, monthly transacting active were 53 million in March, up 17% year-over-year. This is really driven by both the virality of our peer-to-peer network effects, as well as increasing focus on leveraging marketing and acquisition tools to drive qualified new customers and higher product adoption over time*.

121.    Likewise, in Block's May 4, 2023 letter to shareholders regarding the Company's Q1 2023 results, signed by Defendants Dorsey and Ahuja, Defendants stated:

Cash App has an extensive, highly engaged network rooted in peer-to-peer payments, which allows for *viral growth as current actives bring their friends and family into Cash App. Growing monthly transacting actives is a component of the inflows framework and one of the ways we drive gross profit: In March, there were 53 million monthly transacting actives.*

122.     In Block's August 3, 2023 Earnings Call, Ahuja again conflated Cash App "transacting actives" with Cash App's "customer base," in the context of discussing Cash App's customer base as a reason for enthusiasm about Cash App Pay. Ahuja stated that Cash App had a

> ***very attractive customer base ... 54 million monthly transacting actives as of June***, who are highly engaged on our platform and inflows over $1,100 during the second quarter. And so with Cash App Pay being present as a payment device on their platform, they get access to these ***customers who don't even necessarily have to have been signed-up by a Cash App Card***. And that's really the proposition that we're selling into these merchants—these large merchants, who are finding real product fit here with Cash App Pay.

123.     In the Q3 2023 Earnings Call on November 2, 2023, Ahuja stated that "as of September [2023], there were 55 million monthly transacting actives, up 11% year-over-year, with growth driven by our peer-to-peer network."

124.     Ahuja stated on the same call:

> This is on the back though of strong results in the third quarter with -- if you look across our inflows framework, strong growth across each of the three aspects of Cash App's inflows, ***whether it's active, which grew 11% year-over-year to 55 million on the back of continued viral growth in our peer-to-peer network mechanisms, or it's inflows per active, which were $1,132 in the quarter, and we're up 8% year-over-year***, relatively stable with the first half of the year. ***Again, this one is really a factor of both our customers' spending power, as well as their adoption of our products and engagement with our platform***.

125.     The highlighted statements in ¶¶ 119–124 were materially false and misleading because (1) they materially overstated the size and growth of Cash App's user base by knowingly including large numbers of duplicate, fraudulent, and illicit accounts, which proliferated due to Block's inadequate AML, KYC, and sanctions compliance controls; and (2) Block failed to disclose that internal data—including, but not limited to, information on account verifications and the number of distinct SSNs linked to user accounts—indicated the actual number of unique Cash App users was substantially lower than publicly reported. These statements were also materially false and misleading for the reasons described by Dr. Daniel McCarthy, Ph.D., in section VII below.

### 4.     Following the Hindenburg Report, Defendants Continued to Make False and Misleading Statements about Block's Compliance Efforts.

126.     During the Company's Q1 2023 May 4, 2023 earnings call, Dorsey stated:

> We also want to make sure that we continue to build trust. And as I talked about

before, trust is earned in many ways. It's through transparency, through reliability, dependability, and that is all something that we earn. We're not given, and that comes over time. *And a lot of that has to be focused on how our customers ultimately trust us, our partners, including our banking partners and the regulatory—regulators trust us as well. So this is a significant focus for us and always has been.* It has to be, as you do anything in the financial space and certainly always been part of our mindset and our approach and turn it over to Amrita to talk about benchmarking against peers and more broadly investment.

127.    Ahuja added the following about Block's compliance mechanisms:

In order to do that, *we must maintain a culture of compliance and responsible risk management, including through investment in programs, processes, controls and teams with deep compliance expertise, prioritizing compliance ultimately helps us drive trust to their customers with regulators and external partners, and that enables us to then develop innovative products responsibly. We have significantly grown our investment in compliance over the last few years.*

At a company level, we expect to invest approximately $160 million in compliance in 2023, which represents an increase in our investment dollars of more than 5x since 2020, outpacing OpEx growth by approximately 2x during that same period. *Specifically within Cash App, the pace of growth on compliance investment has been even faster than that.* With regards to how you might benchmark that, other companies may calculate compliance investment differently. So it can be hard to benchmark across companies. What we include in these figures is investments that go towards personnel as well as software and tooling amongst other areas to support our program.

*These dedicated compliance resources support our business units and our customers that our business units serve and ultimately provide oversight across the ecosystem.* Maybe just to very quickly handle, you also asked about banking -- sort of banking crisis and our partner ecosystem. Look, we benefit from having a diverse ecosystem of products and services with diverse business models. As you heard now with 14 revenue streams at $100 million or more in gross profit, up from 11 a year ago. Across our products and our partners, we are always focused on building redundancies wherever we can in addition to assessing potential future risks. So we have a diverse set of products, and we build redundancies where we can, and we have a transparent approach to our partnership as we always have.

128.    The highlighted statements in ¶¶ 126–127 above were materially false and misleading because they omitted material facts about Cash App's deficient compliance practices, including: (1) Cash App's compliance infrastructure was chronically under-resourced, fundamentally flawed, and reliant on substandard systems and processes for customer due diligence, identity verification, and transaction monitoring that violated AML and sanctions laws and enabled widespread fraud, illegal activity, and the creation of duplicate accounts; (2) Cash App's "frictionless" user experience—characterized by lax onboarding protocols—further facilitated misuse by bad actors engaged in identity theft, scams, and the exploitation of public

1   assistance programs; and (3) Block's senior leadership knowingly deprioritized compliance in

2   favor of growth, as evidenced by a large backlog of unresolved alerts and a persistent failure to

3   shut down accounts involved in illicit conduct. These statements also materially misled investors

4   by creating the false impression that Cash App's reported user metrics were accurate and reliable

5   because they were supported by sound compliance practices.

6       **E.    Defendants Made Materially False and Misleading Statements in 2024.**

7       129.    In its Q4 2023 Shareholder Letter dated February 22, 2024 and signed by

8   Defendants Dorsey and Ahuja, Defendants stated:

> As of December there were 2 million actives (3% of our monthly transacting actives) depositing their paycheck into Cash App each month, relative to 23 million Cash App Card monthly actives (41% of our monthly transacting actives) and ***our broader base of 56 million monthly transacting actives. In the same way that peer-to-peer (P2P) payments was a gateway to the Cash App Card, we see the Cash App Card as a gateway to our customers adopting Cash App as a primary banking solution***.
>
> ***We believe the most direct opportunity for Cash App to drive meaningful top line growth is by converting our existing base of 56 million monthly transacting actives***, who mostly use P2P and Cash App Card, into primary banking actives who deposit their paycheck into Cash App and generate significantly more inflows per active.

16      130.    Block continued to mislead investors about its user metrics on its own website. In

17  a December 1, 2024 online post on its website titled "How Cash App Is Fighting Scams," the

18  Company stated: "***For our current 57 million monthly active customers***, our first line of defense

19  is to make our platform as resilient against scams as possible."

20      131.    The statements in ¶¶ 129–130 were materially false and misleading because

21  (1) they materially overstated the size and growth of Cash App's user base by knowingly

22  including large numbers of duplicate, fraudulent, and illicit accounts, which proliferated due to

23  Block's inadequate AML, KYC, and sanctions compliance controls; and (2) Block failed to

24  disclose that internal data—including, but not limited to, information on account verifications and

25  the number of distinct SSNs linked to user accounts—indicated the actual number of unique Cash

26  App users was substantially lower than publicly reported. These statements were also materially

27  false and misleading for the reasons described by Dr. Daniel McCarthy, Ph.D., in section VII

28  below. The statement in ¶ 130 was also materially false and misleading because the 57 million

figure in the Company's own filings referred to "accounts" and not "customers," which were two

materially different user metrics under the Company's own definitions.

## VI. ADDITIONAL ALLEGATIONS OF SCIENTER

132.    Numerous independent facts—both previously discussed and detailed below—

strongly support the inference that Defendants, particularly Dorsey and Ahuja, acted with

scienter. As senior executives at Block, Dorsey and Ahuja repeatedly promoted misleading Cash

App user metrics despite having direct access to internal data and information revealing

materially lower verified user and unique SSN counts and pervasive fraud and illicit activity on

the platform including criminals' and others' use of multiple accounts. Their leadership positions

and access to contemporaneous contradictory information establish that they either knew the

public statements at issue were materially false or acted with severe recklessness in ignoring the

substantial risk of misleading investors.

133.    These and additional facts discussed below also support a strong inference that

scienter is attributable to Block itself, based on the knowledge and conduct of its senior

leadership—Dorsey, Ahuja, CLO Sivan Whiteley, and CCO Amelia Childress—and the

company's centralized organizational structure, which gave key senior executives access to and

knowledge of the critical information at issue.

### A. Individual Scienter of Dorsey and Ahuja

134.    Multiple FEs and Block's internal reporting and governance structures support a

strong inference that Dorsey and Ahuja were aware of Cash App's significant compliance failures

and the resulting inflation of its reported user metrics during the Class Period. As senior

executives, they repeatedly received specific findings—via Board-level reports, internal

compliance meetings, and employee feedback—highlighting persistent deficiencies in Block's

AML, KYC, and sanctions controls. Despite this knowledge, they continued to publicly promote

inflated user metrics and endorsed or permitted strategic decisions that prioritized business

growth over regulatory compliance. Their executive positions, active Board involvement, and

sales of stock while in possession of adverse non-public information further reinforce the

inference that they acted with scienter.

135.    Dorsey's awareness of compliance deficiencies is supported by his documented access to detailed, high-level compliance assessments. These reports identified numerous structural failures and were regularly prepared to inform Board oversight responsibilities:

a.    **FE 4** stated that Board-level compliance materials were presented to Dorsey, including the *AML CTF Final Report* and the *Audit Risk Committee Summary Report*, which addressed entity-specific and global compliance risks. These reports, prepared mid-year for Q2 or Q3 Board meetings, synthesized both qualitative and quantitative data on compliance failures—including rising SAR volumes, persistent KYC weaknesses, and insufficient transaction monitoring resources. The reports were presented to Dorsey by Childress before being shared with the Board. Based on this process, **FE 4** concluded that Dorsey was "100%" aware of the risks highlighted in the reports.

b.    **FE 2** likewise reported Block's senior leadership team—including Dorsey—commissioned an independent third-party compliance review in 2023 that concluded that Block lacked an adequate compliance program.

136.    Dorsey also issued strategic directives and made personnel decisions that directly impaired Block's compliance capabilities. His actions reflected a pattern of de-emphasizing compliance in favor of organizational loyalty and cost reduction:

a.    **FE 7** recounted that Dorsey's personnel decisions for Block's compliance team reflected a preference for internal loyalty over subject-matter expertise. As one example, Dorsey promoted a machine learning engineer with no risk or compliance experience to lead the risk department.

b.    **FE 2** further reported that based on information they learned in a conversation with CLO Whiteley, Dorsey intervened in 2022 or early 2023 to block efforts by Whiteley to terminate CCO Childress and Regulatory Counsel Crissy Solh, despite serious concerns having been raised about their handling of compliance obligations.

c.    **FE 3** stated that when they joined Block, they believed Jack Dorsey would provide the resources to have a compliance culture. However, **FE 3** learned that Dorsey and Block's leadership had little interest in meaningful compliance improvements. According to **FE**

**3**, senior leadership rarely took substantive compliance action unless spurred by a major external event. **FE 3** cited Russia's invasion of Ukraine—an event that drew intense global scrutiny—as one of the few incidents that triggered executive attention, specifically due to concerns about Vladimir Putin and others potentially using Bitcoin to evade sanctions. **FE 3** noted that "short of a war," it was unclear what would motivate engagement from Block's senior executives.

d.      **FE 6** recalled Dorsey issuing a directive for Cash App to prioritize ease of use and convenience "at the cost of everything else." Reluctance to implement stricter KYC and fraud prevention measures was driven by concerns that such requirements would hinder user onboarding and reduce transaction volume. "The whole vibe," **FE 6** said, "was to make it as easy as possible—compliance be damned."

e.      **FE 9** described an internal spreadsheet referred to as "Jack's Friends," which listed approximately 15 high-profile individuals—including Dorsey and Jay-Z—whose accounts were exempt from standard transaction monitoring and limits, particularly for Bitcoin activity. These individuals were not subject to the same compliance controls as ordinary users. At one point, a report was generated showing that the platform's top Bitcoin transactors were all members of this VIP list. The spreadsheet's name was changed multiple times to make it appear less suspicious. **FE 9** was assigned to conduct a "compliance check" on these accounts but clarified that no formal due diligence had been performed and the review was largely superficial. Similarly, **FE 9** was also directed to suppress or disable monitoring alerts on certain high-risk accounts, including one belonging to an athlete whose transactions repeatedly triggered red flags.

137.    Dorsey was also regularly confronted with employee complaints about compliance failures through company-wide forums, but rather than implementing corrective action, he and senior leadership took steps to suppress dissent and reinforce existing leadership:

a.      According to **FE 2** and **FE 1**, concerns about Cash App's compliance issues were raised during all-hands meetings and "Ask Me Anything" sessions, some of which **FE 2** recalls Dorsey attending. These forums featured anonymous employee questions, which repeatedly highlighted deficiencies in compliance practices and criticized Childress's leadership. **FE 2** recalled questions such as, "When will there be additional support for compliance? We

don't have a compliance program." **FE 2** recalled that Childress and Solh evaded answering, maintaining "there was no issue." **FE 1** recounted that during one meeting, Block's leadership responded to these questions by staging a coordinated show of support for Childress, during which her direct reports were prompted to publicly endorse her.[18]

b.      **FE 2** recalled a particularly alarming all-hands meeting on or around Q4 2021 that marked a turning point for many compliance staff. According to **FE 2**, "every single question was about compliance and concerns about compliance," including "the absence of a functioning compliance program, the lack of internal controls, and failures in leadership accountability." When Childress and Solh responded with prewritten, dismissive answers coordinated by Block's communications and policy teams, it triggered a mass resignation of compliance professionals. Despite this, Block did not take meaningful steps to improve its compliance program until government regulators began investigating Cash App's practices.

c.      **FE 2**, who had multiple direct interactions with Dorsey, advised Dorsey upon **FE 2**'s departure in May 2024 to engage with the legal and compliance teams. Dorsey assured **FE 2** that he would.

138.    Dorsey's role as Chairperson of Block's Board further supports a strong inference of scienter. During the Class Period, Dorsey held a central position in the company's governance structure, serving as both CEO (a title renamed "Block Head" in 2022) and Chairman of Block's Board of Directors. In these roles, he presided over all Board meetings and exercised significant influence over committee appointments and corporate strategy. This dual role placed him at the nexus of internal information flow across the Company, with direct access to reports concerning compliance, risk, user metrics, and regulatory issues—including the annual Enterprise Risk

[18] In its 2020 Proxy Statement, Block described company-wide "Town Square" meetings similar to those described by **FE 2**. The Town Square was a "monthly global all-hands meeting" that was "simultaneously broadcast to all of the Company's offices and made available for viewing afterward." The meeting "typically include[d] reports on business developments and provide[d] an opportunity for employees to ask questions of senior management, including . . . Dorsey, either in writing, via video conferencing or live in person." Dorsey would also "provide[] a synopsis" of the most recent Board meeting and "take[] questions from employees about the meeting." Block also held "question-and-answer sessions" with the Board and "senior management," and senior management "periodically host[ed] 'Ask Me Anything' sessions on internal channels to discuss issues." Additionally, Block polled its employees "multiple times a year to collect feedback on management, strategy, culture, compensation and a variety of other areas." Block shared "[k]ey takeaways from these surveys" with the Board and senior management.

1    Report. His sustained leadership in these overlapping executive and Board capacities strongly

2    supports the inference that he was aware of the operational deficiencies for which the Company

3    revealed it was being investigated by the SEC and DOJ in August 2023 and later cited by multiple

4    regulatory agencies and the consequential inflation of the user metrics Block reported to

5    investors.

6        139.    Block's Proxy Statements during the Class Period further support this inference,

7    confirming that Dorsey, as Chairperson of Block's Board, was involved in risk oversight

8    processes through which he likely became aware of the Company's deficiencies. According to

9    Block's 2023 Proxy Statement, which contains similar or identical language to other Proxy

10   Statements during the Class Period, one of the Board's "primary responsibilities" was "oversight

11   of risk management." Dorsey and the Board were responsible for overseeing "[s]trategic,

12   financial and execution risks and exposures associated with [Block's] business strategy, policy

13   matters . . . significant litigation and regulatory exposures and other current matters that may

14   present material risk." The Board executed this oversight responsibility by delegating specific

15   issues to committees and relying on "management reporting processes" designed to ensure

16   visibility into "the identification, assessment[,] management," and "mitigation" of risks. For

17   instance, the Audit and Risk Committee oversaw "[r]isks and exposures associated with" Block's

18   "programs and policies relating to legal and regulatory compliance." The Chair of the Audit and

19   Risk Committee—and in some years, the Lead Independent Director—regularly met with senior

20   executives, including Ahuja, "on a regular cadence to identify and discuss risks and exposures,

21   and escalate[d] potential issues" to the Audit and Rick Committee or the full Board, including

22   Dorsey, "as appropriate."

23       140.    Ahuja's scienter is supported by the fact that she was repeatedly and directly

24   informed of the severe compliance failures affecting Cash App, both through formal reporting

25   channels and internal forums. According to **FE 4**, Ahuja had direct visibility into critical

26   compliance documentation, including the *AML CTF Final Reports* and the *ARC Summary*

27   *Reports*. **FE 4** stated that Ahuja was "100%" aware of the compliance risks detailed in these

28   reports.

AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT
CASE NO. 5:25-CV-00642-NW

141.    Ahuja's integral involvement with Board-related functions also supports a strong inference of scienter. Although Ahuja was not a Board member, her roles as CFO and COO required regular engagement with the Board and its committees—including the Audit and Risk Committee, which oversees risks related to financial reporting, internal controls, compliance, and security—in connection with financial reporting, investor relations, and executive compensation. According to Block's Proxy Statements, beginning in 2022, Ahuja met "on a regular cadence" with the Audit and Risk Committee Chair to "identify and discuss risks and exposures." She attended portions of every Board and Audit and Risk Committee meeting during the Class Period.

142.    The fact that Dorsey and Ahuja each spoke about Cash App's compliance protocols, practices, and procedures and about user metrics for Cash App during the Class Period, as described in section V, *supra*, further supports an inference of scienter.

143.    Defendants' shift from disclosing customer-based user metrics to inflated account-based "transacting actives," as described in section V, *supra*, likewise supports a strong inference of scienter as to both Dorsey and Ahuja. As senior executives, both Dorsey and Ahuja were directly involved in promoting Cash App's user growth and had access to internal data reflecting the actual number of verified users and unique Social Security Numbers linked to Cash App accounts. Dorsey also acknowledged in an August 2020 earnings call that the monthly active customers metric differed significantly from the number of accounts, and that customers was the more conservative of the user metrics to report: "So, we do believe Cash App has reached a mainstream scale, and that's with over 30 million monthly active customers in June. ***And these are monthly active customers, not overall accounts***."

144.    Despite knowing that these figures were materially lower than the publicly reported "transacting actives," Dorsey and Ahuja repeatedly emphasized the inflated metric while withholding the more accurate internal data. This misrepresented both the true size of Cash App's user base and the pace of its growth, which was further exaggerated by comparing account-based metrics to earlier customer-based figures—thereby masking the impact of the methodology change. Their persistent use of this misleading metric—despite knowing its inflationary effect and inconsistency with prior reporting—demonstrates an intent to mislead investors about the scale

and trajectory of Cash App's user growth. As detailed above, they further obscured the truth by adopting the contorted term "transacting actives," a shift so contrived that even during analyst calls, they at times reverted to calling them "customers." This inconsistency suggests the term was deliberately introduced to mislead investors, who were focused on meaningful user metrics rather than vague counts of active accounts. These facts further support a strong inference that Dorsey and Ahuja intended to misrepresent the scale and trajectory of Cash App's user growth.

145.    Dorsey's and Ahuja's trading activity during the Class Period further supports an inference of scienter. Together, they sold over $650 million in Block Class A Common Stock while in possession of material, adverse non-public information about the Company's widespread compliance failures and inflated Cash App user metrics. Between November 2020 and May 2021, Dorsey sold 2,612,148 shares, generating approximately $599 million in proceeds. By May 17, 2021, he had **fully liquidated and cashed out** his holdings of Block Class A Common Stock.[19] Ahuja likewise sold 324,266 shares of Block Class A Common Stock between November 9, 2020 and April 2, 2025, netting proceeds of approximately $51 million.

**B.    Corporate Scienter**

146.    Reported actions by CLO Whiteley, CCO Childress, and other senior personnel further reinforce a strong inference of corporate scienter when considered alongside the evidence concerning Dorsey and Ahuja. FEs have provided accounts supporting an inference that Whiteley and Childress were also aware of Cash App's significant compliance failures and the consequential inflation of the user metrics Block disclosed to investors during the Class Period.

147.    Whiteley was repeatedly made aware of Cash App's compliance issues, according to multiple FEs. Whiteley not only had visibility into Cash App's compliance problems, but also actively participated in efforts to downplay or deflect credible warnings:

a.    **FE 1** stated that Whiteley attended a Cash App Compliance all-hands meeting where significant concerns were raised about Block's compliance leadership, particularly regarding the performance and oversight of Childress.

---

[19] Dorsey converted 1,000,000 shares of Block Class B Common Stock to Block Class A Common Stock on May 27, 2022. He has not subsequently reported any sales of Block stock.

AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT
CASE NO. 5:25-CV-00642-NW

b.    **FE 2** described a conversation in which Whiteley admitted to seeking to terminate Regulatory Counsel Crissy Solh and CCO Amelia Childress given serious concerns having been raised about their handling of compliance obligations. However, as described above, Whiteley claimed she was overruled by Dorsey.

c.    Following the release of the Hindenburg Report, **FE 6** raised concerns directly with Whiteley about an internal memo that downplayed both the Report's implications and the proliferation of sextortion cases on Cash App. **FE 6** was reprimanded shortly thereafter. Another FE, **FE 1**, noted that Block fostered an environment in which experienced compliance personnel were routinely ignored, undermined, or pushed out.

148.    Whiteley's reported concerns about Childress are underscored by additional FE reporting indicating that Childress herself was repeatedly made aware of serious compliance failures but failed to take effective action:

a.    **FE 7**, Block's Head of Bitcoin Compliance, stated that they regularly escalated compliance concerns through weekly documented one-on-one meetings with CCO Amelia Childress as well as submissions to the Board's Risk Committee and inclusion in strategic planning materials. Despite these efforts, **FE 7** reported that their submissions were frequently rejected or diluted, impeding effective compliance oversight.

b.    **FE 1** stated that, around October 2022, the sanctions team emailed Childress a log documenting hundreds of potential violations—possibly around 800—that had not been properly disclosed to OFAC, intending to submit a voluntary self-disclosure to regulators. However, the warning "fell on" Childress's "deaf ears," and no action was taken in response.

149.    According to Block's 2022 and 2023 Proxy Statements, Whiteley also met "on a regular cadence" with the Audit and Risk Committee Chair, as well as Ahuja and other executive officers, "to identify and discuss risk and exposures." The Audit and Risk Committee Chair then "escalate[d] potential issues" to the Committee or the full Board, "as appropriate."

150.    Beyond the conduct of individual executives, additional allegations reflect a broader pattern of awareness and inaction within Block's senior leadership, further reinforcing an inference of corporate scienter. Multiple FEs reported that Block's senior leadership was

repeatedly made aware of the systemic compliance failures through internal reports, employee complaints, and third-party reviews. As stated above, **FE 7** reported raising these issues through inputs to Block's Audit and Risk Committee—though those were often rejected or sanitized—and in strategic planning documents. Similarly, **FE 2** stated that Cash App's pervasive and longstanding compliance failures were consistently documented in internal reports to Cash App CEO Brian Grassadonia, Childress, and Regulatory Counsel Crissy Solh.

151.    In addition, during each year of the Class Period, Block conducted an annual Enterprise Risk Assessment ("ERA"), which was shared with and discussed by the Board and overseen by the Audit and Risk Committee. As disclosed in each of Block's Proxy Statements filed with the SEC during the Class Period, the ERA formed a key part of the Company's overall risk management process. The Board, with support from the Audit and Risk Committee, routinely evaluated the ERA framework—including how risks were identified, assessed, monitored, and reported—and worked with management and outside advisors to define and review key risk areas. These areas included strategic, operational, financial, compliance, and personnel risks. Block's ERAs further demonstrate that senior leadership had structured, recurring access to documentation whose purpose was, *inter alia*, to identify compliance risks and related issues.

## VII.    **EXPERT ANALYSIS CONFIRMS BLOCK'S USER METRIC STATEMENTS WERE MATERIALLY FALSE AND MISLEADING.**

152.    Lead Plaintiff retained an expert in user metrics and corporate valuation to evaluate the materiality of Block's statements about user metrics during the Class Period. Dr. Daniel M. McCarthy, Ph.D., is an Associate Professor of Marketing at the University of Maryland's Robert H. Smith School of Business, where he holds tenure. He earned a Ph.D. in Statistics from The Wharton School of the University of Pennsylvania in 2017, and undergraduate degrees from the Wharton School and the School of Engineering and Applied Sciences at the University of Pennsylvania in Finance, Statistics, and Systems Science Engineering, *summa cum laude*. Dr. McCarthy has pioneered customer-based corporate valuation, a "bottom-up" approach to valuing firms by analyzing the value of their customer base, and his research has been

published in top-tier academic journals including the Journal of Marketing Research, Marketing

Science, Management Science, and the Journal of Marketing.

153.    Dr. McCarthy's expertise in customer metrics and corporate disclosure practices is

particularly relevant to the facts alleged herein. Dr. McCarthy has authored multiple papers on

customer-based corporate valuation for public companies, using publicly disclosed customer

metric data to uncover the health and financial valuation of companies through their customer

data. He also co-authored research with Aswath Damodaran and Max Cohen in the MIT Sloan

Management Review article "*IPO Disclosures are Ripe for Reform*," which examines IPO

disclosures and the various ways companies manipulate these disclosures for their benefit. His

Harvard Business Review article "*How to Value a Company by Analyzing Its Customers*"

demonstrates his deep understanding of why customer metrics are material to investor decision-

making and how companies should properly disclose such information. Dr. McCarthy has been

teaching an award-winning course on customer lifetime value for the past six years that focuses

specifically on using customer data to understand business performance.

154.    Dr. McCarthy also has practical experience identifying disclosure errors that

companies have subsequently corrected. His detailed analysis of disclosures by Warby Parker and

DoorDash exposed material errors in their filings, leading both companies to issue restatements

correcting the issues he identified. He co-founded Theta, a predictive customer value analytics

company, in 2018 to commercialize his customer-based corporate valuation methodology, and he

often works with the sort of user metrics data that Block has disclosed to help investors

understand the financial valuation of prospective investments. This combination of academic

research and practical experience qualifies him to assess the adequacy and accuracy of Block's

customer metric disclosures.

155.    Dr. McCarthy's independent opinion is that user growth metrics are highly

material to Cash App's network effect–driven business model, just as they are for social media

platforms like Facebook, Twitter, and Snapchat, because its value depends on the size and

engagement of its user base. Because Cash App users can only transact with others on the

platform, accurate disclosure of these metrics is critical for informed investor decision-making.

1      156.    According to Dr. McCarthy, the widespread materiality of customer metrics is

2  demonstrated by the fact that dozens if not hundreds of public companies voluntarily disclose

3  detailed customer or user metrics in their SEC filings and earnings communications. Companies

4  across technology, media, telecommunications, and financial services regularly report metrics

5  such as monthly active users, daily active users, total customers, or subscriber counts. This

6  widespread disclosure practice exists precisely because these metrics are material to investor

7  decision-making—companies choose to provide this information even when not explicitly

8  required by SEC regulations because investors consistently demand and rely on such data when

9  evaluating companies with network effects or customer-centric business models. Block's own

10  decision to disclose customer metrics, and the many comments that Block's CFO has made about

11  them on investor conference calls, suggests management's recognition of their materiality to

12  investors.

13      157.    For network effect-driven businesses such as the ones mentioned above and

14  Block's Cash App business, the total number of active users is a critical indicator of future growth

15  potential, even if this disclosure does not change what total revenue or total gross profit are in the

16  current period. While a company might achieve the same revenue from either more customers at a

17  lower revenue per customer or fewer customers at a higher revenue per customer, these scenarios

18  have vastly different implications for future growth potential. A larger customer base creates

19  more opportunities for future transactions, word-of-mouth referrals, and network expansion. A

20  larger base creates more utility for prospective customers, because those prospective customers

21  will benefit from having a larger pool of people to derive value from. Each additional user

22  increases the utility of the platform for all existing users at businesses with high network effects,

23  creating positive feedback loops that drive organic growth. In contrast, higher revenue per user

24  from a smaller base may indicate limited growth potential, because of more limited network

25  effects due to the smaller number of users engaging with the business. It is for this reason that

26  there are many documented cases of businesses with high network effects subsidizing user growth

27  without any profit to show for it over the near-term (e.g., Uber's significant subsidization of the

28  rider side of its business early on in its corporate lifecycle). For Cash App, knowing the apples-to-

apples evolution of active customers is essential for evaluating the platform's capacity for viral growth, cross-selling opportunities, and long-term competitive positioning in the digital payments market.

158.    This materiality is demonstrated by market reactions to user metric changes across similar platforms. When Facebook reported its first-ever decline in daily active users in Q4 2021, its stock price fell more than 26% in a single day, erasing over $200 billion in market value. Headlines (such as the Washington Post's "*Facebook loses users for the first time in its history*") specifically emphasized the user decline as a catalyst for the drop. There are numerous other documented instances of similar stock price reactions because of disappointing user metric disclosures at prominent network effect–driven businesses such as Snap, Twitter, and Netflix.

159.    The importance of user metrics is further emphasized by the fact that Cash App, like other payment platforms, faces intense competition from established players like Venmo, Zelle, and PayPal. In this environment, demonstrating continued user growth is critical to maintaining investor confidence and market position.

160.    Further, Dr. McCarthy's independent opinion is that Block's switch from reporting "active customers" before Q4 2021 to the account-based "actives" metric thereafter while continuing to compare the two different metrics in purported year-over-year growth comparisons was materially misleading. Indeed, he has never encountered a situation where a company has chosen to redefine a metric in a material way and then continued year-over-year growth comparisons against the old metric.

161.    According to Dr. McCarthy, Block's filings were misleading because they frequently used identical, or substantially similar, terminology—"transacting actives" and "monthly actives"—for both customer-based and account-based metrics, creating ambiguity about what was being measured. For example, in the Company's Q2 2020 shareholder letter,[20] there were multiple mentions of "transacting actives" and "monthly actives", which at the time referred to *customers*:

---

[20] The annotations in the below image and the others in section VII were added by Dr. McCarthy.




162.    However, in its Q4 2021 shareholder letter, when the user metric changed, Block used the same "transacting actives" and "monthly actives" labels in text and figures that it had used in earlier SEC filings, even though the underlying definition had shifted to count accounts rather than customers:



163.    According to Dr. McCarthy, changing a key performance indicator ("KPI") to be based on person-level rather than account-level user metrics without changing the name of the KPI itself created a substantial risk that investors comparing metrics across periods would unknowingly compare fundamentally different measurements as if they were the same.

164.    This risk of misleading investors was compounded by Block's touting of year-over-year growth figures comparing account-based metrics to customer-based metrics.

1    According to Dr. McCarthy, such figures are substantially likely to mislead investors when made

2    by network effect–driven businesses that permit individual customers to maintain multiple

3    accounts.

4        165.    For example, as discussed above in ¶ 96, in Q4 2021 Block claimed 22%

5    year-over-year growth, comparing 44 million "monthly transacting actives" (accounts) in

6    December 2021 to 36 million in December 2020, without any caveats or qualifying statements.

7    However, the 2020 figure was based on customers, not accounts, as clearly documented in

8    Block's own 2020 10-K filing. According to Dr. McCarthy, this comparison is fundamentally

9    misleading because it suggests growth in Cash App's user base when, in fact, Block was

10    comparing a larger base (accounts) to a smaller base (customers) from the prior year, without any

11    acknowledgment of the incomparability of these figures.

12        166.    Block used the same misleading year-over-year growth comparisons for the

13    subsequent three quarters (*see supra* ¶¶ 103–106), in each instance comparing the current number

14    of active accounts to the number of customers in the prior year.

15        167.    Additionally, according to Dr. McCarthy, the graph from Block's 2022 10-K was

16    likely to mislead a reasonable investor by presenting a continuous trend line that blends historical

17    customer-based data with more recent account-based data without clearly demarcating when the

18    definitional switch occurred. It is Dr. McCarthy's independent opinion that no reasonable investor

19    reviewing this graph could readily discern from its face that it reflected an apples-to-oranges

20    comparison:

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



17

## VIII.    DEEFENDANTS' MISREPRESENTATIONS AND OMISSIONS CAUSED INVESTORS' LOSSES.

18

19          168.    During the Class Period, Defendants' material misstatements and omissions

20 detailed in section V and further described in section VII above caused the price of Block Class A

21 common stock to be artificially inflated, whether by introducing new inflation into the stock or by

22 maintaining preexisting inflation, with the stock price reaching as high as $289.23 on August 5,

23 2021. As a result of their purchases of Block common stock during the Class Period, Lead

24 Plaintiff and other Class Members suffered economic loss under the federal securities laws when

25 Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed to the

26 market, causing the share price to decline significantly as the artificial inflation in the stock price

27 dissipated.

28

169.    The previously misstated or concealed facts emerged through a series of disclosures (*i.e.*, "corrective disclosures") in March 2023, August 2023, February 2024, May 2024, and May 2025. Defendants' misstatements and omissions were the proximate cause of those stock declines and the losses suffered by Lead Plaintiff and other Class Members.

170.    The declines in the price of Block Class A common stock following the corrective disclosures resulted directly from Defendants' fraudulent misrepresentations being revealed to the market. The timing and magnitude of the price declines in Block Class A common stock compared to contemporaneous changes in equity market and peer company indices, as well as a review of the Company's disclosures and subsequent commentary by market professionals, negate any inference that investors' losses resulted from changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the fraud detailed in this Complaint.

**A.    March 23, 2023: The Hindenburg Report Partially Reveals Defendants' Fraud.**

171.    On March 23, 2023, Hindenburg Research published a report titled "*Block: How Inflated User Metrics and 'Frictionless' Fraud Facilitation Enabled Insiders to Cash Out Over $1 Billion*" (defined above as the "Hindenburg Report").

172.    The Hindenburg Report revealed that Block (1) inflated the number of active Cash App users by including fake and duplicate accounts, (2) cultivated a Cash App user base of fraudsters and individuals engaged in other illegal activity, including drug and sex trafficking, (3) evaded interchange-fee regulations and imposed higher costs on merchants and small businesses who accept Cash App, thereby exposing the Company to increased regulatory scrutiny, and (4) failed to disclose the risky nature of Block's acquisition of Afterpay, an Australian "buy now, pay later" short-term loan company.

173.    On this news, the price of Block Class A common stock fell from $72.65 per share at market close on March 22, 2023, to $61.88 per share at market close on March 23, 2023—a decline of nearly 15% on unusually heavy trading volume of over 140 million shares traded—and continued to fall the next trading day. However, because Defendants failed to disclose the full

truth and continued to make material misrepresentations, the price of Block Class A common stock remained artificially inflated.

**B.    August 3, 2023: Block Discloses Regulatory Scrutiny Related to the Hindenburg Report.**

174.    On August 3, 2023, Block filed with the SEC a quarterly report on Form 10-Q for its second fiscal quarter ended June 30, 2023, which was signed by defendants Dorsey and Ahuja who also certified that the report was materially complete, accurate, and free from fraud.

175.    The August 3, 2023 Form 10-Q announced that Block had "received inquiries from the Securities and Exchange Commission and Department of Justice shortly after the publication of [the Hindenburg Report] in March 2023." The Company further stated that it believed "the inquiries primarily relate to the allegations raised in the" Hindenburg Report.

176.    On this news, the price of Block Class A common stock fell from $73.55 per share at market close on August 3, 2023, to $63.52 per share at market close on August 4, 2023, a decline of nearly 14% on unusually heavy trading volume of over 33 million shares traded. However, because Defendants failed to disclose the full truth and continued to make material misrepresentations, the price of Block Class A common stock remained artificially inflated.

**C.    February 16, 2024: NBC News Reports Whistleblower Allegations Relating to the Absence of Internal Controls at Cash App.**

177.    On February 16, 2024, NBC News published an article titled "*Federal regulators are probing whether Cash App leaves door open to money launderers, terrorists*." The article provided information from a complaint relating to Cash App that two whistleblowers filed with FinCEN.

178.    According to the whistleblowers' complaint, which NBC News reviewed, Cash App "had no effective procedure to establish the identity of its customers." As a result, Cash App facilitated transactions with entities under sanction by the Treasury Department's Office of Foreign Assets Control, operations known to sell personal information and credit card data for illegal purposes, and offshore gambling sites barred to U.S. citizens.

179.    The whistleblowers also described Cash App as "a shadow financial system beyond the reach of regulators," where due diligence on users was negligible and often did not

adhere to sound banking practices and rules. Their complaint also alleged that Block structured Cash App to "misdirect[] the attention of regulators," including by using small partner banks that the much larger Block could pressure into forgoing traditional customer due diligence to ease the process of opening accounts and to generate revenues.

180.    On this news, the price of Block Class A common stock fell from $69.48 per share at market close on February 15, 2024, to $65.64 per share at market close on February 16, 2024—a decline of over 5% on unusually heavy trading volume of over 12 million shares traded. However, because Defendants failed to disclose the full truth and continued to make material misrepresentations, the price of Block Class A common stock remained artificially inflated.

**D.    May 1, 2024: NBC News Reports on Another Former Employee's Revelations About Cash App's Willfully Insufficient Compliance.**

181.    On May 1, 2024, NBC News published an article titled "*Federal prosecutors are examining financial transactions at Block, owner of Cash App and Square.*" This article provided further detail about the federal investigation into Block, including that an additional former employee had come forward with information about the Company's compliance shortcomings. The employee told NBC, "From the ground up, everything in the compliance section was flawed. . . It is led by people who should not be in charge of a regulated compliance program." The article also reported that the former employee had met with prosecutors from the Southern District of New York and provided them with "documents that they say show that insufficient information is collected from Square and Cash App customers to assess their risks, that Square processed thousands of transactions involving countries subject to economic sanctions and that Block processed multiple cryptocurrency transactions for terrorist groups."

182.    On this news, the price of Block Class A common stock fell from $73 per share at market close on April 30, 2024, to $66.84 per share at market close on May 1, 2024—a decline of over 8% on unusually heavy trading volume of over 22 million shares traded. However, because Defendants failed to disclose the full truth and continued to make material misrepresentations, the price of Block Class A common stock remained artificially inflated.

1

2

**E.**    **May 2, 2025: Block Posts Another Disappointing Quarter of Earnings on Flat User Growth.**

3

183.    Regulatory scrutiny following the Hindenburg Report prompted Block to take its KYC/AML obligations more seriously. Those efforts included: hiring an independent consultant to review the comprehensiveness and effectiveness of its AML program; instituting a 24-hour, live-person customer service, investigating unauthorized transactions and providing timely refunds; and responding more promptly to SAR backlogs.

4

5

6

7

184.    The result of this increased compliance focus and due diligence—both in terms of making it more difficult for users to create unverified accounts or by denylisting and removing fraudulent accounts—was that the Company's monthly transacting active accounts stopped growing. On May 1, 2025, following the close of trading, Block cut its profit forecast for 2025 and announced that it had missed estimates for earnings in the first quarter of 2025. Although the Company claimed it was a victim of "macro" forces, financial analysts understood that the Company's decreased financial outlook was largely due to stagnant user growth on Cash App.

8

9

10

11

12

13

14

185.    For example, Wells Fargo said that the Company's "current weakness appears to be driven by more than just macro pressure" and its analyst report said that Cash App's "Key Disclosure" was its "flat" number of monthly actives year over year. The firm Mizuho also bemoaned the "[s]tagnant" growth of Cash App's user base, taking note in particular that this was the "fifth straight quarter of 57mn Cash App actives." Reuters further noted that "[a]t least eight brokerages reduced their price targets on the stock, citing weakness in the company's peer-to-peer Cash App and mounting competition."

15

16

17

18

19

20

21

186.    On this news that Defendants taking their compliance obligations seriously impaired Cash App growth, the price of Block Class A common stock fell from $58.48 per share at market close on May 1, 2025, to $46.53 per share at market close on May 2, 2025—a decline of over 20% on unusually heavy trading volume of over 54 million shares traded.

22

23

24

25

187.    Dr. McCarthy's analysis explains why the stock market's reaction to stagnant user growth took time to materialize. When the Hindenburg Report was published in March 2023, Block's stock initially fell 22%, but the Company's initial response downplayed the fraud

26

27

28

concerns. However, as evidence emerged over subsequent quarters showing significantly slowed growth in active accounts—growth that went essentially flat in 2024 even as competitors such as Venmo and Zelle maintained steady high-single-digit to double-digit expansion—it became increasingly evident that Block's enhanced fraud prevention measures were constraining user growth, suggesting that prior growth had been artificially inflated by fraudulent accounts. The comparative data makes Block's stagnation stand out: while Cash App's monthly transacting users grew only 1.8% in 2024, Venmo added approximately 6 million users (9% growth) and Zelle expanded by 31 million enrolled accounts (26% growth). Cash App was stagnating while the rest of the market was growing strongly. This interpretation is consistent with the pattern where companies implementing stronger verification controls often see temporary declines in reported user metrics as duplicate and fraudulent accounts are eliminated, ultimately leading to Block's stock declining more than 45% from pre-report levels as the market recognized the extent of the user metric inflation.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

188.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

189.    Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

190.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading

forward-looking statements because at the time each of those statements was made, the speaker knew the statement was false or misleading, did not actually believe the statements, had no reasonable basis for the statements, and/or was aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## X.    **PRESUMPTION OF RELIANCE**

191.    Lead Plaintiff and other Class members are entitled to a presumption of reliance established by the fraud-on-the-market doctrine as endorsed in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the presumption of reliance for omissions as endorsed in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

192.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine, in that:

a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.    the misrepresentations and omissions were material;

c.    Block Class A common stock was traded in an efficient market during the Class Period;

d.    the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.    the Company traded on the NYSE, and was covered by multiple analysts;

f.    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.    Lead Plaintiff and members of the Class purchased and/or sold Block common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

193.    As a result of the foregoing facts, the market for Block common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the stock price. Under these circumstances, all purchasers of Block

1    common stock during the Class Period suffered similar injury through their purchase of the

2    Company's common stock at artificially inflated prices, and a presumption of reliance applies.

3    194.    Alternatively, Lead Plaintiff and the Class are entitled to the presumption of

4    reliance established by the Supreme Court in *Affiliated Ute* to the extent Lead Plaintiff's claims

5    are grounded on Defendants' material omissions. Because this action involves Defendants' failure

6    to disclose material adverse information regarding Block's business operations and financial

7    performance—information Defendants were obligated to disclose—positive proof of reliance is

8    not a prerequisite to recovery. Rather, all that is necessary to invoke the *Affiliated Ute*

9    presumption of reliance is that the withheld facts were material in that a reasonable investor

10   would have considered them important in making investment decisions. Given the importance of

11   the Class Period material misstatements and omissions as set forth above, that requirement is

12   satisfied.

13   **XI.    CLASS ACTION ALLEGATIONS**

14   195.    Lead Plaintiff brings this action on its own and as a class action pursuant to

15   Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf all persons and entities who purchased

16   or acquired Block's Class A publicly traded common stock during the Class Period and were

17   damaged thereby (the "Class"). Excluded from the Class are Defendants herein, the officers and

18   directors of the Company, at all relevant times, members of their immediate families and their

19   legal representatives, heirs, successors or assigns, the Court, and any entity in which Defendants

20   have or had a controlling interest.

21   196.    The members of the Class are so numerous that joinder of all members is

22   impracticable. Throughout the Class Period, Block Class A common stock actively traded on the

23   NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and

24   can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are

25   thousands of members in the proposed Class. Record owners and other members of the Class may

26   be identified from records maintained by Block or its transfer agent and may be notified of the

27   pendency of this action by mail, using the form of notice similar to that customarily used in

28   securities class actions.

1    197.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all

2    members of the Class are similarly affected by Defendants' wrongful conduct in violation of

3    federal law that is complained of herein.

4    198.    Lead Plaintiff will fairly and adequately protect the interests of the members of the

5    Class and has retained counsel competent and experienced in class and securities litigation. Lead

6    Plaintiff has no interests antagonistic to or in conflict with those of the Class.

7    199.    Common questions of law and fact exist as to all members of the Class and

8    predominate over any questions solely affecting individual members of the Class. Among the

9    questions of law and fact common to the Class are:

10    a.    whether the federal securities laws were violated by Defendants' acts as

11    alleged herein;

12    b.    whether statements made by Defendants to the investing public during the

13    Class Period misrepresented material facts about the business, operations and management of

14    Block;

15    c.    whether the Individual Defendants caused Block to issue false and

16    misleading financial statements during the Class Period;

17    d.    whether Defendants acted knowingly or recklessly in issuing false and

18    misleading financial statements;

19    e.    whether and to what extent the prices of Block common stock during the

20    Class Period were artificially inflated because of Defendants' conduct complained of herein;

21    f.    whether reliance may be presumed; and

22    g.    whether the members of the Class have sustained damages and, if so, what

23    is the proper measure of damages.

24    200.    A class action is superior to all other available methods for the fair and efficient

25    adjudication of this controversy because joinder of all members is impracticable. Furthermore, as

26    the damages suffered by individual Class members may be relatively small, the expense and

27    burden of individual litigation make it impossible for members of the Class to individually

28

AMENDED CONSOLIDATED CLASS ACTION
COMPLAINT
CASE NO. 5:25-CV-00642-NW

1    redress the wrongs done to them. There will be no difficulty in the management of this action as a

2    class action.

3    **XII.    CLAIMS FOR RELIEF**

4

5                                    **COUNT I**
     **Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)**
6                          **against Block, Dorsey, and Ahuja**

7           201.    Lead Plaintiff repeats and re-alleges each and every allegation contained in the

8    foregoing paragraphs as if fully set forth herein.

9           202.    This Count is asserted against Defendants and is based upon Section 10(b) of the

10   Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and

11   Exchange Commission.

12          203.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and

13   course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

14   practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the

15   other members of the Class; made various untrue statements of material facts and omitted to state

16   material facts necessary in order to make the statements made, in light of the circumstances under

17   which they were made, not misleading; and employed devices, schemes and artifices to defraud in

18   connection with the purchase and sale of securities. Such scheme was intended to, and,

19   throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and

20   other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of

21   Block common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase or

22   otherwise acquire Block common stock at artificially inflated prices. In furtherance of this

23   unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set

24   forth herein.

25          204.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the

26   Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

27   and annual reports, SEC filings, press releases and other statements and documents described

28   above, including statements made to securities analysts and the media that were designed to

1    influence the market for Block common stock. Such reports, filings, releases, and statements were

2    materially false and misleading in that they failed to disclose material adverse information and

3    misrepresented the truth about Block's finances and business prospects.

4    205.    By virtue of their positions at Block, Defendants had actual knowledge of the

5    materially false and misleading statements and material omissions alleged herein and intended

6    thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative,

7    Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain

8    and disclose such facts as would reveal the materially false and misleading nature of the

9    statements made, although such facts were readily available to Defendants. Said acts and

10   omissions of Defendants were committed willfully or with reckless disregard for the truth. In

11   addition, each Defendant knew or recklessly disregarded that material facts were being

12   misrepresented or omitted as described above.

13   206.    Information showing that Defendants acted knowingly or with reckless disregard

14   for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

15   and/or directors of Block, the Individual Defendants had knowledge of the details of Block's

16   internal affairs.

17   207.    The Individual Defendants are liable both directly and indirectly for the wrongs

18   complained of herein. Because of their positions of control and authority, the Individual

19   Defendants were able to and did, directly or indirectly, control the content of the statements of

20   Block. As officers and/or directors of a publicly-held company, the Individual Defendants had a

21   duty to disseminate timely, accurate, and truthful information with respect to Block's businesses,

22   operations, future financial condition and future prospects. As a result of the dissemination of the

23   aforementioned false and misleading reports, releases and public statements, the market price of

24   Block common stock was artificially inflated throughout the Class Period. In ignorance of the

25   adverse facts concerning Block's business and financial condition which were concealed by

26   Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired

27   Block common stock at artificially inflated prices and relied upon the price of the common stock,

28

1    the integrity of the market for the common stock, and/or upon statements disseminated by

2    Defendants, and were damaged thereby.

3         208.    During the Class Period, Block common stock was traded on an active and

4    efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false

5    and misleading statements described herein, which the Defendants made, issued, or caused to be

6    disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

7    of Block common stock at prices artificially inflated by Defendants' wrongful conduct. Had Lead

8    Plaintiff and the other members of the Class known the truth, they would not have purchased or

9    otherwise acquired said common stock, or would not have purchased or otherwise acquired them

10   at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead

11   Plaintiff and the Class, the true value of Block Class A common stock was substantially lower

12   than the prices paid by Lead Plaintiff and the other members of the Class. The market price of

13   Block common stock declined sharply upon public disclosure of the facts alleged herein to the

14   injury of Lead Plaintiff and Class members.

15        209.    By reason of the conduct alleged herein, Defendants knowingly or recklessly,

16   directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5

17   promulgated thereunder.

18        210.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff

19   and the other members of the Class suffered damages in connection with their respective

20   purchases, acquisitions, and/or sales of the Company's common stock during the Class Period,

21   upon the disclosure that the Company had been disseminating misrepresented financial statements

22   to the investing public.

23
                          **COUNT II**
        **Violation of Section 20(a) of the Exchange Act**
24
             **Against Dorsey and Ahuja**

25        211.    Lead Plaintiff repeats and re-alleges each and every allegation contained in the

26   foregoing paragraphs as if fully set forth herein.

27        212.    During the Class Period, the Individual Defendants participated in the operation

28   and management of Block, and conducted and participated, directly and indirectly, in the conduct

1    of Block's business affairs. Because of their senior positions, they knew the adverse non-public

2    information about Block's business operations and financial performance.

3         213.    As officers and/or directors of a publicly owned company, the Individual

4    Defendants had a duty to disseminate accurate and truthful information with respect to Block's

5    financial condition and results of operations, and to correct promptly any public statements issued

6    by Block which had become materially false or misleading.

7         214.    Because of their positions of control and authority as senior officers, the Individual

8    Defendants were able to, and did, control the contents of the various reports, press releases and

9    public filings which Block disseminated in the marketplace during the Class Period concerning

10    Block's operations. Throughout the Class Period, the Individual Defendants exercised their power

11    and authority to cause Block to engage in the wrongful acts complained of herein. The Individual

12    Defendants, therefore, were "controlling persons" of Block within the meaning of Section 20(a)

13    of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which

14    artificially inflated the market price of Block Class A common stock.

15         215.    Each of the Individual Defendants, therefore, acted as a controlling person of

16    Block. By reason of their senior management positions and/or being directors of Block, each of

17    the Individual Defendants had the power to direct the actions of, and exercised the same, to cause

18    Block to engage in the unlawful acts and conduct complained of herein. Each of the Individual

19    Defendants exercised control over the general operations of Block and possessed the power to

20    control the specific activities which comprise the primary violations about which Lead Plaintiff

21    and the other members of the Class complain.

22         216.    By reason of the above conduct, the Individual Defendants are liable pursuant to

23    Section 20(a) of the Exchange Act for the violations committed by Block.

24   **XIII.**    **PRAYER FOR RELIEF**

25         217.    WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

26           A.    Determining this is a proper class action maintained under Rule 23(a) and

27             (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as

28             class representative, and appointing Lieff Cabraser Heimann & Bernstein,

1    LLP and Cohen Milstein Sellers & Toll PLLC as class counsel under Rule

2    23(g);

3    B.  Declaring and determining that Defendants violated the Exchange Act by

4    reason of the acts and omissions alleged in this Complaint;

5    C.  Awarding Lead Plaintiff and other Class members compensatory damages

6    against all Defendants, jointly and severally, for all damages sustained as a

7    result of Defendants' wrongdoing, in an amount to be proven at trial,

8    including prejudgment interest;

9    D.  Awarding Lead Plaintiff and other Class members their reasonable costs

10    and expenses incurred in connection with this action, including attorneys'

11    fees and costs; and

12    E.  Granting such other and further relief as the Court may deem just and

13    proper.

14    **XIV.    JURY DEMAND**

15    Lead Plaintiff demands a trial by jury on all issues so triable.

16

17    Date: June 18, 2025                Respectfully submitted,

18                                        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

19                                        */s/ Richard M. Heimann*

20                                        Richard M. Heimann (S.B.N. 063607)
21                                        Katherine Lubin Benson (S.B.N. 259826)
                                          Courtney J. Liss (S.B.N. 339493)
22                                        275 Battery Street, 29th Floor
                                          San Francisco, CA 94111
23                                        Telephone: (415) 956-1000
                                          rheimann@lchb.com
24                                        kbenson@lchb.com
                                          cliss@lchb.com
25
                                          Steven E. Fineman (S.B.N. 140335)
26                                        Daniel P. Chiplock (*pro hac vice*)
                                          Nicholas Diamand (*pro hac vice*)
27                                        Gabriel A. Panek (*pro hac vice*)
                                          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
28                                        250 Hudson Street, 8th Floor
                                          New York, NY 10013

- 74 -                    AMENDED CONSOLIDATED CLASS ACTION
                                                        COMPLAINT
                                                        CASE NO. 5:25-CV-00642-NW

Telephone: (212) 355-9500
sfineman@lchb.com
dchiplock@lchb.com
ndiamand@lchb.com
gpanek@lchb.com

Julie Goldsmith Reiser (*pro hac vice*)
Claire Marsden (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
jreiser@cohenmilstein.com
cmarsden@cohenmilstein.com

Michael B. Eisenkraft (*pro hac vice*)
Benjamin F. Jackson (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
meisenkraft@cohenmilstein.com
bjackson@cohenmilstein.com

*Counsel for Lead Plaintiff NYC Funds and Co-Lead
Counsel for the Proposed Class*

# APPENDIX

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Alexandra D. Jung, on behalf of the Board of Education Retirement System of the City of New York ("BERS"), hereby certify that:

1.  I am Senior Counsel at the New York City Law Department and authorized to execute this Certification on behalf of BERS. I have reviewed the Amended Complaint. BERS has authorized Cohen Milstein Sellers & Toll PLLC and Lieff Cabraser Heimann & Bernstein LLP to file the Amended Complaint on BERS's behalf.

2.  BERS did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  BERS is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  BERS's transactions in Block Class A common stock that are the subject of this action, from February 26, 2020 to May 1, 2025, are set forth in the attached Schedule A.

5.  During the three years prior to the date of this Certification, BERS sought to serve or served as a representative party for a class in the following actions: *Gonsalves v. Block, Inc. et al.*, No. 5:25-cv-00642 (N.D. Cal.) (appointed lead plaintiff); *Flannery v. Snowflake Inc. et al.*, No. 5:24-cv-01234 (N.D. Cal.) (appointed lead plaintiff); *Washtenaw County Employees' Retirement System v. Dollar General Corporation et al.*, No. 3:23-cv-01250 (M.D. Tenn.) (not appointed lead plaintiff); *In re AT&T Securities Litigation*, No. 3:24-cv-01196 (N.D. Tex.) (appointed lead plaintiff); and *The New York City Fire Department Pension Fund et al. v. Coupang, Inc. et al.*, No. 1:22-cv-07309 (S.D.N.Y.) (appointed lead plaintiff).

6.  BERS will not accept any payment for serving as a representative party on behalf of the class beyond BERS's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___18ᵗʰ___ day of June, 2025.

_Alexandra Jung_
Alexandra D. Jung
Senior Counsel
New York City Law Department

## SCHEDULE A

**BERS**

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 6/2/2020 | Purchase | 350 | 87.68 |
| 6/2/2020 | Purchase | 697 | 87.09 |
| 6/2/2020 | Purchase | 124 | 85.92 |
| 6/2/2020 | Purchase | 4,019 | 86.52 |
| 6/2/2020 | Purchase | 765 | 88.00 |
| 6/3/2020 | Purchase | 30 | 89.88 |
| 6/3/2020 | Purchase | 5,120 | 91.37 |
| 6/3/2020 | Purchase | 443 | 91.97 |
| 6/26/2020 | Purchase | 146 | 104.30 |
| 6/26/2020 | Purchase | 737 | 104.30 |
| 6/26/2020 | Purchase | 8,100 | 104.30 |
| 8/13/2020 | Sale | 264 | 140.45 |
| 9/2/2020 | Purchase | 336 | 162.88 |
| 9/18/2020 | Purchase | 200 | 145.01 |
| 12/18/2020 | Purchase | 420 | 235.45 |
| 12/18/2020 | Purchase | 46 | 235.45 |
| 1/4/2021 | Sale | 584 | 221.16 |
| 2/16/2021 | Sale | 407 | 276.02 |
| 3/24/2021 | Sale | 678 | 213.51 |
| 4/23/2021 | Purchase | 100 | 246.43 |
| 6/9/2021 | Sale | 1,180 | 210.21 |
| 6/25/2021 | Purchase | 255 | 239.94 |
| 6/25/2021 | Purchase | 387 | 239.94 |
| 6/25/2021 | Purchase | 800 | 239.94 |
| 10/26/2021 | Sale | 606 | 263.39 |
| 11/19/2021 | Sale | 287 | 225.14 |
| 11/19/2021 | Sale | 250 | 225.14 |
| 1/18/2022 | Purchase | 2,000 | 129.59 |
| 1/19/2022 | Purchase | 2,619 | 128.14 |
| 1/27/2022 | Purchase | 2,008 | 105.51 |
| 1/27/2022 | Purchase | 1,048 | 105.64 |
| 1/27/2022 | Purchase | 56 | 104.36 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|------------|------------------|--------|-----------------|
| 1/27/2022 | Purchase | 244 | 104.85 |
| 2/4/2022 | Purchase | 3 | 107.91 |
| 2/4/2022 | Purchase | 1,227 | 104.79 |
| 2/4/2022 | Purchase | 312 | 109.83 |
| 2/4/2022 | Purchase | 7 | 108.03 |
| 2/4/2022 | Sale | 1,700 | 109.75 |
| 2/9/2022 | Purchase | 1,882 | 111.86 |
| 2/9/2022 | Purchase | 61 | 110.97 |
| 2/25/2022 | Purchase | 207 | 114.00 |
| 2/25/2022 | Purchase | 658 | 114.47 |
| 3/17/2022 | Purchase | 182 | 124.52 |
| 3/18/2022 | Sale | 299 | 140.64 |
| 5/19/2022 | Purchase | 959 | 87.25 |
| 5/23/2022 | Purchase | 689 | 83.10 |
| 6/24/2022 | Purchase | 2,952 | 71.00 |
| 6/24/2022 | Purchase | 1,800 | 71.00 |
| 7/13/2022 | Purchase | 1,263 | 63.30 |
| 8/19/2022 | Sale | 2,028 | 74.36 |
| 9/16/2022 | Purchase | 1,872 | 64.89 |
| 9/16/2022 | Sale | 800 | 64.89 |
| 10/11/2022 | Purchase | 297 | 54.89 |
| 12/16/2022 | Purchase | 300 | 62.51 |
| 12/28/2022 | Purchase | 288 | 59.25 |
| 1/11/2023 | Purchase | 1,100 | 71.01 |
| 3/17/2023 | Purchase | 3,300 | 73.98 |
| 4/21/2023 | Sale | 4,321 | 63.48 |
| 6/23/2023 | Purchase | 498 | 62.86 |
| 6/23/2023 | Purchase | 145 | 62.86 |
| 6/23/2023 | Sale | 15,200 | 62.86 |
| 12/15/2023 | Purchase | 144 | 74.21 |
| 12/15/2023 | Purchase | 2,781 | 74.21 |
| 12/21/2023 | Purchase | 793 | 76.85 |
| 2/12/2024 | Sale | 2,685 | 68.84 |
| 2/12/2024 | Sale | 5,265 | 67.46 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 3/11/2024 | Sale | 5,066 | 81.88 |
| 3/20/2024 | Purchase | 531 | 78.86 |
| 4/26/2024 | Sale | 434 | 74.48 |
| 6/21/2024 | Purchase | 272 | 62.41 |
| 9/20/2024 | Purchase | 913 | 67.46 |
| 11/18/2024 | Purchase | 334 | 90.64 |
| 11/18/2024 | Purchase | 361 | 90.79 |
| 11/19/2024 | Purchase | 510 | 91.33 |
| 11/19/2024 | Purchase | 146 | 91.57 |
| 11/19/2024 | Purchase | 75 | 92.42 |
| 11/19/2024 | Purchase | 31 | 90.18 |
| 11/19/2024 | Purchase | 72 | 90.25 |
| 11/19/2024 | Purchase | 26 | 91.84 |
| 11/19/2024 | Purchase | 303 | 91.92 |
| 11/19/2024 | Purchase | 72 | 90.91 |
| 11/19/2024 | Purchase | 75 | 92.37 |
| 11/19/2024 | Purchase | 1,194 | 92.49 |
| 11/20/2024 | Purchase | 286 | 91.18 |
| 12/17/2024 | Sale | 1,237 | 94.55 |
| 3/18/2025 | Purchase | 320 | 59.65 |
| 3/18/2025 | Purchase | 894 | 59.34 |
| 3/18/2025 | Purchase | 71 | 59.48 |
| 3/18/2025 | Purchase | 157 | 59.65 |
| 3/18/2025 | Purchase | 217 | 59.74 |
| 3/19/2025 | Purchase | 30 | 60.59 |
| 3/19/2025 | Purchase | 3 | 59.85 |
| 3/19/2025 | Purchase | 57 | 61.81 |
| 3/19/2025 | Purchase | 666 | 61.10 |
| 3/19/2025 | Purchase | 199 | 61.37 |
| 4/4/2025 | Purchase | 43 | 50.26 |
| 4/4/2025 | Purchase | 338 | 50.26 |
| 4/11/2025 | Purchase | 294 | 53.94 |

Prices listed are rounded to two decimal places.

## CERTIFICATION PURSUANT TO
## <u>THE FEDERAL SECURITIES LAWS</u>

I, Alexandra D. Jung, on behalf of the New York City Fire Department Life Insurance Fund ("FDLIF"), hereby certify that:

1. I am Senior Counsel at the New York City Law Department and authorized to execute this Certification on behalf of FDLIF. I have reviewed the Amended Complaint. FDLIF has authorized Cohen Milstein Sellers & Toll PLLC and Lieff Cabraser Heimann & Bernstein LLP to file the Amended Complaint on FDLIF's behalf.

2. FDLIF did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. FDLIF is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. FDLIF's transactions in Block Class A common stock that are the subject of this action, from February 26, 2020 to May 1, 2025, are set forth in the attached Schedule A.

5. During the three years prior to the date of this Certification, FDLIF sought to serve or served as a representative party for a class in the following actions: *Gonsalves v. Block, Inc. et al.*, No. 5:25-cv-00642 (N.D. Cal.) (appointed lead plaintiff); and *Flannery v. Snowflake Inc. et al.*, No. 5:24-cv-01234 (N.D. Cal.) (appointed lead plaintiff).

6. FDLIF will not accept any payment for serving as a representative party on behalf of the class beyond FDLIF's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of June, 2025.

Alexandra D. Jung
Senior Counsel
New York City Law Department

## SCHEDULE A

**FDLIF**

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 6/26/2020 | Purchase | 1 | 104.30 |
| 6/26/2020 | Purchase | 6 | 104.30 |
| 9/18/2020 | Purchase | 5 | 145.01 |
| 6/25/2021 | Purchase | 4 | 239.94 |
| 6/25/2021 | Purchase | 5 | 239.94 |
| 9/17/2021 | Purchase | 4 | 255.79 |
| 1/19/2022 | Purchase | 40 | 128.14 |
| 3/18/2022 | Purchase | 5 | 140.64 |
| 6/24/2022 | Purchase | 14 | 71.00 |
| 9/16/2022 | Purchase | 9 | 64.89 |
| 12/16/2022 | Purchase | 7 | 62.51 |
| 6/23/2023 | Purchase | 5 | 62.86 |
| 6/23/2023 | Purchase | 2 | 62.86 |
| 3/15/2024 | Purchase | 4 | 80.17 |
| 3/15/2024 | Purchase | 4 | 80.17 |
| 9/20/2024 | Purchase | 9 | 67.46 |
| 12/20/2024 | Sale | 7 | 89.65 |
| 1/16/2025 | Sale | 115 | 86.38 |

Prices listed are rounded to two decimal places.

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Alexandra D. Jung, on behalf of the New York City Fire Fighters' Variable Supplements Fund ("FFVSF"), hereby certify that:

1.  I am Senior Counsel at the New York City Law Department and authorized to execute this Certification on behalf of FFVSF. I have reviewed the Amended Complaint. FFVSF has authorized Cohen Milstein Sellers & Toll PLLC and Lieff Cabraser Heimann & Bernstein LLP to file the Amended Complaint on FFVSF's behalf.

2.  FFVSF did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  FFVSF is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  FFVSF's transactions in Block Class A common stock that are the subject of this action, from February 26, 2020 to May 1, 2025, are set forth in the attached Schedule A.

5.  During the three years prior to the date of this Certification, FFVSF sought to serve or served as a representative party for a class in the following actions: *Gonsalves v. Block, Inc. et al.*, No. 5:25-cv-00642 (N.D. Cal.) (appointed lead plaintiff); and *Flannery v. Snowflake Inc. et al.*, No. 5:24-cv-01234 (N.D. Cal.) (appointed lead plaintiff).

6.  FFVSF will not accept any payment for serving as a representative party on behalf of the class beyond FFVSF's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18ᵗʰ day of June, 2025.

Alexandra D. Jung
Senior Counsel
New York City Law Department

## SCHEDULE A

**FFVSF**

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 6/26/2020 | Purchase | 15 | 104.30 |
| 6/26/2020 | Purchase | 77 | 104.30 |
| 9/18/2020 | Purchase | 48 | 145.01 |
| 12/9/2020 | Sale | 183 | 207.04 |
| 6/25/2021 | Purchase | 36 | 239.94 |
| 6/25/2021 | Purchase | 55 | 239.94 |
| 9/17/2021 | Purchase | 39 | 255.79 |
| 12/8/2021 | Sale | 214 | 194.78 |
| 1/19/2022 | Purchase | 387 | 128.14 |
| 6/24/2022 | Purchase | 180 | 71.00 |
| 9/16/2022 | Purchase | 66 | 64.89 |
| 12/9/2022 | Sale | 304 | 64.60 |
| 12/16/2022 | Purchase | 47 | 62.51 |
| 9/15/2023 | Purchase | 63 | 52.83 |
| 12/7/2023 | Sale | 293 | 68.47 |
| 3/15/2024 | Purchase | 17 | 80.17 |
| 3/15/2024 | Purchase | 41 | 80.17 |
| 9/20/2024 | Purchase | 58 | 67.46 |
| 12/9/2024 | Sale | 72 | 95.42 |
| 12/9/2024 | Sale | 17 | 95.42 |
| 12/20/2024 | Purchase | 43 | 89.65 |
| 3/21/2025 | Sale | 20 | 61.11 |
| 3/21/2025 | Sale | 42 | 61.11 |

Prices listed are rounded to two decimal places.

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Alexandra D. Jung, on behalf of the New York City Fire Department Pension Fund ("Fire"), hereby certify that:

1.  I am Senior Counsel at the New York City Law Department and authorized to execute this Certification on behalf of Fire. I have reviewed the Amended Complaint. Fire has authorized Cohen Milstein Sellers & Toll PLLC and Lieff Cabraser Heimann & Bernstein LLP to file the Amended Complaint on Fire's behalf.

2.  Fire did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  Fire is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  Fire's transactions in Block Class A common stock that are the subject of this action, from February 26, 2020 to May 1, 2025, are set forth in the attached Schedule A.

5.  During the three years prior to the date of this Certification, Fire sought to serve or served as a representative party for a class in the following actions: *Gonsalves v. Block, Inc. et al.*, No. 5:25-cv-00642 (N.D. Cal.) (appointed lead plaintiff); *Flannery v. Snowflake Inc. et al.*, No. 5:24-cv-01234 (N.D. Cal.) (appointed lead plaintiff); *Washtenaw County Employees' Retirement System v. Dollar General Corporation et al.*, No. 3:23-cv-01250 (M.D. Tenn.) (not appointed lead plaintiff); *KBC Asset Management NV et al v. Discover Financial Services et al.*, No. 1:23-cv-06788 (N.D. Ill.) (appointed lead plaintiff); *In re AT&T Securities Litigation*, No. 3:24-cv-01196 (N.D. Tex.) (appointed lead plaintiff); *The New York City Fire Department Pension Fund et al. v. Coupang, Inc. et al.*, No. 1:22-cv-07309 (S.D.N.Y.) (appointed lead plaintiff); and *Norfolk County Retirement System v. Community Health Systems, Inc. et al.*, No. 3:11-cv-00433 (M.D. Tenn.) (appointed lead plaintiff).

6.  Fire will not accept any payment for serving as a representative party on behalf of the class beyond Fire's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of June, 2025.

_Alexandra Jung_
Alexandra D. Jung
Senior Counsel
New York City Law Department

## SCHEDULE A

Fire

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 3/6/2020 | Sale | 625 | 73.09 |
| 3/6/2020 | Sale | 281 | 73.09 |
| 6/2/2020 | Purchase | 700 | 87.68 |
| 6/2/2020 | Purchase | 1,393 | 87.09 |
| 6/2/2020 | Purchase | 248 | 85.92 |
| 6/2/2020 | Purchase | 8,034 | 86.52 |
| 6/2/2020 | Purchase | 1,529 | 88.00 |
| 6/3/2020 | Purchase | 60 | 89.88 |
| 6/3/2020 | Purchase | 10,238 | 91.37 |
| 6/3/2020 | Purchase | 886 | 91.97 |
| 6/9/2020 | Sale | 561 | 89.53 |
| 6/26/2020 | Purchase | 12,600 | 104.30 |
| 6/26/2020 | Purchase | 243 | 104.30 |
| 6/26/2020 | Purchase | 1,225 | 104.30 |
| 8/13/2020 | Sale | 530 | 140.45 |
| 9/18/2020 | Purchase | 400 | 145.01 |
| 9/18/2020 | Purchase | 726 | 145.01 |
| 10/27/2020 | Sale | 601 | 171.02 |
| 12/14/2020 | Sale | 393 | 215.86 |
| 12/18/2020 | Purchase | 816 | 235.45 |
| 1/4/2021 | Sale | 853 | 221.16 |
| 1/14/2021 | Sale | 871 | 232.79 |
| 2/16/2021 | Sale | 924 | 276.02 |
| 4/6/2021 | Sale | 800 | 236.50 |
| 4/21/2021 | Sale | 700 | 245.25 |
| 4/21/2021 | Sale | 300 | 245.25 |
| 6/1/2021 | Sale | 309 | 221.95 |
| 6/1/2021 | Sale | 241 | 221.95 |
| 6/9/2021 | Sale | 805 | 210.21 |
| 6/18/2021 | Sale | 816 | 237.05 |
| 6/25/2021 | Purchase | 600 | 239.94 |
| 6/25/2021 | Purchase | 434 | 239.94 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 6/25/2021 | Purchase | 658 | 239.94 |
| 9/15/2021 | Sale | 237 | 248.80 |
| 9/17/2021 | Purchase | 200 | 255.79 |
| 9/17/2021 | Purchase | 412 | 255.79 |
| 10/6/2021 | Sale | 337 | 239.12 |
| 10/26/2021 | Sale | 444 | 263.39 |
| 11/4/2021 | Sale | 431 | 247.46 |
| 11/11/2021 | Sale | 348 | 226.51 |
| 11/19/2021 | Sale | 173 | 225.14 |
| 11/19/2021 | Sale | 151 | 225.14 |
| 12/13/2021 | Sale | 392 | 175.44 |
| 1/6/2022 | Sale | 366 | 144.66 |
| 1/18/2022 | Purchase | 2,700 | 129.59 |
| 1/19/2022 | Purchase | 5,204 | 128.14 |
| 1/27/2022 | Purchase | 4,015 | 105.51 |
| 1/27/2022 | Purchase | 2,097 | 105.64 |
| 1/27/2022 | Purchase | 112 | 104.36 |
| 1/27/2022 | Purchase | 488 | 104.85 |
| 2/4/2022 | Purchase | 13 | 108.03 |
| 2/4/2022 | Purchase | 624 | 109.83 |
| 2/4/2022 | Purchase | 2,454 | 104.79 |
| 2/4/2022 | Purchase | 6 | 107.91 |
| 2/9/2022 | Purchase | 3,763 | 111.86 |
| 2/9/2022 | Purchase | 121 | 110.97 |
| 2/25/2022 | Purchase | 413 | 114.00 |
| 2/25/2022 | Purchase | 1,316 | 114.47 |
| 3/2/2022 | Purchase | 1,900 | 124.26 |
| 3/2/2022 | Sale | 4,072 | 124.26 |
| 3/4/2022 | Purchase | 1,600 | 106.52 |
| 3/17/2022 | Purchase | 363 | 124.52 |
| 5/19/2022 | Purchase | 1,917 | 87.25 |
| 5/23/2022 | Purchase | 1,377 | 83.10 |
| 6/24/2022 | Purchase | 2,000 | 71.00 |
| 6/24/2022 | Purchase | 3,416 | 71.00 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 7/13/2022 | Purchase | 2,526 | 63.30 |
| 8/19/2022 | Sale | 860 | 74.36 |
| 9/16/2022 | Purchase | 800 | 64.89 |
| 9/16/2022 | Purchase | 776 | 64.89 |
| 10/11/2022 | Purchase | 590 | 54.89 |
| 12/16/2022 | Purchase | 614 | 62.51 |
| 12/22/2022 | Sale | 625 | 60.59 |
| 12/28/2022 | Purchase | 577 | 59.25 |
| 3/17/2023 | Purchase | 400 | 73.98 |
| 6/9/2023 | Sale | 1,244 | 64.94 |
| 6/23/2023 | Purchase | 489 | 62.86 |
| 6/23/2023 | Purchase | 142 | 62.86 |
| 6/23/2023 | Sale | 21,400 | 62.86 |
| 8/1/2023 | Sale | 2,100 | 78.76 |
| 12/1/2023 | Sale | 626 | 65.04 |
| 12/13/2023 | Sale | 6,191 | 69.35 |
| 12/21/2023 | Purchase | 1,990 | 76.85 |
| 3/15/2024 | Purchase | 161 | 80.17 |
| 3/15/2024 | Purchase | 390 | 80.17 |
| 3/20/2024 | Purchase | 1,887 | 78.86 |
| 6/21/2024 | Purchase | 864 | 62.41 |
| 6/27/2024 | Sale | 1,017 | 63.39 |
| 9/20/2024 | Purchase | 722 | 67.46 |
| 10/9/2024 | Purchase | 4,022 | 68.27 |
| 11/18/2024 | Purchase | 5,820 | 90.00 |
| 11/18/2024 | Purchase | 9,570 | 88.36 |
| 11/18/2024 | Purchase | 690 | 89.99 |
| 11/18/2024 | Purchase | 11,420 | 88.64 |
| 11/18/2024 | Purchase | 1,051 | 90.64 |
| 11/18/2024 | Purchase | 1,137 | 90.79 |
| 11/18/2024 | Purchase | 2,280 | 86.41 |
| 11/19/2024 | Purchase | 3,758 | 92.49 |
| 11/19/2024 | Purchase | 954 | 91.92 |
| 11/19/2024 | Purchase | 236 | 92.37 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 11/19/2024 | Purchase | 1,605 | 91.33 |
| 11/19/2024 | Purchase | 81 | 91.84 |
| 11/19/2024 | Purchase | 461 | 91.57 |
| 11/19/2024 | Purchase | 97 | 90.18 |
| 11/19/2024 | Purchase | 227 | 90.25 |
| 11/19/2024 | Purchase | 236 | 92.42 |
| 11/19/2024 | Purchase | 227 | 90.91 |
| 11/20/2024 | Purchase | 900 | 91.18 |
| 11/22/2024 | Purchase | 1,860 | 92.54 |
| 11/25/2024 | Purchase | 560 | 90.53 |
| 12/20/2024 | Purchase | 647 | 89.65 |
| 12/30/2024 | Sale | 540 | 88.20 |
| 1/16/2025 | Sale | 6,550 | 85.53 |
| 2/20/2025 | Sale | 520 | 82.28 |
| 2/20/2025 | Sale | 910 | 82.57 |
| 2/20/2025 | Sale | 5,490 | 82.71 |
| 2/21/2025 | Sale | 550 | 71.80 |
| 2/21/2025 | Sale | 190 | 70.24 |
| 2/21/2025 | Sale | 24,000 | 71.46 |
| 3/18/2025 | Purchase | 886 | 59.65 |
| 3/18/2025 | Purchase | 197 | 59.48 |
| 3/18/2025 | Purchase | 436 | 59.65 |
| 3/18/2025 | Purchase | 601 | 59.74 |
| 3/18/2025 | Purchase | 2,478 | 59.34 |
| 3/19/2025 | Purchase | 82 | 60.59 |
| 3/19/2025 | Purchase | 8 | 59.85 |
| 3/19/2025 | Purchase | 1,849 | 61.10 |
| 3/19/2025 | Purchase | 157 | 61.81 |
| 3/19/2025 | Purchase | 551 | 61.37 |
| 4/2/2025 | Purchase | 5,640 | 58.08 |
| 4/2/2025 | Purchase | 800 | 58.11 |
| 4/3/2025 | Purchase | 5,760 | 54.78 |
| 4/4/2025 | Purchase | 925 | 50.26 |
| 4/4/2025 | Purchase | 118 | 50.26 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 4/11/2025 | Purchase | 1,053 | 53.94 |

Prices listed are rounded to two decimal places.

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Alexandra D. Jung, on behalf of the New York City Fire Officers' Variable Supplements Fund ("FOVSF"), hereby certify that:

1.   I am Senior Counsel at the New York City Law Department and authorized to execute this Certification on behalf of FOVSF. I have reviewed the Amended Complaint. FOVSF has authorized Cohen Milstein Sellers & Toll PLLC and Lieff Cabraser Heimann & Bernstein LLP to file the Amended Complaint on FOVSF's behalf.

2.   FOVSF did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.   FOVSF is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.   FOVSF's transactions in Block Class A common stock that are the subject of this action, from February 26, 2020 to May 1, 2025, are set forth in the attached Schedule A.

5.   During the three years prior to the date of this Certification, FOVSF sought to serve or served as a representative party for a class in the following actions: *Gonsalves v. Block, Inc. et al.*, No. 5:25-cv-00642 (N.D. Cal.) (appointed lead plaintiff); and *Flannery v. Snowflake Inc. et al.*, No. 5:24-cv-01234 (N.D. Cal.) (appointed lead plaintiff).

6.   FOVSF will not accept any payment for serving as a representative party on behalf of the class beyond FOVSF's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __18th__ day of June, 2025.

_Alexandra Jung_
Alexandra D. Jung
Senior Counsel
New York City Law Department

## SCHEDULE A

**FOVSF**

| Trade Date | Transaction Type | Shares | Share Price ($) |
|------------|------------------|--------|-----------------|
| 5/12/2020 | Purchase | 29 | 75.21 |
| 6/26/2020 | Purchase | 7 | 104.30 |
| 6/26/2020 | Purchase | 36 | 104.30 |
| 9/18/2020 | Purchase | 34 | 145.01 |
| 1/25/2021 | Sale | 124 | 216.64 |
| 6/25/2021 | Purchase | 25 | 239.94 |
| 6/25/2021 | Purchase | 38 | 239.94 |
| 9/17/2021 | Purchase | 27 | 255.79 |
| 1/19/2022 | Purchase | 306 | 128.14 |
| 1/27/2022 | Sale | 67 | 105.64 |
| 5/20/2022 | Purchase | 29 | 83.44 |
| 6/24/2022 | Purchase | 101 | 71.00 |
| 9/16/2022 | Purchase | 56 | 64.89 |
| 12/16/2022 | Purchase | 52 | 62.51 |
| 1/24/2023 | Sale | 207 | 80.79 |
| 4/13/2023 | Sale | 37 | 64.56 |
| 6/23/2023 | Purchase | 29 | 62.86 |
| 6/23/2023 | Purchase | 9 | 62.86 |
| 1/23/2024 | Sale | 197 | 66.20 |
| 3/15/2024 | Purchase | 25 | 80.17 |
| 3/15/2024 | Purchase | 10 | 80.17 |
| 9/20/2024 | Purchase | 44 | 67.46 |
| 12/20/2024 | Sale | 34 | 89.65 |
| 1/23/2025 | Sale | 151 | 87.80 |

Prices listed are rounded to two decimal places.

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Alexandra D. Jung, on behalf of the New York City Employees' Retirement System ("NYCERS"), hereby certify that:

1.  I am Senior Counsel at the New York City Law Department and authorized to execute this Certification on behalf of NYCERS. I have reviewed the Amended Complaint. NYCERS has authorized Cohen Milstein Sellers & Toll PLLC and Lieff Cabraser Heimann & Bernstein LLP to file the Amended Complaint on NYCERS's behalf.

2.  NYCERS did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  NYCERS is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  NYCERS's transactions in Block Class A common stock that are the subject of this action, from February 26, 2020 to May 1, 2025, are set forth in the attached Schedule A.

5.  During the three years prior to the date of this Certification, NYCERS sought to serve or served as a representative party for a class in the following actions: *Gonsalves v. Block, Inc. et al.*, No. 5:25-cv-00642 (N.D. Cal.) (appointed lead plaintiff); *Flannery v. Snowflake Inc. et al.*, No. 5:24-cv-01234 (N.D. Cal.) (appointed lead plaintiff); *KBC Asset Management NV et al v. Discover Financial Services et al.*, No. 1:23-cv-06788 (N.D. Ill.) (appointed lead plaintiff); *In re AT&T Securities Litigation*, No. 3:24-cv-01196 (N.D. Tex.) (appointed lead plaintiff); *The New York City Fire Department Pension Fund et al. v. Coupang, Inc. et al.*, No. 1:22-cv-07309 (S.D.N.Y.) (appointed lead plaintiff); and *Norfolk County Retirement System v. Community Health Systems, Inc. et al.*, No. 3:11-cv-00433 (M.D. Tenn.) (appointed lead plaintiff).

6.  NYCERS will not accept any payment for serving as a representative party on behalf of the class beyond NYCERS's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18ᵗʰ day of June, 2025.

Alexandra D. Jung
Senior Counsel
New York City Law Department

## SCHEDULE A

**NYCERS**

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 6/26/2020 | Purchase | 1,128 | 104.30 |
| 6/26/2020 | Purchase | 5,677 | 104.30 |
| 9/1/2020 | Sale | 6,790 | 166.66 |
| 9/18/2020 | Purchase | 5,017 | 145.01 |
| 10/27/2020 | Sale | 4,336 | 171.02 |
| 12/18/2020 | Purchase | 3,402 | 235.45 |
| 1/4/2021 | Sale | 3,957 | 221.16 |
| 1/14/2021 | Sale | 3,244 | 232.79 |
| 2/16/2021 | Sale | 3,538 | 276.02 |
| 2/22/2021 | Purchase | 126 | 272.43 |
| 4/7/2021 | Sale | 3,821 | 245.12 |
| 4/21/2021 | Sale | 589 | 245.25 |
| 4/21/2021 | Sale | 1,082 | 245.25 |
| 6/1/2021 | Sale | 1,682 | 221.95 |
| 6/1/2021 | Sale | 1,311 | 221.95 |
| 6/9/2021 | Sale | 4,542 | 210.21 |
| 6/18/2021 | Sale | 3,528 | 237.05 |
| 6/25/2021 | Purchase | 2,782 | 239.94 |
| 6/25/2021 | Purchase | 4,218 | 239.94 |
| 9/17/2021 | Purchase | 5,968 | 255.79 |
| 10/26/2021 | Sale | 9,031 | 263.39 |
| 11/3/2021 | Purchase | 24,175 | 251.14 |
| 12/17/2021 | Purchase | 3,070 | 167.06 |
| 1/19/2022 | Purchase | 20,028 | 128.14 |
| 1/27/2022 | Purchase | 3,445 | 105.51 |
| 1/27/2022 | Purchase | 1,799 | 105.64 |
| 1/27/2022 | Purchase | 96 | 104.36 |
| 1/27/2022 | Purchase | 418 | 104.85 |
| 2/4/2022 | Purchase | 6 | 107.91 |
| 2/4/2022 | Purchase | 2,508 | 104.79 |
| 2/4/2022 | Purchase | 638 | 109.83 |
| 2/4/2022 | Purchase | 14 | 108.03 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 2/9/2022 | Purchase | 3,848 | 111.86 |
| 2/9/2022 | Purchase | 124 | 110.97 |
| 2/14/2022 | Purchase | 8,300 | 111.64 |
| 2/14/2022 | Sale | 32,183 | 111.64 |
| 2/16/2022 | Purchase | 14,363 | 109.00 |
| 2/25/2022 | Purchase | 422 | 114.00 |
| 2/25/2022 | Purchase | 1,344 | 114.47 |
| 3/2/2022 | Purchase | 8,400 | 124.26 |
| 3/2/2022 | Sale | 15,971 | 124.26 |
| 3/17/2022 | Purchase | 371 | 124.52 |
| 3/18/2022 | Purchase | 16,194 | 140.64 |
| 3/18/2022 | Purchase | 1,477 | 140.64 |
| 4/5/2022 | Purchase | 7,900 | 135.92 |
| 4/5/2022 | Purchase | 900 | 135.92 |
| 4/5/2022 | Sale | 3,271 | 135.92 |
| 4/6/2022 | Purchase | 200 | 126.18 |
| 5/19/2022 | Purchase | 1,960 | 87.25 |
| 5/23/2022 | Purchase | 1,411 | 83.10 |
| 6/24/2022 | Purchase | 2,900 | 71.00 |
| 7/13/2022 | Purchase | 2,763 | 63.30 |
| 9/16/2022 | Sale | 800 | 64.89 |
| 9/16/2022 | Sale | 300 | 64.89 |
| 9/16/2022 | Sale | 800 | 64.89 |
| 10/11/2022 | Purchase | 566 | 54.89 |
| 11/10/2022 | Purchase | 1,900 | 67.37 |
| 12/16/2022 | Purchase | 800 | 62.51 |
| 12/28/2022 | Purchase | 562 | 59.25 |
| 1/11/2023 | Purchase | 2,400 | 71.01 |
| 3/17/2023 | Purchase | 7,300 | 73.98 |
| 4/21/2023 | Sale | 61,827 | 63.48 |
| 6/23/2023 | Sale | 39,100 | 62.86 |
| 12/21/2023 | Purchase | 1,635 | 76.54 |
| 3/15/2024 | Purchase | 34,864 | 80.17 |
| 3/15/2024 | Purchase | 14,400 | 80.17 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 3/20/2024 | Purchase | 2,063 | 78.86 |
| 4/1/2024 | Sale | 9,935 | 81.46 |
| 4/15/2024 | Sale | 6,237 | 73.50 |
| 4/19/2024 | Sale | 2,344 | 70.42 |
| 4/26/2024 | Sale | 2,701 | 74.48 |
| 6/21/2024 | Purchase | 1,103 | 62.41 |
| 6/28/2024 | Purchase | 3,996 | 64.49 |
| 7/18/2024 | Purchase | 596 | 69.05 |
| 7/18/2024 | Purchase | 6,219 | 69.03 |
| 7/25/2024 | Sale | 1,278 | 62.34 |
| 8/2/2024 | Purchase | 1,596 | 59.98 |
| 8/2/2024 | Purchase | 2,806 | 60.29 |
| 9/9/2024 | Purchase | 106 | 61.87 |
| 9/9/2024 | Purchase | 155 | 62.09 |
| 9/9/2024 | Purchase | 38 | 62.60 |
| 9/9/2024 | Purchase | 769 | 62.20 |
| 9/20/2024 | Purchase | 6,287 | 67.46 |
| 10/15/2024 | Purchase | 165 | 71.45 |
| 10/16/2024 | Purchase | 910 | 72.41 |
| 10/16/2024 | Purchase | 71 | 72.21 |
| 10/28/2024 | Purchase | 434 | 74.30 |
| 10/28/2024 | Purchase | 143 | 74.12 |
| 10/28/2024 | Purchase | 356 | 74.30 |
| 11/4/2024 | Purchase | 71 | 73.46 |
| 11/4/2024 | Purchase | 222 | 72.89 |
| 11/4/2024 | Purchase | 122 | 72.82 |
| 11/4/2024 | Purchase | 242 | 73.49 |
| 11/4/2024 | Purchase | 291 | 73.06 |
| 11/6/2024 | Purchase | 80 | 76.17 |
| 11/6/2024 | Purchase | 2,399 | 77.21 |
| 11/6/2024 | Purchase | 392 | 76.22 |
| 11/6/2024 | Sale | 4,047 | 77.64 |
| 11/7/2024 | Purchase | 403 | 77.09 |
| 11/7/2024 | Purchase | 518 | 77.03 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 11/13/2024 | Purchase | 117 | 88.53 |
| 11/13/2024 | Purchase | 382 | 86.12 |
| 11/13/2024 | Purchase | 1,281 | 86.63 |
| 11/14/2024 | Purchase | 1,748 | 84.04 |
| 11/14/2024 | Purchase | 443 | 83.94 |
| 11/14/2024 | Purchase | 358 | 84.04 |
| 11/18/2024 | Purchase | 13,170 | 88.64 |
| 11/18/2024 | Purchase | 800 | 89.99 |
| 11/18/2024 | Purchase | 1,228 | 90.64 |
| 11/18/2024 | Purchase | 1,329 | 90.79 |
| 11/18/2024 | Purchase | 2,630 | 86.41 |
| 11/18/2024 | Purchase | 6,710 | 90.00 |
| 11/18/2024 | Purchase | 11,030 | 88.36 |
| 11/18/2024 | Sale | 9,395 | 90.79 |
| 11/19/2024 | Purchase | 266 | 90.91 |
| 11/19/2024 | Purchase | 539 | 91.57 |
| 11/19/2024 | Purchase | 1,125 | 92.49 |
| 11/19/2024 | Purchase | 266 | 90.25 |
| 11/19/2024 | Purchase | 95 | 91.84 |
| 11/19/2024 | Purchase | 448 | 91.88 |
| 11/19/2024 | Purchase | 4,390 | 92.49 |
| 11/19/2024 | Purchase | 113 | 90.18 |
| 11/19/2024 | Purchase | 276 | 92.37 |
| 11/19/2024 | Purchase | 1,114 | 91.92 |
| 11/19/2024 | Purchase | 276 | 92.42 |
| 11/19/2024 | Purchase | 1,876 | 91.33 |
| 11/20/2024 | Purchase | 1,050 | 91.18 |
| 11/22/2024 | Purchase | 3,430 | 92.54 |
| 11/25/2024 | Purchase | 350 | 90.53 |
| 12/10/2024 | Purchase | 192 | 94.10 |
| 12/11/2024 | Purchase | 960 | 98.09 |
| 12/12/2024 | Purchase | 188 | 96.45 |
| 12/17/2024 | Sale | 7,949 | 94.55 |
| 12/30/2024 | Sale | 1,070 | 88.20 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 1/16/2025 | Sale | 685 | 86.38 |
| 1/16/2025 | Sale | 4,142 | 86.38 |
| 2/20/2025 | Sale | 1,050 | 82.57 |
| 2/20/2025 | Sale | 590 | 82.28 |
| 2/20/2025 | Sale | 6,330 | 82.71 |
| 2/21/2025 | Sale | 29,140 | 71.46 |
| 2/21/2025 | Sale | 230 | 70.24 |
| 2/21/2025 | Sale | 670 | 71.80 |
| 3/10/2025 | Sale | 1,268 | 54.74 |
| 3/10/2025 | Sale | 90 | 54.23 |
| 3/10/2025 | Sale | 406 | 54.00 |
| 3/10/2025 | Sale | 645 | 54.12 |
| 3/18/2025 | Purchase | 261 | 59.48 |
| 3/18/2025 | Purchase | 1,175 | 59.65 |
| 3/18/2025 | Purchase | 579 | 59.65 |
| 3/18/2025 | Purchase | 3,288 | 59.34 |
| 3/18/2025 | Purchase | 797 | 59.74 |
| 3/19/2025 | Purchase | 2,453 | 61.10 |
| 3/19/2025 | Purchase | 109 | 60.59 |
| 3/19/2025 | Purchase | 10 | 59.85 |
| 3/19/2025 | Purchase | 209 | 61.81 |
| 3/19/2025 | Purchase | 732 | 61.37 |
| 4/1/2025 | Sale | 1,358 | 54.73 |
| 4/1/2025 | Sale | 123 | 55.11 |
| 4/1/2025 | Sale | 963 | 54.52 |
| 4/2/2025 | Purchase | 6,510 | 58.08 |
| 4/2/2025 | Purchase | 930 | 58.11 |
| 4/3/2025 | Purchase | 6,630 | 54.78 |
| 4/11/2025 | Sale | 104 | 51.80 |
| 4/17/2025 | Sale | 1,189 | 53.72 |

Prices listed are rounded to two decimal places.

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Alexandra D. Jung, on behalf of the New York City Police Officers' Variable Supplements Fund ("POVSF"), hereby certify that:

1.    I am Senior Counsel at the New York City Law Department and authorized to execute this Certification on behalf of POVSF. I have reviewed the Amended Complaint. POVSF has authorized Cohen Milstein Sellers & Toll PLLC and Lieff Cabraser Heimann & Bernstein LLP to file the Amended Complaint on POVSF's behalf.

2.    POVSF did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.    POVSF is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.    POVSF's transactions in Block Class A common stock that are the subject of this action, from February 26, 2020 to May 1, 2025, are set forth in the attached Schedule A.

5.    During the three years prior to the date of this Certification, POVSF sought to serve or served as a representative party for a class in the following actions: *Gonsalves v. Block, Inc. et al.*, No. 5:25-cv-00642 (N.D. Cal.) (appointed lead plaintiff); and *Flannery v. Snowflake Inc. et al.*, No. 5:24-cv-01234 (N.D. Cal.) (appointed lead plaintiff).

6.    POVSF will not accept any payment for serving as a representative party on behalf of the class beyond POVSF's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18ᵗʰ day of June, 2025.

Alexandra Jung

Alexandra D. Jung
Senior Counsel
New York City Law Department

## SCHEDULE A

**POVSF**

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 6/26/2020 | Purchase | 54 | 104.30 |
| 6/26/2020 | Purchase | 273 | 104.30 |
| 9/18/2020 | Purchase | 176 | 145.01 |
| 12/9/2020 | Sale | 373 | 207.04 |
| 6/25/2021 | Purchase | 138 | 239.94 |
| 6/25/2021 | Purchase | 210 | 239.94 |
| 9/17/2021 | Purchase | 149 | 255.79 |
| 12/8/2021 | Sale | 657 | 194.78 |
| 1/19/2022 | Purchase | 1,523 | 128.14 |
| 6/21/2022 | Purchase | 616 | 60.52 |
| 6/24/2022 | Purchase | 642 | 71.00 |
| 9/16/2022 | Purchase | 254 | 64.89 |
| 12/9/2022 | Sale | 1,192 | 64.60 |
| 12/16/2022 | Purchase | 208 | 62.51 |
| 6/23/2023 | Purchase | 163 | 62.86 |
| 6/23/2023 | Purchase | 47 | 62.86 |
| 8/24/2023 | Sale | 242 | 55.63 |
| 8/29/2023 | Purchase | 251 | 57.76 |
| 12/7/2023 | Sale | 1,034 | 68.47 |
| 12/15/2023 | Purchase | 9 | 74.21 |
| 12/15/2023 | Purchase | 180 | 74.21 |
| 6/28/2024 | Purchase | 239 | 64.49 |
| 9/20/2024 | Sale | 154 | 67.46 |
| 9/20/2024 | Sale | 46 | 67.46 |
| 9/20/2024 | Sale | 44 | 67.46 |
| 11/19/2024 | Purchase | 43 | 92.42 |
| 11/19/2024 | Purchase | 112 | 92.42 |
| 11/19/2024 | Purchase | 227 | 92.42 |
| 12/9/2024 | Sale | 351 | 95.42 |
| 12/9/2024 | Sale | 79 | 95.42 |
| 12/20/2024 | Purchase | 182 | 89.65 |
| 3/21/2025 | Sale | 85 | 61.11 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|------------|------------------|--------|-----------------|
| 3/21/2025 | Sale | 180 | 61.11 |

Prices listed are rounded to two decimal places.

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Alexandra D. Jung, on behalf of the New York City Police Superior Officers' Variable Supplement Fund ("PSOVSF"), hereby certify that:

1.  I am Senior Counsel at the New York City Law Department and authorized to execute this Certification on behalf of PSOVSF. I have reviewed the Amended Complaint. PSOVSF has authorized Cohen Milstein Sellers & Toll PLLC and Lieff Cabraser Heimann & Bernstein LLP to file the Amended Complaint on PSOVSF's behalf.

2.  PSOVSF did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  PSOVSF is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  PSOVSF's transactions in Block Class A common stock that are the subject of this action, from February 26, 2020 to May 1, 2025, are set forth in the attached Schedule A.

5.  During the three years prior to the date of this Certification, PSOVSF sought to serve or served as a representative party for a class in the following actions: *Gonsalves v. Block, Inc. et al.*, No. 5:25-cv-00642 (N.D. Cal.) (appointed lead plaintiff); and *Flannery v. Snowflake Inc. et al.*, No. 5:24-cv-01234 (N.D. Cal.) (appointed lead plaintiff).

6.  PSOVSF will not accept any payment for serving as a representative party on behalf of the class beyond PSOVSF's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of June, 2025.

*Alexandra Jung*
Alexandra D. Jung
Senior Counsel
New York City Law Department

## SCHEDULE A

**PSOVSF**

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 6/26/2020 | Purchase | 206 | 104.30 |
| 6/26/2020 | Purchase | 1,035 | 104.30 |
| 9/18/2020 | Purchase | 322 | 145.01 |
| 12/9/2020 | Sale | 719 | 207.04 |
| 6/25/2021 | Purchase | 231 | 239.94 |
| 6/25/2021 | Purchase | 350 | 239.94 |
| 9/17/2021 | Purchase | 249 | 255.79 |
| 12/8/2021 | Sale | 1,476 | 194.78 |
| 1/19/2022 | Purchase | 2,429 | 128.14 |
| 6/21/2022 | Purchase | 373 | 60.52 |
| 6/24/2022 | Purchase | 995 | 71.00 |
| 9/16/2022 | Purchase | 405 | 64.89 |
| 12/9/2022 | Sale | 1,825 | 64.60 |
| 12/16/2022 | Purchase | 304 | 62.51 |
| 6/12/2023 | Purchase | 567 | 64.20 |
| 12/7/2023 | Sale | 1,259 | 68.47 |
| 12/15/2023 | Purchase | 7 | 74.21 |
| 12/15/2023 | Purchase | 145 | 74.21 |
| 3/15/2024 | Purchase | 131 | 80.17 |
| 3/15/2024 | Purchase | 54 | 80.17 |
| 9/20/2024 | Purchase | 196 | 67.46 |
| 11/19/2024 | Purchase | 2,389 | 92.42 |
| 12/9/2024 | Sale | 358 | 95.42 |
| 12/9/2024 | Sale | 1,612 | 95.42 |
| 12/20/2024 | Purchase | 155 | 89.65 |

Prices listed are rounded to two decimal places.

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Alexandra D. Jung, on behalf of the Teachers' Retirement System of the City of New York ("TRS"), hereby certify that:

1.   I am Senior Counsel at the New York City Law Department and authorized to execute this Certification on behalf of TRS. I have reviewed the Amended Complaint. TRS has authorized Cohen Milstein Sellers & Toll PLLC and Lieff Cabraser Heimann & Bernstein LLP to file the Amended Complaint on TRS's behalf.

2.   TRS did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.   TRS is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.   TRS's transactions in Block Class A common stock that are the subject of this action, from February 26, 2020 to May 1, 2025, are set forth in the attached Schedule A.

5.   During the three years prior to the date of this Certification, TRS sought to serve or served as a representative party for a class in the following actions: *Gonsalves v. Block, Inc. et al.*, No. 5:25-cv-00642 (N.D. Cal.) (appointed lead plaintiff); *Flannery v. Snowflake Inc. et al.*, No. 5:24-cv-01234 (N.D. Cal.) (appointed lead plaintiff); *KBC Asset Management NV et al v. Discover Financial Services et al.*, No. 1:23-cv-06788 (N.D. Ill.) (appointed lead plaintiff); *In re AT&T Securities Litigation*, No. 3:24-cv-01196 (N.D. Tex.) (appointed lead plaintiff); *The New York City Fire Department Pension Fund et al. v. Coupang, Inc. et al.*, No. 1:22-cv-07309 (S.D.N.Y.) (appointed lead plaintiff); and *Norfolk County Retirement System v. Community Health Systems, Inc. et al.*, No. 3:11-cv-00433 (M.D. Tenn.) (appointed lead plaintiff).

6.   TRS will not accept any payment for serving as a representative party on behalf of the class beyond TRS's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18ᵗʰ day of June, 2025.

*Alexandra Jung*
Alexandra D. Jung
Senior Counsel
New York City Law Department

## SCHEDULE A

**TRS**

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 3/6/2020 | Sale | 4,068 | 73.09 |
| 3/6/2020 | Sale | 1,824 | 73.09 |
| 6/11/2020 | Sale | 4,699 | 86.09 |
| 6/26/2020 | Purchase | 1,919 | 104.30 |
| 6/26/2020 | Purchase | 9,656 | 104.30 |
| 9/18/2020 | Purchase | 6,313 | 145.01 |
| 10/27/2020 | Sale | 2,721 | 171.02 |
| 1/4/2021 | Sale | 4,177 | 221.16 |
| 1/14/2021 | Sale | 2,448 | 232.79 |
| 2/16/2021 | Sale | 3,353 | 276.02 |
| 4/7/2021 | Sale | 3,606 | 245.12 |
| 4/21/2021 | Sale | 1,360 | 245.25 |
| 4/21/2021 | Sale | 2,498 | 245.25 |
| 6/1/2021 | Sale | 2,262 | 221.95 |
| 6/1/2021 | Sale | 1,763 | 221.95 |
| 6/9/2021 | Sale | 5,126 | 210.21 |
| 6/25/2021 | Purchase | 4,021 | 239.94 |
| 6/25/2021 | Purchase | 6,098 | 239.94 |
| 11/3/2021 | Purchase | 30,218 | 251.14 |
| 11/19/2021 | Sale | 7,210 | 225.14 |
| 11/19/2021 | Sale | 6,289 | 225.14 |
| 12/17/2021 | Purchase | 11,690 | 167.06 |
| 1/19/2022 | Purchase | 30,017 | 128.14 |
| 1/27/2022 | Purchase | 4,306 | 105.51 |
| 1/27/2022 | Purchase | 523 | 104.85 |
| 1/27/2022 | Purchase | 2,248 | 105.64 |
| 1/27/2022 | Purchase | 120 | 104.36 |
| 2/4/2022 | Purchase | 17 | 108.03 |
| 2/4/2022 | Purchase | 3,135 | 104.79 |
| 2/4/2022 | Purchase | 797 | 109.83 |
| 2/4/2022 | Purchase | 8 | 107.91 |
| 2/9/2022 | Purchase | 4,810 | 111.86 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 2/9/2022 | Purchase | 155 | 110.97 |
| 2/14/2022 | Purchase | 7,800 | 111.64 |
| 2/14/2022 | Sale | 71,826 | 111.64 |
| 2/25/2022 | Purchase | 527 | 114.00 |
| 2/25/2022 | Purchase | 1,680 | 114.47 |
| 2/28/2022 | Purchase | 60,098 | 127.50 |
| 3/2/2022 | Purchase | 7,900 | 124.26 |
| 3/17/2022 | Purchase | 464 | 124.52 |
| 3/18/2022 | Sale | 400 | 140.64 |
| 3/18/2022 | Sale | 700 | 140.64 |
| 3/18/2022 | Sale | 10,907 | 140.64 |
| 4/5/2022 | Purchase | 10,500 | 135.92 |
| 4/5/2022 | Purchase | 1,300 | 135.92 |
| 4/5/2022 | Sale | 7,172 | 135.92 |
| 4/6/2022 | Purchase | 200 | 126.09 |
| 5/19/2022 | Purchase | 2,450 | 87.25 |
| 5/23/2022 | Purchase | 1,764 | 83.10 |
| 6/24/2022 | Purchase | 23,400 | 71.00 |
| 6/27/2022 | Sale | 6,000 | 69.39 |
| 7/13/2022 | Purchase | 3,454 | 63.30 |
| 8/5/2022 | Purchase | 11,300 | 87.73 |
| 9/16/2022 | Purchase | 11,275 | 64.89 |
| 9/16/2022 | Sale | 200 | 64.89 |
| 9/16/2022 | Sale | 2,900 | 64.89 |
| 9/16/2022 | Sale | 300 | 64.89 |
| 9/16/2022 | Sale | 2,200 | 64.89 |
| 10/11/2022 | Purchase | 711 | 54.89 |
| 10/17/2022 | Purchase | 19,200 | 55.92 |
| 10/17/2022 | Purchase | 2,100 | 55.92 |
| 12/16/2022 | Sale | 300 | 62.51 |
| 12/16/2022 | Sale | 400 | 62.51 |
| 12/16/2022 | Sale | 600 | 62.51 |
| 12/16/2022 | Sale | 200 | 62.51 |
| 12/16/2022 | Sale | 6,300 | 62.51 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 12/16/2022 | Sale | 300 | 62.51 |
| 12/16/2022 | Sale | 200 | 62.51 |
| 12/16/2022 | Sale | 200 | 62.51 |
| 12/28/2022 | Purchase | 704 | 59.25 |
| 1/11/2023 | Purchase | 20,000 | 71.01 |
| 3/17/2023 | Purchase | 2,500 | 73.98 |
| 3/24/2023 | Sale | 36,300 | 60.68 |
| 6/16/2023 | Sale | 900 | 66.51 |
| 6/16/2023 | Sale | 100 | 66.51 |
| 6/23/2023 | Sale | 47,700 | 62.86 |
| 12/15/2023 | Purchase | 307 | 74.21 |
| 12/15/2023 | Purchase | 5,944 | 74.21 |
| 12/21/2023 | Purchase | 2,032 | 76.54 |
| 3/15/2024 | Purchase | 786 | 80.17 |
| 3/15/2024 | Purchase | 1,902 | 80.17 |
| 3/20/2024 | Purchase | 2,423 | 78.86 |
| 4/22/2024 | Sale | 4,172 | 71.60 |
| 4/22/2024 | Sale | 1,549 | 71.60 |
| 5/7/2024 | Sale | 3,094 | 71.60 |
| 6/21/2024 | Purchase | 1,448 | 62.41 |
| 6/28/2024 | Purchase | 10,265 | 64.49 |
| 7/11/2024 | Sale | 3,527 | 66.49 |
| 7/18/2024 | Purchase | 903 | 69.05 |
| 7/18/2024 | Purchase | 9,432 | 69.03 |
| 8/2/2024 | Purchase | 2,972 | 59.98 |
| 8/2/2024 | Purchase | 5,223 | 60.29 |
| 9/9/2024 | Purchase | 197 | 61.87 |
| 9/9/2024 | Purchase | 71 | 62.60 |
| 9/9/2024 | Purchase | 289 | 62.09 |
| 9/9/2024 | Purchase | 1,432 | 62.20 |
| 9/24/2024 | Sale | 3,395 | 67.54 |
| 10/15/2024 | Purchase | 268 | 71.45 |
| 10/16/2024 | Purchase | 1,693 | 72.41 |
| 10/16/2024 | Purchase | 133 | 72.21 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 10/28/2024 | Purchase | 663 | 74.30 |
| 10/28/2024 | Purchase | 809 | 74.30 |
| 10/28/2024 | Purchase | 265 | 74.12 |
| 11/4/2024 | Purchase | 542 | 73.06 |
| 11/4/2024 | Purchase | 132 | 73.46 |
| 11/4/2024 | Purchase | 227 | 72.82 |
| 11/4/2024 | Purchase | 452 | 73.49 |
| 11/4/2024 | Purchase | 413 | 72.89 |
| 11/6/2024 | Purchase | 730 | 76.22 |
| 11/6/2024 | Purchase | 4,467 | 77.21 |
| 11/6/2024 | Purchase | 148 | 76.17 |
| 11/7/2024 | Purchase | 750 | 77.09 |
| 11/7/2024 | Purchase | 965 | 77.03 |
| 11/13/2024 | Purchase | 2,386 | 86.63 |
| 11/13/2024 | Purchase | 221 | 88.53 |
| 11/13/2024 | Purchase | 711 | 86.12 |
| 11/14/2024 | Purchase | 825 | 83.94 |
| 11/14/2024 | Purchase | 3,255 | 84.04 |
| 11/14/2024 | Purchase | 666 | 84.04 |
| 11/18/2024 | Purchase | 4,020 | 86.41 |
| 11/18/2024 | Purchase | 1,532 | 90.64 |
| 11/18/2024 | Purchase | 10,230 | 90.00 |
| 11/18/2024 | Purchase | 16,800 | 88.36 |
| 11/18/2024 | Purchase | 1,659 | 90.79 |
| 11/18/2024 | Purchase | 1,210 | 89.99 |
| 11/18/2024 | Purchase | 20,080 | 88.64 |
| 11/19/2024 | Purchase | 1,391 | 91.92 |
| 11/19/2024 | Purchase | 2,096 | 92.49 |
| 11/19/2024 | Purchase | 2,341 | 91.33 |
| 11/19/2024 | Purchase | 5,480 | 92.49 |
| 11/19/2024 | Purchase | 332 | 90.91 |
| 11/19/2024 | Purchase | 119 | 91.84 |
| 11/19/2024 | Purchase | 332 | 90.25 |
| 11/19/2024 | Purchase | 833 | 91.88 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 11/19/2024 | Purchase | 344 | 92.42 |
| 11/19/2024 | Purchase | 141 | 90.18 |
| 11/19/2024 | Purchase | 672 | 91.57 |
| 11/19/2024 | Purchase | 344 | 92.37 |
| 11/19/2024 | Sale | 6,580 | 91.04 |
| 11/20/2024 | Purchase | 1,311 | 91.18 |
| 11/22/2024 | Purchase | 380 | 92.54 |
| 11/27/2024 | Purchase | 290 | 89.06 |
| 12/5/2024 | Purchase | 480 | 97.55 |
| 12/9/2024 | Sale | 14,751 | 95.42 |
| 12/9/2024 | Sale | 3,271 | 95.42 |
| 12/10/2024 | Purchase | 362 | 94.10 |
| 12/11/2024 | Purchase | 1,110 | 98.09 |
| 12/12/2024 | Purchase | 352 | 96.45 |
| 12/17/2024 | Sale | 11,029 | 94.55 |
| 1/16/2025 | Sale | 13,537 | 85.53 |
| 2/20/2025 | Sale | 1,280 | 82.57 |
| 2/20/2025 | Sale | 720 | 82.28 |
| 2/20/2025 | Sale | 7,710 | 82.71 |
| 2/21/2025 | Sale | 850 | 71.80 |
| 2/21/2025 | Sale | 37,160 | 71.46 |
| 2/21/2025 | Sale | 300 | 70.24 |
| 3/10/2025 | Sale | 169 | 54.22 |
| 3/10/2025 | Sale | 2,361 | 54.74 |
| 3/10/2025 | Sale | 756 | 54.00 |
| 3/10/2025 | Sale | 1,201 | 54.12 |
| 3/18/2025 | Purchase | 3,410 | 59.34 |
| 3/18/2025 | Purchase | 827 | 59.74 |
| 3/18/2025 | Purchase | 600 | 59.65 |
| 3/18/2025 | Purchase | 1,218 | 59.65 |
| 3/18/2025 | Purchase | 271 | 59.48 |
| 3/19/2025 | Purchase | 216 | 61.81 |
| 3/19/2025 | Purchase | 2,544 | 61.10 |
| 3/19/2025 | Purchase | 759 | 61.37 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 3/19/2025 | Purchase | 113 | 60.59 |
| 3/19/2025 | Purchase | 10 | 59.85 |
| 4/1/2025 | Sale | 2,528 | 54.73 |
| 4/1/2025 | Sale | 230 | 55.11 |
| 4/1/2025 | Sale | 1,794 | 54.52 |
| 4/2/2025 | Purchase | 1,130 | 58.11 |
| 4/2/2025 | Purchase | 7,940 | 58.08 |
| 4/3/2025 | Purchase | 8,100 | 54.78 |
| 4/11/2025 | Purchase | 3,924 | 53.94 |
| 4/11/2025 | Sale | 180 | 51.80 |
| 4/17/2025 | Sale | 2,214 | 53.72 |

Prices listed are rounded to two decimal places.

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Alexandra D. Jung, on behalf of the Teachers' Retirement System of the City of New York Variable A ("TRS Var-A"), hereby certify that:

1.  I am Senior Counsel at the New York City Law Department and authorized to execute this Certification on behalf of TRS Var-A. I have reviewed the Amended Complaint. TRS Var-A has authorized Cohen Milstein Sellers & Toll PLLC and Lieff Cabraser Heimann & Bernstein LLP to file the Amended Complaint on TRS Var-A's behalf.

2.  TRS Var-A did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  TRS Var-A is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  TRS Var-A's transactions in Block Class A common stock that are the subject of this action, from February 26, 2020 to May 1, 2025, are set forth in the attached Schedule A.

5.  During the three years prior to the date of this Certification, TRS Var-A sought to serve or served as a representative party for a class in the following actions: *Gonsalves v. Block, Inc. et al.*, No. 5:25-cv-00642 (N.D. Cal.) (appointed lead plaintiff); *Flannery v. Snowflake Inc. et al.*, No. 5:24-cv-01234 (N.D. Cal.) (appointed lead plaintiff); *The New York City Fire Department Pension Fund et al. v. Coupang, Inc. et al.*, No. 1:22-cv-07309 (S.D.N.Y.) (appointed lead plaintiff); and *Norfolk County Retirement System v. Community Health Systems, Inc. et al.*, No. 3:11-cv-00433 (M.D. Tenn.) (appointed lead plaintiff).

6.  TRS Var-A will not accept any payment for serving as a representative party on behalf of the class beyond TRS Var-A's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18ᵗʰ day of June, 2025.

*Alexandra Jung*
Alexandra D. Jung
Senior Counsel
New York City Law Department

## SCHEDULE A

**TRS Var-A**

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 3/12/2020 | Sale | 2,000 | 55.27 |
| 6/26/2020 | Purchase | 2,610 | 104.30 |
| 9/11/2020 | Sale | 1,496 | 140.67 |
| 9/18/2020 | Purchase | 1,662 | 145.01 |
| 9/21/2020 | Purchase | 7,920 | 149.98 |
| 9/22/2020 | Purchase | 6,067 | 155.86 |
| 9/22/2020 | Purchase | 7,838 | 152.96 |
| 9/23/2020 | Sale | 93 | 154.59 |
| 10/27/2020 | Purchase | 266 | 172.65 |
| 10/27/2020 | Purchase | 2,572 | 170.31 |
| 10/30/2020 | Purchase | 2,410 | 155.27 |
| 11/6/2020 | Purchase | 4,111 | 197.28 |
| 11/25/2020 | Purchase | 3,118 | 213.41 |
| 11/25/2020 | Purchase | 273 | 211.05 |
| 12/10/2020 | Purchase | 1,769 | 214.65 |
| 12/15/2020 | Sale | 2,243 | 220.87 |
| 12/23/2020 | Purchase | 647 | 234.91 |
| 1/6/2021 | Purchase | 1,370 | 230.44 |
| 1/14/2021 | Sale | 795 | 229.98 |
| 1/22/2021 | Purchase | 243 | 220.22 |
| 1/26/2021 | Purchase | 2,151 | 213.76 |
| 2/4/2021 | Purchase | 1,172 | 236.05 |
| 2/24/2021 | Purchase | 472 | 237.26 |
| 3/15/2021 | Sale | 1,838 | 241.24 |
| 3/25/2021 | Purchase | 2,791 | 206.39 |
| 4/7/2021 | Purchase | 3,646 | 246.94 |
| 4/15/2021 | Sale | 666 | 262.28 |
| 4/22/2021 | Purchase | 2,967 | 249.50 |
| 5/19/2021 | Sale | 516 | 196.42 |
| 6/2/2021 | Purchase | 1,916 | 221.01 |
| 6/11/2021 | Sale | 1,619 | 219.50 |
| 6/22/2021 | Purchase | 1,634 | 230.54 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 6/25/2021 | Purchase | 3,300 | 239.92 |
| 7/20/2021 | Purchase | 321 | 242.12 |
| 7/20/2021 | Purchase | 336 | 238.90 |
| 8/23/2021 | Sale | 351 | 269.86 |
| 9/16/2021 | Sale | 813 | 248.80 |
| 9/17/2021 | Purchase | 948 | 255.79 |
| 9/23/2021 | Purchase | 20,623 | 266.58 |
| 9/24/2021 | Purchase | 625 | 260.08 |
| 9/24/2021 | Purchase | 13,467 | 262.35 |
| 10/1/2021 | Purchase | 3,451 | 239.93 |
| 10/7/2021 | Purchase | 2,495 | 249.63 |
| 10/7/2021 | Purchase | 1,859 | 249.63 |
| 10/8/2021 | Purchase | 934 | 245.14 |
| 10/8/2021 | Purchase | 696 | 245.14 |
| 10/13/2021 | Purchase | 803 | 241.83 |
| 10/13/2021 | Purchase | 747 | 242.15 |
| 10/13/2021 | Sale | 516 | 241.70 |
| 10/15/2021 | Purchase | 226 | 248.69 |
| 10/18/2021 | Purchase | 339 | 248.31 |
| 10/25/2021 | Purchase | 47,441 | 260.72 |
| 10/26/2021 | Purchase | 20,206 | 265.16 |
| 11/5/2021 | Purchase | 5,009 | 241.13 |
| 11/8/2021 | Purchase | 2,384 | 239.05 |
| 11/11/2021 | Purchase | 594 | 226.98 |
| 11/17/2021 | Purchase | 485 | 234.70 |
| 11/23/2021 | Purchase | 218 | 209.93 |
| 11/24/2021 | Purchase | 2,391 | 215.38 |
| 11/24/2021 | Purchase | 1,120 | 215.38 |
| 12/7/2021 | Purchase | 7,275 | 189.51 |
| 12/8/2021 | Purchase | 3,072 | 193.72 |
| 12/8/2021 | Purchase | 1,487 | 193.72 |
| 12/16/2021 | Purchase | 5,216 | 165.19 |
| 12/17/2021 | Purchase | 4,363 | 163.06 |
| 12/17/2021 | Sale | 2,649 | 161.40 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 12/21/2021 | Purchase | 3,705 | 164.32 |
| 1/14/2022 | Purchase | 4,554 | 132.24 |
| 1/14/2022 | Purchase | 2,126 | 132.24 |
| 1/19/2022 | Purchase | 18,387 | 128.14 |
| 1/21/2022 | Purchase | 623 | 123.81 |
| 2/1/2022 | Purchase | 800 | 125.88 |
| 2/7/2022 | Sale | 778 | 107.59 |
| 2/7/2022 | Sale | 3,426 | 104.15 |
| 2/7/2022 | Sale | 1,370 | 102.53 |
| 2/8/2022 | Sale | 5,996 | 101.81 |
| 2/8/2022 | Sale | 145 | 102.01 |
| 2/15/2022 | Purchase | 3,430 | 112.82 |
| 2/16/2022 | Purchase | 2,286 | 110.34 |
| 2/16/2022 | Purchase | 10,726 | 110.99 |
| 2/17/2022 | Sale | 1,867 | 109.22 |
| 3/9/2022 | Purchase | 835 | 109.75 |
| 3/11/2022 | Sale | 686 | 103.55 |
| 3/11/2022 | Sale | 1,371 | 103.76 |
| 3/11/2022 | Sale | 4,114 | 103.86 |
| 3/11/2022 | Sale | 103 | 104.98 |
| 3/14/2022 | Sale | 2,626 | 97.96 |
| 3/15/2022 | Purchase | 5,481 | 100.98 |
| 3/23/2022 | Purchase | 2,063 | 140.92 |
| 4/5/2022 | Purchase | 4,069 | 136.30 |
| 4/5/2022 | Purchase | 1,869 | 136.30 |
| 4/28/2022 | Purchase | 697 | 102.64 |
| 5/2/2022 | Purchase | 7,295 | 101.86 |
| 5/2/2022 | Purchase | 3,345 | 101.86 |
| 5/24/2022 | Purchase | 753 | 76.87 |
| 6/14/2022 | Sale | 7,509 | 59.77 |
| 6/24/2022 | Purchase | 775 | 68.69 |
| 6/24/2022 | Purchase | 12,200 | 71.00 |
| 7/26/2022 | Purchase | 687 | 67.57 |
| 8/23/2022 | Purchase | 598 | 73.96 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 9/20/2022 | Purchase | 4,502 | 61.79 |
| 9/20/2022 | Sale | 1,644 | 62.04 |
| 9/20/2022 | Sale | 3,014 | 62.13 |
| 9/20/2022 | Sale | 641 | 61.47 |
| 9/21/2022 | Sale | 1,760 | 61.29 |
| 9/27/2022 | Purchase | 88 | 54.99 |
| 10/25/2022 | Purchase | 619 | 59.00 |
| 11/4/2022 | Purchase | 10,048 | 61.05 |
| 11/4/2022 | Purchase | 4,443 | 61.05 |
| 11/10/2022 | Purchase | 4,382 | 66.50 |
| 11/22/2022 | Purchase | 641 | 62.17 |
| 12/14/2022 | Sale | 2,986 | 71.42 |
| 12/16/2022 | Purchase | 6,934 | 62.51 |
| 1/3/2023 | Purchase | 10,432 | 64.02 |
| 1/3/2023 | Purchase | 4,519 | 64.02 |
| 1/19/2023 | Sale | 6,785 | 70.27 |
| 1/25/2023 | Purchase | 744 | 75.64 |
| 2/24/2023 | Purchase | 243 | 73.88 |
| 3/22/2023 | Purchase | 13,006 | 74.25 |
| 3/22/2023 | Purchase | 5,730 | 74.25 |
| 4/26/2023 | Purchase | 672 | 60.68 |
| 5/25/2023 | Purchase | 705 | 60.58 |
| 6/6/2023 | Purchase | 7,975 | 65.93 |
| 6/6/2023 | Purchase | 3,409 | 65.93 |
| 6/23/2023 | Purchase | 1,254 | 62.94 |
| 7/27/2023 | Purchase | 609 | 77.28 |
| 8/14/2023 | Sale | 4,095 | 60.16 |
| 8/23/2023 | Purchase | 415 | 56.95 |
| 9/8/2023 | Sale | 15,562 | 53.24 |
| 9/8/2023 | Sale | 6,599 | 53.24 |
| 9/11/2023 | Sale | 15,576 | 54.02 |
| 9/11/2023 | Sale | 6,606 | 54.02 |
| 9/15/2023 | Sale | 9,375 | 52.77 |
| 9/15/2023 | Sale | 3,962 | 52.77 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 9/18/2023 | Sale | 9,375 | 51.86 |
| 9/18/2023 | Sale | 3,962 | 51.86 |
| 9/19/2023 | Sale | 8,436 | 49.88 |
| 9/19/2023 | Sale | 3,565 | 49.88 |
| 9/20/2023 | Sale | 9,512 | 48.61 |
| 9/20/2023 | Sale | 4,020 | 48.61 |
| 9/21/2023 | Sale | 9,495 | 45.87 |
| 9/21/2023 | Sale | 4,012 | 45.87 |
| 9/22/2023 | Sale | 9,456 | 45.08 |
| 9/22/2023 | Sale | 3,996 | 45.08 |
| 9/25/2023 | Sale | 9,495 | 45.27 |
| 9/25/2023 | Sale | 4,013 | 45.27 |
| 9/26/2023 | Sale | 9,559 | 44.96 |
| 9/26/2023 | Sale | 4,040 | 44.96 |
| 9/27/2023 | Sale | 9,734 | 44.50 |
| 9/27/2023 | Sale | 4,114 | 44.50 |
| 9/28/2023 | Sale | 9,331 | 43.90 |
| 9/28/2023 | Sale | 3,943 | 43.90 |
| 9/29/2023 | Sale | 9,359 | 44.76 |
| 9/29/2023 | Sale | 3,955 | 44.76 |
| 2/6/2024 | Sale | 14,817 | 67.02 |
| 3/14/2024 | Sale | 3,447 | 81.19 |
| 12/19/2024 | Sale | 3,701 | 88.03 |
| 12/20/2024 | Sale | 527 | 88.35 |
| 12/20/2024 | Sale | 2,671 | 88.37 |
| 2/14/2025 | Sale | 4,419 | 84.10 |
| 2/18/2025 | Sale | 17,480 | 84.15 |
| 2/26/2025 | Purchase | 1,631 | 65.31 |
| 2/26/2025 | Purchase | 9,269 | 64.08 |
| 2/27/2025 | Purchase | 9,974 | 65.11 |
| 2/27/2025 | Purchase | 667 | 64.96 |
| 2/27/2025 | Purchase | 208 | 65.53 |
| 2/27/2025 | Purchase | 51 | 65.29 |
| 3/6/2025 | Purchase | 5,738 | 59.46 |

| Trade Date | Transaction Type | Shares | Share Price ($) |
|---|---|---|---|
| 3/7/2025 | Purchase | 5,462 | 59.64 |
| 3/10/2025 | Purchase | 4,367 | 54.35 |
| 3/10/2025 | Purchase | 33 | 54.00 |
| 3/11/2025 | Purchase | 344 | 55.37 |
| 3/12/2025 | Purchase | 1,028 | 56.12 |
| 3/13/2025 | Purchase | 3,103 | 54.43 |
| 3/14/2025 | Purchase | 1,282 | 57.02 |
| 3/14/2025 | Purchase | 1,443 | 56.91 |
| 3/28/2025 | Purchase | 346 | 56.80 |
| 3/28/2025 | Purchase | 113 | 56.37 |
| 3/28/2025 | Purchase | 361 | 56.49 |
| 3/28/2025 | Purchase | 3,633 | 55.91 |
| 3/28/2025 | Purchase | 4,647 | 55.28 |
| 4/3/2025 | Purchase | 454 | 53.34 |
| 4/3/2025 | Purchase | 2,246 | 53.69 |
| 4/4/2025 | Purchase | 2,400 | 50.17 |
| 4/7/2025 | Purchase | 2,300 | 50.74 |
| 4/11/2025 | Purchase | 2,902 | 53.71 |
| 4/11/2025 | Purchase | 974 | 53.84 |
| 4/14/2025 | Purchase | 2,100 | 54.62 |
| 4/15/2025 | Purchase | 350 | 55.24 |
| 4/15/2025 | Purchase | 647 | 55.20 |
| 4/16/2025 | Purchase | 665 | 54.08 |
| 4/17/2025 | Purchase | 986 | 53.92 |
| 4/17/2025 | Purchase | 676 | 53.88 |

Prices listed are rounded to two decimal places.