GIBSON, DUNN & CRUTCHER LLP
BRIAN M. LUTZ, SBN 255976
  blutz@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200

JESSICA VALENZUELA, SBN 220934
  jvalenzuela@gibsondunn.com
310 University Avenue
Palo Alto, CA 94301
Telephone: 650.849.5300

COLIN B. DAVIS, SBN 273942
  cdavis@gibsondunn.com
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
Telephone: 949.451.3800

*Attorneys for Defendants Block, Inc., Jack Dorsey, and Amrita Ahuja*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CORINNE GONSALVES, individually and on behalf of others similarly situated, | Case No. 5:25-cv-00642-NW |
| | CLASS ACTION |
| Plaintiff, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| v. | |
| BLOCK, INC., JACK DORSEY, and AMRITA AHUJA, | HEARING: |
| Defendants. | Date:      November 5, 2025<br>Time:      9:00 a.m.<br>Judge:     Hon. Noël Wise<br>Location:  Courtroom 3, 5th Floor |

Gibson, Dunn &
Crutcher LLP

**TABLE OF CONTENTS**

**Page**

I.      STATEMENT OF ISSUES TO BE DECIDED .................................................................1

II.     INTRODUCTION ........................................................................................................1

III.    BACKGROUND ...........................................................................................................4

        A.      Block's Business ...............................................................................................4

        B.      Cash App Experiences Rapid Growth ..............................................................5

        C.      Block Warns Investors That Growth Will Test Its Compliance Efforts ...............5

        D.      Block Renames Cash App's Reported Growth Metric .....................................6

        E.      The Hindenburg Report and Subsequent Investigations ..................................6

        F.      This Litigation .................................................................................................7

IV.     LEGAL STANDARD ...................................................................................................7

V.      ARGUMENT ................................................................................................................8

        A.      Plaintiff Fails to Adequately Plead Falsity .......................................................8

                1.      Statements About Cash App's Compliance Efforts Were Not False or
                        Misleading. ..........................................................................................9

                2.      Cash App's Account and Growth Metrics Were Not False or
                        Misleading. ........................................................................................12

                3.      Most of the Challenged Statements Are Non-Actionable Corporate
                        Puffery. ..............................................................................................15

        B.      Plaintiff Fails To Satisfy The PSLRA's Stringent Requirements For Pleading
                Scienter ..........................................................................................................16

                1.      The Former Employees "FEs" Do Not Support A Strong Inference Of
                        Scienter. .............................................................................................17

                2.      Additional Allegations Do Not Plead Scienter. .................................20

        C.      The Complaint Fails to Plead Loss Causation .................................................24

        D.      Plaintiff Fails to State Section 20(a) Claims Against the Individual Defendants ........25

VI.     CONCLUSION ...........................................................................................................25

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Accuray, Inc. Sec. Litig.*,
    757 F. Supp. 2d 936 (N.D. Cal. 2010) ........................................................................17

*In re Autodesk, Inc. Sec. Litig.*,
    132 F. Supp. 2d 833 (N.D. Cal. 2000) ........................................................................22

*Bhangal v. Hawaiian Elec. Indus., Inc.*,
    2024 WL 4505465 (N.D. Cal. Oct. 15, 2024)..............................................................16

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002)........................................................................................10

*Browning v. Amyris, Inc.*,
    2014 WL 1285175 (N.D. Cal. Mar. 24, 2014).............................................................17

*In re Cisco Sys. Inc. Sec. Litig.*,
    2013 WL 1402788 (N.D. Cal. Mar. 29, 2013).............................................................18

*City of Hollywood Firefighters Pension Fund v. Atlassian Corp.*,
    2024 WL 235183 (N.D. Cal. Jan. 22, 2024) ...............................................................14

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ................................................................16, 21

*In re Cloudera, Inc. Sec. Litig.*,
    2021 WL 2115303 (N.D. Cal. May 25, 2021) ...............................................8, 9, 10, 15

*Curry v. Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017)......................................................................................25

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010)......................................................................................15

*Damri v. LivePerson, Inc.*,
    772 F. Supp. 3d 430 (S.D.N.Y. 2025)..........................................................................13

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    2017 WL 4049253 (S.D.N.Y. June 28, 2017)..............................................................12

*In re Dothill Sys. Corp. Sec. Litig.*,
    2009 WL 734296 (S.D. Cal. Mar. 18, 2009) ...............................................................19

*In re Downey Sec. Litig.*,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009).............................................................19

*In re Eargo, Inc. Sec. Litig.*,
    656 F. Supp. 3d 928 (N.D. Cal. 2023) ........................................................................22

ii

*Elec. Workers Pension Fund v. HP Inc.*,
　2021 WL 1056549 (N.D. Cal. Mar. 19, 2021) .................................................................21

*Espy v. J2 Glob., Inc.*,
　99 F.4th 527 (9th Cir. 2024) ..............................................................................8, 24

*In re Facebook, Inc. Sec. Litig.*,
　477 F. Supp. 3d 980 (N.D. Cal. 2020) ..........................................................................14

*Glazer Cap. Mgmt., LP v. Magistri*,
　549 F.3d 736 (9th Cir. 2008) .....................................................................................22

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
　63 F.4th 747 (9th Cir. 2023) ........................................................................................7

*Golub v. Gigamon, Inc.*,
　372 F. Supp. 3d 1033 (N.D. Cal. 2019) ..........................................................................9

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
　554 F. Supp. 2d 1083 (C.D. Cal. 2008).........................................................................23

*Inchen Huang v. Higgins*,
　2019 WL 1245136 (N.D. Cal. Mar. 18, 2019) .........................................................11, 18

*In re Intrexon Corp. Sec. Litig.*,
　2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ...................................................................24

*Ironworkers Loc. 580–Joint Funds v. Linn Energy, LLC*,
　29 F. Supp. 3d 400 (S.D.N.Y. 2014)........................................................................14, 15

*Jackson v. Fischer*,
　931 F. Supp. 2d 1049 (N.D. Cal. 2013) ........................................................................25

*Joyce v. Amazon.com, Inc.*,
　2023 WL 8370101 (W.D. Wash. Dec. 4, 2023).............................................................21

*Kang v. PayPal Holdings, Inc.*,
　620 F. Supp. 3d 884 (N.D. Cal. 2022) ..........................................................................19

*Loos v. Immersion Corp.*,
　762 F.3d 880 (9th Cir. 2014)........................................................................................25

*M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*,
　2017 WL 5635425 (C.D. Cal. Oct. 30, 2017) ................................................................11

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
　39 F.4th 1092 (9th Cir. 2022)........................................................................................8

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
　601 U.S. 257 (2024) ......................................................................................................8

*Melot v. JAKKS Pac., Inc.*,
　2016 WL 6902093 (C.D. Cal. Nov. 18, 2016) ...............................................................16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ..........................................................................8, 19

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ............................................................................24, 25

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ...........................................................................17, 22

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
   2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) .......................................................13

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
   2018 WL 3126393 (N.D. Cal. June 26, 2018) ..................................................11, 19

*Nozak v. N. Dynasty Mins. Ltd.*,
   804 F. App'x 732 (9th Cir. 2020) ...........................................................................23

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ................................................................................23

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ..................................................................................25

*Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*,
   2024 WL 4251896 (Sept. 17, 2024) .......................................................................25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ..............................................................7, 17, 22, 23

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ....................................................................................7

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ....................................................................................8

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ..................................................................................23

*Sanchez v. IXYS Corp.*,
   2018 WL 4787070 (N.D. Cal. Oct. 2, 2018) ..........................................................10

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) .........................................................................8, 20, 21

*In re Solarcity Corp. Sec. Litig.*,
   274 F. Supp. 3d 972 (N.D. Cal. 2017) ...................................................................15

*Veal v. LendingClub Corp.*,
   423 F. Supp. 3d 804 (N.D. Cal. 2019) .......................................16, 17, 18, 20, 21, 22

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ................................................................................18

iv

*In re Vicor Sec. Litig.*,
  2025 WL 1616537 (N.D. Cal. June 6, 2025) ....................................................................14

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)............................................................................20

*Weir v. Allianz SE*,
  2024 WL 1813520 (C.D. Cal. Mar. 14, 2024) ...............................................................11

*Weir v. Allianz SE*,
  2025 WL 1792516 (9th Cir. June 27, 2025) ....................................................10, 15, 16

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021).........................................................................................19

*Wozniak v. Align Tech., Inc.*,
  2011 WL 2269418 (N.D. Cal. June 8, 2011) ..................................................................21

*Zamir v. Bridgepoint Educ., Inc.*,
  2016 WL 3971400 (S.D. Cal. July 25, 2016) .................................................................21

*Zucco Partners, LLC v. Digimarc Corp.*
  552 F.3d 981 (9th Cir. 2009)....................................................................................17, 21

**Statutes**

15 U.S.C. § 78u-4(b)(1) .............................................................................................................7

15 U.S.C. § 78u-4(b)(4) ...........................................................................................................24

**Other Authorities**

H.R. CONF. REP. 104–369 .........................................................................................................7

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on November 5, 2025 at 9:00 a.m. before the Honorable Noël Wise in Courtroom 3, 5th Floor of the Robert F. Peckham Federal Building & United States Courthouse, 280 1st Street, San Jose, CA 95113, Defendants Block, Inc. ("Block" or the "Company"), Jack Dorsey, and Amrita Ahuja, by and through their undersigned counsel, will, and hereby do, move the Court for an order granting their Motion to Dismiss Plaintiff's Amended Consolidated Class Action Complaint (the "Complaint").

Defendants seek dismissal of the Complaint pursuant to Rule 9(b) and Rule 12(b)(6) of the Federal Rules of Civil Procedure and 15 U.S.C. § 78u-4(b) on grounds that (1) Plaintiff fails to plead particularized facts demonstrating that any Defendant made a false or misleading statement, (2) Plaintiff fails to plead particularized facts demonstrating that any Defendant acted with scienter when making any challenged statement, and (3) Plaintiff fails to plead loss causation.

This Motion is based on this Notice of Motion, the supporting Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, the attached Declaration of Brian M. Lutz and Exhibits A through P attached thereto, the pleadings and papers on file in this action, and any other matters and arguments as may be considered in connection with reply briefing and the hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF ISSUES TO BE DECIDED

1.    Whether Plaintiff's claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 should be dismissed because: (i) Plaintiff fails to plead that any challenged statement was false or misleading; (ii) Plaintiff fails to plead that any Defendant made a challenged statement with the requisite scienter, or fraudulent intent; and (iii) Plaintiff fails to plead loss causation.

2.    Whether Plaintiff's claim under Section 20(a) should be dismissed for failure to plead a primary violation of the Exchange Act.

## II.    INTRODUCTION

This case should be dismissed because the Complaint fails to meet the "formidable" and "stringent" requirements for pleading securities fraud under the Private Securities Litigation Reform Act ("PSLRA").  To proceed past the pleadings stage and into discovery, a plaintiff asserting claims

for securities fraud must plead with particularized facts: (1) a materially false or misleading statement when made, (2) that the speaker made the statement with fraudulent intent, and (3) that investors suffered losses when new information revealed the truth and corrected the misstatement.  The Complaint does not meet any of these mandatory pleading requirements—missing one alone is fatal—and should be dismissed for that reason.

This case does not present the typical securities fraud class action fact pattern.  Aside from pointing to a stock drop, the Complaint is missing all the traditional hallmarks of securities fraud.  Plaintiff does not claim that Block misstated its financial results or engaged in accounting fraud.  Block did not file for bankruptcy or sell off parts of its business to survive.  No Block product or business is alleged to have failed.  No auditor resigned or issued a report critical of the Company.  Block did not fire any executives, nor did any resign under questionable circumstances.

Rather, Plaintiff tries to spin a tale of "fraud" by hindsight based on generic statements about compliance (mostly buried in voluminous SEC filings) and business performance metrics that are not even alleged to have been false and, as a result, never were corrected or restated.  The fact that Block *later* faced compliance challenges addressed by regulators, and that a short seller *later* claimed it would be better for Block to report the number of "unique people" using Cash App, does not mean that Block's prior statements about its compliance program and metrics were false or misleading at the time they were made.  The statements at issue in the Complaint are a far cry from anything resembling fraud—and make little sense when framed as violations of the securities laws.  At bottom, as in all cases premised on securities fraud, Plaintiff is required to show that the defendant made a materially false and misleading statement with intent to do so.  When the Court examines each identified statement with those requirements in mind, the Complaint fails as a matter of law.

Plaintiff's claim centers on Cash App—Block's mobile-based financial services app that allows individuals to send, receive, and manage their money. Cash App experienced remarkable growth during the incredibly long putative class period—2020 to 2025—attracting tens of millions of new accounts, earning billions of dollars in revenue, and delivering significant positive returns for Block investors. Plaintiff seeks to re-write the success story of Cash App's remarkable growth into a years-long effort by Block and its senior officers to deceive investors about Cash App's compliance and growth.

Plaintiff has two theories of falsity, each of which fails under the PSLRA's heightened pleading standard.   First, Plaintiff claims that *every* statement Block and its senior officers made about compliance during a five-year period amounted to securities fraud because Block purportedly failed to disclose weaknesses in Block's compliance program that failed to eliminate bad actors from engaging in misconduct on Cash App.  To be sure, like any high-growth app connecting people and providing a platform for them to engage with each other, as the number of Cash App accounts grew significantly, so too did the risks of bad actors using the platform for fraudulent or improper activities.  But Block was frank about these challenges, telling investors that despite the Company's best efforts and millions of dollars of compliance investments to better address fraud on the platform, Block's compliance programs could not prevent all misconduct by bad actors using Cash App.  Mainstream news articles reported the same, strongly undercutting Plaintiff's theory of "compliance" fraud.

Second, Plaintiff claims that Block lied about the number and growth of Cash App accounts. Plaintiff does not contend that the actual reported Cash App metrics were false—and certainly no facts are alleged concerning the "correct" numbers that should have been reported.  Instead, Plaintiff claims that it was misleading for Block to report on the number of active accounts because that number may have included multiple accounts from a single individual, and that Block misstated Cash App's growth by purportedly mixing and matching different metrics.  Again, Plaintiff's theory falls apart because Block told investors in plain terms that its reported metrics could include more than one account for a given user, as anyone with multiple accounts on a digital application or platform would understand. That Block changed the name of the metric it used to quantify accounts—from "transacting active customer" to "transacting active account"—does not mean that it changed the method of calculating the metric.  It did not, and the Complaint fails to plead otherwise with the requisite particularized facts. The single challenged statement by Dorsey about the number of Cash App accounts does not change the analysis, as his statement is consistent with the Company's reported "user base" on the platform. The bottom line is Block never changed how it calculated its Cash App reported metrics, never changed any reported numbers, and continued calculating and disclosing Cash App active accounts in exactly the same way throughout the relevant period.

The Complaint also fails to plead scienter, or specific facts showing that any Defendant acted

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 5:25-cv-00642-NW

with intent to defraud when making any of the challenged statements. Plaintiff asks the Court to infer that Block's senior-most executives knew they were lying to investors about Cash App's compliance and growth metrics based on hearsay accounts of "former employees" ("FEs"). But under established law, these allegations fall short of pleading a strong inference of scienter as to any Defendant. None of these sources had relevant contact with the Individual Defendants, and none of them say anything about Dorsey or Ahuja's state of mind—let alone provide specific facts showing that they knew or were provided information contradicting their challenged statements. Plaintiff's reliance on stock trades by Dorsey and Ahuja also gets them nowhere: every one of their stock sales was made pursuant to a 10b5-1 trading plan or to satisfy tax obligations, which under black letter law negates any inference of scienter. And Plaintiff's ancillary theories all provide no help either. The gaping hole in Plaintiff's Complaint is the absence of well-pled facts showing that either Individual Defendant knew, or was deliberately reckless in not knowing, that the challenged statements about Block's compliance efforts and Cash App growth metrics were untrue or misleading at the time they were made.

Finally, the Complaint fails to meet the essential loss causation element. At best, Plaintiff claims that Block's stock price declined during a period in which there were negative reports about Cash App. But Plaintiff does not plead specific facts showing that new information entered the market that "corrected" the supposed misleading statements. This deficiency is another ground for dismissal.

For all these reasons, explained below, the Complaint should be dismissed with prejudice.

### III.    BACKGROUND

#### A.    Block's Business

Block (formerly Square, Inc.) provides financial products and services to help sellers start, run, and grow their business, and help individuals send, receive, and manage their money. ¶¶ 19-20; Ex. N at 3.[1]  The Company was co-founded in 2009 by Defendant Jack Dorsey, who serves as Block's CEO and Chairman of the Board, and Jim McKelvey. ¶¶ 12-13. Defendant Amrita Ahuja served as Block's CFO throughout the relevant period and as COO starting in February 2023. ¶ 14. During the relevant

---

[1] Citations to " ¶ " or " ¶¶ " refer to paragraphs of the Amended Complaint. Citations to "Ex." refer to the Exhibits to the Declaration of Brian M. Lutz ("Lutz Decl."), filed concurrently herewith. Citations to pages of Defendants' Exhibits refer to ECF page numbers.

period, Block's business consisted of two main segments: Square and Cash App.  Square, among other things, provides point-of-sale software solutions, and inventory and customer relationship management products, to help sellers more effectively operate and manage their businesses.  ¶ 19; Ex. I at 5-6.  Cash App is Block's mobile-based financial services platform that allows consumers to send, receive, and manage their money.  ¶ 20; Ex. I at 3.

**B.     Cash App Experiences Rapid Growth**

To advance its mission of expanding financial access and promoting economic empowerment, Block designed Cash App to be simple, intuitive, and convenient.  Ex. I at 3; ¶ 21.  Block understood that Cash App's ability to scale would depend in part on peer-to-peer transactions generating so-called "network effects"—that is, the positive feedback loop that takes hold when an individual's decision to use a platform prompts others to use the platform, which then raises the value of the platform for all users.  ¶¶ 77, 96; Ex. I at 10.  Cash App's easy-to-use platform, addition of new features, and sophisticated marketing enabled Cash App to grow significantly since its launch.  Between 2019 and 2023, Cash App's monthly active accounts grew from 24 million to 56 million.  ¶ 2.  Between 2020 and 2024, Cash App's gross profit quadrupled, growing from $1.23 billion to $5.24 billion.  ¶ 25.

**C.     Block Warns Investors That Growth Will Test Its Compliance Efforts**

As with any growing digital platform, as the Cash App network expanded, opportunities for bad actors to use the platform for fraud and other improper activities increased.  ¶¶ 81, 83.  This was especially the case as millions of individuals began using Cash App and similar digital payment services to receive COVID-19 stimulus funds and unemployment benefits.  ¶¶ 36-37.  Block warned investors of this risk.  At the beginning of the class period, Block explicitly told investors that, though its anti-money laundering, know-your-customer, and other compliance programs were designed to prevent illicit activity, Cash App was still "a target for illegal or improper uses, including fraudulent or illegal sales of goods or services" and that Cash App could be used for "illegitimate transactions."  Ex. A at 11.  Block explained that Cash App's accelerating growth would "continue to place significant demands on [the Company's] risk management and compliance efforts" and that Block would need to continue developing and improving its compliance infrastructure.  *Id.*  And Block warned that its compliance programs "may not be sufficient to identify [and mitigate] all of the risks to which we are

5

exposed," which could lead to enforcement actions, fines, and other penalties. *Id.* at 11; *id.* at 9.

## D. Block Renames Cash App's Reported Growth Metric

Throughout the relevant period, so that investors could understand the platform's growth, Block shared with investors the number of active Cash App accounts each quarter. At the beginning of the relevant period, Block reported the number of Cash App "transacting active customer[s]," defined as "customer[s] [with] at least one financial transaction using any product or service within Cash App during the specified period"—namely, monthly. Ex. H at 7; Ex. C at 7; *see, e.g.*, ¶¶ 73-74, 77-78. On February 24, 2022, with the release of its full year 2021 financial results, Block re-named the metric "transacting actives," defined as Cash App "account[s] [with] at least one financial transaction using any product or service within Cash App during the specified period"—again, monthly. Ex. L at 8. Both metrics measured *active* Cash App accounts, not *all* accounts—active and inactive—on the platform. Block made clear that the "transacting actives" metric counted all "active" accounts even if "multiple accounts" could be tied to a single individual. Ex. M at 7. For the remainder of the relevant period, Block continued reporting Cash App growth using the "monthly transacting actives" metric, while acknowledging that investors may "disagree with our methodologies" or may not think that Block's metrics "accurately reflect[ed]" its business. Ex. K at 22; Ex. M at 7.

## E. The Hindenburg Report and Subsequent Investigations

On March 23, 2023, Hindenburg Research—a short seller that "stands to realize significant gains" when "the price of any stock covered [by one of its reports] declines" (Dkt. 106-1 at 78)—issued a report discussing risks the Company had already disclosed to investors. It claimed that Block's compliance controls for Cash App enabled "bad actors" to set up accounts for fraud and illegal activity. ¶¶ 45-48. The report claimed that Block "overstated" its "user counts" because the "transacting active accounts" metric included "multiple accounts tied to the same person." ¶ 49. Block's response to the report explained that its "approach to compliance [was] consistent with other financial services platforms" and that its "compliance investments [had] grown more than twice as fast as overall gross profit." ¶ 117. Block also noted that out of the more than 51 million monthly transacting actives on Cash App as of December 2022, 44 million were "verified" accounts, and those "44 million verified accounts constituted approximately 97% of Cash App inflows in December 2022." ¶ 56; Ex. P at 2.

Block continued to report its "monthly transacting actives" metric every fiscal quarter going forward.

Following the Hindenburg Report, the State Money Transmission Regulators, Consumer Financial Protection Bureau, and New York Department of Financial Services commenced investigations into Block's compliance, leading to settlements in which Block did not admit any violations.  Dkts. 106-4, 106-5, 106-6.

**F.    This Litigation**

On the heels of the regulatory settlements, on January 17, 2025, a putative Block shareholder filed the initial class action complaint in this action.  Dkt. 1.  Lead plaintiffs filed the operative amended complaint on June 18, 2025.  Dkts. 102, 106.  The Complaint alleges that between February 26, 2020 and May 1, 2025, Defendants made false or misleading statements about Block's compliance programs and about Cash App's "user metrics and user growth" in violation of Section 10(b) and Rule 10b-5. ¶¶ 69-70.  Plaintiff also brings a claim for "control person" liability under Section 20(a).

## IV.    LEGAL STANDARD

The PSLRA governs securities class actions alleging violations of Section 10(b) and Rule 10b-5.  The statute imposes "uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits."  H.R. CONF. REP. 104–369, at 41.  This pleading burden is "formidable," *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023), and applies in addition to Federal Rule of Civil Procedure 9(b), which requires the complaint to "state with particularity the circumstances constituting fraud."

To survive a motion to dismiss, a plaintiff must plead as to each defendant (1) a material misrepresentation or omission of fact by that defendant ("falsity"), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) a causal connection between the alleged misrepresentation and the plaintiff's loss.  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057 (9th Cir. 2014).  To satisfy the ***falsity element***, the complaint must plead particularized facts "specify[ing] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (citing 15 U.S.C. § 78u-4(b)(1)).  To plead ***scienter***, the complaint must allege particularized facts supporting "a strong inference" that each defendant made a

false or misleading statement either intentionally or with deliberate recklessness; that is, with intent to deceive, manipulate, or defraud. *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999) (cleaned up). These formidable pleading requirements "present no small hurdle." *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1096 (9th Cir. 2022). To plead **loss causation** under the corrective disclosure theory advanced here, a plaintiff "must allege with particularity facts plausibly suggesting that a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements[.]" *Espy v. J2 Glob., Inc*., 99 F.4th 527, 540 (9th Cir. 2024) (quotations omitted).

## V.    ARGUMENT

### A.    Plaintiff Fails to Adequately Plead Falsity

Plaintiff's theory of securities fraud—that Block misled investors about the efficacy of its compliance effort, failed to inform investors that Cash App was used for illicit activity, and "overstated the size and growth of Cash App's user base"—fails to meet the "exacting requirements for pleading falsity." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

Plaintiff's core theory is fraud by omission, but this requires more than simply pleading that Defendants failed to disclose material information. "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024); *id.* at 265 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). Rather, "disclosure is required under these provisions only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Id*. at 264 (cleaned up). The Complaint fails to meet this burden. Here, the "facts" allegedly omitted were, in fact, explicitly and repeatedly disclosed by Block and known to the market. Plaintiff's theory of falsity falls short because Plaintiff fails to plead specific, "contemporaneous facts that would establish a contradiction between the alleged materially misleading statements and reality."

*In re Cloudera, Inc. Sec. Litig.*, 2021 WL 2115303, at *11 (N.D. Cal. May 25, 2021).  Many of the challenged statements fail for other reasons as well, including that the statements are classic "puffery."[2]

### 1.     Statements About Cash App's Compliance Efforts Were Not False or Misleading.

Plaintiff challenges nine statements by Block from February 2020 to May 2023 regarding its efforts to combat illicit activity on Cash App.  ¶¶ 71, 81, 83, 91, 92, 110, 117, 126, 127.  This includes risk factors in February 2020 about its compliance program, including that Block "designed" its anti-money laundering program "to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity" (¶ 71); media statements in October 2020 acknowledging a "rise in scammers" and informing investors that it has "taken a number of proactive steps and made it our top priority" (¶ 81); and statements to the media from 2021-2023 that "preventing fraud is critically important" and Block is "continu[ing] to invest" in staffing and new technology "to help prevent, detect, and report bad activity on the platform" (¶¶ 83, 91, 110).

Plaintiff fails to carry its substantial burden of showing that any of these truthful statements about Block's compliance efforts were, in fact, untrue.  Missing from the Complaint are facts showing, for example, that Block did *not* design anti-money laundering programs, that Block did *not* take efforts to combat wrongdoing on Cash App, or that Block did *not* invest in compliance.  *See Golub v. Gigamon, Inc.*, 372 F. Supp. 3d 1033, 1052 (N.D. Cal. 2019) (falsity requires particularized facts that "directly contradict" or are "necessarily inconsistent with" the challenged statements).  The Complaint also challenges Block's statements explaining that it was bolstering its compliance efforts—for example that Block's "compliance investments have grown more than twice as fast as overall gross profit" (¶ 117); that "compliance investments have … meaningfully increased as a percentage of our overall operating expenses" (¶ 117); and "We continue to invest in and bolster fraud-fighting resources by both increasing staffing and adopting new technology" (¶ 83).  Again, each of these statements is true, and the Complaint pleads no facts demonstrating that Block failed to increase compliance investments more

---

[2] Plaintiff challenges 38 "statements" (many of which contain multiple statements), which are set forth in Appendix A.  Space constraints do not permit Defendants to address every single challenged statement in this brief, but Defendants have identified representative examples of each category of challenged statements and explained why they fail to support a claim.  Every challenged statements in the Complaint fails for the reasons discussed herein and summarized in the chart.

than twice as fast as overall gross profit, or that Block failed to increase staffing and adopt new technology. Falsity requires "contemporaneous facts that would establish a contradiction between the alleged materially misleading statements and reality," and the Complaint fails to plead any such facts, let alone with the specificity required under the PSLRA. *In re Cloudera*, 2021 WL 2115303, at *16.

Plaintiff also fails to plead that these statements were misleading by omission. Plaintiff claims that Block failed to disclose: (1) that its compliance program did not eliminate improper activity; (2) Cash App's "frictionless" onboarding protocols allegedly enabled "bad actors" to use the platform; and (3) Block's senior leadership allegedly prioritized growth over compliance. ¶ 69. These "facts" either were disclosed or the Complaint does not plead with particularity that they existed in the first place.

As to the first two alleged omissions, Block was transparent that despite its best compliance efforts, bad actors still could use Cash App for misconduct. Block explicitly and repeatedly warned investors that Cash App was "a target for illegal or improper uses, including fraudulent or illegal sales of goods or services," and that Cash App was "used to process illegitimate transactions." Ex. A at 11. Mainstream news sources reported the same. *See, e.g.*, ¶ 81 (October 11, 2020 *New York Times* article stating that "fraud issues have been particularly acute for . . . Cash App"); Ex. F at 7 ("Cash App's popularity for fraudulent schemes is evident"). Because these facts were known to the market, Plaintiff's theory that their omission "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]" makes little sense. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *Sanchez v. IXYS Corp.*, 2018 WL 4787070, at *3 (N.D. Cal. Oct. 2, 2018) ("Publicly available information cannot be a material omission under federal securities laws.").

Plaintiff's claim that Block failed to disclose that its compliance efforts still enabled improper conduct also fails. Block never guaranteed that its compliance measures would prevent all improper activity on Cash App. Indeed, Block told investors just the opposite: that despite efforts to "vet and monitor customers and … payments transactions," its compliance infrastructure "may not be sufficient to identify all of the risks to which we are exposed" or "to prevent or mitigate the risks we have identified." Ex. A at 11; Ex. I at 17; *Weir v. Allianz SE*, 2025 WL 1792516, at *2 (9th Cir. June 27, 2025) (statements about compliance efforts not misleading where the company "did not promise to

eliminate risk or that misconduct would never occur").  The 2025 consent orders also do not support Plaintiff's omissions theory. These settlements (in which Block did not admit to any wrongdoing) repeated what Block had already told investors—its compliance measures were insufficient to prevent all illegal activity.  Dkts. 106-4; Dkt. 106-5 at 2 (asserting that Block failed to take "effective measures" to "address fraud on the Cash App platform"); Dkt. 106-6 at 14 (asserting that Block failed to maintain "effective and compliant" know-your-customer and transaction monitoring processes).

Plaintiff also claims that Block failed to disclose that its "senior leadership knowingly deprioritized compliance in favor of growth."  ¶ 69.  This conclusory statement is unsupported by specific facts about "senior leadership," relying instead on vague and unhelpful FE opinions about the purported "culture" around compliance.  First, according to FE 7, "submissions concerning compliance issues were frequently rejected or diluted . . . reflecting a corporate culture that prioritized growth and profitability over security and experienced leadership."  ¶ 40(b).  This is a conclusion, not a well-pled allegation supported by specific facts. *Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2018 WL 3126393, at *5 (N.D. Cal. June 26, 2018) (confidential witness opinions insufficient to plead falsity).  And FE 6, according to the Complaint, "recalled Dorsey issuing a directive for Cash App to prioritize ease of use and convenience 'at the cost of everything else.'"  ¶ 136(d).  But that statement provides no specifics— no details about the context, timing, or anything else—to connect this statement with compliance.  *See Inchen Huang v. Higgins*, 2019 WL 1245136, at *7 (N.D. Cal. Mar. 18, 2019) (FE accounts can only support falsity if accounts have sufficient specificity in "time, context, and details").  If anything, this allegation is consistent with Block's public disclosures—that both "customer acquisition" (¶ 76) *and* building "trust" through compliance efforts (¶¶ 126-27) were top priorities for Block.

In sum, none of the challenged statements about Block's compliance efforts are supported by particularized facts demonstrating that they were false or misleading when made.  Rather, Plaintiff primarily relies on the later disclosure of compliance issues to try and plead that Block's statements (which at all times warned investors of compliance challenges) were false when made, which is insufficient under the PSLRA.  *Weir v. Allianz SE*, 2024 WL 1813520, at *8 (C.D. Cal. Mar. 14, 2024) ("statements describing internal controls are not automatically rendered false" by later activities that "circumvented those controls"); *M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*, 2017 WL 5635425,

at *5 (C.D. Cal. Oct. 30, 2017) (rejecting claim that statements about the state of internal controls were false under the securities laws where the allegations "were based, primarily, on later disclosures, and constituted allegations of fraud in hindsight"); *see also In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *7 (S.D.N.Y. June 28, 2017) (statements concerning adequacy of anti-money laundering and know-your-customer procedures "not actionable" merely because the procedures were "deficient").

### 2.    Cash App's Account and Growth Metrics Were Not False or Misleading.

Plaintiff challenges Block's disclosures between February 2020 and December 2024 of Cash App account metrics: "monthly transacting active customers," which Block renamed "monthly transacting actives" in 2022. Plaintiff also challenges Block's quarterly reporting of Cash App's growth, and specifically Block's reported "monthly transacting active" metric on a year-over-year basis. For example, Plaintiff challenges statements that "Cash App had approximately 24 million monthly active customers in December 2019, achieving 60% year-over-year growth" (¶ 73); "In December [2021], there were more than 44 million monthly transacting actives on Cash App, an increase of 22% year over year" (¶ 96); and over a dozen similar disclosures. ¶¶ 73-79, 85-89, 96, 100, 103-06, 112, 114, 119, 120-24, 129-30. Plaintiff claims: (1) the numbers were overstated because they included "duplicate" and fake accounts; (2) Block purportedly failed to disclose "internal data," such as "account verifications," indicating that the number of unique Cash App accounts was lower than publicly reported; and (3) Block inflated Cash App growth after 2022 by purportedly comparing monthly transacting active *accounts* with the prior year's monthly transacting active *customers*, the latter of which Plaintiff claims was more narrowly defined and, thus, smaller. ¶¶ 70, 96-97, 107, 109. None of these theories satisfies the "exacting requirements" for pleading falsity under the PSLRA.

### a.    Plaintiff Fails to Plead Facts Showing That Block Reported Inaccurate or Misleading Metrics.

The Complaint fails to plead any facts—let alone facts with the required specificity—demonstrating that Block's reported account metrics were inflated. For the first half of the relevant period, Block defined "transacting active [] customer" as having "at least one financial transaction using a product or service within Cash App during the specified period." Ex. B at 7; Ex. J at 7. Block

later renamed the metric "transacting active," but defined it in the same way: an account "that has at least one financial transaction using any product or service within Cash App during a specified period." Ex. O at 7. Block is not alleged to have miscounted Cash App accounts, regardless of the label it used. *Damri v. LivePerson, Inc.*, 772 F. Supp. 3d 430, 457 (S.D.N.Y. 2025) (dismissing securities fraud claims challenging defendant's change of financial metrics where the complaint did "not allege that [defendant] ever inaccurately tabulated any of the announced metrics it used"). Rather, Plaintiff contends that Cash App's reported metrics were misleading because they included "duplicate" and "fraudulent" accounts and that unidentified "internal data" purportedly showed that the number of "unique Cash App users" was lower. ¶ 70. But Block never said it was reporting unique individual users, and the Company was transparent that "active" accounts could include "multiple accounts" tied to a single customer. Ex. M at 7. Nor does the Complaint identify what Block's "internal data" supposedly showed, let alone that it contradicted Block's disclosure of Cash App growth metrics. *See Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) ("Generically asserting in an undifferentiated manner that facts [existed] 'during the Class Period' is insufficient" to "establish that key representations were false or misleading when made.").

Plaintiff points to a single remark by Defendant Dorsey during an August 5, 2020 earnings call to claim that Block's "monthly transacting active customer" metric only measured unique individual users. *See* ¶¶ 78, 97. Not so. During the August 5, 2020 earnings call, Cash App reported that it had "over 30 million monthly actives." ¶ 76. During the later Q&A session, an analyst asked "what in your view could evolve to be Cash App's total addressable user base?" Ex. D at 9; ¶ 78. Dorsey responded by reiterating the same disclosure that had been made earlier, and directed the analyst to focus on active use, not overall total base: "we do believe Cash App has reached a mainstream scale, and that's with over 30 million monthly active customers in June. And these are monthly ***active*** customers, not overall accounts." ¶ 78 (emphasis added). The obvious implication of Dorsey's statement is exactly what he said—that Block measured its accounts base by the number of *active* customers, not by the total number of accounts on the platform (regardless of activity), and that this was a "monthly" measurement of active accounts, rather than an annual or other time period. Dorsey simply referred to accounts with the name of the account metric that Block was using at the time:

"monthly transacting active customers," which, as set forth above, Block never purported to describe individual users. *See City of Hollywood Firefighters Pension Fund v. Atlassian Corp.*, 2024 WL 235183, at *10 (N.D. Cal. Jan. 22, 2024) ("context is key" when evaluating alleged misstatements).

At bottom, Plaintiff takes issue with how Block calculated Cash App growth metrics. But "[t]here is no requirement that companies like [Block] use specific methods to calculate user engagement." *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1027 (N.D. Cal. 2020); *Ironworkers Loc. 580–Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 428 (S.D.N.Y. 2014) ("choosing to calculate a metric in a particular way" where "there is no settled formula" is a "business decision[]," not securities fraud). Nor is there a rule prohibiting companies from changing what metrics they report or how they calculate them. *Facebook*, 477 F. Supp. 3d at 1027 ("[S]imply using a new methodology to count accounts is not misleading."). That Plaintiff disagrees with the growth metric Block disclosed (and the terminology used for it) and would have preferred that Block report the number of distinct social security numbers or unique users does not state a claim for securities fraud.

> **b.    Block Did Not Mislead Investors With "Apples-to-Oranges" Comparisons.**

Plaintiff also fails to plead facts showing that Block misled investors when disclosing "monthly transacting actives" on a year-over-year basis. The foundational premise for Plaintiff's theory—that Block substantively "changed" the Cash App accounts metric and was comparing "apples-to-oranges"—is conclusory and wrong. *See In re Vicor Sec. Litig.*, 2025 WL 1616537, at *5 (N.D. Cal. June 6, 2025) ("speculative and conclusory allegations" that defendants' statements aimed to "cover-up" declining customer demand cannot support an "inference of falsity"). Plaintiff alleges that Block not only changed the *name* of the metric from "monthly transacting active customer" to "monthly transacting actives," but that it changed the *way* it calculated actives. But the Complaint offers no well-pleaded facts in support of that allegation.[3] With good reason; the way Block calculated actives never varied, and Block was clear that this metric included accounts with "at least one financial transaction using a product or service within Cash App during the specified period." Ex. L at 8; Ex. O at 7. And Block was clear that it was not reporting all accounts on its platform—only those that engaged in

---

[3] Even before Block renamed the metric, the Company often used the phrase "monthly actives" as shorthand for "monthly transacting active customers." ¶¶ 87-89.

activity on Cash App within the specified period (monthly). How Block calculated "the size and growth of Cash App's user base" (¶ 70)—and what was included in its reported metrics—"would have been clear to anyone who actually read [Block's public] statements." *Ironworkers Local 580*, 29 F. Supp. 3d at 427. And Dorsey's remark during the August 5, 2020 earnings call does not counsel a different result because, as explained above, that statement—which simply affirmed that Block's metrics were based on active monthly use, not total accounts—does not support Plaintiff's conclusory allegation that Block's metrics were "fundamentally different" (¶ 97) over the course of the class period.

**c.    Plaintiff's Challenge to Other Statements About Growth Also Fails.**

The Complaint fails to plead that other statements regarding Cash App's growth were false or misleading when made. These statements include: "With our marketing efforts, we are focused on attracting customers who could use more products and bring greater funds into our ecosystem" (¶ 87); "Peer-to-peer payments have allowed us to virally grow Cash App's network and remained the primary driver of customer acquisition" (¶ 96); and "[T]he average customer who adopts two or more products in Cash App generates 3 times to 4 times the gross profit compared to the average peer-to-peer customer" (¶ 88). *See* ¶¶ 75-77, 79, 87, 88, 96, 119. These statements were also true, and the Complaint makes no effort to plead "contemporaneous facts" showing they were false when made. *In re Cloudera*, 2021 WL 2115303, at *16.

**3.    Most of the Challenged Statements Are Non-Actionable Corporate Puffery.**

Several challenged statements about Cash App's compliance and growth also are inactionable statements of corporate optimism. "Vague, generalized assertions of corporate optimism or statements of 'mere puffing'"—including aspirational statements about compliance—"are not actionable misrepresentations under federal securities laws." *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 994 (N.D. Cal. 2017); *Weir*, 2025 WL 1792516, at *1. Reasonable investors "know how to devalue the optimism of corporate executives" and will not rely on vague, "feel good" statements when making investment decisions. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

The vast majority of the challenged compliance statements are textbook puffery. ¶¶ 71, 81, 83, 91, 92, 110, 117, 126-27. For example, Plaintiff challenges Block's statements that (i) "Preventing fraud is critically important to Cash App" (¶ 83); (ii) Block had "taken a number of proactive steps [in

1  response to scammers] and made it a top priority" (¶ 81); and (iii) Block was "constantly improving

2  systems and controls to help prevent, detect, and report bad activity" on Cash App (¶¶ 83, 91, 110).

3  These and similar statements cannot support a securities fraud claim because they are "transparently

4  aspirational" statements and vague "corporate optimism" on which investors do not rely. *Weir*, 2025

5  WL 1792516, at *1 (statements describing "risk mitigation activities" and "system of internal controls"

6  non-actionable puffery); *Bhangal v. Hawaiian Elec. Indus., Inc.*, 2024 WL 4505465, at *12 (N.D. Cal.

7  Oct. 15, 2024) (statement that "Safety is our number one priority" was nonactionable puffery); *Veal v.*

8  *LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (statements touting "relentless focus

9  on compliance" and "building trust" with stakeholders were "corporate optimism and puffery").

10      Many of Block's statements regarding Cash App's growth strategies also are non-actionable

11  puffery.  ¶¶ 76-77, 79, 87, 96, 100, 119, 120, 122, 129.  Statements such as "strong network effects"

12  "really enabled us to scale this network of active customers rapidly and efficiently" (¶ 77); "customer

13  acquisition . . . remains a top priority for Cash App" (¶ 76); and "We see a compelling opportunity to

14  invest in acquiring new customers, driven by peer-to-peer payments as well as creative marketing

15  strategies" (¶ 79), also are generalized expressions of optimism that cannot support a securities fraud

16  claim.  *See, e.g.*, *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064

17  (N.D. Cal. 2012) (statements touting "strong demand metrics" and "robust" product portfolio were not

18  actionable); *Melot v. JAKKS Pac., Inc.*, 2016 WL 6902093, at *19 (C.D. Cal. Nov. 18, 2016) (statement

19  that business was "showing strong momentum" was non-actionable puffery).

20  **B.    Plaintiff Fails To Satisfy The PSLRA's Stringent Requirements For Pleading Scienter**

21      The lack of falsity is, itself, fatal to Plaintiff's claim, but even if Plaintiff could show that any

22  of the alleged misstatements were false—and it cannot—the Complaint also fails because it does not

23  plead a strong and compelling inference that any Defendant acted with scienter.  Without any specific

24  facts showing Dorsey or Ahuja's state of mind, the Complaint asks the Court to infer that these

25  executives operated a five-year-long fraud based on unfounded and scattershot scienter theories that

26  come nowhere close to establishing the cogent and compelling inference of scienter required under the

27  PSLRA.  Former employee musings about interaction with other non-defendant personnel, speculation

28  about what unidentified internal reports might say, and routine non-discretionary stock trades come

1    nowhere close to meeting the heightened standard for pleading fraudulent intent.

2    **1.    The Former Employees "FEs" Do Not Support A Strong Inference Of Scienter.**

3    Plaintiff asks the Court to draw inferences based on hearsay statements from several

4    unidentified FEs, who seem, at most, to have had one limited and scattered interaction with Dorsey and

5    no interaction at all with Ahuja.  These FE allegations do not establish a strong inference of scienter.

6    The Ninth Circuit applies a two-part test for determining whether confidential witness

7    allegations support a strong inference of scienter: (1) "whether a complaint has provided sufficient

8    detail about a confidential witness' position within the defendant company to provide a basis for

9    attributing the facts reported by that witness to the witness' personal knowledge" and (2) whether

10    "those statements which are reported by confidential witnesses with sufficient reliability and personal

11    knowledge [are] themselves . . . indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552

12    F.3d 981, 995 (9th Cir. 2009).  Confidential witness allegations do not support an inference of scienter

13    when the confidential witnesses "were simply not positioned to know the information alleged," "report

14    only unreliable hearsay," or "allege conclusory assertions of scienter." *Id.* at 996.  "[T]he Court may

15    disregard confidential witness statements that are speculative, lack specificity, or are not based on

16    personal knowledge." *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *18 (N.D. Cal. Mar. 24, 2014);

17    *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020) (CW allegations "high on alarming

18    adjectives" but "short on the facts" insufficient to plead scienter).  The FE statements here fail to

19    support any inference of scienter—let alone a strong one—for multiple reasons.

20    ***FEs Had No Direct Contact With Defendants.***  Allegations attributed to confidential witnesses

21    cannot create a strong inference of scienter unless the reporting witness "has reliable personal

22    knowledge of the defendants' mental state." *Zucco*, 552 F.3d at 998; *see also Intuitive Surgical*, 759

23    F.3d at 1063 (confidential witnesses must provide "first hand knowledge regarding what the individual

24    defendants knew or did not know" to be indicative of scienter).  Confidential witness allegations are

25    insufficient to establish scienter where the witnesses have had "no personal interactions" with any

26    individual defendants.  *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010); *see*

27    *also Veal*, 423 F. Supp. 3d at 814 ("None of the CWs had any direct (or indirect) contact with any of

28    the Individual Defendants and therefore cannot provide reliable insight into the Defendants' state of

mind."); *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *11 (N.D. Cal. Mar. 29, 2013) ("no facts alleging that any of the confidential witnesses had direct contact with [individual defendants]").

Here, not a single FE is alleged to have had any direct contact with Ahuja, and only one (FE 2) allegedly had direct contact with Dorsey.  And even then, the only alleged interaction with Dorsey is that, in May 2024, FE 2 "advised Dorsey . . . to engage with the legal and compliance teams" and that Dorsey "assured FE 2 that he would."  ¶ 137(c).  In other words, the Complaint pleads no facts from FE 2—particularized or otherwise—about Dorsey's state of mind about *anything*, let alone that he acted with fraudulent intent when making any challenged statement.  Further, one interaction with Dorsey in May 2024 says nothing about his state of mind in the first *four years* of the relevant period.[4] Because the Complaint does not plead facts showing that any FE had direct personal interactions with the Individual Defendants that would have provided reliable insight into their intent to commit fraud, the FE statements do not support any inference of scienter.  *See Veal*, 423 F. Supp. 3d at 814.

**"All-Hands Meeting" Allegations Are Unreliable And Unparticularized.**  Plaintiff alleges that Dorsey and Ahuja "had ongoing visibility into compliance issues through all-hands meetings and internal forums" (¶ 41), but these allegations from FE 1 and FE 2 fall short of supporting an inference of scienter.  FE 1 and FE 2 claim that "Cash App's compliance issues were raised during all-hands meetings and 'Ask Me Anything' sessions," but the Complaint does not describe *what* compliance "deficiencies" were discussed at the meetings, *who* raised or discussed those deficiencies, or *when* all but one of those meetings occurred.  ¶ 137(a)-(b).  These FEs also fail to allege that Dorsey or Ahuja attended any *specific* meeting (the most that FE 2 recalled is that Dorsey attended "some" meetings). ¶ 137(a)-(b).  In addition, the allegation that a meeting during an unspecified time in Q4 2021 "was all about compliance" would not contribute to an inference of scienter even if it had more detail because none of the challenged statements made in Q4 2021 were even about compliance—they were about the Cash App account metrics.  The FE accounts of the meetings therefore "lack the specificity in time, context, and details that courts have frequently required as indicia of reliability."  *Inchen Huang*, 2019

---

[4] Plaintiff's sweepingly long putative class period makes no sense as a matter of law and common sense, and is no doubt alleged for improper tactical purposes.  *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (criticizing securities plaintiff's use of "unusually long" class period for tactical purposes), *abrogated on other grounds*, *Forescout*, 63 F.4th 747 (9th Cir. 2023).

Gibson, Dunn &
Crutcher LLP

WL 1245136, at *7 (cleaned up); *see also Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 900 (N.D. Cal. 2022) (FE allegations of undated "weekly meetings" where "updates" provided insufficient).

***FEs' Opinions And Speculation Do Not Support An Inference of Scienter.*** Plaintiff attempts to bolster its weak scienter argument by referencing FEs' opinions, speculation, and hearsay regarding Cash App's compliance environment. *See, e.g.*, ¶ 31 ("FE 9 described Cash App's compliance environment as a toxic 'Wild West'"), ¶ 33(c) ("FE 9 described this as a fundamental failure that even a basic compliance program should have prevented"), ¶ 39(a) ("FE 5 described Cash App's KYC practices as seriously deficient"), ¶ 39(b) ("FE 6 characterized Block's internal compliance controls as a 'complete disaster.'"). But "[t]hese opinions, formed with the benefit of hindsight, do not establish that [Dorsey and Ahuja], or anyone making statements on behalf of [Block], shared the confidential witnesses' opinions" at the time of any challenged statement. *Solazyme*, 2018 WL 3126393, at *5; *see also Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) (FE allegations insufficient to establish scienter where plaintiffs "failed to plead facts showing that Defendants adopted" the FEs' views). After-the-fact "disagreement and questioning" of the Company's compliance program says nothing about the Individual Defendants' state of mind at the time of the challenged statements. *See Metzler*, 540 F.3d at 1069; *In re Downey Sec. Litig.*, 2009 WL 2767670, at *11 (C.D. Cal. Aug. 21, 2009) ("second-guessing of management decisions by confidential witnesses does not provide a basis for securities fraud"); *In re Dothill Sys. Corp. Sec. Litig.*, 2009 WL 734296, at *7 (S.D. Cal. Mar. 18, 2009) (finding no scienter based on "confidential witnesses [who] present only 'a litany of employee complaints about how [the company] was managed during the relevant period'").

***FEs' Vague Allegations Regarding Compliance Reports Are Insufficient.*** Plaintiff seeks to establish scienter with scant FE allegations regarding compliance reports. For example, FE 2 claims that "Block's senior leadership team—including Dorsey—commissioned an independent third-party compliance review in 2023 that concluded that Block lacked an adequate compliance program."[5] ¶ 135(b). FE 4 claims that periodic compliance reports addressing "entity-specific and global compliance risks" and providing "qualitative and quantitative data on compliance failures" were

---

[5] Plaintiff also claims that, earlier in 2023, another compliance review was commissioned by Cash App's leadership. ¶ 42. Plaintiff does not allege that Dorsey or Ahuja reviewed or were apprised of it.

presented to Dorsey, and that Ahuja had "visibility" into those reports.  ¶¶ 135(a), 140.  For alleged internal reports to support a strong inference of scienter, the complaint must provide "at least some specifics from those reports as well as such facts as may indicate their reliability."  *In re Silicon Graphics*, 183 F.3d at 985.  No such facts are alleged here: FE 2 says nothing about the third-party compliance review—its scope, purpose, recommendations, how it contradicted any challenged statements, or whether Ahuja was apprised of the review or its results.  *See* ¶ 135(b).  FE 4 does not specify the contents of any specific report (and whether it was even about Cash App), or how they contradicted any challenged statement.  *See* ¶ 135(a).  These general allegations do not support any inference that the Individual Defendants acted with an intent to defraud; indeed, if anything, commissioning compliance reports shows commitment to compliance that *undercuts* fraudulent intent.

At most, these FE allegations establish that the Defendants were potentially aware of challenges and areas of improvement in Cash App's compliance environment.  But, it was public knowledge—based on Block's disclosures and public reporting—that Cash App's compliance programs could not prevent all fraud on the platform, and that Block was working to improve compliance.  *See* ¶¶ 81, 83, 91, 92, 110 (quoting public reports regarding fraud on Cash App); Ex. A at 11 (explaining that Block's compliance programs "may not be sufficient" to prevent fraud and illegal activity on Cash App).

The bottom line is that these allegations do not plead scienter because these witnesses had little or no contact with the Individual Defendants and they do not "identify any specific information that was either received or communicated by any Individual Defendant that would contradict any public statement at the time it was made."  *Veal*, 423 F. Supp. 3d at 814; *see also In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351-52 (S.D.N.Y. 2011) (allegations that defendants "received reports detailing significant and widespread problems with Wachovia's lending" insufficient because they "fail[ed] to specify which reports revealed the widespread lending problems, what information those reports contained, and whether the reports contradicted the public declarations of [d]efendants").

## 2. Additional Allegations Do Not Plead Scienter.

***That Dorsey and Ahuja "spoke about" Cash App's compliance programs and growth metrics does not support an inference of fraud.***  Plaintiff claims that the unremarkable fact that Dorsey and Ahuja "spoke about" Cash App's growth metrics and compliance program in general terms supports

an inference of scienter.  ¶ 142.  This contention is nonsensical.  "[T]he mere fact that the Individual Defendants spoke about a topic does not provide support for a strong inference of scienter."  *Joyce v. Amazon.com, Inc.*, 2023 WL 8370101, at *14 (W.D. Wash. Dec. 4, 2023).  Indeed, "if the mere decision to speak on a topic were indicative of scienter, there would be no distinction between the element of scienter and the requirement to plead a false statement."  *Id.* at *13.

   ***Dorsey and Ahuja's stock sales do not support an inference of fraud.***  Stock sales by insiders may only constitute circumstantial evidence of scienter where the sales are "unusual or suspicious."  *In re Silicon Graphics*, 183 F.3d at 986.  Stock sales are suspicious when "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  *Id.*  None of the alleged sales by Dorsey or Ahuja, ¶ 145, were "unusual or suspicious."

   None of Dorsey or Ahuja's stock sales were "suspicious" because they were non-discretionary sales made pursuant to a Rule 10b5-1 trading plan or to satisfy tax obligations.  Ex. E, Ex. G; *see Royal Oak*, 880 F. Supp. 2d at 1069; *Elec. Workers Pension Fund, Loc. 103, IBEW v. HP Inc.*, 2021 WL 1056549, at *7 (N.D. Cal. Mar. 19, 2021) (no scienter given that "defendants' stock sales were made to either satisfy tax obligations or according to a 10b5-1 plan").  The size of the sales relative to overall holdings—Dorsey sold just 5% of his shares and Ahuja's holdings *increased* during the relevant period—also defeats any inference of scienter.  *Wozniak v. Align Tech., Inc.*, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011) ("The Ninth Circuit has held that typically 'larger sales amounts' than 37% of a defendant's holdings are necessary to support scienter."); *Zamir v. Bridgepoint Educ., Inc.*, 2016 WL 3971400, at *10 (S.D. Cal. July 25, 2016) ("That Defendants . . . increased their holdings 'giv[es] rise to an inference of good faith,' not scienter.").  Nor does Plaintiff provide pre-class period trading, so there is no basis to claim that sales during the class period trading was "unusual."  *Zucco*, 552 F.3d at 1005 ("For individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period.").

   ***The Consent Orders do not support an inference of fraud.***  The regulatory consent orders (Pl.'s Ex. D-F) do not help Plaintiff plead scienter.  *First*, Plaintiff cannot rely on the allegations in the consent orders to allege fraud.  *Veal*, 423 F. Supp. 3d at 811 ("Plaintiffs may not allege 'facts' simply because they appear in FTC's Complaint.").  *Second*, as a general matter, government investigations

1    are not enough to raise any inference of scienter, much less a strong inference—particularly where, as

2    here, the settlements contained no admission of wrongdoing.  *See In re Eargo, Inc. Sec. Litig.*, 656 F.

3    Supp. 3d 928, 947-48 (N.D. Cal. 2023) ("A government investigation is not evidence of fraud,

4    especially where the investigation ended with a settlement that disclaims liability."); Dkts. 106-4 at 2

5    (not admitting liability), 106-5 at 4 (same), 106-6 (same).  *Finally*, nothing in the consent orders "would

6    support the conclusion that [Dorsey or Ahuja] had actual knowledge of the violations" alleged in the

7    consent orders.  *See Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 749 (9th Cir. 2008) ("[T]he

8    mere fact that *someone* at [the company] had knowledge of the illegal transactions is not sufficient to

9    satisfy the scienter pleading requirements of the PSLRA, given the context and limited nature of the

10   misrepresentations at issue.").  The consent orders include no allegations about Dorsey or Ahuja, much

11   less allegations supporting Plaintiff's claim that Dorsey and Ahuja acted with intent to defraud.

12       ***Dorsey and Ahuja's leadership roles do not support an inference of fraud.***  Generic

13   allegations that Dorsey and Ahuja were senior executives of Block and therefore "either knew the

14   public statements at issue were materially false or acted with severe recklessness in ignoring the

15   substantial risk of misleading investors" (¶ 132), obviously do not plead scienter.  *Veal*, 423 F. Supp.

16   3d at 814 ("scienter cannot be established based on 'general awareness' and 'hands-on management

17   style' or by lumping 'management' and 'executives' together").  Plaintiff puts no meat on this bone.

18   They lob conclusory allegations that the Individual Defendants received unspecified reports that

19   "highlighted Cash App's persistent compliance issues" (*see, e.g.*, ¶¶ 41, 134, 138, 139, 141), but no

20   such reports or their contents are identified.  *See Nguyen*, 962 F.3d at 417 (generic allegations of a

21   "stream of complaints and incident reports" failed to plead scienter); *In re Autodesk, Inc. Sec. Litig.*,

22   132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) ("plaintiffs must do more than allege that these key officers

23   had the requisite knowledge by virtue of their 'hands on' positions, because that would eliminate the

24   necessity for specially pleading scienter").

25       ***The Core Operations theory is not a basis to plead scienter.***  "The core operations theory of

26   scienter relies on the principle that corporate officers have knowledge of the critical core operations of

27   their companies."  *Intuitive Surgical*, 759 F.3d at 1062 (cleaned up).  Adequately alleging scienter

28   under this theory is "not easy."  *Id.*  To plead scienter through the core operations doctrine, there must

Gibson, Dunn &
Crutcher LLP

22

1    be "either [1] specific admissions by one or more corporate executives of detailed involvement in the

2    minutia of a company's operations, such as data monitoring, or [2] witness accounts demonstrating that

3    executives had actual involvement in creating false reports." *Id.* By contrast, if "a complaint relies on

4    allegations that management had an important role in the company but does not contain additional

5    detailed allegations about the defendants' actual exposure to information, it will usually fall short of

6    the PSLRA standard." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

7        Here, the Complaint does not contain a single executive "admission" or any allegation that

8    Dorsey or Ahuja created "false reports" that would satisfy the required showing. *See Intuitive Surgical*,

9    759 F.3d at 1062.  Instead, Plaintiff's core operations argument appears to rest on the "important role"

10   theory rejected by the Ninth Circuit in *Killinger*, containing little more than the cursory allegation that

11   KYC, AML, and sanctions screening controls were "core functions" (¶ 30), an entirely unsupported

12   allegation which makes little sense and does not support an inference of scienter.  Moreover, to plead

13   scienter under the core operations theory, it is not sufficient to plead that defendants had knowledge of

14   core operations generally; instead, the complaint must also allege facts that contradict the alleged

15   misstatements. *See Intuitive Surgical*, 759 F.3d at 1062 ("At best, these facts support a 'mere inference

16   of the defendants' knowledge of all core operations,' not scienter.").  Such allegations are absent here.

17       ***No corporate scienter.***  A corporate defendant—like Block—"is deemed to have the requisite

18   scienter for fraud only if the individual corporate officer making the statement has the requisite level

19   of scienter." *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1101 n.12 (C.D. Cal.

20   2008).  Because Plaintiff failed to plead specific facts supporting a strong inference of scienter for

21   Dorsey and Ahuja, Plaintiff cannot establish that Block had the requisite level of scienter.  Plaintiff

22   also tries to plead scienter through "corporate scienter," ¶¶ 146-51, a doctrine the Ninth Circuit has

23   "not . . . adopted." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014); *see also Nozak*

24   *v. N. Dynasty Mins. Ltd.*, 804 F. App'x 732, 734 (9th Cir. 2020).  The Ninth Circuit has left open the

25   possibility that the doctrine may apply in very narrow circumstances, when "a company's public

26   statements were so important and so dramatically false that they would create a strong inference that

27   at least *some* corporate officials knew of the falsity upon publication." *NVIDIA*, 768 F.3d at 1063.

28   Here, the Complaint does not come close to pleading such "dramatically false" allegations. *See Glazer*,

549 F.3d at 743 (stating that corporate scienter could apply in the hypothetical scenario where "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero").

Whether considered alone or together, Plaintiff's allegations fail to support a strong inference of scienter as to any Defendant.

## C.    The Complaint Fails to Plead Loss Causation

Plaintiff must plead "loss causation," namely, that the alleged misstatements "caused the loss for which the plaintiff seeks to recover damages." *See* 15 U.S.C. § 78u-4(b)(4).  The "burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through corrective disclosures which caused the company's stock price to drop and investors to lose money." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022) (quotations omitted).  To be "corrective," a disclosure must reveal information not already available to the public.  *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *7 (N.D. Cal. Feb. 24, 2017).  None of Plaintiff's five alleged corrective disclosures meet the mark.

***March 23, 2023 Hindenburg Report.***  The Hindenburg Report is not a corrective disclosure. *First*, the report is not corrective because it is based on information largely from public sources.  *See Espy*, 99 F.4th at 542 (different Hindenburg report not corrective disclosure because it was based on "careful reading of public documents"); *see also Nektar*, 34 F.4th at 839 (short-seller report based on public information only "corrective" if the report "required extensive and tedious research involving the analysis of far-flung bits and pieces of data").  The Hindenburg Report did not disclose "new" information and did not disclose the results of any "analysis of far-flung bits and pieces of data."  *See Nektar*, 34 F.4th at 839; Pl.'s Ex. A at 78 ("all information contained herein . . . has been obtained from public sources").  Plaintiff's own allegations support that conclusion: Plaintiff claims the Hindenburg Report "revealed that Block (1) inflated the number of active Cash App users by including fake and duplicate accounts, [and] (2) cultivated a Cash App user base of fraudsters and individuals engaged in other illegal activity, including drug and sex trafficking" (¶ 172), but the Complaint makes clear these were in the public at the time of the report.  *See* ¶¶ 81, 83, 91, 92, 110 (describing public reports regarding illegal activity on Cash App); ¶ 108 (conceding Block disclosed in 2022 that users could have multiple accounts).  *Second*, the Hindenburg Report cannot constitute a corrective disclosure

because the "character" of the Report—produced by a "self-interested" short-seller "who disavowed any accuracy"—renders it inadequate to amount to a corrective disclosure." *Nektar,* 34 F.4th at 840.

*August 3, 2023 Disclosure of Regulatory Scrutiny.*  Block's disclosure that it had received government inquiries after the publication of the Hindenburg Report (¶ 175) does not constitute a corrective disclosure. *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("The announcement of an investigation does not 'reveal' fraudulent practices to the market.").  Moreover, Plaintiff does not explain what alleged misstatements this disclosure "corrected." *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014) (no loss causation when "unclear what claims made by the Defendants were invalidated by" the corrective disclosure).  Indeed, the disclosure merely repeated information from the Hindenburg Report. *Nektar*, 34 F.4th at 839 (a corrective disclosure "must by definition reveal new information to the market that has not yet been incorporated into the stock price").

*February 16 and May 1, 2024 NBC News Reports.*  The third and fourth alleged corrective disclosures are news reports repeating allegations from a FinCEN complaint and a former employee. ¶¶ 177-79, 181.  These allegations add nothing "new" to what was disclosed in the Hindenburg Report, the news articles that preceded it, and the August 3, 2023 disclosure. *Nektar*, 34 F.4th at 839; *Curry v. Yelp Inc.*, 875 F.3d 1219, 1225-26 (9th Cir. 2017) (complaints to regulator not a corrective disclosure).

*May 2, 2025 Disclosure.*  That Block "cut its profit forecast for 2025 and announced that it had missed estimates for earnings in the first quarter of 2025" is not a corrective disclosure.  ¶ 184; *see Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*, 2024 WL 4251896, at *11 (Sept. 17, 2024) ("strains credulity" for financial forecast to constitute corrective disclosure); *Loos*, 762 F.3d at 887-88 ("[D]isappointing financial results [are] insufficient to establish loss causation as a matter of law.").  And, again, this alleged corrective disclosure did not disclose any new corrective information.

### D.    Plaintiff Fails to State Section 20(a) Claims Against the Individual Defendants

"[T]he viability of the § 20 claim depends on the viability of the primary claims under § 10(b) and Rule 10b-5." *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1061 (N.D. Cal. 2013).  Because Plaintiff fails to plead a primary violation of the Exchange Act, the Section 20(a) also should be dismissed.

**VI.    CONCLUSION**

For these reasons, the Court should dismiss the Complaint with prejudice.

1

2   Dated: July 30, 2025

3                                          GIBSON, DUNN & CRUTCHER LLP

4                                          By: /s/ Brian M. Lutz
                                                Brian M. Lutz
5
                                           *Attorneys for Defendants Block, Inc., Jack*
6                                          *Dorsey, and Amrita Ahuja*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28