1  Richard M. Heimann (SBN 063607)          Julie Goldsmith Reiser
   Katherine Lubin Benson (SBN 259826)      COHEN MILSTEIN SELLERS & TOLL
2  LIEFF CABRASER HEIMANN &                 PLLC
   BERNSTEIN, LLP                           1100 New York Avenue NW, Suite 800
3  275 Battery Street, 29th Floor           Washington, DC 20005
   San Francisco, CA 94111                  Telephone: (202) 408-4600
4  Telephone: (415) 956-1000                jreiser@cohenmilstein.com
   rheimann@lchb.com
5  kbenson@lchb.com

6  [Additional attorneys listed on signature page]

7  *Counsel for Lead Plaintiff, the NYC Funds*

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                         SAN JOSE DIVISION

11

12  CORINNE GONSALVES, individually and on      Case No. 5:25-cv-00642-NW
    behalf of others similarly situated,
13                                              CLASS ACTION
                    Plaintiff,
14                                              **PLAINTIFF'S OPPOSITION TO**
           v.                                   **DEFENDANTS' MOTION TO DISMISS**
15
16  BLOCK, INC., JACK DORSEY, and AMRITA        Hearing Date: November 5, 2025
    AHUJA,                                      Time: 9:00 a.m.
17                                              Courtroom: San Jose, Courtroom 3, 5th Floor
                    Defendants.                 Judge: Hon. Noël Wise
18
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................................... 2

III.    LEGAL STANDARD ........................................................................................................... 5

IV.     ARGUMENT ........................................................................................................................ 5

    A.      Defendants Made False and Misleading Statements About Material Aspects of Block's Business Throughout the Class Period. ........................................................ 5

        1.      Defendants Materially Misrepresented Cash App's User Metrics. ........................... 6

            a.      Block Materially Inflated Its Reported User Metrics by Including Large Numbers of Fraudulent, Duplicate, and/or Illicit Accounts. ................ 6

            b.      Block's User Metrics Misled Investors by Comparing Customers with Accounts. ................................................................................................... 7

        2.      Defendants Misrepresented the Existence and Strength of Block's Compliance Infrastructure. ................................................................................... 10

            a.      Defendants' Compliance Statements Were False or Misleading. ................. 10

            b.      Defendants' Compliance Statements Were Material. .................................... 14

    B.      The Complaint Pleads a Strong Inference of Scienter. .......................................... 15

        1.      Dorsey and Ahuja Had Direct, Contemporaneous Access to Reports Contradicting Their Public Statements. ................................................................. 16

        2.      Dorsey and Ahuja's Detailed Public Statements and Their Control Over the Metrics Make Their Claims of Ignorance Implausible. ............................................. 19

        3.      Senior Management's Claimed Ignorance Strains Credulity Given the Centrality of Cash App's User Metrics to Block's Valuation. ................................... 19

        4.      Multiple Senior Executives' Knowledge—Not Just Dorsey's and Ahuja's—Is Imputed to Block .................................................................................................. 20

        5.      Dorsey and Ahuja's Stock Sales Bolster the Strong Scienter Inference. .................. 22

    C.      The Complaint Pleads Loss Causation. ................................................................. 23

    D.      The Complaint States a Section 20(a) Claim Against Dorsey and Ahuja. ............. 25

V.      CONCLUSION .................................................................................................................. 25

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 5:25-CV-00642-NW

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) ................................................................. 18

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ................................................................................... 21

*In re Apple Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. Jun. 2, 2020)......................................................... 22

*In re Autodesk, Inc. Sec. Litig.*,
132 F. Supp. 2d 833 (N.D. Cal. 2000) .................................................................. 18

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ................................................ 20, 22

*Azar v. Yelp, Inc.*,
2019 WL 285196 (N.D. Cal. Jan. 22, 2019) ......................................................... 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................................5

*Bernstein v. Ginkgo Bioworks Holdings, Inc.*,
2023 WL 11996105 (N.D. Cal. Mar. 10, 2023)..................................................... 24

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................ 20

*Bhangal v. Haw. Elec. Indus., Inc.*,
2024 WL 4505465 (N.D. Cal. Oct. 15, 2024)........................................................ 15

*In re BofI Holding, Inc. Sec. Litig.*,
2016 WL 5390533 (S.D. Cal. Sept. 27, 2016).................................................. 11, 14

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ........................................................................... 23, 25

*Borteanu v. Nikola Corp.*,
2023 WL 11017679 (D. Ariz. Dec. 8, 2023) ........................................................ 24

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)................................................................... 25

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014)....................................................... 16

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 5:25-CV-00642-NW

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Cisco Sys. Inc. Sec. Litig.*,
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ........................................................... 18

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) .............................................................. 10, 23

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017) ................................................................................ 25

*Damri v. LivePerson, Inc.*,
772 F. Supp. 3d 430 (S.D.N.Y. 2025) ...................................................................... 10

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
2017 WL 4049253 (S.D.N.Y. June 28, 2017) ........................................................ 13

*In re DiDi Corp. Sec. Litig.*,
2005 WL 3090882 (C.D. Cal. July 21, 2005) ............................................................ 9

*In re Doximity, Inc. Sec. Litig.*,
2025 WL 1449598 (N.D. Cal. May 13, 2025) ................................................... *passim*

*DZ Reserve v. Meta Platforms, Inc.*,
96 F.4th 1223 (9th Cir. 2024) ................................................................................... 7

*E. Ohman Jor Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) .............................................................................. 8, 21

*In re Eargo, Inc. Sec. Litig.*,
656 F. Supp. 3d 928 (N.D. Cal. 2023) .................................................................... 18

*Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*,
2021 WL 1056549 (N.D. Cal. Mar. 19, 2021) ........................................................ 23

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) .............................................................................. 23, 24

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) .................................................................... 22

*In re Facebook, Inc. Sec. Litig.*,
477 F. Supp. 3d 980 (N.D. Cal. 2020) ...................................................................... 7

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) ................................................................................... 13

*Ferraro Family Found., Inc. v. Corcept Therapeutics Inc.*,
2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ........................................................ 24

**TABLE OF AUTHORITIES**
(continued)

Page

*Gauquie v. Albany Molecular Resch, Inc.*,
    2016 WL 4007591 (E.D.N.Y. July 26, 2016) ........................................................ 19

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
    97 F.4th 1171 (9th Cir. 2024) ..................................................................... 5, 23, 24

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................................................................... 12

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ..................................................................................... 23

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ............................................................. 5, 18, 21, 22

*Hefler v. Wells Fargo & Co.*,
    2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .......................................................... 7

*In re Intuitive Surgical Sec. Litig.*,
    2014 WL 7146215 (N.D. Cal. Dec. 15, 2014) ....................................................... 17, 18, 19

*Ironworkers Loc. 580-Joint Funds v. Linn Energy, LLC*,
    29 F. Supp. 3d 400 (S.D.N.Y. 2014) ................................................................... 7, 10

*Joyce v. Amazon.com, Inc.*,
    2023 WL 8370101 (W.D. Wash. Dec. 4, 2023) ....................................................... 19

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ................................................................................. 9, 14

*Kyung Cho v. UCBH Holdings, Inc.*,
    890 F. Supp. 2d 1190 (N.D. Cal. 2012) ................................................................... 25

*Lamartina v. VMware, Inc.*,
    2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ....................................................... 18, 22

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ............................................................................. 24, 25

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ..................................................................................... 24

*Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*,
    797 F.3d 160 (2d Cir. 2015) ....................................................................................... 21

*M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*,
    2017 WL 5635425 (C.D. Cal. Oct. 30, 2017) ......................................................... 13

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

*Melot v. JAKKS Pac., Inc.*,

4
2016 WL 6902093 (C.D. Cal. Nov. 18, 2016)........................................................... 10

5
*In re MicroStrategy, Inc. Sec. Litig.*,

6
115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................................................... 22

7
*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
78 F. Supp. 3d 1215 (N.D. Cal. 2015) .................................................................... 20

8
*N.M. State Inv. Council v. Ernst & Young LLP*,

9
641 F.3d 1089 (9th Cir. 2011) ................................................................................ 15

10
*In re Nektar Therapeutics Securities Litigation*,
34 F.4th 828 (9th Cir. 2022) .................................................................................. 23

11

12
*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) .................................................................................. 16

13
*Nordstrom, Inc. v. Chubb & Son, Inc.*,

14
54 F.3d 1424 (9th Cir. 1995) .................................................................................. 21

15
*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
2016 WL 7475555 (N.D. Cal. Dec. 29, 2016)........................................................... 10

16
*Norfolk Cnty. Ret. Sys v. Solazyme, Inc.*,

17
2018 WL 3126393 (N.D. Cal. June 26, 2018) .......................................................... 13

18
*In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*,

19
221 F. Supp. 2d 1090 (N.D. Cal. 2002) .................................................................... 7

20
*In re Novatel Wireless Sec. Litig.*,
830 F. Supp. 2d 996 (S.D. Cal. 2011) ..................................................................... 25

21
*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,

22
380 F.3d 1226 (9th Cir. 2004) ........................................................................... 16, 22

23
*Oregon Public Employees Retirement Fund v. Apollo Group Inc.*,
774 F.3d 598 (9th Cir. 2014) .................................................................................. 24

24

25
*Patel v. L-3 Commc'ns Holdings Inc.*,
2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)............................................................ 21

26
*Pension Tr. Fund for Oper. Eng'rs v. DeVry Educ. Grp., Inc.*,

27
2018 WL 6714326 (N.D. Ill. Dec. 20, 2018) ............................................................ 11

28
*Pino v. Cardone Cap., LLC*,
139 F.4th 1102 (9th Cir. 2025) ................................................................................ 5

- v -

**TABLE OF AUTHORITIES**
(continued)

Page

*Police & Fire Ret. Sys. of City of Detroit v. Crane*,
  87 F. Supp. 3d 1075 (N.D. Cal. 2015) .................................................................. 10

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ............................................................................... 24

*Pujo v. EHang Holdings Ltd.*,
  2025 WL 1242324 (C.D. Cal. Mar. 26, 2025) ................................................. 23, 24

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ........................................................................ 16, 17

*In re Questcor Sec. Litig.*,
  2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ......................................................... 22

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ............................................................................... 19

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,
  2025 WL 1900722 (N.D. Cal. July 9, 2025) ............................................. 17, 19, 20

*Robb v. Fitbit Inc.*,
  2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ......................................................... 17

*Roberti v. OSI Sys., Inc.*,
  2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ....................................................... 19

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ......................................................................... 18, 19

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ................................................................................. 7

*SEC v. Heart Tronics, Inc.*,
  2015 WL 13343180 (C.D. Cal. Feb. 18, 2015) ..................................................... 21

*Shaev v. Baker*,
  2017 WL 1735573 (N.D. Cal. May 4, 2017) ......................................................... 17

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..................................................... 7, 19, 20

*In re St. Jude Med.*,
  836 F. Supp. 2d 878 (D. Minn. 2011) .................................................................. 15

*In re SVB Fin. Grp. Sec. Litig.*,
  2025 WL 1676800 (N.D. Cal. June 13, 2025) .............................................. *passim*

# TABLE OF AUTHORITIES
### (continued)

Page

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)......................................................................................................... 15

*Tsantes v. BioMarin Pharm. Inc.*,
  2022 WL 17974486 (N.D. Cal. Nov. 18, 2022) .................................................. 21

*Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*,
  2025 WL 39936 (N.D. Cal. Jan. 6, 2025) ......................................................... 23

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) .............................................................. 22

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ....................................................... 15, 18

*In re WageWorks, Inc., Sec. Litig.*,
  2020 WL 2896547 (N.D. Cal. June 1, 2020) .................................................... 23

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
  694 F. Supp. 2d 1192 (W.D. Wash. 2009)................................................. 11, 14

*Weir v. Allianz SE*,
  2024 WL 1813520 (C.D. Cal. Mar. 14, 2024)................................................... 13

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
  282 F. Supp. 3d 1074 (N.D. Cal. 2017) ......................................................... 7, 15

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023) .............................................................. 16

*Wozniak v. Align Technology, Inc.*,
  2011 WL 2269418 (N.D. Cal. June 8, 2011) .................................................... 22

*Zamir v. Bridgepoint Education, Inc.*,
  2016 WL 3971400 (S.D. Cal. July 25, 2016) .................................................... 22

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ....................................................................... 16, 25

**Court Rules**

Fed. R. Civ. P. 15(a)(2)............................................................................................ 25

1    I.    **INTRODUCTION**

2        Block, Inc. and its senior executives engaged in a years-long scheme to mislead investors about the

3    scale and sources of Cash App's explosive growth. Throughout the Class Period, Defendants repeatedly

4    assured the market that Cash App's rapidly expanding user base reflected viral adoption by engaged

5    consumers, while concealing that millions of those "actives" were fraudulent, duplicate, and/or illicit

6    accounts enabled by Block's intentionally frictionless account creation, coupled with its "complete disaster"

7    of a compliance infrastructure. ¶ 39(b).[1] The result was a distorted picture of Block's growth, profitability,

8    long-term value—and, correspondingly, its stock price. When the truth came to light through a succession of

9    corrective disclosures arising from investigative reports, whistleblowers, regulatory action, and earnings

10   reports, Block's stock declined 84% from its Class Period high.

11       Block's valuation hinges on Cash App's ability to grow as a peer-to-peer payments platform.

12   Defendants capitalized on this dynamic by presenting strong "user" metrics as compelling evidence of Cash

13   App's viral growth and Block's financial strength. But Block inflated metrics by as much as 30%, because

14   Cash App's deficient compliance controls did not require identity verification, prevent blocked users from

15   creating virtually unlimited additional accounts, or otherwise detect or prevent abuse of the platform.

16   Instead, the Company welcomed illicit actors with "frictionless" onboarding.

17       To sustain the illusion of robust growth and uninterrupted momentum, at the mid-point of the Class

18   Period Block changed how it counted Cash App's user metric—from "transacting active customers" to

19   "transacting actives." It now counted accounts, not individual users. Block misled investors about the

20   change, and continued to report misleading year-over-year growth that compared the new account-based

21   figures to the earlier customer-based metrics.

22       Defendants further reinforced this illusion—and boosted investor confidence in the inflated user

23   metrics—by claiming Block had robust systems in place to prevent fraud, money laundering, and illicit

24   activity. The Company never had a compliance infrastructure capable of meeting basic regulatory

25   requirements. Whistleblowers, external consultant reports commissioned by Block's officers, and regulatory

26   findings all concluded that Block's controls were deficient and resulted in widespread fraud on the Cash

27   App platform. CEO Jack Dorsey and CFO Amrita Ahuja were repeatedly warned of compliance failures yet

28
_____
[1] Citations to "¶" or "¶¶" refer to the Amended Complaint (ECF No. 106) ("Compl.").

continued to reassure the market and promote inflated user metrics.

The Complaint pleads each contested element of securities fraud with precision.[2] First, the Complaint pleads multiple false and misleading statements regarding user metrics and compliance controls: Defendants misled investors into believing the Company had implemented effective compliance controls and that its user metric figures were accurate and reflected strong growth. These are concrete, testable misrepresentations about core aspects of the Company's business.

Second, the Complaint pleads a strong inference of scienter. Block's senior leadership—including Dorsey and Ahuja—were directly and repeatedly informed of compliance failures through Board-level risk reports, internal audits, and external compliance reviews documenting the deficiencies they later denied. Their statements, roles, control over the metrics at issue, and suspiciously massive stock sales further reinforce the inference that they acted knowingly or with deliberate recklessness.

Third, the Complaint pleads loss causation. A cascade of corrective disclosures—beginning with the March 2023 Hindenburg Report (the "Hindenburg Report" or "Report") and followed by additional whistleblower revelations, regulatory investigations, and enforcement actions—which progressively exposed the falsity of Defendants' statements and triggered steep stock price declines. Each revealed new information about the compliance failures and inflated metrics that Defendants concealed from the market.

## II.    <u>STATEMENT OF FACTS</u>

Defendant Jack Dorsey co-founded Block in 2009. ¶ 12. As CEO and Chairman, he led Block's rapid growth as a financial technology ("fintech") company serving both businesses and individuals. Defendant Amrita Ahuja serves both as Block's CFO and its Chief Operating Officer ("COO"), holding the first title for over five years and the second since February 2023. ¶¶ 14, 17.

Block began with Square, a mobile credit card reader for businesses, before launching Cash App, a consumer-focused mobile financial platform that offers a wide range of services, including payments, banking, investing, cryptocurrency, tax filing, and small-dollar lending. ¶¶ 17, 20. Its niche is "frictionless" banking—initially requiring only a debit card and an email address or phone number to open an account. By bypassing traditional bank requirements, Cash App provided a fast, digital alternative to physical cash. ¶ 20.

Cash App's strategy centered on acquiring more users and deepening their engagement with its

---

[2] Defendants challenge only falsity, scienter, and loss causation. Mot. 1.

financial services. ¶ 26. During the Class Period, user acquisition was the company's strategic "North Star." As then-Cash App CEO Brian Grassadonia explained, "everything we built was towards achieving a low-cost customer acquisition model that could scale our network virally and eventually become massive." ¶ 27.

From December 2019 to December 2023, Cash App's user base reportedly grew by tens of millions. By 2024, it had surpassed Square as Block's primary revenue source. ¶¶ 19, 25. This explosive growth made Cash App's user metrics central to Block's valuation, and Defendants repeatedly highlighted them in earnings calls, investor presentations, and SEC filings, knowing analysts and investors relied on these figures to assess Cash App's current value and future profitability. ¶¶ 4, 28, 155–59.

In fact, Cash App's rapid user growth was driven in significant part by fraudulent, duplicate, and/or illicit accounts enabled by longstanding, systemic failures in Block's core compliance protocols—know-your-customer ("KYC"), anti-money laundering ("AML"), and sanctions screening. ¶ 3. Former employees ("FEs") confirmed Block deliberately underinvested in compliance, marginalized experienced compliance personnel, and retaliated against those pushing for stronger oversight. ¶¶ 31, 33, 39.

These lax protocols made Cash App a magnet for bad actors, who created many fraudulent, duplicate, and/or illicit accounts to facilitate their illicit activities. ¶¶ 29, 34–35. In one example, in 2022, the Company discovered that approximately 30 members of a Russian criminal network had opened 8,359 Cash App accounts using falsified information. ¶ 32. Several states also identified Cash App as a major conduit for fraudulent unemployment claims during the COVID-19 pandemic and sought to claw back over $700 million in improper payments. ¶¶ 36–37. Block knowingly reported Cash App active user metrics artificially inflated by as much as 30% due to these fraudulent, duplicate, and/or illicit accounts. ¶¶ 29, 34.

Block's senior leadership—including Defendants Dorsey and Ahuja, along with Chief Legal Officer ("CLO") Sivan Whiteley and Chief Compliance Officer ("CCO") Amelia Childress—knew of these persistent compliance deficiencies. Dorsey and Ahuja received Board-level materials and participated in meetings detailing ongoing failures in Block's AML, KYC, and sanctions screening controls and were repeatedly apprised of these issues through all-hands meetings and internal forums. ¶¶ 134, 135(a), 137, 140. Dorsey's dual role as CEO and Board Chair gave him access to risk assessments highlighting persistent deficiencies presented to the Board's Audit and Risk Committee, while Ahuja's operational responsibilities gave her continuous exposure to compliance reports detailing several compliance failures. ¶¶ 134, 139–40.

In 2023, Dorsey and Ahuja received at least two third-party reports concluding that Block lacked an adequate compliance program. ¶¶ 42, 135(b). But they took no action until intense pressure from regulators forced their hand. ¶¶ 135–45.

Despite knowing that Cash App's compliance was seriously deficient, Defendants repeatedly assured investors that Block's systems adequately detected and prevented illegal activity. In March 2023, for example, Block falsely claimed that its "approach to compliance is consistent with other financial services platforms," even though its senior leadership knew the Company had chronically under-resourced and fundamentally flawed compliance controls and substandard fraud-detection systems. ¶¶ 117–18.

Defendants knowingly inflated Block's active user metrics by including large numbers of fraudulent, duplicate, and/or illicit accounts. ¶¶ 4, 29, 34. In early 2022, in a shift designed to demonstrate artificial growth, Defendants switched from counting "active customers" to counting "actives," meaning accounts, further inflating the user metrics. Their statements misled investors and analysts, who viewed the inflated metrics as evidence of Cash App's scalability and growth potential. ¶¶ 97–98, 116.

On March 23, 2023, after a two-year investigation based on dozens of interviews, whistleblower disclosures, internal documents, public records, and law enforcement materials, Hindenburg Research published a Report exposing that 40 to 75% of Cash App accounts that Cash App employees had reviewed were, fake, fraudulent, or duplicative. ¶¶ 5, 34, 44–49. Block's stock price declined 15%. ¶ 53. A week later, Block disclosed user figures that confirmed that the actual number of individual Cash App users was inflated by 15% to 30% to reach the 51 million headline figure Block had touted to investors. ¶ 56.

Between August 2023 and May 2024, a series of whistleblowers further exposed Cash App's systemic compliance failures. In its Q2 2023 Form 10-Q, Block first acknowledged that it had received inquiries from the SEC and DOJ following the Hindenburg Report. ¶ 59. Block's stock dropped nearly 14% in response. *Id.* In February 2024, new whistleblower allegations surfaced, detailing widespread compliance lapses at Block—including weak identity verification protocols and the facilitation of illicit and sanctioned transactions—triggering another stock decline of more than 5%. ¶ 60. In May 2024, NBC News reported that federal prosecutors were investigating Block for allegedly processing transactions linked to sanctioned countries and terrorist organizations. ¶ 62. The report cited more than a hundred pages of supporting documents corroborating those transactions, and reported that "compliance lapses were known to Block's

leadership." *Id*. It led to an 8% drop in Block's share price. *Id.*

In early 2025, Block entered into several regulatory consent orders and paid state and federal regulators hundreds of millions of dollars in penalties and fines for its persistent AML, KYC, and sanctions screening failures. ¶¶ 64–67. These regulatory actions had finally forced Block to add compliance friction to its "frictionless" onboarding, leading to five straight quarters of flat user growth. ¶ 67. On May 1, 2025, Block missed its Q1 earnings target and cut its profit outlook; analysts quickly attributed the miss to stagnant user growth, causing the stock price to decline 20%. ¶ 68.

## III.   LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). At this stage, courts accept all well-pleaded facts as true and construe them in the plaintiff's favor. *Pino v. Cardone Cap., LLC*, 139 F.4th 1102, 1107 (9th Cir. 2025). "To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege: (1) a material misrepresentation or omission ('falsity'), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024).

## IV.   ARGUMENT[3]

### A.   Defendants Made False and Misleading Statements About Material Aspects of Block's Business Throughout the Class Period.

Under the securities laws, "[a] statement is false or misleading if it directly contradicts what the defendant knew at that time or omits material information." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023). To determine whether a statement or omission is misleading, the "central inquiry is whether a reasonable investor would have been misled about the nature of his investment." *Genius Brands*, 97 F.4th at 1181.

---

[3] Unless otherwise indicated, all emphasis in this brief has been added, all alterations have been adopted, and all internal citations and quotation marks have been omitted.

1.    **Defendants Materially Misrepresented Cash App's User Metrics.**

    a.    **Block Materially Inflated Its Reported User Metrics by Including Large Numbers of Fraudulent, Duplicate, and/or Illicit Accounts.**

Cash App's utility and value grows with the size of its user base, because a larger customer base creates more opportunities for future transactions, referrals to the platform, and network expansion, which can in turn increase profits. ¶¶ 155, 157. Throughout the Class Period Block trumpeted Cash App's user metric, which it called "actives," to show purported user growth in its public filings and in response to analyst questions. *See* ¶¶ 73–79, 85–89, 96, 100, 103–06, 112, 114, 116, 119–24, 129–30.

Each of these statements was false or misleading because the reported figures included large numbers of fraudulent, duplicate, and/or illicit accounts that proliferated due to the Company's inadequate AML, KYC, and sanctions controls. ¶¶ 70, 80, 90, 99, 102, 107, 113, 115, 125, 131; *see* ¶ 4. Hindenburg reported that Block's lax compliance protocols allowed illicit actors to easily create and retain Cash App accounts, such that 40% to 75% of accounts employees reviewed were fake, involved in fraud, or tied to single users opening multiple accounts. ¶ 34. Block was also slow to evaluate accounts flagged as problematic: by 2020, the Company faced a backlog of 169,000 transaction monitoring alerts meant to spur the Company to file required suspicious activity reports ("SARs") with the Financial Crimes Enforcement Network ("FinCEN"), and to prevent from continuing suspicious activity. ¶¶ 32, 33(b). In one case, a single SAR flagged 91 individuals controlling 16,811 accounts. Compl. Ex. F ¶ 27. Users easily created fraudulent accounts—including with fake names like "Jesus Christ," "Barbie," "Elon Musk," and "Donald Trump"— because Block required little in terms of identity verification. ¶¶ 34, 39. Former employees confirm the Company's "Wild West" compliance environment had "no effective procedure" to confirm customer identities. ¶¶ 39(f), 60.

Block's internal data confirmed the inflation of Cash App's user metrics. When the Company for the first time publicly disclosed its internal breakdown in response to investor questions following the Hindenburg Report, it revealed that Cash App had 51 million "actives" (the metric Block had touted to investors), but only 44 million of those were "verified" through Social Security Numbers ("SSNs") and, of those, only 39 million were linked to unique SSNs. Def. Ex. P at 1. Thus, Block ***had not verified and did not know*** who created or used 7 million of its active Cash App accounts, and, as alleged in the Complaint,

many of those accounts were fraudulent, duplicate, and/or illicit. ¶¶ 5, 29; *see* ¶ 157. Yet Block included them in its reported totals to suggest greater growth and thereby inflated the true totals by as much as 15-30%. *See In re Doximity, Inc. Sec. Litig.*, 2025 WL 1449598, at *6–7 (N.D. Cal. May 13, 2025) (Wise, J.) (overstating "the number of regular users" on platform was misleading). "The fact that a critical performance metric was based on a significant number of fraudulent accounts would certainly give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1096 (N.D. Cal. 2017); *see Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *6 (N.D. Cal. Feb. 27, 2018) (false and misleading to "attribute[] its financial success" to "materially and artificially inflated . . . metrics").

Defendants argue they were not required to disclose user metrics at all, or to use a particular formula. Mot. 14. Fair enough. But once they elected to use those metrics as a key indicator of Cash App's growth and the Company's financial health, they were bound to "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800, at *10 (N.D. Cal. June 13, 2025) (Wise, J.) (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016)), *am. in other part on denial of recons.*, 2025 WL 2265575 (N.D. Cal. July 29, 2025); *see also Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1136–43 (N.D. Cal. 2017) (company failed to disclose "adverse user engagement trend" for "key user engagement metric"); *In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 221 F. Supp. 2d 1090, 1103 (N.D. Cal. 2002) (company misled investors by including individuals who were not active customers in disclosed number of "subscribers"); *DZ Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1231, 1234 (9th Cir. 2024) (in consumer case, metric that "actually measures social media accounts, not living humans" was misleading). Reporting metrics they knew to be significantly inflated with illicit accounts, as Defendants did here, differs from the authorities Defendants cite, where the dispute was over "specific methods" for calculating metrics. *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1027 (N.D. Cal. 2020); *Ironworkers Loc. 580-Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426–27 (S.D.N.Y. 2014).

       **b.**    <u>**Block's User Metrics Misled Investors by Comparing Customers with Accounts.**</u>

Halfway through the Class Period, Block switched from reporting "transacting active ***customers***"

(*i.e.*, individuals) to the broader "transacting ***actives***" (*i.e.*, accounts). Defendants reported year-over-year comparisons that falsely suggested uninterrupted momentum, and included growth charts in public filings that misled investors about what was being counted and the actual trajectory of Cash App growth, Block's key revenue driver.

For the first two years of the Class Period, Defendants used the metric "transacting active Cash App customers" to tout the size and growth rate of Cash App's user base. ¶¶ 73–77, 79, 85–89; Mot. Ex. B at 7; Mot. Ex. C at 7, Mot. Ex. J at 7; Mot. Ex. H at 5, 7. Block defined a "transacting active Cash App customer" as a "***customer*** [with] at least one cash inflow or outflow" in a given period. ¶ 73. The term "account" did not appear in this definition, and executives reinforced the notion that the metric referred to real, unique, individual users. *See, e.g.*, ¶ 77 (Ahuja discussing Cash App's efforts to "acquire new customers" and "scale [the] network of active customers."); ¶ 76 (Ahuja responding to question about Cash App's "30 million users" by discussing "customer acquisition" and transacting active customers).

In February 2022, Block changed its core metric to "transacting actives," meaning the number of Cash App ***accounts*** with "at least one financial transaction using any product or service within Cash App" in a given period, rather than the number of unique ***customers***. ¶ 94. As Dr. Daniel McCarthy, an expert on customer metrics and corporate disclosure practices, explains in the Complaint, Defendants misled investors by comparing the new accounts metric to the earlier customers metric, including through graphics that implied continued year-over-year growth. ¶ 167.[4] Indeed, this shift in terminology—changing from "transacting active customers" to "transacting actives"—was itself misleading. Linguistically, "transacting actives" appears to be a simple abbreviation of "transacting active customers." The terms share nearly identical language and rhythm, and "actives" functions as plausible shorthand for "active customers," particularly in investor communications where brevity is common. As Dr. McCarthy explains, this deliberate similarity misled investors into believing the metric remained consistent and led them to unknowingly compare materially different figures. ¶¶ 161, 163.

But through the change, Block inflated its reported user counts by including multiple accounts owned by the same individual customer. The first partial acknowledgement of this possibility came only

---

[4] *See E. Ohman Jor Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 930–31 (9th Cir. 2023) (crediting expert analysis in securities fraud complaint as "sufficiently reliable" because it "was prepared by knowledgeable and competent professionals," was sufficiently "detailed," and was corroborated by other sources).

months after the shift to "transacting actives," in a May 2022 investor letter, which stated that "[c]ertain of these [transacting active] accounts may share an alias identifier with one or more other transacting active accounts," and that this might represent "one customer with multiple accounts" or "multiple customers sharing one alias identifier (for example, families)." ¶ 108. Yet even a year later, following the Hindenburg Report, Block reported that the most frequently asked investor question was "Why would a Cash App customer have multiple accounts?" Def. Ex. P at 1. The question reveals that, until the Report's release, investors did not realize the metric included multiple accounts belonging to a single customer and that Block misled investors in switching the metric.

Defendants now claim that Block "never changed how it calculated actives" and only "renamed" the metric. Mot. 3, 13. This wholly unsupported factual assertion must be rejected, because at the pleading stage, the Court must credit Plaintiff's plausible allegations and draw all reasonable inferences in its favor. *See Doximity*, 2025 WL 1449598, at *2. Moreover, Dorsey himself distinguished between "active customers" and "overall accounts" in 2020, confirming he understood they were not the same. ¶ 78.[5] Defendants posit (at 13) that "Block is not alleged to have miscounted Cash App accounts," completely missing the point that its earlier "transacting active customer" metric ***did not refer to accounts*** but rather to ***unique customers*** and, therefore, it is the changed input that Plaintiffs challenge and not the method of calculation. Their assertion that "Block never said it was reporting unique individual users" (at 13) is contradicted by their own definition of "transacting active customer." Finally, Defendants praise Block for being "transparent that 'active' accounts could include 'multiple accounts' tied to a single customer," (at 13) but that explanation first came in May 2022, ***after*** their sleight of hand in changing the metric. ¶¶ 94, 108.

The result of Block's definitional change was a single "trend line" stitched together from two incompatible datasets: one customer-based, the other account-based. ¶¶ 161–62, 167 (McCarthy analysis, including charts). This misleading "trend" continued for several quarters. *E.g.*, ¶ 96 ("22% year over year"); ¶ 105 ("up 18% year-over-year"), ¶ 106 ("20% year over year"). Dr. McCarthy has "never encountered a

---

[5] Defendants proffer a different interpretation of Dorsey's statement (Mot. 13), but the issue of how a reasonable investor would have understood his comment is not properly resolved at the pleading stage. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 (9th Cir. 2018) (district court abused discretion by judicially noticing earnings call transcript where "[r]easonable people could debate what exactly [the] call disclosed"); *In re DiDi Corp. Sec. Litig.*, 2005 WL 3090882, at *12 n.14 (C.D. Cal. July 21, 2005) ("implication" of a statement is "more appropriate for summary judgment or trial").

situation" where a company materially altered a metric and then continued making year-over-year comparisons to the old metric as if nothing had changed. ¶ 160. Further, Block continued discussing "customer acquisition" as if "actives" and "customers" were interchangeable. ¶ 96. The result was a misleading portrayal of sustained user growth. ¶ 167. *See Police & Fire Ret. Sys. of City of Detroit v. Crane*, 87 F. Supp. 3d 1075, 1082–83 (N.D. Cal. 2015) (company's failure to disclose that the "comparison between the earlier and later revenue figures was not apples-to-apples" was misleading).

This case is therefore fundamentally different from those cited by Defendants, in which the plaintiffs did not allege that the defendant companies obscured a definitional change in their key metrics or misled investors by comparing different metrics. *See Damri v. LivePerson, Inc.*, 772 F. Supp. 3d 430, 457 (S.D.N.Y. 2025) (plaintiffs challenged company's "justifications for altering key metrics," not alteration itself); *Linn Energy*, 29 F. Supp. 3d at 426–27 (plaintiffs challenged "the way [defendant] chose to calculate [financial] metrics" but did not actually claim metrics were "incorrect"); *see also Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) (plaintiffs did not plead "contemporaneous facts" that were "known to Defendants ***at the time the statements were made***" that would render the statements misleading). Defendants' own statements and definitions show they were aware Block knew the metrics were different yet compared them anyway.

Defendants (Mot. 16) try to dismiss certain of the challenged statements about user metrics and growth as puffery. But these statements are not vague "assertions of corporate optimism" or "references to anticipated product line growth." *Cf. City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,* 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012); *Melot v. JAKKS Pac., Inc.*, 2016 WL 6902093, at *19 (C.D. Cal. Nov. 18, 2016). Rather, the Company obscured user metrics and included fraudulent, duplicate, and/or illicit accounts to continue reflecting growth. *E.g.*, ¶ 96 (challenging apples-to-oranges year-over-year comparison of customers to accounts).

### 2. Defendants Misrepresented the Existence and Strength of Block's Compliance Infrastructure.

#### a. Defendants' Compliance Statements Were False or Misleading.

Defendants misleadingly claimed that Block had built a robust compliance infrastructure to prevent fraud, money laundering, and illicit activity. In reality, the Company's compliance systems were incapable

1  of meeting even basic regulatory requirements, and Defendants took few, if any, steps to strengthen internal

2  controls until after a series of disclosures revealed deficiencies in Block's compliance infrastructure.

3      ***Statements relating to Block's AML program (¶ 71)***: AML compliance is a core operation for any

4  financial institution, especially a fintech company like Block. Compl. Ex. F ¶ 11; *see ¶* 30. Block

5  misleadingly assured investors:

6            We have implemented an AML program designed to prevent our payments
          network from being used to facilitate money laundering, terrorist financing,

7            and other illicit activity. . . . Our AML compliance program includes policies,
          procedures, reporting protocols, and internal controls, including the

8            designation of an AML compliance officer, and is designed to address these
          legal and regulatory requirements and to assist in managing risk associated

9            with money laundering and terrorist financing.

10  ¶ 71. Block made that statement in its FY2019 10-K, issued on February 26, 2020, and repeated it in sum

11  and substance every year during the Class Period. ¶ 71 & n.17. As the New York Department of Financial

12  Services found, Block "failed to maintain a compliant and effective AML program," and what little AML

13  compliance existed "failed to adequately consider the substantial risks posed to an entity of its new size and

14  complexity." Compl. Ex. F ¶¶ 9, 12.[6] Block's promise that it had "implemented an AML program" was also

15  directly contradicted by two third-party compliance assessments concluding the Company lacked an

16  adequate compliance program. ¶ 42.

17      In *SVB*, this Court held that similar assurances—a financial institution's promise to maintain a

18  "liquidity risk management and monitoring process designed to ensure appropriate liquidity"—were

19  actionable because they "turn[ed] on an issue of material fact": whether the liquidity controls were, in fact,

20  "designed" as claimed. 2025 WL 1676800, at *11; Ex. 1 to Consol. Am. Compl. at 35, *SVB*, No. 23-cv-

21  01097-NW (N.D. Cal. Jan. 16, 2024), ECF 88-1. As here, the plaintiffs alleged that regulator findings

22  reinforced the false and misleading nature of the statements. The Court's conclusion in *SVB* is in accord

23  with decisions from other Districts. *See, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *9

24  (S.D. Cal. Sept. 27, 2016) (statements about lending practices actionable where actual practices fell short of

25  internal and regulatory standards); *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192,

26

27  [6] Defendants note that "Block did not admit to any wrongdoing" in connection with the 2025 settlements
(Mot. 11), but that is irrelevant where the regulators found Block's compliance controls to be severely
deficient during the Class Period. *See, e.g.*, *Pension Tr. Fund for Oper. Eng'rs v. DeVry Educ. Grp., Inc.*,

28  2018 WL 6714326, at *3 (N.D. Ill. Dec. 20, 2018) (settlements in which company was not "require[d] . . . to
admit wrongdoing" nevertheless supported falsity and scienter).

1213 (W.D. Wash. 2009) (holding actionable a claim that internal controls were effective when "the problems identified were slowly addressed, never fully remediated, and never disclosed to the public"); *see also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 369 (E.D.N.Y. 2013) (collecting cases finding actionable misstatements about compliance with self-imposed or regulatory standards).

> ***Statements about steps Block was taking to enforce compliance controls on Cash App (¶¶ 81, 92, 110)***: Block repeatedly misled investors about whether it was addressing fraud and illegal activity on Cash App. For example, in October 2020, in response to complaints about scammers, Block said: "***We've taken a number of proactive steps*** and made it our top priority." ¶ 81. In August 2021, a spokesperson said Cash App had "enhanced our systems to monitor and ***act upon*** deposits that we deem to be risky." ¶ 92. And in August 2022, a spokesperson claimed that when accounts were flagged as potentially fraudulent, "***we will review*** the account" and "***take the necessary action*** starting with account closure and disablement." ¶ 110.

The statements were materially misleading. The Consumer Financial Protection Bureau ("CFPB") found Block "***did not have*** . . . a fraud governance model." Compl. Ex. E ¶ 52 (emphasis added). The Company knew of severe deficiencies in its internal controls. *E.g.*, Compl. Ex. F ¶ 13 ("In 2018, Block had accumulated a transaction monitoring backlog of approximately 18,000 [SARs], which grew to over 169,000 by 2020."), ¶ 28 ("As part of a 2022 internal investigation, Block self-identified over 8,000 accounts linked to a Russian criminal network. . . . [T]his discovery further highlights the gaps in Block's KYC and on-boarding practices."). An FE explained that multiple unfavorable third-party compliance reviews in or around 2023 revealed the Company "[didn't] have a compliance program at all." ¶ 42. That FE also revealed that senior executives reportedly disputed the reviews' methodologies, sought to undermine their findings, and failed to implement meaningful remedial measures. *Id.* Another FE, Block's Head of Bitcoin Compliance, "reported that their submissions concerning compliance issues were frequently rejected or diluted, impeding effective compliance oversight and reflecting a corporate culture that prioritized growth and profitability over security and experienced leadership." ¶ 40(b). Additionally, a whistleblower complaint revealed Block operated as a "shadow financial system" facilitating transactions with sanctioned entities and illicit actors—ranging from stolen data sales to offshore gambling and potentially terrorism financing. ¶ 60. Block executives, including Dorsey, not only ignored these issues but "directed strategic and personnel decisions that deliberately weakened Cash App's compliance infrastructure and kept non-

performing personnel in key compliance positions." ¶ 41. Whether Block was actually addressing fraud on the platform "turn[s] on an issue of material fact." *SVB*, 2025 WL 1676800, at *11 (falsity alleged for "whether SVB's liquidity risk management and monitoring process[] was actually 'designed to ensure appropriate liquidity'").

Defendants say they disclosed that "bad actors still could use Cash App for misconduct" and Cash App's "compliance infrastructure 'may not be sufficient to identify all of the risks to which we are exposed' or 'to prevent or mitigate the risks we have identified.'" Mot. 10. This is a strawman. Plaintiff does not assert Defendants promised Cash App was fraud-free; rather, the Complaint alleges Defendants knowingly misrepresented whether their compliance program met legal standards. The Ninth Circuit recently rejected this defense, holding that Facebook's general disclaimers about ongoing risks—such as stating it "could not provide 'absolute security'" and "would continue to be subject to cyberattacks"—did not immunize the company from liability for statements that "sidestepp[ed] the reality of what Facebook allegedly knew" about cyberattacks that had already occurred. *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 951 (9th Cir. 2023); *see also SVB*, 2025 WL 1676800, at *11 (declining to dismiss statements about potential risks "when, as alleged, Defendants knew that those risks had [already] been realized"). Here, too, Defendants' statements about Block's compliance with its AML obligations are provably false because they knew or should have known that Block's AML infrastructure was deficient at the time the statements were made. This is not "fraud by hindsight" because the Complaint describes real-time information from FEs and internal reports showing Defendants were aware of the issues; Defendants' authorities (at 11-12) are therefore distinguishable because the plaintiffs in those cases did not show contemporaneous falsity.[7]

***Statements about Block's investments in and dedication to compliance (¶¶ 83, 91, 110, 117, 126, 127)***: Defendants repeatedly assured investors of Block's commitment to compliance in three ways:

---

[7] *Weir v. Allianz SE*, 2024 WL 1813520, at *8 (C.D. Cal. Mar. 14, 2024) ("Weir does not allege any material information that was in Allianz's hands at the time of the statements that investors were entitled to know."); *M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*, 2017 WL 5635425, at *5 (C.D. Cal. Oct. 30, 2017) (plaintiffs did not allege "that Defendants knew of omitted information about internal controls when the statements were made" and confidential witness allegations lacked "indicia of personal knowledge"); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *7 (S.D.N.Y. June 28, 2017) (plaintiffs alleged "neither facts showing that the descriptions of the processes were false or misleading at the time they were included in the public statements, nor facts showing that the processes were not followed"); *Norfolk Cnty. Ret. Sys v. Solazyme, Inc.*, 2018 WL 3126393, at *5 (N.D. Cal. June 26, 2018) (CWs did not allege that defendant's "statements were inaccurate at the time he made them").

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 5:25-CV-00642-NW

*First*, Defendants falsely claimed compliance was a "significant focus" for Block and the Company was "continu[ing] to invest in and bolster fraud-fighting resources." ¶¶ 83, 91, 110, 126. Block did not begin developing a fraud governance model until late 2020—and only in response to a CFPB audit. Compl. Ex. E ¶ 52. Deficient controls persisted throughout the Class Period. Compl. Ex. F ¶¶ 13, 20, 27–28. FEs confirm Dorsey and Ahuja knew "Block lacked an adequate compliance program" and Dorsey "de-emphasiz[ed] compliance in favor of organizational loyalty and cost reduction." ¶¶ 134–36; *see* ¶¶ 137–42, 146–51. These statements painted a false picture of a company laser-focused on compliance, when Block's internal controls ranged from non-existent to woefully deficient. *See SVB*, 2025 WL 1676800, at *11 (denying motion to dismiss where plaintiffs alleged defendant's risk controls were deficient); *BofI*, 2016 WL 5390533, at *11 (similar); *Wash. Mut.*, 694 F. Supp. 2d at 1213 (similar).

*Second*, Defendants' post-Report statements that the Company had recently increased investments in compliance were false or materially misleading. ¶¶ 117, 127. FEs report Block was already on notice it "lacked an adequate compliance program." ¶ 135(b); *see* ¶ 136(b). Yet, Block took no serious remedial action to fund its compliance efforts, evidenced by the internal reports continuing to apprise Dorsey and Ahuja of rising SAR volumes, persistent KYC weaknesses, and insufficient transaction resources. ¶ 41. These statements indicated that Block was adequately invested in fraud-fighting resources and now was supplementing that amount further. Yet it omitted "what [Defendants] knew at that time" concerning ongoing and persistent deficiencies. *Khoja*, 899 F.3d at 1008; *see BofI*, 2016 WL 5390533, at *11.

*Third*, after the Hindenburg Report, Defendants misleadingly asserted that Block's compliance structure was "consistent with other financial services platforms." ¶ 117. But the Report was focused on why Block's compliance failures were worse than other platforms because of its "frictionless" model.

### b.    Defendants' Compliance Statements Were Material.

Dismissal on materiality grounds is rarely appropriate because materiality turns on "fact-intensive assessments" better suited for a jury. *SVB*, 2025 WL 1676800, at *11. It is only proper where statements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ." *Id.* Not so here. Block issued numerous statements about core internal controls—including whether it had an AML program (¶ 71 & n.17), steps it was taking to fight fraud on Cash App (¶¶ 81, 92, 110), and broader assurances about its compliance infrastructure (¶¶ 83, 91, 110, 117, 126, 127). Defendants' repeated emphasis on these issues

reinforces their importance. *See BofI*, 2016 WL 5390533, at *11; *SVB*, 2025 WL 1676800, at *11.

Investor reactions to news of compliance failures confirms materiality. Among the most frequent questions the Company received following the Hindenburg Report was how much Block had invested in compliance. Def. Ex. P at 3. Block's response—citing a "meaningful[] increase" in such investments (¶ 117)—supports materiality. *See In re St. Jude Med.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011) (statements "in response to either investors' frequently asked questions or an analyst's specific inquiry" supports materiality). These were not "aspirational" statements but rather specific claims about monitoring and fraud prevention efforts. By contrast, Defendants' authorities considered only generalized language concerning "focus" or "building trust." *See* Mot. 16.[8]

Block's reliance on Cash App's user base for network-effect-driven growth further supports materiality. ¶ 155; *see* ¶ 4. Investors had a clear interest in whether Block was removing fraudulent, duplicate, and/or illicit accounts; as Bloomberg News explained, investors were on high alert about the adequacy of compliance protocols. ¶ 52. *See In re Wells Fargo*, 282 F. Supp. 3d at 1103–04 (materiality established where bank "tout[ed] the effectiveness" of internal controls while its financial performance was driven by the failure of those controls).

### B.    The Complaint Pleads a Strong Inference of Scienter.

To plead scienter, Plaintiff must "state with particularity facts giving rise to a strong inference that [D]efendant[s] . . . possessed actual knowledge or acted with deliberate recklessness" when making the misstatements or omissions. *Doximity*, 2025 WL 1449598, at *8 (quoting *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011)). The inference "need not be irrefutable . . . or even the most plausible," just "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). The Court evaluates scienter holistically, asking "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23.

The Complaint easily meets this standard. It sets out detailed, corroborated accounts from multiple FEs and other sources showing that, even as Defendants publicly promoted Cash App's compliance controls

---

[8] *Bhangal v. Haw. Elec. Indus.*, *Inc.*, 2024 WL 4505465, at *12 (N.D. Cal. Oct. 15, 2024); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019).

and growth, they were aware of severe and persistent deficiencies in its AML, KYC, and sanctions programs—and that the company's core user metrics gave a misleading picture of growth. The FEs worked at Block during the Class Period in roles related to risk management, compliance, internal controls, and marketing, which "positioned [them]" to possess firsthand knowledge of facts relating to the specific fraud underlying Plaintiff's claims. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009); *see* Compl. at 2 & nn.2–4. By contrast, the confidential witness ("CW") allegations in Defendants' cases demonstrated only disagreement within the defendant company, were far less particularized than those here, or were inconsistent with practical experience. *See* Mot. 17.[9]

### 1. Dorsey and Ahuja Had Direct, Contemporaneous Access to Reports Contradicting Their Public Statements.

Dorsey and Ahuja had direct, contemporaneous access—through board-level risk reports, internal meetings, and employee feedback—to information regarding severe, persistent compliance deficiencies belying their public statements. ¶¶ 42, 135, 137, 140–41. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (allegations of "actual access to the disputed information raise a strong inference of scienter"); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("contemporaneous reports or data" directly contradicted defendants' statements, supporting scienter).

Courts routinely credit FE or CW accounts of executive access to internal data and metrics. *See, e.g.*, *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 884 (N.D. Cal. 2023) (scienter where CWs alleged the "executives' ability to access Salesforce," a database with customer data). Here, multiple FEs describe how Dorsey and Ahuja were repeatedly warned about Cash App's pervasive compliance failures. According to FE 4, Block's former Global Risk Assessment Program Manager, both received two mid-year Board reports—the AML CTF Final Report and the Audit Risk Committee Summary Report—that detailed rising SAR volumes, persistent KYC deficiencies, and insufficient transaction-monitoring resources. ¶ 135(a). In 2023, they also received two independent compliance reviews—one commissioned by Cash App's

---

[9] *Zucco*, 552 F.3d at 998 (CWs alleged "some disagreement" over [the company's] accounting processes," not that defendants were "deliberately reckless" in manipulating financials); *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *18 (N.D. Cal. Mar. 24, 2014) (plaintiffs failed to allege CW's dates of employment, responsibilities, or sources of information); *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408, 416 (9th Cir. 2020) (lone CW's allegations lacked "any details" about what reports executives received and supported a scienter theory that had "no basis in logic or common experience").

leadership and another by Block's senior leadership, including Dorsey—that, per FE 2 (who read both), concluded that Block lacked an adequate compliance program. ¶¶ 42, 135(b). Dorsey also received annual Enterprise Risk Assessments ("ERAs") which evaluated Block's risk management framework. ¶ 151.

As in *Doximity*, 2025 WL 1449598, at *9, these reports contained information contradicting Defendants' public statements. FEs confirmed Dorsey and Ahuja "had access to the [reports] showing the true" state of Cash App's compliance program. *Id.* For instance, FE 4 stated Dorsey was "100%" aware of the risks identified and Ahuja had "direct visibility into critical compliance documentation." ¶¶ 135(a), 140. "[T]aken collectively," the FEs' detailed accounts "establish the existence of" reports "that were available to executives," describe the contents of the reports, and show that the executives were aware of the compliance issues the reports raised—which compellingly supports scienter. *Quality Sys.*, 865 F.3d at 1145; *see also, e.g.*, *Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 2025 WL 1900722, at *9 (N.D. Cal. July 9, 2025) (finding scienter because of access to database of "detailed information" about relevant metrics and "weekly reports via email" contradicting defendants' statements). Defendants' demand for granular detail about the reports' content is misplaced at the pleading stage. *Robb v. Fitbit Inc.*, 2017 WL 219673, at *8 (N.D. Cal. Jan. 19, 2017) (pleading "precise level of inaccuracy" in internal reports unnecessary); *In re Intuitive Surgical Sec. Litig.*, 2014 WL 7146215, at *5 (N.D. Cal. Dec. 15, 2014) (report contents need not be alleged where FE accounts are corroborated).

Notably, FE 1, FE 5, and FE 9 also corroborated the longstanding deficiencies in Cash App's adherence to AML, KYC, and sanctions laws and regulations discussed in these reports, and described the fraud those deficiencies enabled. *See* ¶¶ 33(a)–(c), 35, 38, 39. FE 1, FE 7, and FE 9's accounts of the lack of oversight of Cash App's Bitcoin functionality further depict a pattern of inadequate compliance monitoring. ¶¶ 40, 136(e). These allegations are corroborated by internal reports of widespread compliance failures (¶¶ 31–40), Dorsey's pattern of deprioritizing compliance (¶ 136(a)–(e)), whistleblower statements (¶ 62), public reports of Cash App fraud (¶¶ 52, 81, 83, 110, 177, 181), government investigations known to Block by August 2020 (Compl. Ex. A at 36) and resulting consent orders (¶¶ 64-67; Compl. Exs. D, E, F), and external reporting such as the Hindenburg Report. *See, e.g.*, *Shaev v. Baker*, 2017 WL 1735573, at *11, *17 (N.D. Cal. May 4, 2017) (finding scienter on similar record). Defendants' supporting authority, by contrast, involve far sparser FE allegations that fail to "identify any specific information that was either received or

communicated," directly or indirectly, "by any Individual Defendant that would contradict" the alleged misstatements. *See Veal*, 423 F. Supp. 3d at 814.[10] Further, Plaintiff does not rely on the consent orders themselves to show scienter; instead, Plaintiff contends that the existence of multiple government investigations into Block during the Class Period strongly suggests that Defendants were aware of regulators' concerns about Cash App's compliance controls when they made the alleged misstatements. *SVB*, 2025 WL 1676800, at *13.[11]

Employees thus repeatedly brought these compliance failures to Defendants' attention. Courts "need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *Id.* (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)). Defendants' decision to speak publicly about Block's compliance practices and user metrics while disregarding the compliance failures all around them was the height of recklessness.

This common-sense inference is reinforced by Dorsey's and Ahuja's roles at Block. As CEO and Chair, Dorsey sat at the "nexus of internal information flow," with direct access to reports on compliance, risk, user metrics, and regulatory issues. ¶¶ 138–39. Ahuja's roles as CFO and COO also required regular engagement with the Board and the Audit & Risk Committee. ¶ 141. Both Dorsey and Ahuja were repeatedly exposed to employee concerns through all-hands meetings, internal forums, and governance channels, and regularly engaged with the Board and its Audit & Risk Committee that oversaw legal and regulatory compliance. ¶¶ 41, 134, 135(a), 137(a)–(c), 138–41. Such allegations about management's exposure to the underlying facts support a strong inference of scienter, whether as part of a holistic *Tellabs* analysis or independently. *See, e.g.*, *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *15–16 (N.D. Cal. Mar. 31, 2023) (finding scienter where defendants attended a meeting where facts contradicting their statements were likely discussed and company policy implied defendants' access to contradictory facts).[12]

---

[10] *See* Mot. 17–18. Defendants' cases likewise do not require FEs to have had "direct contact" with Dorsey and Ahuja. *See Intuitive Surgical*, 759 F.3d at 1063; *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010); *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *11 (N.D. Cal. Mar. 29, 2013).

[11] By contrast, in Defendants' cases, the plaintiffs cited enforcement actions and settlements for the truth of the facts alleged. *Veal*, 423 F. Supp. 3d at 816; *In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 947 (N.D. Cal. 2023); *Glazer Cap. Mgmt.*, 549 F.3d at 748–49.

[12] Defendants' cases (at 22) are of no moment: one predates *Tellabs* (*In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000)), while the other involved plaintiffs who failed to allege "any specific information that was either received or communicated by any Individual Defendant that would contradict any public statement [when] made" (*Veal*, 423 F. Supp. 3d at 814).

2. **Dorsey and Ahuja's Detailed Public Statements and Their Control Over the Metrics Make Their Claims of Ignorance Implausible.**

Defendants argue that scienter cannot be inferred from the mere fact that Dorsey and Ahuja "spoke about [the] topic[s]." Mot. 21.[13] But "an assertion that Defendants were unaware of an alleged issue can be 'directly contradicted by the fact that [they] specifically addressed it'" in "detailed factual statements." *Twitter*, 282 F. Supp. 3d at 1147 (quoting *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014)); *see, e.g.*, *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) ("scienter can be established by the fact that [d]efendants touched on the specific issue . . . in their public statements."); *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) (executive "[a]ctively communicat[ed] with the public about th[e] issue," which "demonstrate[d] [his] sensitivity to it"). Dorsey and Ahuja spoke about user metrics in detail while redefining and presenting those metrics in ways they must have known could mislead investors. Their own words demonstrate their awareness of the critical distinction between customer-based and account-based metrics. ¶¶ 78, 144. Moreover, they played central roles in controlling, changing, and clarifying the definition of the very metrics they promoted.

3. **Senior Management's Claimed Ignorance Strains Credulity Given the Centrality of Cash App's User Metrics to Block's Valuation.**

Plaintiff's allegations support a strong inference of scienter under the core operations theory,[14] which "relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Stitch Fix*, 2025 WL 1900722, at *9 (quoting *Intuitive Surgical*, 759 F.3d at 1062). Core operations allegations, such as those about "management's role in a company," plead scienter in three circumstances: (i) as part of the *Tellabs* holistic analysis, (ii) as an independent basis for scienter "where they are particular and suggest that defendants had actual access to the disputed information," or (iii) even "without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *S. Ferry*, 542 F.3d at 785–86 (cleaned up).

---

[13] Defendants' lone case is inapposite because the plaintiffs did not allege contemporaneous awareness of contradictory facts. *See Joyce v. Amazon.com, Inc.*, 2023 WL 8370101 (W.D. Wash. Dec. 4, 2023).

[14] KYC, AML, and sanctions controls are undisputably "core operation[s]" (*S. Ferry*, 542 F.3d at 785) for a financial payments company (¶¶ 3, 30), a fact that Defendants do not contest.

All three circumstances are present here. As discussed above in Part IV.B.1, Dorsey and Ahuja's central roles at Block, when considered with corroborating FE accounts and other contemporaneous facts, establish scienter, as does their actual access to multiple reports disclosing the truth about Cash App's compliance practices and user metrics. Plaintiff also pleads the third circumstance through allegations that Cash App's user metrics were so "integral to [its] success" and directly impacted revenue that it would be "absurd" to suggest that Dorsey and Ahuja did not know they were inflated due to compliance deficiencies. *Twitter*, 282 F. Supp. 3d at 1146 ("absurd" for CEO and CFO to be unaware of adverse trends in Twitter's "most important" user metrics); *Doximity*, 2025 WL 1449598, at *8-9 ("implausible" that CEO would not have been aware of user engagement metrics); *see also Stitch Fix*, 2025 WL 1900722, at *9 ("implausible" that executives were not aware of "test[] results showing [a new product]'s failure as a new customer acquisition vehicle" and its threat to the company's "core product").

Here, as in *Twitter* and *Doximity*, user growth was Block's "North Star" and primary lever for expansion. ¶¶ 26–27. Dorsey and Ahuja repeatedly highlighted user growth in earnings calls, investor presentations, and SEC filings (¶¶ 76, 78, 88–89, 98, 103–05, 116, 119–20, 122–24), and analysts relied on it in valuing Block (¶¶ 98, 116, 185). As Cash App's then-CEO explained, "everything we built was towards achieving a low-cost customer acquisition model that could scale our network virally and eventually become massive." ¶ 27. And the financial stakes were enormous: Cash App generated $1.23 billion in gross profit in 2020 (about 45% of Block's total) and $5.24 billion by 2024 (roughly 59%). ¶ 25. Given that Cash App was Block's primary revenue driver—and that Cash App's financial success was dependent on user growth—it strains credulity to suggest Dorsey and Ahuja were unaware of the KYC, AML, and sanctions control failures that inflated the metric for years. Courts infer scienter in analogous circumstances. *See Stitch Fix*, 2025 WL 190072, at *9; *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *20 (N.D. Cal. Nov. 27, 2018); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1226 (N.D. Cal. 2015).

### 4.    Multiple Senior Executives' Knowledge—Not Just Dorsey's and Ahuja's—Is Imputed to Block

Because Plaintiff plausibly alleges scienter as to Dorsey and Ahuja and Defendants do not dispute Dorsey and Ahuja acted within their authority when making the statements at issue, scienter is imputed to

Block. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 705 (9th Cir. 2021). Additionally, courts in this District apply the corporate scienter doctrine. *NVIDIA*, 768 F.3d at 1063 (citing *Glazer*, 549 F.3d at 743); *Tsantes v. BioMarin Pharm. Inc.*, 2022 WL 17974486, at *1 (N.D. Cal. Nov. 18, 2022). The Complaint pleads corporate scienter through Block's CLO Whiteley and CCO Childress—senior executives who, like Dorsey and Ahuja, were aware of Cash App's systemic compliance deficiencies. *See, e.g.*, *SEC v. Heart Tronics, Inc.*, 2015 WL 13343180, at *6 (C.D. Cal. Feb. 18, 2015) (imputing general counsel's scienter to corporation); *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995) ("[C]orporate scienter relies heavily on the awareness of the directors and officers who . . . are necessarily aware of the requirements of SEC regulations and state law and of the danger of misleading [investors]."); *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 177–78 (2d Cir. 2015) (imputing scienter of managing director to company); *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *14–15 (S.D.N.Y. Apr. 21, 2016) (imputing scienter of subsidiary's CFO to parent defendant where subsidiary comprised 36% of defendant's business).

Multiple FEs raised serious compliance concerns directly to Whiteley and Childress: Whiteley told FE 2 she had tried to fire Childress and Regulatory Counsel Crissy Solh over their handling of compliance obligations but was overruled by Dorsey (¶ 147(b)), and FE 2 confirmed that the compliance failures were consistently documented in internal reports to Childress, Solh, and Cash App's then-CEO (¶ 150); FE 6 "raised concerns directly with Whiteley" about a memo downplaying the Hindenburg Report and sextortion cases (¶ 147(c)); FE 7 "regularly escalated compliance concerns" to Childress in weekly one-on-ones (¶ 40(b)); and FE 1 recounted that, around October 2022, "the sanctions team emailed Childress a log" of hundreds of potential OFAC violations (¶ 148(b)). Other FEs described meetings with Whiteley and Childress where employees "criticized Childress's leadership" as CCO. ¶¶ 137(a), 137(b), 147(a). These first-hand accounts show Whiteley and Childress had "actual access" to and awareness of the pervasive compliance failures squarely within their remit. Beyond ignoring these issues, Childress and Solh dismissed concerns at Block's Q4 2021 all-hands meeting, which caused a "mass resignation" of compliance professionals. ¶ 137(b). Taken together, these allegations establish a strong inference that multiple senior executives—beyond Dorsey and Ahuja—possess the requisite scienter that may be imputed to Block.

Plaintiff also pleads corporate scienter under the collective-scienter doctrine, which applies when "a

company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." *Glazer Cap. Mgmt.*, 549 F.3d at 744. Block's pervasive compliance failures rendered Cash App's most critical metric—user growth—materially misleading. Given the steady flow of internal and external reports, whistleblower disclosures, and government investigations, it is implausible that no Defendant knew the underlying truth. This inference is reinforced by multiple FEs who raised compliance concerns with senior leadership, alongside other internal reports, employee complaints, and third-party reviews. ¶ 150.

### 5.  Dorsey and Ahuja's Stock Sales Bolster the Strong Scienter Inference.

Dorsey and Ahuja sold over $650 million in stock while possessing material nonpublic information, supporting a strong inference of scienter. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009); ¶ 145. "[W]here . . . as here, stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings." *Oracle*, 380 F.3d at 1232.[15] Defendants' claim that Dorsey sold "just 5%" of his holdings is misleading; by May 2021, he had liquidated *all* his unrestricted Class A shares, ¶ 145, retaining only Class B shares vital to maintaining control of the Company. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 643–47 (E.D. Va. 2000) (scienter pled where CEO sold 100% of his Class A shares representing only 2.2% of his total holdings). Similarly, Ahuja's increased holdings as the result of stock-based compensation likewise do not negate an inference of scienter, because receiving stock through compensation does not "demonstrate[] the same good faith as a stock purchase." *Lamartina*, 2023 WL 2763541, at *15.[16]

Defendants' claims (at 21) that the trades were made under Rule 10b5-1 plans or for tax reasons are factually unsupported and in any event insufficient to rebut well-pled allegations on the pleadings. *In re Apple Sec. Litig.*, 2020 WL 2857397, *22 n. 13 (N.D. Cal. Jun. 2, 2020) (use of 10b5-1 plan is affirmative defense); *Yelp*, 2018 WL 6182756, at *18–19. A 10b5-1 plan does not foreclose an inference of scienter. *See, e.g.*, *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 n.3 (N.D. Cal. 2019); *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013). Defendants' authorities

---

[15] Defendants' cite to *Wozniak v. Align Technology, Inc.*, 2011 WL 2269418, *14 (N.D. Cal. June 8, 2011), is misplaced because it states large percentage sales are "typically" present for scienter, not required.

[16] *Zamir v. Bridgepoint Education, Inc.*, 2016 WL 3971400 (S.D. Cal. July 25, 2016) concerns purchases of stock, *see id.* at *10, not stock-based compensation.

1  provide no meaningful analysis and depart from the correct approach taken in this District, which recognizes

2  corporate officers may manipulate Rule 10b5-1 plans.[17]

3      **C.**    **The Complaint Pleads Loss Causation.**

4          "Loss causation" is similar to "the showing of proximate causation required in ordinary tort actions."

5  *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020). To plead this element, "the plaintiff

6  must show that after purchasing her shares and before selling, the following occurred: (1) the truth became

7  known, and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or

8  eliminated." *Id.* This is a "low bar," *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal.

9  June 1, 2020), that "simply calls for enough fact to raise a reasonable expectation that discovery will reveal

10  evidence of loss causation," *Doximity*, 2025 WL 1449598, at *10. Given the fact-intensive inquiry,

11  dismissal on loss causation "is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec.*

12  *Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

13          ***March 23, 2023 Hindenburg Report***. The Report partially revealed Defendants' fraud. ¶¶ 44–53,

14  171–73. It drew on "dozens of interviews with former employees, partners, and industry experts" to reveal

15  that Cash App's user metrics were vastly overinflated, Block facilitated fraud to increase Cash App's user

16  base, and Block ignored complaints about fraud on the platform. Compl. Ex. A at 2, 13, 21–25, 50–51.

17  Disclosure of such non-public insider information pleads loss causation, particularly when specific roles and

18  titles are identified. *Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*, 2025 WL

19  39936, at *4–6 (N.D. Cal. Jan. 6, 2025); *see, e.g.*, Compl. Ex. A at 21 ("[m]ultiple former customer service

20  reps"), 25 ("a former compliance employee").

21          Short-seller reports qualify as corrective disclosures. *See Genius Brands*, 97 F.4th at 1186–87 (loss

22  causation established by Hindenburg report); *Pujo v. EHang Holdings Ltd.*, 2025 WL 1242324, at *4 (C.D.

23  Cal. Mar. 26, 2025) (collecting cases). Hindenburg Research was a "well-known short-seller firm[] whose

24  reports are not 'anonymous.'" *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 541 (9th Cir. 2024). The report in *In re*

25  *Nektar Therapeutics Securities Litigation*, 34 F.4th 828 (9th Cir. 2022) (Mot. 25), was different: it came

26  from an obscure entity with "no associated contact information that would allow investors to verify the

27

28     [17] *See Juniper*, 880 F. Supp. 2d at 1069; *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*, 2021 WL 1056549, at *7 (N.D. Cal. Mar. 19, 2021)).

1    report's reliability." *Espy*, 99 F.4th at 541; *Pujo*, 2025 WL 1242324, at *13 ("[I]t would be a loophole for

2    fraudsters if no claim could be made for fraud as long as it was Hindenburg that initially exposed [it].").

3    Nor was the Report a repackaging of public materials. The Report synthesized information from

4    former employees, and FOIA and litigation records, making otherwise complex data accessible to the

5    market for the first time. *Genius Brands*, 97 F.4th at 1186–87; *Ferraro Family Found., Inc. v. Corcept*

6    *Therapeutics Inc.*, 2021 WL 3748325, at *26 (N.D. Cal. Aug. 24, 2021). The Report did not simply describe

7    Cash App fraud; it uncovered that it was ***Block's own conduct*** that enabled the fraud and led to Block's

8    inflation of key user metrics. ¶ 48. Further, the price decline of nearly 15% (¶¶ 53, 173) creates a strong

9    inference that the market considered it new information. *See, e.g.*, *Bernstein v. Ginkgo Bioworks Holdings,*

10   *Inc.*, 2023 WL 11996105, at *8 & n.2 (N.D. Cal. Mar. 10, 2023) (12% price drop "help[ed] to rule out

11   alternative causes"); *Borteanu v. Nikola Corp.*, 2023 WL 11017679, at *16 (D. Ariz. Dec. 8, 2023)

12   (Hindenburg report "changed the market's perception" as shown by a "resulting stock price change").

13   ***August 3, 2023 Disclosure of Regulatory Scrutiny***. On August 3, 2023, Block disclosed that the

14   SEC and DOJ launched investigations "primarily relate[d] to the allegations raised in" the Hindenburg

15   Report. ¶ 175. Block's share price declined 14%. ¶ 176. An investigation announcement establishes loss

16   causation when "viewed together and within the context" of related events, *Pub. Emps. Ret. Sys. of Miss. v.*

17   *Amedisys, Inc.*, 769 F.3d 313, 323–25 (5th Cir. 2014), that indicate investors understood it "as at least a

18   partial disclosure of the inaccuracy" of previous statements, *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210

19   (9th Cir. 2016). Block confirmed the investigations were tied to the Report's allegations about compliance

20   deficiencies (¶ 175), and subsequent consent orders confirmed the weakness of the Company's compliance

21   and the proliferation of multiple accounts by bad actors (¶¶ 64–67). Defendants cite *Loos v. Immersion*

22   *Corp.*, 762 F.3d 880 (9th Cir. 2014), but the case predates *Lloyd* and holds only "the mere announcement of

23   an investigation," "standing alone and without any subsequent disclosure of actual wrongdoing," is not a

24   corrective disclosure. *Id.* at 889, 890 n.3. And *Oregon Public Employees Retirement Fund v. Apollo Group*

25   *Inc.*, 774 F.3d 598 (9th Cir. 2014), concerns an "expression of concern," not an investigation. *Id.* at 608.

26   ***February 16, 2024 and May 1, 2024 Whistleblower Reports***. On these dates, NBC News articles

27   revealed whistleblower reports from former Block employees about Cash App's severe compliance failures,

28   including allegedly processing transactions linked to sanctioned countries and terrorist organizations,

prompting stock price declines. ¶¶ 60, 62. The May report cited more than one hundred pages of supporting documents corroborating those transactions. ¶ 62. Disclosures by "knowledgeable third parties such as whistleblowers . . . or investigative reporters" establish loss causation on the pleadings. *BofI*, 977 F.3d at 790; *see Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 114, 141 (D. Conn. 2021) (Bloomberg article "provided additional details about [defendant's] improper and unethical conduct" based on "interviews with more than twenty current and former employees"). Defendants' *Curry v. Yelp Inc.*, 875 F.3d 1219 (9th Cir. 2017), concerned generic consumer complaints, not insider reports supported by documents and later validated by investigations. *See BofI*, 977 F.3d at 793 (distinguishing *Curry*).

**May 1, 2025 Earnings Disclosure**. The May 1 earnings release was not merely a "financial forecast" (at 25) but a critical corrective disclosure: Cash App monthly actives remained flat at 57 million for the fifth consecutive quarter, triggering a 20% drop in Block's stock price. ¶¶ 184–86. Analysts identified "flat" user count as the "Key Disclosure," and expressed concern over the persistent growth stagnation. ¶ 185. At least eight brokerages cut their price targets, citing ongoing weakness in Cash App's user metrics. *Id.* "[W]hen 'analysts note the probable relationship between' alleged misstatements and a stock price decline, plaintiffs have adequately pleaded loss causation." *Doximity*, 2025 WL 1449598, at *11 (quoting *Lloyd*, 811 F.3d at 1202). *See, e.g.*, *id.* at *10–11 (analysts linked revised revenue guidance to misstated user engagement); *Azar v. Yelp, Inc.*, 2019 WL 285196, at *5 (N.D. Cal. Jan. 22, 2019) ("analysts connected" subject of the fraud to the company's "lowered earnings forecasts"); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1020–21 (S.D. Cal. 2011) ("analyst reports attributed the miss and disappointing guidance" to fraud).

### D.    The Complaint States a Section 20(a) Claim Against Dorsey and Ahuja.

Section 20(a) allows for derivative liability against "controlling persons" "as long as the plaintiff demonstrates a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator." *Zucco*, 552 F.3d at 990. This "is an intensely factual question." *Id.* The Complaint pleads the claim given the control Defendants exercised over Block and its statements. ¶¶ 16, 214–15; *see, e.g.*, *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1206–07 (N.D. Cal. 2012).

### V.    **CONCLUSION**

Defendants' motion should be denied in its entirety.[18]

---

[18] Should the Court grant any part of the motion, Plaintiff requests leave to replead. Fed. R. Civ. P. 15(a)(2).

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 5:25-CV-00642-NW

Date: September 15, 2025

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

*/s/      Richard M. Heimann*

Richard M. Heimann (S.B.N. 063607)
Katherine Lubin Benson (S.B.N. 259826)
Courtney J. Liss (S.B.N. 339493)
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
rheimann@lchb.com
kbenson@lchb.com
cliss@lchb.com

Steven E. Fineman (S.B.N. 140335)
Daniel P. Chiplock (*pro hac vice*)
Nicholas Diamand (*pro hac vice*)
Gabriel A. Panek (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212)-355-9500
sfineman@lchb.com
dchiplock@lchb.com
ndiamand@lchb.com
gpanek@lchb.com

Julie Goldsmith Reiser (*pro hac vice*)
Claire Marsden (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
jreiser@cohenmilstein.com
cmarsden@cohenmilstein.com

Michael B. Eisenkraft (*pro hac vice*)
Benjamin F. Jackson (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
meisenkraft@cohenmilstein.com
bjackson@cohenmilstein.com

*Counsel for Lead Plaintiff NYC Funds and Co-Lead*
*Counsel for the Proposed Class*