GIBSON, DUNN & CRUTCHER LLP
BRIAN M. LUTZ, SBN 255976
  blutz@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200

JESSICA VALENZUELA, SBN 220934
  jvalenzuela@gibsondunn.com
310 University Avenue
Palo Alto, CA 94301
Telephone: 650.849.5300

COLIN B. DAVIS, SBN 273942
  cdavis@gibsondunn.com
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
Telephone: 949.451.3800

*Attorneys for Defendants Block, Inc., Jack Dorsey, and Amrita Ahuja*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CORINNE GONSALVES, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>        v.<br><br>BLOCK, INC., JACK DORSEY, and AMRITA AHUJA,<br><br>        Defendants. | Case No. 5:25-cv-00642-NW<br><br>CLASS ACTION<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>HEARING:<br><br>Date:     November 5, 2025<br>Time:    9:00 a.m.<br>Judge:   Hon. Noël Wise<br>Location: Courtroom 3, 5th Floor |

**TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................................................... 1

II.    ARGUMENT ........................................................................................................... 2

    A.    Plaintiff Fails to Plead Falsity. .................................................................... 2

        1.    Block's Compliance Statements Were Not False or Misleading. .................... 2

        2.    Cash App's Account and Growth Metrics Were Not False or Misleading. ........................................................................................ 5

    B.    The Opposition Confirms That Plaintiff Fails to Plead Scienter. ................................. 8

        1.    The Former Employee Allegations are Not Reliable and Should Not Be Credited. .............................................................................. 9

        2.    Vague Allegations of "Access To" Compliance Information Remain Insufficient. ................................................................................ 9

        3.    Plaintiff's Attempt to Invoke the Core Operations Doctrine Fails. ............... 11

        4.    Plaintiff's Attempt to Invoke the Corporate Scienter Theory Fails. .............. 12

        5.    Dorsey and Ahuja's Stock Trades Do Not Support Scienter. ........................ 13

        6.    Holistic Analysis Does Not Support Scienter. ................................................ 13

    C.    Plaintiff Has Not Pled Loss Causation With Particularity. .......................................... 14

III.   CONCLUSION ....................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**                                                                                            **Page(s)**

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)................................................................................5

*Apollo Grp. Inc.*, 774 F.3d 598 (9th Cir. 2014) ......................................................................16

*Bao v. SolarCity Corp.*,
  2016 WL 4192177 (N.D. Cal. Aug. 9, 2016)............................................................................9

*In re Block, Inc. Sec. Litig.*,
  2025 WL 2607890 (S.D.N.Y. Sept. 9, 2025)........................................................................2, 3

*Bodri v. GoPro, Inc.*,
  252 F. Supp. 3d 912 (N.D. Cal. 2017) ...................................................................................10

*In re BofI Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020)..................................................................................................16

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  556 F. Supp. 3d 100 (D. Conn. 2021) ....................................................................................16

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002)....................................................................................................7

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010)..................................................................................................8

*Dolly v. GitLab Inc.*,
  2025 WL 2372965 (N.D. Cal. Aug. 14, 2025)........................................................................16

*In re Doximity, Inc. Securities Litigation*,
  2025 WL 1449598 (N.D. Cal. May 13, 2025) ...............................................................6, 11, 13

*In re Eargo, Inc. Sec. Litig.*,
  656 F. Supp. 3d 928 (N.D. Cal. 2023) .....................................................................................4

*Espy v. J2 Glob., Inc.*,
  99 F.4th 527 (9th Cir. 2024) ..................................................................................................15

*In re Facebook, Inc. Sec. Litig.*,
  477 F. Supp. 3d 980 (N.D. Cal. 2020) ..................................................................................5, 6

*Jedrzejczyk v. Skillz Inc.*,
  2023 WL 2333891 (N.D. Cal. Mar. 1, 2023)............................................................................6

*Lamartina v. VMware, Inc.*,
  2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)........................................................................11

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002)...........................................................................................10, 11

ii

Gibson, Dunn &
Crutcher LLP

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ................................................................................16

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ..................................................................................16

*In re Maxwell Techs., Inc. Sec. Litig.*,
  18 F. Supp. 3d 1023 (S.D. Cal. 2014) .....................................................................13

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ................................................................................15

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ......................................................................14

*Ng v. Berkeley Lights, Inc.*,
  2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ...........................................................15

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ....................................................................................9

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
  54 F.3d 1424 (9th Cir. 1995) ..................................................................................13

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
  2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) ...........................................................4

*In re NVIDIA Corp. Sec. Litig.*,
  2011 WL 4831192 (N.D. Cal. Oct. 12, 2011) ....................................................11, 13

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ................................................................................13

*In re Paypal Holdings, Inc. S'holder Derivative Litig.*,
  2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ..............................................................4

*Pirani v. Netflix, Inc.*,
  710 F. Supp. 3d 756 (N.D. Cal. 2024) .......................................................................4

*Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*,
  2024 WL 4251896 (N.D. Cal. Sept. 17, 2024) ........................................................15

*Police & Fire Retirement System of the City of Detroit v. Crane*,
  87 F. Supp. 3d 1075 (N.D. Cal. 2015) .......................................................................9

*Police Ret. Sys. of St. Louis v. Intuitive Surgical*,
  759 F.3d 1051 (9th Cir. 2014) ........................................................................9, 12, 13

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ..................................................................................16

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ................................................................................11

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
CASE NO. 5:25-CV-00642-NW

*Reidinger v. Zendesk, Inc.*,
  2021 WL 796261 (N.D. Cal. Mar. 2, 2021), *aff'd*, 2022 WL 614235 (9th Cir. Mar.
  2, 2022) ...........................................................................................................................11, 13

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,
  2025 WL 1900722 (N.D. Cal. July 9, 2025)........................................................................11, 13

*Shaev v. Baker*,
  2017 WL 1735573 (N.D. Cal. May 4, 2017) ..............................................................................11

*Shenwick v. Twitter*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................................6, 13

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999)...............................................................................................10, 14

*Sneed v. Talphera, Inc.*,
  147 F.4th 1123 (9th Cir. 2025), 147 F.4th ..................................................................................10

*In re SVB Fin. Grp. Sec. Litig.*,
  2025 WL 1676800 (N.D. Cal. June 13, 2025) .......................................................................3, 12

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012)......................................................................................................14

*In re Wells Fargo & Co. Shareholder Deriv. Litig.*,
  282 F. Supp. 3d 1074 (N.D. Cal. 2017) .......................................................................................7

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023) .......................................................................................11

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) ......................................................................................11

*In re XenoPort, Inc. Sec. Litig.*,
  2011 WL 6153134 (N.D. Cal. Dec. 12, 2011) ............................................................................15

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009).................................................................................................12, 14

## I.    INTRODUCTION

At the heart of every securities fraud case brought under Section 10(b) is an allegation that a defendant made statements that were materially false or misleading and did so with fraudulent intent. The Court's focus, therefore, must be on Block's statements as it considers whether Plaintiff has met the "formidable" pleading standard required to survive dismissal under the PSLRA. Plaintiff's Opposition ("Opp."), however, fails to meaningfully engage with Block's statements at all, substituting instead an unsupported narrative about Block's compliance culture and its approach to counting accounts that, even if true, would not transform its accurate statements into securities fraud.

Plaintiff claims that Block misled investors when it said it had "implemented" a compliance program because Block's compliance efforts were allegedly "deficient." But, as a district court recently confirmed in dismissing another securities case against Block, statements that a company has "implemented" controls are not actionable assurances of compliance. Nor can Plaintiff overcome the fact that Block told investors that Cash App was a target for fraudulent activity and that its compliance program could not prevent all improper activity from occurring on the platform. The compliance statements do not give rise to a securities fraud claim as a matter of law.

Plaintiff also fails to plead falsity with respect to Cash App's account metrics. Plaintiff insists the number of "transacting active accounts" was "inflated" because it included "fraudulent" and "duplicate" accounts, rather than "unique, individual users." But Block told investors exactly what it was counting—active accounts, that could include "multiple accounts" tied to a single customer—and never purported to count *unique individuals*. Plaintiff's disagreement over the best way to define and calculate Block's accounts metric is not a ground for securities fraud. And Plaintiff's apples-to-oranges theory fails out of the gate: Plaintiff pleads no facts, much less particularized ones, that Block ever changed how it counted its accounts metric (it did not; the metric was and remains apples-to-apples).

Plaintiff's scienter argument fares no better. Plaintiff does not contest that the Former Employee (FEs) lacked relevant contact with Dorsey or Ahuja and thus cannot attest to their state of mind. Plaintiff insists that Dorsey and Ahuja possessed information that purportedly made the challenged statements misleading, but specifics are scant. Instead, Plaintiff relies on a generous reading of vague, conclusory, and hearsay allegations from FEs and speculation based on non-discretionary

stock sales, never identifying the specific information Dorsey and Ahuja had that contradicted the alleged misstatements.  That is a far cry from the specific facts necessary to create a strong inference of scienter under the PSLRA.  Nor do Plaintiff's core operations and corporate scienter theories cure Plaintiff's failure to plead that any Defendant acted with fraudulent intent.

Finally, Plaintiff cannot overcome that the Complaint fails to plead, as required, that each (or any) of the five "corrective disclosures" revealed new information to the market that corrected a prior misstatement.  The Complaint also should be dismissed on loss causation grounds.

## II.    ARGUMENT

### A.    Plaintiff Fails to Plead Falsity.

#### 1.    Block's Compliance Statements Were Not False or Misleading.

Plaintiff's challenge to Block's compliance statements fails on every level.   Opp. 10-15.  Block's statements that it had "implemented" a compliance program "designed to" prevent fraud and address legal requirements cannot support a securities fraud claim because the statements were not assurances of actual compliance (and were true in any event). Opp. 11; ¶ 71.  And Block could not have misled investors about the "strength" of its compliance program, Opp. 10, when it repeatedly warned investors that despite its efforts, Cash App still was "a target for illegal [and] improper uses" and was "used to process illegitimate transactions."  Dkt. 108-3 at 11; Mot. 10.  Plaintiff also fails to plead any facts contradicting Block's statements about steps it was taking to improve compliance.

Plaintiff contends that Block's statements that it had implemented an AML program "designed to" prevent fraud and address "legal and regulatory requirements" were false or misleading because regulators and third-party assessments concluded the Company's AML program was not "adequate." Opp. 11.  That argument fails.  As a district court concluded last month in dismissing similarly deficient securities fraud claims against Block, "[s]tatements that a company has implemented internal controls do not, on [their] own, constitute assertions that the controls are adequate, nor does a subsequent circumvention of such controls support an inference that the descriptive statements about the implementation of such controls were false."  *In re Block, Inc. Sec. Litig.*, 2025 WL 2607890, at *9 (S.D.N.Y. Sept. 9, 2025).  That is precisely what Plaintiff alleges here—that Block's statements about *implementing* a compliance program were "assurances" of compliance.  Opp. 11.  Block's "descriptive

statements about the implementation of [compliance] controls" are not "actionable assurances of actual compliance," nor securities fraud.[1]  *In re Block*, 2025 WL 2607890, at *9.  And even if bad actors were able to "circumvent[]" those controls, that does not render Block's statements false or misleading.  *Id.*

Plaintiff relies on *SVB* to argue that Block's "implementation" statements are actionable, Opp. 11-13, but that case is far different from this one.  *In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800 (N.D. Cal. June 13, 2025).  There, this Court found actionable SVB's statements that it maintained a liquidity risk management process "designed to ensure appropriate liquidity to meet expected and contingent funding needs under both normal and stress environments," that the bank "ha[d] so much liquidity available" that, in the event "something happens … we can protect ourselves if we need to," and that the bank had "ample liquidity to support lots of scenarios that may get worse and worse."  *Id.* at *11 (citing Dkt. 88-1).  The Court concluded that SVB's statements were actionable because the statements crossed the line from general description to highly specific assurances that the bank not only had *implemented* and *designed* a process to ensure liquidity, but that such a program *would work*.  *Id*.  Here, by contrast, Block's statements about its controls contained *no such assurances*—Block said that its compliance program was designed to prevent fraud and address legal requirements, not, as the defendants in *SVB* suggested, that the program "had" in fact achieved its goals.  *Id.*  Put another way, while the defendants in *SVB* made assertions about specific "*facts*" about what SVB's controls could achieve and had achieved, *id.*, Block's statements "lack any meaningful detail about the quality of the measures or controls."  *Block*, 2025 WL 2607890, at *9.[2]

Plaintiff also contends that other compliance statements—including that Block had "enhanced [its] systems to monitor and act" in response to fraud (¶ 92), and that Block "continue[d] to invest in

---

[1] It was publicly reported that Block's compliance efforts faced challenges.  Mot. 10.  Plaintiff tries to sidestep that by arguing that the Complaint alleges Block "misrepresented whether their compliance program met legal standards."  Opp. 13.  This allegation lacks any support.  Block did not "make[] *any* specific representations about whether Block does or does not meet [particular] laws and regulations."  *Block*, 2025 WL 2607890, at *10.  Therefore, "a failure to meet the [AML] standards (assuming such failure had been properly alleged) could not render the statements at issue materially misleading because [Block's] statements made no representations about meeting such standards."  *Id.*

[2] Plaintiff claims that "third-party compliance reviews" revealed that Block "didn't have a compliance program at all," Opp. 12, but the Complaint says no such thing.  It references, instead, a single remark from Afterpay's former CCO purportedly heard by an FE.  ¶ 42.

and bolster fraud-fighting resources by both increasing staffing and adopting new technology" (¶¶ 83, 91, 110)—were actionable in light of regulatory orders and FE statements indicating that Block's compliance program was "inadequate" and had significant flaws.  Opp. 12-14, 17.  This argument also fails.  Not only are these statements non-actionable puffery (*see infra*), but also "[a] government investigation is not evidence of fraud, especially where," as here, "the investigation ended with a settlement that disclaims liability."  *In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 947 (N.D. Cal. 2023); Mot. 22.  Indeed, none of the regulatory findings "directly contradict" the challenged statements.  *Pirani v. Netflix, Inc.*, 710 F. Supp. 3d 756, 768 (N.D. Cal. 2024).  Block's statements that it "[had] implemented an AML program," "continued to invest in and bolster fraud-fighting resources," and other similar statements, are not contradicted by a regulator finding that Block's compliance program had "deficiencies," especially when Plaintiff does not even bother to align either the specific deficiencies, or the time of any particular regulator finding, with the time of any specific alleged misstatement.  *See Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) ("Generically asserting in an undifferentiated manner that facts [existed] 'during the Class Period' is insufficient" to "establish that key representations were false or misleading when made.").  In fact, the consent orders on which Plaintiff relies *credit* Block for "increasing compliance staffing resources," and "implementing additional [compliance] controls" that are *consistent* with the alleged misstatements.  Dkt. 106-6 at 15.  And Block was not required, as Plaintiff suggests, Opp. 11, to disclose details about ongoing investigations.[3]  *See In re Paypal Holdings, Inc. S'holder Derivative Litig.*, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) (no duty to disclose regulator investigation).

    Plaintiff also has no credible response to the fact that nearly every challenged compliance

---

[3] Plaintiff also misquotes and mischaracterizes the CFPB's findings.  The CFPB Order does not state that Block "***did not have*** . . . a fraud governance model."  Opp. at 12, 14.  Rather, it explains that "Respondent's first formal audit of Cash App's fraud strategy, conducted at the end of 2020, concluded that Respondent did not have and should develop and establish a fraud governance model to ensure a consistent approach to fraud prevention."  Dkt. 106-5 ¶ 52.  The Order thus describes the conclusion of an internal audit—not a "CFPB audit"—and says nothing about informal or ongoing reviews of Cash App's fraud-prevention framework.  Nor does Plaintiff attempt to explain what a "fraud governance model" is or how it relates to its allegations.  In any event, audits evaluate ***prior***-period operations rather than contemporaneous or forward-looking conditions, so an audit "conducted at the end of 2020" has nothing to do with Defendants' ***subsequent*** statements in 2021 or 2022.

statement is puffery. Mot. 15-16. Plaintiff argues that these statements touched on "core" and "importan[t]" issues, Opp. 14-15, but even if that were true, "the key inquiry in determining whether a statement amounts to puffery is 'not whether the topic of a statement was a key to corporate success, but the nature of the specific statement and whether it concretely assured investors of anything.'" *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *22 (S.D.N.Y. Apr. 2, 2020). The plainly generic statements in question—*e.g.*, "[p]reventing fraud is critically important to Cash App" (¶ 83), and "[w]e are constantly improving systems and controls to help prevent, deter, and report bad activity on the platform" (¶¶ 83, 91, 110)—are not as a matter of law—verifiable statements of fact that can give rise to liability. Mot. 16.

**2.    Cash App's Account and Growth Metrics Were Not False or Misleading.**

Plaintiff argues that Block lied to investors when reporting Cash App's "transacting active customers" and "transacting active accounts" metric by (1) allegedly "inflat[ing]" the reported numbers with "fraudulent" and "duplicate" accounts, Opp. 6-7, and (2) "changing" the metric and "comparing the new accounts metric to the earlier customers metric," which "falsely suggested uninterrupted momentum" in accounts growth, Opp. 8. These arguments make little sense. Block never represented that individuals could only have one Cash App account, or that every Cash App account was a good actor. To the contrary, investors knew that individuals could sign up for multiple Cash App accounts (*see* ¶ 21), Block confirmed this in its disclosures (Dkt. 108-15 at 7; ¶ 108), and Block was clear that individuals might use Cash App for fraudulent purposes (Dkt. 108-3 at 11).

**a.    Block Did Not "Inflate" Cash App Account Metrics.**

Plaintiff contends that Block's account metrics "inflated the true totals" of Cash App accounts by including "large numbers" of accounts that were not unique individual users. Opp. 6-7. In *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1002, 1026 (N.D. Cal. 2020), the plaintiff offered a similar inflation theory, alleging that Facebook committed fraud in reporting Daily Active Users—*e.g.*, "DAUs were 1.37 billion on average for September 2017, an increase of 16% year-over-year"— because Facebook "failed to account for the number of fake accounts." Judge Davila rejected this theory, concluding that Facebook's decision on how to "count accounts" and report user growth was a "business decision," and that the plaintiff failed to plead the reported figures were misleading based on

the metrics Facebook chose to use. *Id.* at 1027. The same rationale applies here. Plaintiff argues that Block should have reported the same breakdown of accounts it released after the Hindenburg Report—that is, a metric the Plaintiff believes better equated to "unique individual users," rather than total active accounts. Opp. 6-7. But a difference of opinion about how metrics should be calculated and disclosed does not give rise to securities fraud. *Facebook*, 477 F. Supp. 3d at 1027; *Jedrzejczyk v. Skillz Inc.*, 2023 WL 2333891, at *2 (N.D. Cal. Mar. 1, 2023) (rejecting securities fraud complaint based on allegations that defendants "failed to report what [p]laintiffs contend is the most relevant metric").

In any event, Plaintiff's inflation theory fails because Plaintiff does not plead with particularity what Cash App's "true totals" were throughout the relevant period. Plaintiff's reliance on the one-time "internal breakdown" of accounts released in response to the Hindenburg Report does not plead falsity because Plaintiff fails to plead, as in *Shenwick v. Twitter*, that management internally relied on an undisclosed, alternative method of counting accounts that showed "adverse … trends" that made statements about Cash App's growth "implausible."[4] 282 F. Supp. 3d 1115, 1137 (N.D. Cal. 2017).

This case is easily distinguishable from *In re Doximity, Inc. Securities Litigation*, where the Court found that the statement "80% of all U.S. doctors were active members of the Doximity [social media] platform" was adequately alleged to be misleading because contemporaneous data indicated that "slightly more than half of all U.S. physicians either never used Doximity or used it less than once a quarter." 2025 WL 1449598, at *6 (N.D. Cal. May 13, 2025). Here, by contrast, Plaintiff does not (and cannot) allege that Block falsely reported any metric. Dkt 108-15 at 6. And *In re Wells Fargo & Co. Shareholder Deriv. Litig.* does not help Plaintiff because there the defendants were alleged to have overseen a massive fraudulent account-creation scheme whereby employees were creating accounts for customers without their authorization, while giving investors the impression that its accounts were genuine. 282 F. Supp. 3d 1074 (N.D. Cal. 2017). By contrast, the public here was aware, and Block

---

[4] Indeed, this breakdown confirmed that the non-verified accounts were only a small portion of Cash App's inflows, which confirms the inclusion of these accounts in the reported totals did not conceal any "adverse" trends. *See* Dkt. 108-18 at 2 ("We estimate that the **44 million** verified accounts constituted approximately **97**% of Cash App inflows in December 2022."). In fact, Block's stock price increased when Block shared the breakdown of verified accounts and accounts tied to unique SSNs, hardly an indication that investors viewed this information as negative for Block. Ex. S.

Gibson, Dunn &
Crutcher LLP

repeatedly confirmed, that "multiple accounts" could be tied to a single customer. Dkt. 108-15 at 7.

Plaintiff argues that even if not required to use a "particular formula," Block still misled investors before February 2022 by omitting the number of "fraudulent" and "duplicate" accounts because the term "*customers*" conveyed unique individuals rather than "accounts." Opp. 7-8. An omission is actionable only when it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). That is not the case here because Block never represented it was reporting "unique individual users," so the omission of the number of "duplicate" accounts could not have created a misleading impression.[5] In fact, Block confirmed when it changed the name of its metric that "transacting actives" included accounts where "one customer [had] multiple accounts." Dkt. 108-15 at 7; Mot. 13. Block's transparency only highlights that there was no fraud here: it would have made no sense for Defendants to clarify how Block calculated active accounts if they were intending to defraud investors. Under these circumstances, no reasonable investor would have been duped into believing that Block reported the number of unique individuals using Cash App, and Block had no obligation to break out its numbers in Plaintiff's preferred manner.

Plaintiff points to Dorsey's remark on an August 2020 earnings call to argue that Block did, in fact, tell investors that "transacting active customers" meant "unique, individual users." Opp. 8-9. Not so. In responding to a question about Cash App's "total addressable user base," Dorsey reiterated that Cash App had "over 30 million monthly active customers" emphasizing that this number (which Block also referred to as "monthly actives') counted *active* customers, not overall accounts, such as *inactive* (or dormant) accounts. Mot. 13-14. Dorsey said nothing about the number of unique, individual *people* who used Cash App—which is not surprising given that Block had never purported to disclose unique individual users rather than active accounts. Under the rigorous PSLRA pleading standard, Plaintiff's "speculative inference" about Dorsey's remark that—despite common knowledge that individuals could sign up for more than one account, including "Cash for Business" accounts that facilitated

---

[5] Plaintiff's use of the expression "duplicate" accounts is misleading. The Complaint includes no factual allegations establishing that Cash App users created "duplicate" accounts. At most, FEs state that a customer could have multiple different accounts (e.g., ¶ 49)—a fact Block publicly disclosed.

1  transactions to business accounts using Cash App (*see* Ex. Q at 61)—Dorsey's use of the generic word

2  "customer" meant "individual" rather than "account" fails to plead falsity. *In re Cutera Sec. Litig.*, 610

3  F.3d 1103, 1111 (9th Cir. 2010).

4          **b.**      **Block Did Not Make Misleading "Apples-to-Oranges" Comparisons.**

5          According to Plaintiff, Block misled investors by changing Cash App's account metric from

6  "transacting active customers" (which Plaintiff falsely claims measured "unique, individual users") to

7  "transacting actives" (which measured accounts), and "comparing the new accounts metric to the

8  earlier customers metric" created an illusion of growth. Opp. 8-10. But again, the metric never changed

9  (Mot. 13), and Plaintiff pleads no particularized facts demonstrating that "transacting active customers"

10 measured unique individual users. In fact, when Block announced the metric name change and what

11 it measured (unique accounts) the Company's stock price increased, *see* Ex. R, ¶ 94, undercutting any

12 suggestion that investors were (negatively) surprised by the disclosure or viewed it to be materially

13 negative news. . Ex. R. Plaintiff theorizes that Block somehow misled investors by describing the

14 metrics with similar "language and rhythm," which led investors to believe "the metric remained

15 consistent." Opp. 8. But that is precisely the point—the new name ("transacting actives") was similar

16 to the old one ("transacting active customers") because it measured the same thing: *active accounts*.

17 Mot. 13-15. Plaintiff pleads no facts showing that the metric changed, so Plaintiff's apples-to-oranges

18 theory of fraud fails.[6]  And Plaintiff's throwaway theory that investors "did not realize" that

19 "transacting actives" included multiple accounts tied to a single customer fails because that is exactly

20 what Block said in its SEC disclosures. Opp. 9; *see* Dkt. 108-15 at 7.[7]

21 **B.**    **The Opposition Confirms That Plaintiff Fails to Plead Scienter.**

22         The PSLRA's scienter requirement is an "'exacting' pleading obligation that presents no small

23 hurdle for the securities fraud plaintiff." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020)

24 (citation omitted). The Opposition confirms that Plaintiff cannot meet this high bar. Plaintiff claims

---

25 [6] Plaintiff's failure to plead that Block substantively changed its metric is why *Police & Fire Retirement*
26 *System of the City of Detroit v. Crane* (Opp. 10), a case where the plaintiff successfully alleged a
   "significant change" in accounting practices, is inapposite. 87 F. Supp. 3d 1075, 1082 (N.D. Cal. 2015).

27 [7] Plaintiff does not meaningfully engage with Defendants' argument that many challenged statements
28 regarding Cash App's growth strategies are non-actionable puffery. *Compare* Mot. 16, *with* Opp. 10.

that the Complaint includes "detailed, corroborated" allegations that Dorsey and Ahuja "were aware of severe and persistent deficiencies in its [compliance] programs—and that the company's core user metrics gave a misleading picture of growth." Opp. 15-16. But "Plaintiff['s] summary in [its] briefing offers more than [its] allegations deliver." *Bao v. SolarCity Corp.,* 2016 WL 4192177, at *6 (N.D. Cal. Aug. 9, 2016). And Plaintiff fares no better under the "core operations" theory (which rarely establishes scienter) and the corporate scienter doctrine (which has not been adopted in this Circuit).

**1.    The Former Employee Allegations are Not Reliable and Should Not Be Credited.**

Plaintiff tacitly admits that none of the Former Employees ("FEs") had any relevant direct contact with Dorsey or Ahuja and therefore cannot reliably speak to their state of mind. Instead, Plaintiff claims the FEs are reliable because they held roles that "positioned them to possess firsthand knowledge of facts relating to the specific fraud underlying Plaintiff's claims." Opp. 16. Even if that highly dubious assertion were true (and based on their alleged job titles, there are no reasonable grounds for this conclusion), that is not enough. *Police Ret. Sys. of St. Louis v. Intuitive Surgical,* 759 F.3d 1051, 1063 (9th Cir. 2014) (FEs must have "first hand knowledge regarding what the individual defendants knew"); *Sneed v. Talphera, Inc.,* 147 F.4th 1123, 1134 (9th Cir. 2025), 147 F.4th at 1134 (no scienter because "most witnesses never interacted with" defendants); Mot. 17-18 (citing additional cases). Plaintiff's conclusory, unsupported claim that no "direct contact" is required is simply wrong.

**2.    Vague Allegations of "Access To" Compliance Information Remain Insufficient.**

Even assuming that the FEs are reliable and have personal knowledge of Dorsey and Ahuja's state of mind, their accounts do not contribute to an inference of scienter. Mot. 17-20. Plaintiff's scienter argument relies completely on the proposition that "Dorsey and Ahuja had direct, contemporaneous access—through board-level risk reports, internal meetings, and employee feedback—to information regarding severe, persistent compliance deficiencies belying their public statements," Opp. 16, but no such facts are alleged. Pleading scienter based on a defendant's "actual access" to information requires specifics about "the who, what, where, when, and how regarding each Defendant's access to the relevant information that belies fraudulent intent." *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 932 (N.D. Cal. 2017) (quotation omitted). That detail is missing here.

***Internal Reports***. Plaintiff ignores that, for internal reports to support scienter, the complaint

must provide "at least some specifics from those reports as well as such facts as may indicate their reliability." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999), *superseded by statute on other grounds* ("We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability."); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("[N]egative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient[.]")  Plaintiff does not describe any reports beyond their titles, and includes no specifics of the issues the reports addressed (¶¶135(a), 140); nor does Plaintiff explain how Dorsey or Ahuja's knowledge of any issues described in the reports means that any statements were misleading.  *See In re NVIDIA Corp. Sec. Litig.*, 2011 WL 4831192, at *11 (N.D. Cal. Oct. 12, 2011) ("[k]nowledge of the problem" insufficient to infer scienter).

Plaintiff's cases, in which the complaints identified the reports defendants reviewed, exactly what the reports stated, and how that information contradicted the misstatements, only highlight the insufficiency of the allegations here.  In both *In re Quality Systems* and *Oracle*, defendants "admitted to having monitored a database of sales data, and Plaintiffs made specific allegations regarding large portions of that sales data that contradict [defendants'] public statements." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145-46 (9th Cir. 2017).[8]  These facts are missing here.  Plaintiff's vague allegations that executives had "access to" (¶ 132) allegedly adverse information at some unspecified time during a five-year period are not enough under the PSLRA.  *See Lipton,* 284 F.3d at 1036.[9]

---

[8] *See also Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 884 (N.D. Cal. 2023) (plaintiffs' allegations that defendants had continuous access to aggregate customer data supported a strong inference that defendants knew that customer demand would decline); *Doximity*, 2025 WL 1449598, at *9 (defendant had a dashboard showing the number of active members that contradicted reported numbers); *Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 2025 WL 1900722, at *6, *9 (N.D. Cal. July 9, 2025) (defendants reviewed "internal test results" that "directly contradicted" defendants' statements).  The Court in *Shaev* also did not find scienter "on a similar record."  *Shaev v. Baker*, 2017 WL 1735573, at *10-*17 (N.D. Cal. May 4, 2017) (scienter adequately pled with "extensive and detailed allegations," including that defendants were directly emailed information contradicting public statements, and defendant admitted knowing information contradicting public statements).

[9] Plaintiff's allegations regarding certain 2023 compliance reviews (which Ahuja is not alleged to have received) say nothing about the Defendants' state of mind in the three years prior.  If anything, commissioning compliance reviews shows commitment to compliance and undercuts fraudulent intent.

***Executive Roles***.  Plaintiff argues that it can establish scienter simply because, as CEO and CFO, Dorsey and Ahuja were "expos[ed] to the underlying facts."  Opp. 18.  Allowing Plaintiff to plead scienter on that flimsy basis is equivalent to not requiring Plaintiff to plead scienter at all.[10] *Reidinger v. Zendesk, Inc.*, 2021 WL 796261, at \*10 (N.D. Cal. Mar. 2, 2021), *aff'd*, 2022 WL 614235 (9th Cir. Mar. 2, 2022) ("The scienter requirement exists because falsity does not always equal fraud.").  The authority Plaintiff cites also is not applicable here.  *See, e.g.*, *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at \*15–16 (N.D. Cal. Mar. 31, 2023) (scienter pleaded through "detailed and specific allegations about management's exposure to factual information").

***Employee Feedback***.  Plaintiff claims that employees "repeatedly brought these compliance failures to Defendants' attention."  Opp. 18.  But the Complaint includes no specific, non-hearsay allegations.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009), as amended (Feb. 10, 2009) (scienter allegations not credited when they are based on "unreliable hearsay").  The Opposition ignores that the Complaint lacks the required detail establishing what compliance deficiencies were raised, who raised them and when, whether they were raised to Dorsey or Ahuja, and how they supposedly contradicted any statement.  *See* Mot. 18-19.

***Government Investigations***.  Plaintiff cites *SVB* for the proposition that "the existence of multiple government investigations … strongly suggests that Defendants were aware of regulators' concerns about Cash App's compliance controls."  Opp. 18.  But the Complaint in *SVB* included specific allegations concerning regulator inquiries sent to the defendants *during the class period* informing them of issues that "directly conflicted with representations to investors."  *SVB*, 2025 WL 1676800, at \*13.  There are no facts demonstrating contemporaneous regulator communications here.

### 3.    Plaintiff's Attempt to Invoke the Core Operations Doctrine Fails.

Given the absence of any allegations that Defendants knew that statements about compliance or Cash App's account metrics were misleading, Plaintiff retreats to the core operations doctrine.  Opp.

---

[10] Plaintiff's new, ***unpled*** contention that Dorsey and Ahuja "played central roles in controlling, changing, and clarifying the definition of the very metrics they promoted"—unsupported by any FE allegations—is improper and does not establish scienter in any event.  *Id*.; *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1174 (C.D. Cal. 2007) (no "strong inference of scienter" based on "must have known" allegations).

19-20. But it is "not easy" to plead a core operations inference where, like here, the Plaintiff failed to plead "actual access to the disputed information" (Opp. 19): establishing scienter on core operations alone requires specific allegations detailing each defendant's involvement in the "minutia" of the company's operations or in creating "false reports." *Intuitive Surgical*, 759 F.3d at 1062; Mot. 22-23.

Plaintiff's core operations argument rests on the conclusory claims that "Cash App's user metrics were so integral to its success and directly impacted revenue that it would be absurd to suggest that Dorsey and Ahuja did not know they were inflated due to compliance deficiencies" and that "KYC, AML and sanctions controls are undisputably core operations." Opp. 19-20. But simply saying that something is "integral" or "undisputably core operations" is not enough. *Intuitive Surgical*, 759 F.3d at 1062; *see also Zendesk, Inc.*, 2022 WL 614235, at *2 (9th Cir. Mar. 2, 2022) (no scienter under core operations based on allegations that "data security is a core element of Zendesk's business").

Plaintiff's cases demonstrate the inapplicability of the core operations doctrine here. For example, in *Twitter*, the Court held that defendants knew the omission of Twitter's DAU metric from Twitter's public statements was misleading because defendants analyzed the metric internally, and the metric was so integral to Twitter's success that "it would be 'absurd' for [Defendants] not to have been aware of adverse DAU trends." *Twitter*, 282 F. Supp. 3d at 1146.[11] But as established *supra* n.4, there are no allegations here of any adverse, undisclosed trends in Block's metrics that contradicted the alleged misstatements. Plaintiff's attempt to use the core operations doctrine to infer not only Defendants' *knowledge* of facts contradicting the challenged statements, but also the contradictory *facts themselves*, stretches the doctrine well beyond its breaking point.

### 4. Plaintiff's Attempt to Invoke the Corporate Scienter Theory Fails.

Plaintiff's attempt to invoke the corporate scienter doctrine to impute scienter of *other* Block employees (CLO Whiteley and CCO Childress) to the Company fails. Opp. 20-22. This Circuit has "not … adopted" the corporate scienter doctrine. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014); Mot. 23. Unsurprisingly, Plaintiff cites no case from this Circuit applying the doctrine.

---

[11] Contrary to Plaintiff's argument, this Court in *Doximity* did not find scienter alleged based on core operations. *Doximity*, 2025 WL 1449598, at *8-9 (finding scienter "under a holistic, *Tellabs* analysis"). *Stitch Fix* also is inapposite. 2025 WL 1900722, at *9 (implausible that executives were unaware that a new product "failed" at acquiring new customers when customer acquisition was its very purpose).

*See, e.g., Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995) ("we see no way that [plaintiff] could show that the corporation, but not any individual defendants, had the requisite intent to defraud"); *NVIDIA*, 768 F.3d at 1063–64 (rejecting corporate scienter).  Plaintiff thus provides no basis for (unpled) knowledge by two non-defendants—who did not make or authorize any misstatements—to be imputed to any Defendant.  *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023 at 1032–33 (S.D. Cal. 2014) ("[C]orporate scienter is not sufficiently alleged … where one executive had the knowledge and other, perhaps-innocent executives made the statements.").

### 5.    Dorsey and Ahuja's Stock Trades Do Not Support Scienter.

Plaintiff has no answer for the fact that Dorsey and Ahuja's stock trades were not suspicious, *i.e.*, "dramatically out of line with prior trading practices."  *In re Silicon Graphics*, 183 F.3d at 986; Mot. 21.  Plaintiff's failure to allege any prior trading history to compare either Defendant's class period sales alone defeats any inference of scienter.  *Zucco Partners*, 552 F.3d 981 at 1005-06.

Plaintiff asks the Court to ignore SEC filings, which are subject to judicial notice and establish Dorsey and Ahuja's sales were not suspicious. Opp. 22; Mot. 21.  Plaintiff's cases do not establish that the Court may infer scienter where no prior trading history is pled and where trades were made pursuant to a 10b5-1 plan.  Opp. 22-23; *see also In re VeriFone Holdings, Inc. Sec. Litig.,* 704 F.3d 694, 704 n.2 (9th Cir. 2012) (no scienter where defendants had "preexisting trading plans.")

Plaintiff also tries to distort the fact that Dorsey sold only 5% of his holdings by pointing out that Dorsey "liquidated all his unrestricted Class A shares … retaining only Class B shares vital to maintaining control of the company." Opp. 22.  True but irrelevant.  Plaintiff's own authority confirms that courts look at a defendant's "total holdings" when determining whether the amount sold was suspicious.  *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 645 (E.D. Va. 2000).  Moreover, Plaintiff's reliance on *Oracle Corp.*, 380 F.3d at 1232 (Opp. 22), to argue that the volume of stock sales alone can make them suspicious makes no sense; there defendant sold $900 million of stock in less than a month, not pursuant to a 10b5-1 plan, after he had sold no stock in the previous five years.

### 6.    Holistic Analysis Does Not Support Scienter.

Far from a theory of fraud that is cogent and compelling, the Opposition offers nothing to displace the powerful competing inference that Defendants honestly and candidly disclosed to investors

1    Block's active accounts and described Block's compliance program throughout the relevant period.

2    Plaintiff does not point to any concrete contradictory information that Dorsey and Ahuja were aware

3    of, instead relying on vague claims that Dorsey and Ahuja had access to documents, the contents of

4    which Plaintiff fails to describe.  Plaintiff also fails to allege any suspicious trading or any other motive

5    to deceive investors; in fact, Ahuja's increase in holdings negates scienter.  *See In re XenoPort, Inc.*

6    *Sec. Litig.*, 2011 WL 6153134, at *5 (N.D. Cal. Dec. 12, 2011) (finding good faith when defendants

7    held on to the stock).  Instead, Plaintiff improperly asks the Court to infer that Dorsey and Ahuja knew

8    they were lying to investors based on unreliable and vague hearsay accounts and the mere fact that they

9    were executives.  Plaintiff, in sum, has come nowhere close to pleading scienter as to any Defendant.

10   **C.    Plaintiff Has Not Pled Loss Causation With Particularity.**

11         To plead loss causation, Plaintiff must "allege that the practices that the plaintiff contends are

12   fraudulent were revealed to the market and caused the resulting losses."  *Metzler Inv. GMBH v.*

13   *Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) (affirming dismissal for failure to plead

14   loss causation); *see also Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*, 2024

15   WL 4251896, at *10-12 (N.D. Cal. Sept. 17, 2024) (dismissing complaint that pled only the disclosure

16   of "confirmatory information," not corrective disclosures).  Each alleged corrective disclosure must be

17   assessed independently.  *See e.g.*, *Metzler*, 540 F.3d at 1065.  Plaintiff's Opposition does not change

18   that the Complaint fails to plead these required facts.  Plaintiff has not pled that any fraud was

19   "revealed" through any of the alleged corrective disclosures: investors knew all along that Block's

20   compliance efforts were not a guarantee and that Cash App was used by bad actors, and investors also

21   knew what Block's transacting active metrics represented.  Mot. 10, 14.

22         Plaintiff is wrong that pleading loss causation is a "low bar."  Opp. 23.  It is a "high bar" to

23   plead loss causation based on a short seller report, as Plaintiff tries to do here.  *Ng v. Berkeley Lights,*

24   *Inc.,* 2024 WL 695699, at *16 (N.D. Cal. Feb. 20, 2024).  Courts repeatedly find a failure to plead loss

25   causation based on reports by Hindenburg and other short sellers.  *See Espy v. J2 Glob., Inc.*, 99 F.4th

26   527, 541-42 (9th Cir. 2024) (Hindenburg report not a corrective disclosure); *Ng*, 2024 WL 695699, at

27   *2, *16-17 (no corrective disclosure where short seller report contained "a multitude of disclaimers as

28   to its completeness and accuracy … even if the [report] provide[d] new information to the market,"

Gibson, Dunn &
Crutcher LLP

14

including information from FEs).  Here, the Hindenburg Report not only disclaims its accuracy (Pl.'s Ex. A at 78-79), but Plaintiff fails to plead—as required—what previously unknown information the Hindenburg Report purportedly disclosed.  *Dolly v. GitLab Inc.*, 2025 WL 2372965, at *15 (N.D. Cal. Aug. 14, 2025) (corrective disclosure requires disclosure of "new information").  As Plaintiff concedes, the existence of fraud on Cash App was long known to the public, so that disclosure cannot form the basis for loss causation. Opp. 17 (describing "public reports of Cash App fraud" from as early as 2020).

Nor did any of the so-called corrective disclosures that followed the Hindenburg Report reveal any "new" information or correct any alleged misstatement.  *Id.*; *Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014).  Specifically, Block's August 3, 2023 disclosure of SEC and DOJ investigations cannot be a corrective disclosure because, as Plaintiff's own authority recognizes, the "commencement of government investigations on suspected fraud do not, standing alone, amount to a corrective disclosure." *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (citing *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014)).  Such an announcement can only "form the basis for a viable loss causation theory if the complaint also alleges a subsequent corrective disclosure by the defendant." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (quotation omitted). But the Complaint pleads nothing like this: the subsequent three disclosures offer nothing "new" to what Hindenburg and news articles preceding it had already disclosed.  Mot. 25; *see, e.g.*, *Dolly*, 2025 WL 2372965, at *15-*16.  February 16 and May 1, 2024 NBC News reports recited generic allegations from "whistleblowers" and a former employee that Block's compliance program was deficient.[12]  And, Plaintiff's argument that Block's disclosure that "Cash App monthly actives remained flat" was corrective is belied by Plaintiff's admission that this was the "fifth consecutive quarter" where the metric was flat.  Opp. 25.  These disclosures revealed nothing new and cannot plead loss causation.

### III.    CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

---

[12] Plaintiff's cases are inapposite.  In *In re BofI Sec. Litig.*, a whistleblower lawsuit revealed to the market **for the first time** specific allegations of "rampant and egregious wrongdoing."  977 F.3d 781, 788 (9th Cir. 2020). And in *Alexion*, the article at issue revealed new information "based on interviews with more than twenty current and former employees and a review of more than 2,000 pages of internal documents."  *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 114 (D. Conn. 2021).

Gibson, Dunn & Crutcher LLP

Dated: October 15, 2025

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Brian M. Lutz
      Brian M. Lutz

*Attorneys for Defendants Block, Inc., Jack Dorsey, and Amrita Ahuja*

Gibson, Dunn &
Crutcher LLP