United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORINNE GONSALVES, et al.,<br>Plaintiffs,<br>v.<br>BLOCK, INC., et al.,<br>Defendants. | Case No. 25-cv-00642-NW<br><br>**ORDER GRANTING MOTION FOR CLASS CERTIFICATION IN PART; ORDER APPOINTING CLASS REPRESENTATIVE AND CLASS COUNSEL**<br><br>Re: ECF No. 138 |

This is a putative class action for securities fraud under the Private Securities Litigation Reform Act ("PSLRA") against Block, Inc., and two individual directors and officers, Jack Dorsey and Amrita Ahuja (collectively, Defendants). Block is the parent company of Cash App, a mobile-based financial platform.

Lead Plaintiff NYC Funds filed a First Amended Consolidated Class Action Complaint ("FAC") alleging that Defendants made materially false and misleading statements regarding Cash App's compliance programming, which led to a series of enforcement actions and an 84% drop in Block's stock price. ECF No. 106. Lead Plaintiff brings claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5.

Lead Plaintiff now moves to (1) certify the putative class, (2) appoint Lead Plaintiff NYC Funds as Class Representative, and (3) appoint Lieff Cabraser and Cohen Milstein as Class Counsel. ECF No. 138. Lead Plaintiff asserts that the class should be defined as: All persons and entities who purchased or acquired Block's Class A publicly traded common stock during the Class Period (February 26, 2020, to May 1, 2025), and were damaged accordingly.

The motion for class certification is fully briefed, and the Court held a hearing on June 29,

2026. ECF No. 178. For the foregoing reasons, the Court GRANTS in part the motion for class certification, GRANTS the request to appoint Lead Plaintiff as Class Representative, and GRANTS the request to appoint Lieff Cabraser and Cohen Milstein as Class Counsel.

## I. BACKGROUND

The Court has outlined the factual background of this case in prior orders, *see, e.g.*, ECF Nos. 123, and repeats only facts that inform the class certification analysis.

Block is a financial technology company with its principal executive offices in Oakland, California. Block owns a "suite of financial products"; its two main business units are Square and Cash App, the latter of which is at issue in this action. FAC ¶ 17. Launched in 2013, Cash App is "a mobile-based financial platform" intended for "individual consumers." *Id.* ¶ 20. Cash App facilitates mobile "payments, banking, investing, cryptocurrency, tax filing, and small-dollar lending." *Id.*

Lead Plaintiff explains that "Cash App's business model relies on two primary levers for revenue growth: (1) acquiring new users, and (2) monetizing existing users by expanding their engagement across multiple products and encouraging higher fund inflows." FAC ¶ 26. "For Block, the growth of [Cash App's] user base is essential to its valuation as a company." *Id.* ¶ 4.

From 2019 to 2023, Block reported substantial growth in Cash App's user base: "[i]n December 2019, Block reported 24 million monthly active users; by December 2020, it was 36 million users; and by December 2023, the Company touted 56 million users." *Id.* ¶ 2. Block publicly attributed the growth in users to "viral adoption among customers and an intuitive, social network-like user experience," as well as Cash App's "strong compliance infrastructure." *Id.* Cash App's user growth metric was important to investors for valuing Block's "scalability and profitability." *Id.* ¶ 4.

Plaintiff alleges that Block's statements regarding the growth of Cash App's users were misleading and deceptive for two main reasons. First, "Cash App's user base was materially smaller than publicly represented, because the reported numbers were inflated by duplicate, fraudulent, and illicit accounts enabled by Cash App's lack of adequate compliance." *Id.* ¶ 4. Second, Plaintiff asserts that during the same period that Block was investing in "frictionless

onboarding" to facilitate new users, Block was also dealing with a series of compliance concerns. *Id.* ¶¶ 3, 42. For example, "in 2022 Block discovered that approximately 30 members of a Russian criminal network opened ***8,359*** Cash App accounts using falsified information, adding thousands of bogus, prohibited users to Cash App's publicly reported user base totals." *Id.* ¶ 32 (emphasis in original). Plaintiff submits that, "Block deliberately underinvested in its compliance infrastructure" to facilitate its "frictionless onboarding" processes, which in turn generated duplicate and fraudulent users – amounting to an overstatement of Cash App's user metrics. *Id.* ¶¶ 29, 31.

These concerns came into light in March 2023. After interviewing former Block employees, Hindenburg Research published a report on March 23, 2023, titled "*Block: How Inflated User Metrics and 'Frictionless' Fraud Facilitation Enabled Insiders to Cash Out Over $1 Billion*" ("Hindenburg Report"). FAC ¶ 45. The report estimated that "between 40% and 75% of the Cash App accounts" Hindenburg reviewed "were fake, involved in fraud, or tied to a single user opening multiple accounts." *Id.* ¶ 34. The day after the Hindenburg Report was published, "the price of Block Class A common stock fell from $72.65 per share at market close on March 22, 2023, to $61.88 per share at market close on March 23, 2023—a decline of nearly 15% on unusually heavy trading volume of over 140 million shares traded—and continued to fall the next trading day." *Id.* ¶ 173.

In the months following the Hindenburg Report, state and federal enforcement agencies initiated investigations and eventually assessed costly penalties against Block. On May 1, 2025, Block missed its earnings target for the first quarter and reduced its profit outlook. Plaintiff asserts that Block's stock price collapsed when it was revealed that user growth metrics were inflated, and when Block had to address persistent compliance concerns, which had also contributed to inflated user counts.

## II. LEGAL STANDARD

To certify a class action, Lead Plaintiff must "prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir.

2022); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*") (plaintiffs must "actually *prove*—not simply plead" satisfaction of each Rule 23 requirement). To carry its burden, Lead Plaintiff may rely on any admissible evidence. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016).

First, Lead Plaintiff bears the burden of establishing that the proposed class satisfies the four threshold requirements of Fed. R. Civ. P. 23(a): (1) numerosity of class members; (2) commonality of issues of fact and law; (3) typicality of its own claims; and (4) adequacy of itself and class counsel to fairly and adequately pursue the action.

Second, Lead Plaintiff must show that the proposed class meets the requirements of at least one of the provisions of Rule 23(b). Fed. R. Civ. P. 23(b). Here, Lead Plaintiff seeks certification pursuant to Rule 23(b)(3). Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*

"[A] district court must be 'satisfied, after a rigorous analysis, that the prerequisites' of both Rule 23(a) and 23(b)(3) have been satisfied." *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 664 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). "Importantly, the inquiry at the class certification stage differs from that at summary judgment." *Noohi v. Johnson & Johnson Consumer Inc.*, No. 23-55190, 2025 WL 2089582, at *4 (9th Cir. July 25, 2025). The issue before the district court is "merely to decide a suitable method of adjudicating the case," whether as a class action or not, and the court "should not 'turn class certification into a mini-trial' on the merits." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011)). District courts shall consider the merits of a plaintiff's case "only to the extent [] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *In re Diamond Foods, Inc. Sec. Litig.*, 295 F.R.D. 240, 245 (N.D. Cal. 2013) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

United States District Court
Northern District of California

## III. DISCUSSION

Lead Plaintiff asks the Court to certify a class that spans from February 26, 2020, when Block allegedly weakened its compliance controls, to May 1, 2025, the date "Block missed its first-quarter earnings target and reduced its profit outlook" ("Class Period"). ECF No. 138 at 2, 4.

As discussed during the motion hearing, and as evident in their opposition brief, Defendants do not challenge the Rule 23(a) factors. The Court is similarly satisfied that Lead Plaintiff has established the numerosity, commonality, typicality and adequacy requirements, and demonstrated that the proposed class meets each of the prerequisites of Rule 23(a).

Defendants raise a single challenge to Lead Plaintiff's motion. Defendants argue that Plaintiff has failed to prove, under Rule 23(b)(3), that "questions of law or fact common to class members predominate." Fed. R. Civ. P. 23(b)(3).[1]

### A. Predominance

To succeed on its claims for violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, Lead Plaintiff "must prove, among other things, a material misrepresentation or omission by the defendant and the plaintiff's reliance on that misrepresentation or omission" as well as damages. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021) (citing *Halliburton II*, 573 U.S. at 267). At this class certification stage, Defendants argue that Lead Plaintiff has not shown that common questions of law and fact predominate with respect to the elements of (1) reliance, and (2) damages. Specifically, Defendants challenge Lead Plaintiff's request to certify a class that includes investors who purchased Block stock *more than two years* after the date of the initial corrective disclosure, the March 23, 2023 Hindenburg Report.

#### 1. Reliance

Lead Plaintiff is entitled to a fraud-on-the-market presumption of reliance for its Section 10(b) claims. *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). "The 'fundamental premise' of the fraud-on-the-market theory underlying *Basic*'s presumption is 'that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his

[1] Defendants do not challenge whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

transaction.'" *Goldman Sachs Grp.*, 594 U.S. at 118 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011)); *id*. at 119 (emphasizing the importance of *Basic* reliance in securities cases, "without the *Basic* presumption, individualized issues of reliance ordinarily would defeat predominance and preclude certification of a securities-fraud class action").

But Defendants may rebut the *Basic* presumption of reliance "by showing 'that an alleged misrepresentation did not actually affect the market price of the stock.'" *Id*. at 119 (quoting *Halliburton II*, 573 U.S., at 284). Defendants can show that an alleged misrepresentation did not affect the stock price by demonstrating, for example, that the "causal connection" between the misrepresentation and an investor's decision to trade at a fair market price was severed, or that news of the fraud "credibly entered the market and dissipated the effects of the misstatements" and therefore investors "who traded [] shares after the corrective statements would have no direct or indirect connection with the fraud." *Basic*, 485 U.S. at 249. "Defendants bear the burden of production and the burden of persuasion on the issue of price impact." *In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2017 WL 6026244, at *6 (N.D. Cal. Dec. 5, 2017).

Here, there are two distinct periods within Plaintiff's proposed class definition: (1) February 26, 2020, to March 23, 2023, and (2) March 24, 2023, to May 1, 2025. The reliance analysis is different in each of these time periods. For the first period, the Court finds that Lead Plaintiff is entitled to the presumption of reliance due to the fraud-on-the-market theory. Defendants have not attempted to rebut the presumption for this period.

For the second period, Defendants argue that the presumption of reliance has been defeated because the disclosures made after the March 23, 2023 Hindenburg Report "did not actually affect the market price of the stock." *Halliburton II*, 573 U.S. at 284. The Court agrees.

Plaintiff's claims and injuries stem from an inflation maintenance theory. ECF No. 138 at 15 ("the Class's injuries are all predicated on the same artificial inflation and subsequent decline in Block's share price after the truth was exposed."). Under this theory, "price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen 'without the false statement.'" *Goldman*, 594 U.S. at 123

(quoting *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015)). As the Supreme Court has explained, "Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Id.* (citations omitted). Courts in this District have analyzed corrective disclosures using the following rubric: "A finding of 'back-end' price impact requires proof that the information disclosed [on the date of the corrective disclosure] was (i) corrective of one or more prior false statements or omissions, (ii) new (unknown to the market prior to [the date of the corrective disclosure]), and (iii) 'value relevant' (i.e., caused at least some of the stock price decline)." *In re FibroGen Sec. Litig.,* No. 21-CV-02623-EMC, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024) (citing *Goldman*, 594 U.S. at 123; *Basic*, 485 U.S. at 238, 248); *In re Enovix Corp. Sec. Litig.*, No. 23-CV-00071-SI, 2026 WL 1078569, at *8 (N.D. Cal. Apr. 21, 2026).

Here, Defendants have shown a lack of price impact on Block's stock for four disclosures that occurred after March 23, 2023 – meaning after the Hindenburg Report.[2] Each of these subsequent disclosures built upon the Hindenburg Report but did not contain fundamentally different information. Plaintiff relies on these latter disclosures as a basis to extend the Class Period, even though the disclosures merely repeat information in the Hindenburg Report or note that the concerns identified with the Hindenburg Report have since materialized. For example, the August 3, 2023 Form 10-Q discloses that Block "received inquiries from the Securities and Exchange Commission and Department of Justice shortly after the publication of [the Hindenburg Report] in March 2023." FAC ¶ 175. This disclosure concerned the reaction to the Report, but was not a corrective disclosure, or new misrepresentation. *See In re FibroGen Sec. Litig.*, 2024 WL 1064665 at *13 (finding that a report did not constitute a corrective disclosure and therefore did not cause price impact where the report was "not . . . the first time the market learned about the

---

[2] Lead Plaintiff alleges that following the March 23, 2023 Hindenburg Report there were four additional corrective disclosures: August 2, 2023 Form 10-Q (FAC ¶¶ 174–76); February 16, 2024 NBC News Article (FAC ¶¶ 177–80); May 1, 2024 NBC News Article (FAC ¶¶ 181–82); May 1, 2025 Quarterly Earnings Call (FAC ¶¶ 183–87).

manipulations themselves. Rather, this is when the market learned about *the [agency]'s reaction*, a fact which cannot properly be characterized as a corrective disclosure because it was not previously known to Defendants and did not contradict a previously uncorrected misstatement." (emphasis added)). In another example, Lead Plaintiff alleges that Block's May 1, 2025 quarterly earnings call served as a corrective disclosure because Block announced that it "had missed estimates for earnings in the first quarter of 2025." FAC ¶ 184. Lead Plaintiff has failed to explain how this general performance announcement relates to Block's alleged misrepresentations, let alone constitutes a corrective disclosure. *In re Enovix Corp. Sec. Litig.*, 2026 WL 1078569 at *11 (holding that there was a mismatch between a misrepresentation and the purported disclosure where the company made a general disclosure about performance and did not discuss the specific subject of the alleged fraud). The Court finds that, for the corrective disclosures Lead Plaintiff alleges Block made after March 23, 2023, Defendants have rebutted the *Basic* presumption of reliance by demonstrating that the disclosures were not "corrective" of subsequent false statements and did not reflect "new" information unknown to the market previously. *In re FibroGen Sec. Litig.,* 2024 WL 1064665 at *12.

Accordingly, the Court finds that the Class Period ends on March 23, 2023. Following the publication of the Hindenburg Report, there is a lack of predominance because investors in this period would need to individually allege reliance and would not have the benefit of the presumption of reliance under the fraud-on-the-market theory.

**2. Damages**

The Court turns to Defendants' second objection that Lead Plaintiff has not demonstrated that common questions of law and fact predominate with respect to damages. Consistent with its finding above, the Court analyzes damages for the Class Period ending on March 23, 2023.

At this stage, Lead Plaintiff's burden regarding damages is merely to "'show that their damages stemmed from the defendant's actions that created the legal liability' under the proposed damages model." *In re Apple Inc. Sec. Litig.*, No. 4:19-CV-2033-YGR, 2022 WL 354785, at *10 (N.D. Cal. Feb. 4, 2022) (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)). Defendants contend that Plaintiff failed to meet its burden of proving that damages can be

calculated on a class-wide basis in a way that is consistent with its theory of liability, as required by the Supreme Court's decision in *Comcast Corp. v. Behrend*. 569 U.S. 27, 34 (2013). Specifically, Defendants argue that Lead Plaintiff's general discussion in its expert report is insufficient because the report does not identify a specific methodology or valuation technique for estimating inflation that accounts for the unique and particular facts of this case. ECF No. 144 at 26.

Both parties have acknowledged that an "out-of-pocket" methodology for calculating damages is workable. The out-of-pocket (or event study) method is the standard measurement of damages in Section 10(b) securities cases. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972) (out-of-pocket method is "the correct measure of damages" in Exchange Act case); *see also Hatamaian v. Advanced Micro Devices, Inc.*, No. 14-cv-00226, 2016 WL 1042502, at *8 (N.D. Cal. Mar. 16, 2016). Courts regularly affirm that the out-of-pocket method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action. *See e.g.*, *In re SanDisk LLC Sec. Litig.*, 2018 WL 4293336, at *2 (N.D. Cal. Sept. 4, 2018) ("The out-of-pocket method is widely considered an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation.").

Defendants take issue with whether Plaintiff's expert's out-of-pocket methodology accounts "for the numerous 'confounding' factors that impacted Block's trading price to assess damage correlated to Plaintiff's specific theory of fraud." ECF No. 144 at 27. The Court disagrees. Dr. Feinstein's report details how such a model could be constructed, including by using an event study and removing the effects of confounding information and events. ECF No. 138-2, ¶ 157 (iv) ("This approach and analysis enable computation of the artificial inflation ribbon even in cases where there is confounding information, changes in the concealed information, and changes in the value of the concealed information, among other potential complexities."); *see also SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020) (rejecting challenge that "plaintiff will be unable to disaggregate the artificial inflation from confounding events," which "is an inquiry into loss causation [that] need not be analyzed at the class certification

stage”).

Defendants additionally challenge whether Dr. Feinstein’s report addresses the materialization of known and disclosed risks. ECF No. 144 at 27. Again, this challenge is at its core about the inputs to, and execution of, the out-of-pocket methodology – a concern that does not need to be addressed at the class certification stage. *See Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, No. C 19–04744 WHA, 2021 WL 229310, at *7 (N.D. Cal. Jan. 21, 2021) (“Calculating the actual inputs into the out-of-pocket method by parsing and scaling the abnormal returns requires an analysis of ‘loss causation.’”); *Hatamian*, 2016 WL 1042502, at *8 (“The ultimate question, then, is not as Defendants suggest, but rather is whether ‘damages could feasibly and efficiently be calculated once the common liability questions are adjudicated.’”). Other courts have rejected similar challenges to an out-of-pocket methodology, and the Court is persuaded by their reasoning. *See, e.g.*, *Weston v. DocuSign, Inc.*, 348 F.R.D. 354, 368–70 (N.D. Cal. 2024) (rejecting arguments that expert did “not adequately explain how the out-of-pocket damages method applies specifically to this case” and “fail[ed] to account for the materialization of risk theory” (emphasis omitted)).

The Court finds that, at this stage, Lead Plaintiff has established that damages can be measured on a class-wide basis using an out-of-pocket methodology for the period from February 26, 2020, to March 23, 2023, and that individualized damages issues will not predominate over common issues. *See In re SanDisk LLC Sec. Litig.*, 2018 WL 4293336 at *2 (“The admittedly short portion of the [expert] report addressing this damages methodology, coupled with its general acceptance, suffices to show for class certification purposes that classwide damages can be determined without excessive difficulty and attributed to [plaintiffs’] theory of liability.” (internal quote omitted)).

The Court is satisfied that Lead Plaintiff has shown that common questions of law and fact predominate for the elements of reliance and damages for a Class Period from February 26, 2020, to March 23, 2023.

## IV. CLASS REPRESENTATIVE AND CLASS COUNSEL

Defendants do not challenge that Lead Plaintiff NYC Funds will serve as an adequate

Class Representative nor that Lieff Cabraser and Cohen Milstein are appropriate Class Counsel. For adequacy of class counsel, the Court must review "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. Pro. 23(g)(1)(A). Lieff Cabraser and Cohen Milstein are experienced class action litigation firms that have dedicated a substantial amount of time and resources to this case. The firms are competent and qualified and have no conflicts of interest with any class members. The requirements of Rule 23(g) are therefore satisfied.

Lead Plaintiff is appointed Class Representative pursuant to Rules 23(a) and 23(b)(3), and Lieff Cabraser and Cohen Milstein are appointed as Co-Lead Class Counsel pursuant to Rule 23(g).

## V. CONCLUSION

Lead Plaintiff's motion to certify this class is GRANTED IN PART. The class is certified as to: All persons and entities who were damaged as a result of their purchase or acquisition of Block's Class A publicly traded common stock during the period from February 26, 2020, to March 23, 2023. Lead Plaintiff's motion to appoint class representatives and class counsel is GRANTED.

**IT IS SO ORDERED.**

Dated: October 28, 2026

Noël Wise
United States District Judge